**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **DEVON W. BROWN** | ) | |
|    **Plaintiff** | ) | |
| | ) | |
|   **v.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **CITY OF ATLANTA, Georgia,** | ) | **CIVIL ACTION FILE** |
| **BRYANT BURNS, KELVIN WALLS,** | ) | **NO. 1:16-CV-00008-CAP** |
| **ALFRED WATKINS, GARY SMITH,** | ) | |
| **RICHARD DILLON,** | ) | |
| **ROBBIE SCANDRICK,** | ) | |
| **GORDON CABANAW,** | ) | |
| **RITCHIE NEWELL, and** | ) | |
| **STANLEY REYNOLDS** | ) | |
| | ) | |
|   **Defendants** | ) | |
| | ) | |

_____

## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED BRIEF IN SUPPORT OF THEREOF</u>

COME NOW, Defendants City of Atlanta (hereinafter "the City), Bryant Burns, Kelvin Walls, Alfred Watkins, Gary Smith, Richard Dillon, Robbie Scandrick, Gordon Cabanaw[1], Ritchie Newell, and Stanley Reynolds; in their individual and official capacities (collectively hereinafter "City Defendants"), by

_____

[1]Gordon Cabanaw is Deceased.

its counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, hereby files their Motion for Summary Judgment and Brief in Support Thereof and states:

## STATEMENT OF THE CASE

Devon W. Brown ("Plaintiff") filed suit in this court on January 4, 2016, alleging (1) federal unconstitutional search and seizure; (2) state unconstitutional search and seizure (3) violation of right to peaceably assemble; and (4) various state law claims. Plaintiff amended the complaint on March 2, 2016. Plaintiff seeks compensatory damages, punitive damages and attorney's fees.

The Court subsequently granted a Motion to Dismiss in part and dismissed Count III on Plaintiff's Amended Complaint on August 18, 2016. It is undisputed that Plaintiff leased a commercial space and declared himself as a private club and that Plaintiff did not have a business license neither an alcohol license at the time of arrest[2]. Defendants now file their Motion for Summary Judgment on all remaining counts.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact

---

[2] See City Defendants Statement of Undisputed Facts filed contemporaneously with this motion.

exists and that the movant is entitled to judgment as a matter of law.[3]  The court should view the evidence and any inferences that may be drawn in the light most favorable to the non-movant.[4]  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.[5]  The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.[6]

A dispute is genuine if the evidence is such that the factual issues may reasonably be resolved in favor of the nonmoving party.[7]  However, Rule 56 "[b]y its very terms . . . provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."[8]  An issue is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or is "not significantly probative."[9]

---

3 Fed. R. Civ. P. 56(c).
4 *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).
5 *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).
6 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).
7 *Id.* at 248.
8 *Id.* at 247-248. (Emphasis in Original).
9 *Anderson*, 477 U.S. at 249-50.

Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case.[10]  Thus, to create a genuine issue of material fact for trial, the party opposing the summary judgment must come forward with specific evidence of every element essential to his case with respect to which (1) he has the burden of proof, and (2) the summary judgment movant has made a plausible showing of the absence of evidence of the necessary element.[11]

### **ARGUMENT**

I.   **PLAINTIFF HAS FAILED TO ESTABLISH LIABILITY BY THE CITY OF ATLANTA IN COUNT I; THEREFORE, SUMMARY JUDGMENT SHOULD BE GRANTED AS A MATTER OF LAW.**

"[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."[12]  A municipality may only be held liable under 42 U.S.C. Section 1983 where an official policy or custom causes the alleged constitutional injury.[13]

---

10 *Id.* at 248.
11 *Celotex*, 477 U.S. at 323.
[12] *See Canton*, 489 U.S. at 388, 109 S.Ct. 1197. *McDowell v. Brown,* 392 F.3d 1283, 1289 (11th Cir. 2004).
[13] *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

a. **THE CITY OF ATLANTA <u>DID NOT</u> VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHTS.**

In order to withstand a motion for summary judgment on the issue of municipal liability, Plaintiff must present facts that support the existence of a policy, practice, or custom that lead to a violation of their constitutional rights.[14] Unless the policy itself is unconstitutional, considerably more proof than the single incident is required to establish both the requisite fault on the part of the municipality and the causal connection between the policy and the alleged constitutional deprivation.[15]

Plaintiff asserts that his constitutional rights to be free from unlawful search and seizure were violated when City Defendants entered his commercial premise without a warrant to conduct a compliance check.[16]   He asserts that City Defendants violated his rights because he was operating a "private club," not open to the public, and that City Defendants did not have the right to enter without a warrant.[17]   Although Plaintiff admitted in his deposition that "they supposed to

---

[14] *Riley v. Newton*, 94 F.3d 632, 638 (11th Cir. 1996).
[15] *Tuttle*, 471 US at 823-824; *Pembauer v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

[16] Amended Complaint paragraphs 78-88.
[17] Depo. of Devon Brown, page 55, lines 21-25 and page 56, lines 1-3, Ex. 2.

check businesses,"[18] Plaintiff stated that his "private club"[19] was not a business; and therefore, not subject to compliance checks or licensure.[20]

However, this argument fails because City Defendants had the right to enter Plaintiff's self-designated private club and conduct an administrative inspection[21] pursuant to City Code Section 10-32 and Section 30-76.   A "private club" is considered an alcohol licensed establishment regulated by both state and local law. Plaintiff has provided no evidence to support his contention that his private club was exempt from city ordinances, including inspections.    As a self-proclaimed "private club,"[22] Plaintiff was subject to compliance checks for licensing because private clubs are regulated entities.

Private clubs are regulated by the City of Atlanta and subject to administrative inspection as defined by the Code.  City Code Section 10-1 defines private club.[23] The City Code clearly states that the Atlanta Police Department has

---

[18] Depo. of Devon Brown, page 75, lines 16-21, Ex. 2.

[19] Depo. of Devon Brown, pages 55, line 25-page 56, line 1; 57, lines 1-19; 58, lines 4-6; 75, lines 4-21; and 100, 1-5, Ex. 2.

[20] *Id.*

[21] The administrative inspection is referred to as compliance check and used interchangeably.

[22] Depo. of Devon Brown pages 55, line 25-page 56, line 1; 57, lines 1-19; 58, lines 4-6; 75, lines 4-21; and 100, lines 1-5, Ex. 2.

[23] "Private club means a corporation chartered, organized and existing under the laws of the state, exempt from federal income taxes pursuant to section 501(c) of the Internal Revenue Code, as amended, actively and continuously in operation within the city as a nonprofit corporation for at least one year immediately prior to the application for a license under this chapter and during which time such corporation shall have had continuously not less than 250 members whose names, current addresses and current telephone numbers shall be kept listed on the club premises and made available for inspection on the premises by the Atlanta Police Department during all hours

the right to enter and inspect during the hours that the premises is open for business.  In fact, Plaintiff read this ordinance and had an awareness of the requirements to legally operate because he knew that he needed a certain number of members and had researched opening a private club.[24]

In addition, Plaintiff's private club would be governed by the Alcoholic Beverages Code as well. The relevant section states:

"(b)It shall be a violation of this chapter for any premises, that performs or undertakes any type of operation or activity for which an occupation tax certificate issued pursuant to Chapter 30 to provide alcoholic beverages to persons on the premises unless a license issued under this chapter allowing on premises consumption of alcoholic beverages has first been obtained. This prohibition shall apply without regard to whether the alcoholic beverages are provided free of charge . . . ."[25]

Plaintiff readily admits that they built the bar on premise to provide and store drinks,[26] members usually brought their own liquor, Plaintiff did not possess a liquor license[27] and on the night of the inspection they were consuming at a minimum tequila and beer.[28] The Code goes on to state that any person employed

---

during which the private club is open for business (emphasis added)…. Furthermore, the corporation shall maintain on its premises any additional federal and state income tax returns filed by the corporation within the past three years and shall make such documents available for inspection upon request by the Atlanta Police Department during all hours during which the private club is open for business (emphasis added) …."

[24] Depo. of Devon Brown page 57, lines 15-25; page 58, lines 1-8; page 99, lines 13-25; and page 100, lines 1-5, Ex. 2.

[25] Atlanta City Code Section 10-3(b), Ex. 7.

[26] Depo. of Devon Brown page 38, lines 22-25 and page 39, lines 1-14, Ex. 2.

[27] Depo. of Sgt. Burns, page 59, lines 9-13, Ex. 4.

[28] Depo. of Devon Brown page 51, lines 21-25 and page 41, lines 10-25, Ex. 2; Admissions #31, Ex. 3.

by the business and present at the time may be charged with the offense.[29] Plaintiff stated that he was president of the "private club" and was on the lease for the location;[30] therefore, Plaintiff's arrest was valid and there was no constitutional violation.

Plaintiff also alleges that the administrative inspection was illegal and a violation of his constitutional rights. However, it is well established law that administrative inspections and searches of closely regulated businesses[31] are constitutional. "Warrantless administrative inspections 'do not offend the Fourth Amendment if they are necessary in order to monitor closely regulated businesses for the purpose of learning whether a particular business is conforming to the statute regulating that business (citation omitted)'. Liquor establishments, including nightclubs and bars. . . are 'closely regulated (citation omitted).'"[32] Plaintiff's business appeared to be an illegally operating bar or nightclub and alcohol was being stored and consumed on premise the night of the arrest.[33]

---

[29] Atlanta City Code Section 10-3(c) (in pertinent part): "Any person employed by the business and who is present at the time when alcoholic beverages are being provided by a non-licensed premises or location may be charged with this offense." Ex. 7.

[30] Amended Complaint paragraph 6 and Depo. of Devon Brown, page 13, lines 7-10, Ex. 2.

[31] City Defendants would assert that on the face of the record, Plaintiff was operating a nightclub, adult entertainment business and/or bar.

[32] *Indigo Room, Inc. v. City of Fort Myers,* 589 Fed. Appx. 938, 945 (11th Cir, 2014).

[33] Plaintiff's Response to Admissions, #31, Ex. 3 and Depo. of Devon Brown, page 51, lines 21-25 and page 41, lines 10-25, Ex. 2.

The warrantless administrative inspection is an exception to the Fourth Amendment general warrant requirement but it "does not confer authority on law enforcement to ignore the requirement for a warrant where 'the primary purpose [of the search or seizure] was to detect evidence of ordinary criminal wrongdoing.'"[34]  *Bruce v. Beary* makes it clear that "administrative inspections do not offend the Fourth Amendment if they are necessary in order to monitor closely regulated businesses for the purpose of learning whether a particular business is conforming to the statute regulating that business."[35]

Plaintiff cites *Bruce* in his Amended Complaint as support for his position;[36] however, the facts in *Bruce* can be distinguished from this case.  In *Bruce*, the place of business entered was an auto body shop that was subject to inspection by Florida statute for the purpose of locating stolen vehicles, investigating titling and registration, inspecting vehicles and records, etc.[37] The officers in *Bruce* arrived at 10:30 am and there were 20 officers that surrounded the premises and blocked all exits.[38]  Some of the officers were dressed in SWAT uniforms and they entered the

---

[34] *Id.*
[35] *Id. at 1239.*
[36] Amended Complaint paragraphs 84 and 85.
[37] *Bruce v. Beary*, 498 F.3d 1232, 1236 (11th Cir.2007).
[38] *Id.*

premises with guns drawn.[39]  The officers then searched and patted down all the employees, searched closed drawers and brief cases and subsequently searched the entire premise after getting a warrant at 6 pm.[40]  All after receiving the paperwork required in the statute, to wit, the officer admitted that it had "no bearing on his investigation."[41]

Unlike the Defendants in *Bruce*, City Defendants were reasonable regarding the administrative inspection and search of Plaintiff's premise and did not go beyond the scope and purpose of the ordinances.  City Defendants consisted of a reasonable number of persons: six (6) Atlanta Police Department officers and three (3) civilians from the Solicitor's office and Building Inspections.  No one from S.W.A.T participated, no one had on tactical gear and no masks[42] on and they did not enter the building with guns drawn as in *Bruce*.  City Defendants entered an unlocked door of a commercial space around 4:00 am after observing a man at the front door, cars in the parking lot, and loud music coming from the building to determine if the business possessed the proper licensing.[43]  City Defendants did not conduct a criminal style raid, as in *Bruce* and alleged in Plaintiff's Amended

---

[39] *Id.*
[40] *Id. at 1236-1237.*
[41] *Id. at 1236.*
[42] Transcript of criminal proceeding page 14, lines 19-25, Ex. 6.
[43] Transcript of criminal proceeding page 15, lines 1-18, Ex. 6.

Complaint,[44] but a lawful administrative inspection that led to the lawful arrest of Plaintiff for failure to have a business and alcohol license.

In addition, City Defendants asked for the person in charge, asked for the business license, asked for the alcohol license, and asked for the membership roster for the private club after Plaintiff advised that he was operating a private club and that he was the president, staying within the scope of the Code.[45] City Defendants only arrested Plaintiff after he refused to provide identification and he refused to verbally agree to obtain proper licensing for the business.[46]

Plaintiff cannot demonstrate a violation of his constitutional rights and therefore summary judgment should be granted on behalf of the City of Atlanta on all counts in total or in part.

### b. THE CITY OF ATLANTA DID NOT HAVE A CUSTOM OR POLICY THAT CONSTITUTED DELIBERATE INDIFFERENCE TO PLAINTIFF'S CONSTITUTIONAL RIGHTS.

Plaintiff must establish that the City's policy or custom evidenced a *deliberate indifference* to Plaintiff's constitutional rights. Plaintiff did not plead this element and there is no record evidence to establish that the City was deliberately indifferent to Plaintiff's constitutional rights. "Deliberate indifference

---

[44] Plaintiff's Amended Complaint, paragraph 63.
[45] Depo. of Sgt. Burns page 81, lines 4-25 and page 82, lines 1-9, Ex. 4.
[46] Depo. of Devon Brown page 95, lines 6-13, Ex. 2. Devon Brown Formal Complaint dated 2/14/14, Ex. 1. Depo. of Sgt. Burns p. 56, lines 13-18, Ex. 4.

exists if an official '(1) [has] subjective knowledge of a risk of serious harm; [and] (2) disregard [s] ... that risk; (3) by conduct that is more than gross negligence.[47]'" The record in this case is void of any evidence to support this element.

City Defendants conducted administrative inspections around the Metropolitan Parkway corridor[48] to ensure that businesses had the proper permits and were compliant with building codes and other health and safety regulations.[49] Plaintiff's business was unlocked[50] and open and City Defendants conducted an administrative inspection for licensing pursuant to City ordinance and due to several observed violations from outside.[51]

There is no record evidence that the City exhibited a deliberate indifference and summary judgment should be granted to the City in totality or in part.

    c. **PLAINTIFF'S CONSTITUTIONAL RIGHTS WERE NOT VIOLATED; THEREFORE, PLAINTIFF CANNOT ESTABLISH THAT ANY VIOLATION OF HIS CONSTITUTIONAL RIGHTS IS THE RESULT OF THE CITY OF ATLANTA'S POLICIES AND CUSTOMS.**

Plaintiff's constitutional rights were not violated as stated above; and therefore, there can be no causal connection between a violation of Plaintiff's

---

[47] *Franklin v. Tatum*, 627 F. App'x 761, 765 (11th Cir. 2015) *citing Townsend v. Jefferson Cty.,* 601 F.3d 1152, 1158 (11th Cir.2010) (alteration adopted) (quotation omitted).
[48] Transcript from criminal proceeding page 14, lines 8-18, Ex. 6.
[49] Sgt. Burns Offense Report dated 02/08/2014, Ex. 9.
[50] Depo. of Devon Brown page 90, lines 23-24, Ex. 2.
[51] Depo. of Sgt. Burns pages 76-78, Ex. 4.

constitutional rights and the City's policies or customs.  Assuming *arguendo* that this Court determines that a constitutional violation exists, no evidence exists that any alleged constitutional deprivation has its origin in a policy or practice of the City of Atlanta.

Plaintiff has alleged that the compliance checks conducted by City Defendants is the policy or practice that caused his injury[52] but there is no record evidence to support such a contention other than Plaintiff's legal conclusions.[53] The City of Atlanta's policies do not authorize violations of the Constitution; but conform with accepted and reasonable practices for administrative inspections and searches.

It is well settled that administrative searches are an exemption to the warrant requirement.  Warrantless administrative inspections "do not offend the Fourth Amendment if they are necessary to monitor closely regulated businesses for the purpose of learning whether a particular business is conforming to the statute regulating that business."[54] Liquor establishments, including nightclubs and bars like the [Dirty South Slab Ryders Club] (name added), are "closely regulated."[55]

---

[52] Plaintiff's Amended Complaint Count I.
[53] Plaintiff s Amended Complaint paragraphs 87 and 88.
[54] *Bruce v. Beary*, 498 F.3d 1232, 1239 (11th Cir.2007).
[55] *Crosby v. Paulk*, 187 F.3d 1339, 1346–48 (11th Cir.1999); *see Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).

An ordinance that allows for administrative inspections is not illegal, neither unconstitutional.

Plaintiff also claims that the ordinances violated did not allow for arrest,[56] and therefore his constitutional rights were violated. Plaintiff does not state that Code Sec. 30-59, the ordinance referenced, is the policy that ***caused*** his injury but City Defendants alleged failure to follow it. Plaintiff erroneously believes that Atlanta Police officers could not arrest him because of Code Sec. 30-59, which states **compliance officers** cannot arrest for violations, unless otherwise authorized.[57]

However, Plaintiff was not arrested by a compliance officer. Sgt. Burns, as well as the other officers on scene, was POST certified and Atlanta Police Department officers, not subject to restrictions.[58] The general police powers gave the Sgt. Burns, the right and authority to arrest Plaintiff for violations of the law.[59]

There is no policy or custom attributable to the City of Atlanta that caused injury to Plaintiff; therefore, there can be no causal connection between a policy or custom and any alleged injury. Summary judgment should be granted in favor of the City of Atlanta in whole or in part.

---

[56] Plaintiff's Amended complaint paragraph 82.
[57] Atlanta City Code Sec. 30-59 (2014), Ex. 7.
[58] Depo. of Sgt. Burns, page 26, lines 11-25 and page 27, lines 1-19, Ex. 4.
[59] Atlanta City Code Sec. 98-38 (2014), Ex. 7.

## II.   THE INDIVIDUAL DEFENDANTS IN THIS CASE ARE ENTITLED TO QUALIFIED IMMUNITY RELATED TO COUNT I; THEREFORE, SUMMARY JUDGMENT SHOULD BE GRANTED AS A MATTER OF LAW.

The doctrine of qualified immunity protects government officials performing discretionary functions from being sued in their individual capacities.[60]   The doctrine protects not only against liability, but the need for government officials to even defend against baseless lawsuits.[61]   "Only in exceptional cases will government actors have no shield against claims made against them in their individual capacities."[62]   Qualified immunity is a question of law for the court.[63]

The qualified immunity analysis consists of a preliminary inquiry plus two steps.   As a preliminary matter, the defendant official must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.   Once that inquiry is satisfied, the burden shifts to Plaintiffs, whose allegations, if true, must establish a constitutional violation.[64]   Plaintiff must do more than refer to general rules and abstract rights to meet his burden.[65]   "Qualified

---

[60]   *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692 (1999); *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003) (citing *United States Dep't of State v. Ray*, 502 U.S. 164, 179 (1991) ("We must also keep in mind the fact that '[w]e generally accord . . . official conduct a presumption of legitimacy'.").

[61]   *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982).

[62]   *Redd v. Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998) (citations omitted).

[63]   *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993).

[64]   *Wood v. Kesler*, 323 F.3d 872, 877-78 (11th Cir. 2003); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995).

[65]   *Dorsey v. Wallace*, 134 F.Supp.2d 1364, 1371 (N.D.Ga. 2000, Pannell, J.) (citations omitted).

immunity focuses on the actual, specific details of concrete cases."[66]   Only if Plaintiffs' rights were violated does the court then proceed to the final step in the qualified immunity determination—whether that right was clearly established.[67]

### 1.   CITY DEFENDANTS ACTED IN THEIR DISCRETIONARY CAPACITY.

To be eligible for qualified immunity, a government official "must have been engaged in a 'discretionary function' when he performed the acts of which the Plaintiffs complain."[68]   The inquiry is two-fold, "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."[69]

### a. CITY DEFENDANTS WERE PERFORMING LEGITIMATE JOB-RELATED FUNCTIONS.

Municipalities are authorized to regulate the sale of alcohol under both state law and local ordinance.[70] Municipalities are also authorized to regulate private clubs.[71] Under the City of Atlanta Code of Ordinances ("City Code"), at minimum, businesses operating within the City of Atlanta are required to have a business license. As a part of regulation, City Defendants are authorized to conduct

---

[66]   *Jones*, 174 F.3d at 1283 (citing *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034 (1987)).
[67]   *Wood*, 323 F.3d at 877-78; *Hartsfield*, 50 F.3d at 953.
[68] *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (quoting *Harlow*, 457 U.S. at 818).
[69] *Id.* at 1265-66.
[70] O.C.G.A. §3-3-2 (a), Atlanta City Code §10-1 and §10-3, Ex. 7.
[71] O.C.G.A. §3-7-40, Ex. 7.

compliance checks and Plaintiff admitted in his deposition that "they supposed to check businesses."[72]

City Defendants performed compliance checks in an area of Metropolitan Parkway. They were led by Atlanta Police Department Officers of the License and Permits Unit that is tasked with regulating alcohol licensed establishments and investigating locations suspected of operating without required licenses.[73]

**b. CITY DEFENDANTS USED MEANS THAT WERE WITHIN THEIR POWER.**

In the recent past, the License and Permits Unit had cited and arrested persons for violations of the City Code's alcohol provisions as well as the violation of the requirement to obtain a business license.[74]  City Defendants had the power to write citations and/or arrest violators.  As a result, City Defendants were acting in a discretionary capacity on February 8, 2014.

**2. PLAINTIFF FAILED TO ESTABLISH THAT CITY DEFENDANTS VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHTS.**

City Defendants acted in their discretionary capacity.  The burden shifts to Plaintiff to prove that City Defendants violated Plaintiff's constitutional rights and there is no record evidence to support such a conclusion.

---

[72] Depo. of Devon Brown, page 75, lines 16-21, Ex. 2.
[73] Aff. of Burns, Ex. 5
[74] Aff. of Burns, Ex. 5

a.   ADMINISTRATIVE SEARCHES ARE AN EXCEPTION TO THE WARRANT REQUIREMENT; AND, THEREFORE, PLAINTIFF'S CONSTITUTIONAL RIGHTS WERE NOT VIOLATED.

There are no genuine issues of material fact related to this administrative search and constitutionality as discussed above.   Although administrative searches are a legal and valid exception to the warrant requirement, the Fourth Amendment's prohibition against unreasonable searches and seizures applies to administrative inspections of private commercial businesses.[75]   "Administrative inspections may be unreasonable if they do not have a 'properly defined scope.'"[76] City Defendants performed compliance checks in an area of Metropolitan Parkway where they had knowledge and experience of the businesses in the corridor.[77]

The scope of the inspection in this case was reasonable.   City Defendants entered the commercial property to check Plaintiff's licenses and permits.   That is all they asked for and the failure to have these documents is the reason Plaintiff was arrested.   City Defendants did not go beyond the scope of the checking for compliance.   They did not go beyond this purpose.

b.   CITY DEFENDANTS HAD PROBABLE CAUSE TO ARREST PLAINTIFF; THEREFORE, HIS CONSTITUTIONAL RIGHTS WERE NOT VIOLATED.

---

[75] *Indigo Room, Inc. v. City of Fort Myers,* 589 Fed.Appx. 938, 945 (2014) (citations omitted).
[76] *Id.*
[77] Aff. of Burns, Ex.5.

Further, if an officer has probable cause to believe that an individual has committed even a very minor criminal offense, he may arrest the offender without violating the Fourth Amendment.[78]   In fact, to receive qualified immunity protection, an officer only needs arguable probable cause.[79]   Arguable probable cause exists if an officer could have reasonably believed that probable cause existed in light of the information the officer possessed.[80]   It is not enough that the plaintiff produce evidence that would allow a fact finder to find that the officer was in reality wrong about the facts.   Plaintiff must produce evidence for the fact finder to conclude that no reasonable officer in the defendant's position could have thought the facts were such that they justified defendant's acts.[81]

Probable cause to arrest exists if, at the moment of arrest, the facts and circumstances within the arresting officers' knowledge, and of which he has reasonably trustworthy information, are sufficient to warrant a prudent man in believing that the suspect has committed or is committing an offense.[82]   The standard for probable cause requires that an arrest be objectively reasonable under the totality of the circumstances.   Officers can have reasonable, but mistaken

---

[78] *Lee*, 284 F.3d at 1194-95 (quoting *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001)).
[79] *Holmes*, 321 F.3d at 1079 (citing *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997)).
[80] *Id.*
[81] *Id.*
[82] *Id.*

beliefs, as to the facts establishing the existence of probable cause or exigent circumstances.[83]

City Defendants entered an unlocked door of the commercial space leased to Plaintiff around 4:00 am after observing a man at the front door, cars in the parking lot, and loud music coming from the building.[84]  Plaintiff was in a commercial space[85] and appeared to be open and operating.  Additionally, upon entry, City Defendants observed various infractions and violations of the law and Plaintiff could not produce any of the necessary documentation required to be open and operating a business, let alone a private club.[86] As a result, Plaintiff's constitutional rights were not violated.

City Defendants are entitled to qualified immunity regarding Count I of Plaintiff's Amended Complaint and summary judgment should be granted.

### III.   THE INDIVIDUAL DEFENDANTS IN THIS CASE ARE ENTITLED TO OFFICIAL IMMUNITY RELATED TO COUNT II; THEREFORE, SUMMARY JUDGMENT SHOULD BE GRANTED AS A MATTER OF LAW.

Plaintiff's state law claims fail as a matter of law as City Defendants are entitled to official immunity.  Plaintiff asserts in paragraph 95 of his Amended

---

[83] *Saucier v. Katz*, 533 U.S. 194, 206 (2001).
[84] Transcript of criminal proceeding page 15, lines 24-25 and page 16, lines 1-11, Ex. 6.
[85] Depo. of Devon Brown, page 84, lines17-19, Ex. 2.
[86] Depo. of Sgt. Burns page 59, lines 9-13, Ex. 4.

Complaint that City Defendants were "without authority of law" when they conducted the administrative inspection of Plaintiff's premise.

### a. CITY DEFENDANTS ACTIONS TO ARREST PLAINTIFF WERE DISCRETIONARY ACTS WITHIN THEIR OFFICIAL FUNCTIONS.

The doctrine of official immunity offers public officers and employees who are engaged in discretionary acts limited protection from suit in their personal capacity.[87]  In, Georgia, official immunity turns on the type of function the official is engaged in—whether it is a ministerial or a discretionary act.  A ministerial act is one that is simple, absolute, and definite arising under conditions admitted or proved to exist and requiring merely the execution of a specific duty.[88]  By contrast, a discretionary act calls for the exercise of personal judgment including examining the facts, reaching reasoned conclusions, and acting on them in a way that is not specifically directed.[89]

**Under Georgia law, an officer:**
> *may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.[90]*

---

[87] *Cameron v. Lang*, 274 Ga. 122, 123 (2001).
[88] *Carter v. Glenn*, 249 Ga. App. 414 (2001).
[89] *Id.* at 416.
[90] O.C.G.A. §36-33-4 (emphasis added), Ex. 7

An official function is "any act performed within the officer's or employee's scope of authority, including both ministerial and discretionary acts."[91]   Therefore, while an officer may be personally liable if he acts with negligence, actual malice, or intent to injure in the performance of a ministerial duty, an officer may only be liable for the performance of a discretionary function if he acts with malice or intent to injure.[92]

Plaintiff brought state law claims against City Defendants; however, they were performing discretionary acts within their official functions.  "The decision to make a warrantless arrest, such as the one at issue here, is considered a discretionary act within the scope of the officer's official functions."[93] City Defendants were making a choice or reasoned decision in deciding on a course of conduct (i.e., which establishment to stop at for the administrative inspection and how to proceed with the arrest of Plaintiff).  Thus, they would be using discretion in carrying out their duties.  Therefore, Plaintiff must show that the officers acted with actual malice.

### b. CITY DEFENDANTS DID NOT EXHIBIT ACTUAL MALICE OR INTENT TO CAUSE THE HARM SUFFERED BY PLAINTIFF.

---

[91] *Gilbert v. Richardson*, 264 Ga. 744, 753 (1994).
[92] *Cameron*, at 123.
[93] *Mercado v. Swoope*, 340 Ga. App. 647, 650, 798 S.E.2d 291, 293–94 (2017) (citations omitted).

Actual malice denotes "express malice or malice in fact."[94]   In *Merrow v. Hawkins*, the Georgia Supreme Court distinguished between "malice" and "actual malice," concluding that the requirement that a plaintiff show actual malice "exclude[s] any liability for injuries and damages if officers and employees act with implied malice in the performance of their official functions."[95]   "Our Supreme Court has held that, in the context of official immunity, " 'actual malice' requires a deliberate intention to do wrong."[96]  "A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiff[s]."[97]

Plaintiff has failed to present any evidence against City Defendants of actual malice or intent to cause the harm suffered by Plaintiff.  In Plaintiff's deposition, he states that he did not know any of the City Defendants prior to arrest;[98] *that they offered to let him go if he agreed to get the proper licensing, which he stated he*

---

[94] *Merrow v. Hawkins*, 266 Ga. 390, 392 (1996).
[95] *Id.* Although the Court was reviewing liability of state officers and employees under the 1991 Amendment to Art. I, Sec. II, Par. IX, of the Constitution of the State of Georgia, the language limiting a state officer or employees liability who are performance of their official duties to instances in which they act with "actual malice" or with an actual intent to cause injury is similar to O.C.G.A. §36-33-4.

[96] *Id.* at 391. (actual malice is more than implied malice or reckless disregard for the rights of others).
[97] *Mercado v. Swoope,* 340 Ga. App. 647, 650, 798 S.E.2d 291, 294 (2017) (citations omitted).
[98] Depo. of Devon Brown, page 87, lines 0-17 and page 102, lines 4-21, Ex. 2.

***would not***;[99] they only charged Plaintiff with two offenses when they observed multiple infractions;[100] and, Sgt. Burns even went back to the jail to advise that Plaintiff was a deputy sheriff to ensure that he was not mixed in with the general population for his own safety.  All of these actions do not exhibit actual malice toward Plaintiff or an intent to cause him the harm he allegedly suffered.

Further, "[a]ll that is required for a lawful warrantless arrest is probable cause. To determine whether probable cause existed, we look at the facts within the officer's knowledge at the moment of arrest. Thus, even if it is later determined that the plaintiff had not committed the crime for which he was arrested, the legitimacy of the officer's actions would not be negated if at the moment of arrest he reasonably believed the plaintiff had committed the crime."[101]  For all the reasons discussed within, City Defendants had ample probable cause to arrest Plaintiff.

City Defendants performed these duties with no malice, actual or otherwise. Consequently, City Defendants are entitled to official immunity against Plaintiff's state law claims.

---

[99] Depo. of Devon Brown, page 95, lines 6-13, Ex. 2; Statement of Devon Brown dated February 14, 2014, Ex. 1.

[100] Plaintiff did not have a certificate of occupancy (admission #16); Plaintiff had adult entertainment present without permits (Depo. of Devon Brown, page 39, lines 7-16; page 44, lines 1-21; page 111, lines 3-24, Ex. 2).

[101] *Mercado v. Swoope,* 340 Ga. App. 647, 651, 798 S.E.2d 291, 294 (2017) (citations omitted).

**c. PLAINTIFF HAS NOT ALLEGED ANY OF THE ELEMENTS RELATED TO FALSE ARREST AND BATTERY; AS A RESULT, THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND SUMMARY JUDGMENT SHOULD BE GRANTED FOR FAILURE TO STATE A CLAIM.**

In Plaintiff's amended complaint, paragraph 93 Plaintiff asserts in conclusory language "torts of false arrest and battery under Georgia law." There is no record evidence to support and Plaintiff has not properly plead any of the elements for neither false arrest nor battery. As a result, City Defendants pray that this Court grant this summary judgment motion in total or in part.

## IV. THERE ARE NO GENUINE ISSUES OF MATERIAL FACT RELATED TO COUNT IV AND SUMMARY JUDGMENT IN FAVOR OF CITY DEFENDANTS SHOULD BE GRANTED AS A MATTER OF LAW IN TOTALITY OR IN PART.

City Defendants assert that they are entitled to immunity in relation to this count as stated above. *Supra.* However if immunity is denied City Defendants are still entitled to summary judgment on Count IV because there are no genuine issues of material fact.

In order to establish a claim for intentional infliction of emotional distress, Plaintiff must prove the following elements: 1) the conduct must be intentional or reckless; 2) the conduct must be extreme and outrageous; 3) there must be a causal connection between the wrongful conduct and the plaintiff's emotional distress;

and 4) the emotional distress must be severe.[102]   There is no record evidence to establish that the behavior of City Defendants was extreme and outrageous, neither any evidence to establish that Plaintiff suffered severe emotional distress as a result of the alleged wrongful conduct; therefore summary judgment should be granted in favor of City Defendants.

### a. CITY DEFENDANTS' BEHAVIORS WERE NOT EXTREME AND OUTRAGEOUS.

"To qualify as sufficiently 'extreme and outrageous' the conduct at issue 'must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'"[103]   In this case, City Defendants were simply doing their job and conducting lawful administrative inspections for business licenses.  Nothing that the City Defendants did to Plaintiff went beyond the bounds of decency and there is no record evidence to support such a conclusion by a jury.

In fact, it is undisputed that City Defendants walked in an unlocked door and asked for the person in charge and then asked for the business license and the liquor license.   Plaintiff identified himself as the person in charge and could not produce either document and was subsequently arrested.   There is no record

---

[102] *Standard v. Falstad,* 334 Ga.App. 444, 448 (2015) (citation omitted).
[103] *Id.*

evidence to suggest that City Defendants went beyond the reasonable scope of the law to offend the sensibilities.

Plaintiff cannot satisfy all elements of the cause of action and therefore summary judgment should be granted in total or in part.

### b. PLAINTIFF HAS NOT SUFFERED SEVERE EMOTIONAL DISTRESS.

"[E]motional distress includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that liability arises. The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it."[104]   The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress." Whether a claim of **severe emotional distress** is found is a question for the court.[105]

Plaintiff has not provided any evidence to support a conclusion that he suffered severe emotional distress at all.  Plaintiff makes the claim that his co-workers were "looking at him as if he were a criminal"[106] and that he was "stressed out."[107] But this is the extent of evidence in the record to support "severe emotional

---

[104] *Abdul-Malik v. AirTran Airways, Inc.,* 297 Ga. App. 852, 858, 678 S.E.2d 555, 560 (2009).
[105] *Ghodrati v. Stearnes*, 314 Ga. App. 321, 323, 723 S.E.2d 721, 723 (2012).
[106] Devon Brown Statement from February 14, 2014, Ex. 1.
[107] Devon Brown Depo., page 113, line 6-7, Ex. 2.

distress." There is nothing in the record to support a conclusion by a reasonable jury that an ordinary person could not endure what Plaintiff stated he endured.

Plaintiff cannot establish that he suffered severe emotional distress due to City Defendants' alleged wrongful conduct and summary judgment should be entered in favor of City Defendants.

### C.   PLAINTIFF HAS NOT SUFFERED SEVERE EMOTIONAL DISTRESS ATTRIBUTABLE TO CITY DEFENDANTS.

Plaintiff has not presented a scintilla of evidence that he suffered *severe* emotional distress <u>because</u> of the alleged wrongful search and seizure.  Plaintiff asserts that the *policy* of conducting unreasonable administrative searches of the City of Atlanta is what caused the harm in this case and the statements in the *police reports* caused the harm, not the alleged unlawful search and seizure.  He suggests that his heart condition, a physical condition, is related to stress arising out of the incident but he does not assert a connection between severe emotional distress and the alleged unlawful search and seizure.[108]

Any emotional distress Plaintiff suffered is not a result of the alleged wrongful conduct of City Defendants, i.e. the alleged wrongful search and seizure,

---

[108] Depo. of Devon Brown, page 113, lines 4-23, Ex. 2. There are no medical records or expert testimony to make the connection between his heart condition and the events of February 8, 2014.  In fact, Plaintiff suffered from high blood pressure prior to the incident and that likely is the cause of any heart problems, not the search of his private club or the policies of the City of Atlanta.

but a result of Plaintiff's own actions.  Plaintiff did not have a business license. Plaintiff did not obtain a liquor license. Plaintiff leased a commercial building for his "private club," subjecting him to administrative inspections. Plaintiff was open at 4:00 a.m. Plaintiff was storing alcohol at the bar. Plaintiff had adult entertainment on the premise. Plaintiff had loud music playing at 4:00 a.m. Plaintiff refused to agree to get the proper licensing.  Any embarrassment or repercussions from the arrest is the result of Plaintiff's own behavior, those of his "members" and not the policy or custom of the City of Atlanta to perform compliance checks or administrative inspections.

Because of the foregoing, Plaintiff cannot establish a causal connection between any severe emotional distress experienced by Plaintiff and any alleged wrongful acts of City Defendants and summary judgment should be entered in favor of City Defendants.

## V.   PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES; THEREFORE, SUMMARY JUDGMENT SHOULD BE GRANTED

There is no evidence to support actual malice, there is no evidence in the record to support a granting of punitive damages.   Nothing in the record even suggests that City Defendants actions were accompanied with fraud, ill will,

recklessness, oppressiveness, willful disregard of the plaintiff's right, or other circumstances tending to aggravate the purported injury.

As such, Plaintiff's punitive damage claim is entirely without merit and must be dismissed. Further, punitive damages are not recoverable against a municipality.[1]   Accordingly, this court should dismiss Plaintiff's request for punitive damages against City Defendants and City of Atlanta as a matter of law.

## CONCLUSION

City of Atlanta and City Defendants hereby pray that this Court grant Defendants' Motion for Summary Judgment in whole or in part and any other relief deemed just and proper.

Dated this August 4, 2017.

Respectfully Submitted,
*/s/ Valorri Jones*
**Valorri Jones**
Senior Assistant City Attorney
Georgia Bar No. 848714
Direct Dial: 404-546-4178
E-mail: vcjones@atlantaga.gov
**M. Theresa Stewart**
Assistant City Attorney
Georgia Bar No. 681675
Direct Dial: 404-546-4175
E-mail: mtstewart@atlantaga.gov
**Vera June Starks**
Counsel, City Attorney

---

[1] *Murphy v. City of Flagler Beach*, 846 F.2d 1306, 1309 n. 5 (11th Cir. 1988).

Georgia Bar No. 935496
Direct Dial: 404-546-4080
E-mail: law-vstarks@atlantaga.gov

**Attorneys for Defendants**

City of Atlanta Department of Law
55 Trinity Avenue, Suite 5000
Atlanta, Georgia 30303
Office: 404-546-4100
Fax: 404 420-6627

# DEF. MSJ

# EX. 1

# ATLANTA POLICE DEPARTMENT
## CITIZEN STATEMENT

EMPLOYEE:                          CITIZEN:                          OPS #

| CITIZEN NAME (LAST,FIRST,MI) | RACE | SEX | DOB | DATE & TIME OF STATEMENT |
|---|---|---|---|---|
| Brown, Devon | Blk | M | 7/02/1968 | February 14, 2014/1240hrs |

| ADDRESS | | HOME PHONE | WORK PHONE |
|---|---|---|---|
| 3371 Waggoner Ln<br>Rex, GA 30273 | crazydssr@comcast.net | 404-735-3161 | |

I am Investigator A. Nixon of the Atlanta Police Department. By you making this statement you are providing information in an investigation being conducted by the Atlanta Police Department. Please be advised that your statement and/or your testimony may be needed at a future time for use in a civil service hearing or court of law.

Q. Is the prepared statement you brought in with you today your words?
A. Yes sir.

Q. Is it a true and accurate statement of the events that occurred to you?
A. Yes sir.

Q. You are a Fulton County Sheriff's Deputy?
A. Yes, a sergeant.

Q. In your statement, you mention the "lead APD officer", do you know his name?
A. Burns, Sgt Burns.

Q. You mentioned that the APD incident report was incorrect, can you be more specific?
A. In the report, it states that my front door was open....that is not true. My front doors were closed and the officer physically opened it. I can prove this because my establishment is under surveillance. I brought a copy of the video with me on my thumb drive, but your computer would not play it. I will make a copy and provide it to you.

Q. Is there anything else you would like to add?
A. Yes, because of the APD officers placing in their report that there was sex going on (but no one was taken to jail), they smelled marijuana (but no one was charged with possession of drugs), sales of alcohol (but no alcohol was confiscated) my supervisors and coworkers are

I have read or had read to me the above statement and I swear or affirm that it is true to the best of my knowledge and belief.

_Devon Brown_
CITIZEN SIGNATURE

Sworn and subscribed to me this ___14___ day ___February___ ___2014___

_Devon Brown_
PRINT CITIZEN NAME

P - 2 - 3

[Notary seal: SARAH HEATHER BARR / NOTARY PUBLIC / FULTON COUNTY, GEORGIA]

_Sarah Heather Barr_
2/14/14

## ATLANTA POLICE DEPARTMENT
## CITIZEN STATEMENT

EMPLOYEE:_____ CITIZEN:_____ OPS #_____

looking at me as if I am a criminal.  I am not even going back to work until I get this taken care of.

Q. Have you been to court yet?
A. I went to court on Monday, but the officers did not show up.  The court date was rescheduled to March 3.  I did not have a bond for an ordinance charge.  I spent a day a jail because of "no bond".  I was fed by inmates that I have had to deal with in the past.

There is a distinction between a social club and a motorcycle club.  I do not have to follow the same rules as a social club because I do not own a social club, I am the president of a motorcycle club house.

I have read or had read to me the above statement and I swear or affirm that it is true to the best of my knowledge and belief.

_____
CITIZEN SIGNATURE

Sworn and subscribed to me this ___14___ day ___February___ ___2014___

_____
PRINT CITIZEN NAME

P - 6 - 4

# ATLANTA POLICE DEPARTMENT
## CITIZEN STATEMENT

| EMPLOYEE: | CITIZEN: | | | | OPS # 14-C-0122-MISC |
|---|---|---|---|---|---|

| CITIZEN NAME (LAST,FIRST,MI) | RACE | SEX | DOB | DATE & TIME OF STATEMENT |
|---|---|---|---|---|
| Brown, Devon W. | Blk | Male | 7/2/68 | 03/07/2014 11:02AM |

| ADDRESS | SSN | HOME PHONE | WORK PHONE |
|---|---|---|---|
| 3371 Waggoner Lane Rex,GA 30273 | ------------------ | 678-519-4468 | 404-613-2375 |

I am Investigator Sarah Barr of the Atlanta Police Department. By you making this statement you are providing information in an investigation being conducted by the Atlanta Police Department. Please be advised that your statement and/or your testimony may be needed at a future time for use in a civil service hearing or court of law.

Q: In regards with your complaint, are there any witnesses?
A:Yes.

Q:Are you willing to provide me with your witnesses contact information?
A:Yes I am.

Q:Are you able to provide me with that information now?
A:Yes.

Q:If you can please go ahead with names and phone numbers if you have them and want to provide them?
A:Skip Mitchell 404-914-5559

Q:Have you been honest in making your statement?
A:Yes mam.

Q:If it becomes necessary in this investigation are you willing to submit to a computer voice stress analysis exam?
A:Yes mam.

Q:Is Skip Mitchell a male or female?

I have read or had read to me the above statement and I swear or affirm that it is true to the best of my knowledge and belief.

_CITIZEN SIGNATURE_

Sworn and subscribed to me this ___7___ day ___MARCH___ 2014

_Devon W. Brown_
PRINT CITIZEN NAME

P - 7 - 1 -

NOTARY PUBLIC 2/3/14

SARAH HEATHER BARR
NOTARY PUBLIC
FULTON COUNTY, GEORGIA

## ATLANTA POLICE DEPARTMENT
## CITIZEN STATEMENT

EMPLOYEE:                         CITIZEN:                    OPS # 14-C-0122-MISC

A:Male.

Q:Are you able to provide me with Skip Mitchell's address now?
A:Yea I think I have it. 1342 To-lani Farm Road Stone Mountain, Georgia 30083.

Q:Are you able to provide me with an email address for Skip Mitchell?
A:No mam.

---

I have read or had read to me the above statement and I swear or affirm that it is true to the best of my knowledge and belief.

_Devon W. Bra_____
CITIZEN SIGNATURE

Sworn and subscribed to me this          _7_ day   _MARCH_      2014

_Devon W. Brown_
PRINT CITIZEN NAME

P - 7 - 2 - 2

_Sarah Heather Barr_
SARAH HEATHER BARR
NOTARY
FULTON COUNTY, GEORGIA

February 14, 2014

To: City of Atlanta Police Department (Internal Affair Division)

Subj: Formal Complaint of Constitutional Rights Violation

From: Devon Brown

To whom it may concern:

February 8, 2014, at 3:57 A.M., 6 "unmarked" Atlanta Police vehicles pulled in the parking lot in front of my private motorcycle clubhouse.   A total of 9 officers came into my private motorcycle clubhouse at 3:58 A.M., unannounced, uninvited and without warrant or probable cause and raided my private motorcycle clubhouse.  The lead APD officer asked for the person in charge of the clubhouse.  I identified myself as the President of the motorcycle club.  Without any explanation, he ordered one of his officers to place me in handcuffs.  After I was handcuffed, the lead APD officer yelled out, "Everybody get out except for the DJ".    I asked the lead APD officer, "Do you have a search warrant?" He stated, "I don't need one".

At 4:00 A.M., 3 more APD officials entered my private motorcycle clubhouse.  The lead APD officer asked me, "Where is your business license?"  I stated, "This is a private motorcycle clubhouse and no business license is required."   I informed him that I went to the City of Atlanta License & Permit Office in 2009 to inquire about the criteria to open a private motorcycle clubhouse.  They advised me to place a visible "Private Club" sign on the front door of the clubhouse.  This sign was prominently displayed when all the APD officers raided my clubhouse.  The lead APD officer continued to harass me about a business license, while the other officers searched through my clubhouse, even after I told him it was not necessary for me to have a business license.  This went on from the time they handcuffed me at 3:59 A.M. until the time they escorted me out of my clubhouse at 5:10 A.M.

The lead APD officer told one of his subordinates to search me for weapons or drugs.  As the officer approached to search me, I informed that I had a firearm on my right side.  He reached into my waistband, retrieved my firearm and handed to another officer who ran it through APD dispatch.  None of the officers even bothered to check my ID until they ran my firearm through dispatch.

Upon discovering my Deputy Sheriff credentials, the lead APD officer became uncomfortable about his lack of attention to proper police protocol and his unjustified treatment towards me.  I later discovered there were a few fire inspectors included in the group of APD officers.  They asked if I was the owner of the building.  I told them I was leasing the building.  Upon discovering this fact, the fire inspectors left the clubhouse.

With a more subtle tone, the lead APD officer stated, "If you just tell me you will go check on a business license, I will let you go".  I told him, "I will not tell you that because I know I don't need a business license for a private clubhouse.  My clubhouse is not open to the public."

Since I would not comply with his unlawful order, I was unlawfully detained inside my clubhouse for an hour and 15 minutes, in handcuffs before I was transported to Atlanta City Jail at 5:10 AM.

Fulton County OPS interviewed me after receiving APD's arrest report. They asked me about specific details written in the report:

1. APD reported smelling marijuana inside the clubhouse but no illegal substances were found inside and no one was charged or arrested.
2. APD reported members were having sex at the time of entry but, no one was charged or arrested for lude acts or behavior.
3. APD reported unlicensed sales of alcohol but they did not confiscate any alcohol at all.
4. APD correctly reported we had adult entertainment but none of the entertainers were given tickets and none were arrested.

The above accusations prove that the Atlanta Police Department had malicious intent to defame me as a citizen and as a 20-year veteran of the Fulton County Sheriff's Office. These are my rights they violated upon entering my private clubhouse:

1. First Amendment (Right to Assemble)
2. Second Amendment (Right to Bear Arms)
3. Fourth Amendment (Unlawful Search & Seizure)
4. Fifth Amendment (Miranda Rights)
5. Eight Amendment (Cruel & Unusual Punishment)

Upon your review of my statement of account, I respectfully request all the names and badge numbers of all the officers involved in the violation of my constitutional rights.

I'm looking forward to your speedy response to my formal complaint. I can be reached at the following phone number: 404-735-3161.

Regards,

Devon W Brown

2/14/14

SARAH HEATHER BARR
NOTARY
PUBLIC
FULTON COUNTY, GEORGIA

Sarah Heather
Barr
2/14/14

CC: Sergeant Muhammed, Fulton County Sheriff Office (OPS)

6-2-4

# DEF. MSJ

# EX. 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| Devon W. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | 1:16-cv-00008-CAP |
| | ) | |
| the CITY OF ATLANTA, Georgia, | ) | |
| Bryant BURNS, Kelvin WALLS, | ) | |
| Alfred WATKINS, Gary SMITH, | ) | |
| Richard DILLON, Robbie | ) | |
| SCANDRICK, Gordon CABANAW, | ) | |
| Ritchie NEWELL, and Stanley | ) | |
| REYNOLDS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## AMENDED COMPLAINT

COMES NOW the Plaintiff, Devon W. Brown ("Plaintiff" or "Brown") and files this *Amended Complaint*. The primary purpose of this Amended Complaint is to clarify certain factual issues and to obviate certain arguments asserted in Defendant's *Motion to Dismiss* [Doc. 6], in order to conserve the judicial resources required to litigate and decide such a Motion.

1.     This is an action for damages, declaratory relief, and injunctive relief, brought pursuant to 42 U.S.C. § 1983 and state law, to remedy violations of the Plaintiff's constitutional rights under the First, Fourth and Fourteenth Amendments to the United States Constitution and related rights under Georgia constitutional and statutory law.

## Jurisdiction and Venue

2.     This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as this action arises under the laws and Constitution of the United States; pursuant to 42 U.S.C. § 1983; pursuant to its supplemental jurisdiction under 28 U.S.C. § 1367; and pursuant to 28 U.S.C. § 2201, as an actual controversy exists within this Court's jurisdiction.   This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and 2202.

3.     Venue is proper pursuant to 28 U.S.C. § 1391, because at least one Defendant resides in this district and division, all Defendants reside in this State, and a substantial part of the events or omissions giving rise to the claims set forth in this Complaint occurred within this district and division.

4.     The Honorable Chief Judge Tusan of the Fulton County Superior Court reversed the City of Atlanta municipal court's conviction of Plaintiff for violations of city ordinances on August 31, 2015, thereby providing Plaintiff with

standing to bring suit for constitutional violations that led to the underlying conviction.

5. Plaintiff provided the City of Atlanta with timely notice of his claims, in accordance with Georgia's ante litem notice statute, O.C.G.A. § 36-33-5, in order to bring his state law claims. The City of Atlanta acknowledged receipt of Plaintiff's ante litem notice by letter on or about September 24, 2015. Over thirty days have passed from the presentation of such claim to the City of Atlanta and the City of Atlanta has not acted upon it, see O.C.G.A. § 36-33-5(b), (c).

## Parties

6. Plaintiff Devon Brown ("Brown") is a resident of Georgia. Brown has been a Fulton County Sheriff's Deputy for 19 years. He is the president a motorcycle club, called the Dirty South Slab Riders Club, whose members are from a variety of professions, including law enforcement officers and members of the military, who enjoy riding and maintaining motorcycles.

7. Defendant City of Atlanta (the "City") is a municipal governmental entity that is legally competent to sue and be sued. The City's policies, practices, and customs were the moving force behind the constitutional and statutory violations set out herein. The City maintains its Office at 55 Trinity Avenue, Atlanta, Georgia 30303 and may be served by personal service upon its Mayor or his designee.

8.      Defendant Bryant Burns was a Sergeant in the City of Atlanta Police Department at the time of this filing and at all times pertinent to this action. He may served with the summons and complaint at his place of employment, the City of Atlanta Police Department Zone 3 precinct, which is located at 880 Cherokee Ave SE, Atlanta, GA 30315.

9.      Defendant Kelvin Walls was a Sergeant in the City of Atlanta Police Department at the time of this filing and at all times pertinent to this action. He may served with the summons and complaint at his place of employment, the City of Atlanta Police Department Zone 3 precinct, which is located at 880 Cherokee Ave SE, Atlanta, GA 30315.

10.     Defendant Alfred Watkins was an Officer in the City of Atlanta Police Department at the time of this filing and all times pertinent to this action. He may served with the summons and complaint at his place of employment, the City of Atlanta Police Department Zone 3 precinct, which is located at 880 Cherokee Ave SE, Atlanta, GA 30315.

11.     Defendant Gary Smith was an Investigator in the City of Atlanta Police Department at the time of this filing and all times pertinent to this action. He may served with the summons and complaint at his place of employment, the City of Atlanta Police Department Zone 3 precinct, which is located at 880 Cherokee Ave SE, Atlanta, GA 30315.

4

12.     Defendant Richard Dillon was an Officer in the City of Atlanta Police Department at the time of this filing and at all times pertinent to this action. He may served with the summons and complaint at his place of employment, the City of Atlanta Police Department Zone 3 precinct, which is located at 880 Cherokee Ave SE, Atlanta, GA 30315.

13.     Defendant Robbie D. Scandrick was a Detective for the City of Atlanta Police Department at the time of this filing and all times pertinent to this action. He may served with the summons and complaint at his place of employment, the City of Atlanta Police Department Zone 3 precinct, which is located at 880 Cherokee Ave SE, Atlanta, GA 30315.

14.     Defendant Gordon Cabanaw was Buildings Department Inspector for the City of Atlanta Buildings Department at the time of this filing and all times pertinent to this action. He may be served with the summons and complaint at his place of employment with the City of Atlanta at 55 Trinity Avenue, 3rd Floor - Suite 3800, Atlanta, Georgia 30303.

15.     Defendant Ritchie Newell was a Senior Investigator for City of Atlanta Solicitor's Office at the time of this filing and all times pertinent to this action. He may be served with the summons and complaint at his place of employment, the solicitor's office, which is located at 150 Garnett St SW, Atlanta, GA 30303.

5

16.     Defendant Stanley Reynolds was a Senior Investigator for the City of Atlanta Solicitor's Office at the time of this filing and all times pertinent to this action. He may be served with the summons and complaint at his place of employment, the solicitor's office, which is located at 150 Garnett St SW, Atlanta, GA 30303.

## Facts

### The City of Atlanta License and Permits Unit

17.     City of Atlanta issues business licenses for revenue.

18.     City of Atlanta has a special unit known as the "License and Permits Unit."

19.     The stated purpose of the "License and Permits Unit" is to inspect businesses for failures to comply with the licensing ordinances of the City of Atlanta, and to serve subpoenas, citations, and summonses for suspected violations of same.

20.     However, upon information and belief, the City maintained, at the time of the events giving rise to this case, an unlawful custom or policy of using the License and Permits Unit to conduct warrantless entries onto private property in order to conduct general criminal investigations that went far beyond the legal authority afforded to the unit to inspect compliance with the City's licensing ordinances.

6

21.    Said Unit was operating on February 8th, 2014.

22.    On February 8, 2014, at least nine (9) officers, inspectors, and investigators, were traveling to various properties in an attempt to conduct warrantless entries and searches of same in order to investigate possible criminal activity thereon, in conjunction with City policy. Said officers included Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds, who were all present, and who are hereinafter referred to as the "officers".

<u>The February 8, 2014 Arrest</u>

23.    On February 8, 2014, Brown and the members of his motorcycle club were enjoying a private bachelor party at a property Brown had rented as a clubhouse for the group.

24.    The clubhouse was located at 2031 Metropolitan Parkway in Atlanta, Georgia.

25.    The clubhouse had prominent signs near the entrance that read "Private Club" and "No Trespassing."

26.    The clubhouse had blacked out windows that prevented passers by from seeing inside the club.

27.    The clubhouse was not open to the public.

28.    There was no business being conducted from the clubhouse.

29.    No food or alcohol was being sold, though club members and guests could bring their own food and beverages to enjoy and share.

30.    Plaintiff was not engaged in any activity at the clubhouse that required licensure. He was not operating a business as defined by Atlanta City Code 30-55, and he was not selling alcoholic beverages or providing alcoholic beverages to any person as contemplated by Atlanta City Code 10-3.

31.    Plaintiff was not engaged in any illegal or unlawful activity.

32.    At approximately 4:30 a.m. on February 8, 2014, approximately nine City of Atlanta personnel arrived at Plaintiff Brown's private club, including Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds.

33.    Defendant Burns was the commanding officer that evening.

34.    Burns directed the other officers to enter into Plaintiff's clubhouse.

35.    The officers did not have a search warrant to enter Brown's clubhouse.

36.    No "exigent circumstances" were present that would have permitted a warrantless entry.

37.    According to testimony given to an Internal Affairs investigator by one or more of the officers who entered the clubhouse on that day, a member of the club held the door open to allow the officers to enter.

8

38.     However, surveillance footage shows that the officers entered on their own, and no member opened the door for them.

39.     To be clear, no person held the door open for the officers or otherwise permitted their entry. The officers entered the premises on their own accord, without being let in.

40.     According to testimony given to an Internal Affairs investigator by one or more of the officers who entered the club that day, the officers were there to perform a "compliance check."

41.     However, the entry and subsequence search went far beyond the reasonable or expected scope of the License and Permit Unit.

42.     A gentlemen was playing music for the guests to enjoy, and the officers commanded him to turn off the music.

43.     The officers immediately began to detain members and guests of the club, despite the fact that none of them were committing any crime.

44.     The officers demanded identification from members and guests of the club and began to run "background checks" on them.

45.     Officers demanded to know who was in charge of the clubhouse.

46.     Plaintiff stepped forward and indicated that he was the President of the club.

47.    Defendant Sergeant B. Burns, the lead officer, requested to see Plaintiff's business license.

48.    Plaintiff Brown stated that this was a private clubhouse and not a business.

49.    Plaintiff Brown told the officers that the club members were celebrating a private bachelor party.

50.    Plaintiff Brown told the officers to leave the clubhouse.

51.    Defendant Sgt. Burns and other officers then put Plaintiff Brown in handcuffs, causing him discomfort and distress.

52.    Defendant Sgt. Burns confiscated Plaintiff Brown's lawful firearm.

53.    The officers ignored Plaintiff's demands to leave the premises.

54.    The officers then performed a full-scale search of the premises, despite a total absence of probable cause for same.

55.    Though officers later claimed to smell marijuana and to see other evidence of marijuana use, this was merely a pretext to perform a search, as there was no marijuana being used at the club, where such activity is prohibited.

56.    No illegal contraband was found.

57.    Plaintiff Brown told the City of Atlanta law enforcement agents that he was an active deputy with the Fulton County Sheriff's Office.

58.     Defendant Sergeant K. Walls notified Fulton County Sheriff Department Internal Affairs about Plaintiff's arrest.

59.     Officers repeatedly accused Plaintiff of violating City of Atlanta ordinance § 30-55 for failure to obtain a business license and § 10-3 for failure to comply with commercial liquor license provisions.

60.      Plaintiff Brown was taken out of the clubhouse and formally arrested for violations of City of Atlanta Ordinances § 30-55, failure to obtain a business license and § 10-3, failure to comply with commercial liquor license provisions.

61.     Neither the Atlanta Business Code nor its Alcoholic Beverages Code permits arrest for violation of licensure requirements.

62.     The Business Code states plainly, at Section 30-59, "Compliance investigators may cite individuals or persons for violation of this article but are not empowered to arrest any individual for any violation of this article, and, notwithstanding any authority to the contrary elsewhere in the Atlanta City Code of Ordinances, shall not arrest any individual for any violation of this article."

63.     The raid lasted approximately two to three hours.

64.     At some point during the raid, Defendant Snowden, who was acting as Night Watch Commander, came on the scene and was briefed on what had occurred.

11

65.     Plaintiff Brown was transported to the Atlanta Detention Center until he was later released.

66.     Plaintiff's arrest was publicized widely on television, the internet, and other forums.

### February 14, 2014 Internal Affairs Complaint

67.     On February 14, 2014, Plaintiff Brown filed a formal complaint against the City of Atlanta and City of Atlanta Police Department for the violation of his constitutional rights.

68.     In response to Plaintiff Brown's formal complaint, City of Atlanta opened an internal affairs investigation.

69.     Defendant Senior Investigator Ritchie Newell of the City of Atlanta Solicitor's Office stated in an email to Atlanta Internal Affairs on April 18th, 2014 that he "was advised to not give a statement" to Internal Affairs by his supervisor.

70.     During the internal affairs investigation Senior Investigator Reynolds also refused to give a statement under orders of his supervisors.

71.     The City's Internal Affairs department ultimately found no wrongdoing by the officers involved.

### May 2, 2014 Atlanta Municipal Court Order

72.     On May 2nd, 2014, City of Atlanta Municipal Court Judge Crystal Gaines found Plaintiff Brown guilty of violating City Ordinances § 30-55 for

12

failure to obtain business license and § 10-3 for failure to comply with liquor license requirements.

73.    Plaintiff Brown officially lost his job with the Fulton County Sheriff's Department in July of 2014 as a direct result of the search, seizure, and arrest that occurred on February 8, 2014.

<u>August 31, 2015 Fulton County Superior Court Order</u>

74.    Plaintiff appealed his ordinance case to the Fulton County Superior Court.

75.    The Honorable Chief Judge Gail Tusan of Fulton County Superior Court held, as a matter of law, that Plaintiff's motorcycle club was neither a "Business" nor a "Bottle House" and, thus, not subject to Atlanta City Code § 30-55 and § 10-3.

76.    The Honorable Chief Judge Tusan also held that the Municipal Court erred when it refused to rule on Petitioner's motion to suppress illegally obtained evidence, thereby establishing that the evidence was obtained by way of conduct that violated the Fourth Amendment to the United States Constitution.

**Legal Claims**

77.    By this reference, Plaintiff reincorporates the previously set forth factual allegations as if fully set forth herein.

## COUNT I—UNLAWFUL SEARCH AND SEIZURE—FEDERAL LAW
## (ALL DEFENDANTS)

78.    As fully described herein in the proceeding paragraphs, Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds entered and searched Plaintiff Brown's private clubhouse, without a warrant, exigency, or probable cause to do so, on February 8th, 2014, thereby depriving him of his rights under the Fourth Amendment to the United States Constitution.

79.    As fully described herein in the proceeding paragraphs, Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds unlawfully seized Plaintiff's property, including his private clubhouse and his lawful firearm, without a warrant, exigency, or probable cause to do so, on February 8th, 2014, thereby depriving him of his rights under the Fourth Amendment to the United States Constitution.

80.    As fully described herein in the proceeding paragraphs, Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds arrested Plaintiff Brown without a warrant, probable cause or exigent circumstances.

81.    At all times relevant to this action, the law was established with obvious clarity that conduct of Defendants Burns, Walls, Watkins, Smith, Dillon,

Scandrick, Cabanaw, Newell, and Reynolds, as alleged more specifically hereinabove, violated the Fourth Amendment of the United States Constitution.

82.    The clearly established nature of the law is established by, among other factors, the fact that the ordinances for which Plaintiff was arrested explicitly did not permit arrest for suspected violations.

83.    Upon information and belief, the search and seizure of Plaintiff and his property was carried out pursuant to an unlawful custom or policy by the City of Atlanta.

84.    In order for warrantless searches of a private establishment to pass constitutional muster, said searches must be valid administrative searches of a closely regulated business, in which (1) there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made, (2) the warrantless inspections are necessary to further the regulatory scheme, and (3) the statute's inspection program, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant. Bruce v. Beary, 498 F.3d 1232, 1247 (11th Cir. 2007).

85.    For such "administrative searches" to be valid in the absence of a warrant, they must be limited in time, place, and scope, in order to carry out the purpose for which they are permitted. Where the search itself is disproportionate to the valid need for administrative inspection and is a mere pretext to conduct

general criminal investigations without a warrant, such act violates clearly established law. Id.

86. In this case, the purported "administrative search" was conducted according to a program that, in terms of the certainty and regularity of its application, did not provide a constitutionally adequate substitute for a warrant.

87. The Unit's "compliance checks" went far beyond that which was reasonably necessary to inspect for licensure. Rather than sending in a reasonable number of officers to ask the owner of the club for his business and liquor license, the City sent at least nine (9) officers onto Plaintiff's premises, detained everyone in the establishment, performed criminal background checks on everyone there, searched for drugs and evidence of other crimes, seized Plaintiff's lawful firearm, forced everyone to leave, and arrested the Plaintiff. Such actions went far beyond what is reasonable or necessary to inspect establishments for compliance with local ordinances.

88. This was not merely an isolated incident. These actions were carried out pursuant to a custom, policy, or practice that violates the Fourth Amendment to the U.S. Constitution. Evidence that this action was carried out pursuant to an unlawful City-wide policy shall include the fact that this same task force routinely conducts these sorts of pretextual "compliance checks" in private clubs throughout

16

metro Atlanta, with the full knowledge and authorization of policymaking officials within the City of Atlanta.

89.    According to the Internal Affairs report regarding Plaintiff's arrest, the warrantless entry into his clubhouse was not an isolated event on the night in question. Rather, the Unit had been traveling to numerous locations and attempting to make warrantless entries therein under the pretext of "compliance checks."

90.    This unlawful policy or practice was the moving force behind Plaintiff's injury.

91.    Plaintiff suffered significant damages, including financial loss and emotional distress, as a result of these actions.

<u>COUNT II—UNLAWFUL SEARCH AND SEIZURE—STATE LAW</u>
<u>(INDIVIDUAL DEFENDANTS ONLY)</u>

92.    The unlawful entry and search of Plaintiff's property, and his unlawful arrest, also violated Plaintiff's rights under Article 1 § 1 ¶ 13 of the Georgia Constitution.

93.     Said actions also constitute the torts of false arrest and battery under Georgia law.

94.    The actions of Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds, as described herein, were willful, deliberate, and malicious, thereby depriving them of state law immunity and

17

entitling Plaintiff to an award of punitive damages in an amount to be determined by the enlightened conscience of the jury.

95.   The individual Defendants are liable under state law, including but not limited to O.C.G.A. 33-36-4, because they were carried out by municipal officers without authority of law. See Owens v. City of Greenville, 290 Ga. 557, 561, 722 S.E.2d 755, 759 (2012).

<u>COUNT III—VIOLATION OF RIGHT TO PEACEABLY ASSEMBLE
(INDIVIDUAL DEFENDANTS ONLY)</u>

96.   As fully described herein in the proceeding paragraphs, the Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds violated the First Amendment of the United States Constitution by illegally arresting Plaintiff Brown for peacefully assembling at a private clubhouse to celebrate a private bachelor party.

97.   Under the facts and circumstances alleged herein, an objectively reasonable public official in Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds' position would have known that searching and seizing Plaintiff's private clubhouse, disrupting and disbanding his peaceable private gathering, and arresting Plaintiff for peacefully gathering on his private property, was a violation of the First Amendment to the United States Constitution.

18

98.    At all times relevant to this action, the law was established with obvious clarity that the conduct of the Defendants as alleged more specifically herein above was a violation First Amendment of the United States Constitution.

99.    As a direct and proximate cause of Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds unlawful actions, Plaintiff Brown was illegally arrested and detained against his will thereby suffering a loss of liberty in violation of his rights and a suppression of his rights to free speech and being able to peacefully gather with friends without fear or harassment, violating the First Amendment of the United States Constitution, entitling him to actual and compensatory damages in an amount to be determined by the enlightened conscience of the jury.

100.    The actions of Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds, described herein were willful, deliberate, and malicious, thereby entitling Plaintiff Brown to an award of punitive damages in an amount to be determined by the enlightened conscience of the jury.

101.    In addition to violating federal law, these actions also violated Article 1 § 1 ¶ 9 of the Georgia Constitution, which guarantees free speech and freedom of assembly, and for which the individual defendants are pursuant to O.C.G.A. 33-36-4, because they were carried out by municipal officers without authority of law. See Owens v. City of Greenville, 290 Ga. 557, 561, 722 S.E.2d 755, 759 (2012).

## COUNT IV—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (INDIVIDUAL DEFENDANTS ONLY)

102. Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds' acts of misrepresenting evidence to authorities, arresting Plaintiff Brown without probable cause, harassment, and urging the prosecution of Plaintiff, as described supra, were intentional and/or reckless.

103. Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds conduct was extreme and outrageous.

104. Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds' conduct caused Plaintiff to suffer severe emotional distress, entitling him to compensatory damages in an amount to be determined by the enlightened conscience of the jury.

105. The actions of Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds described herein were willful, deliberate, and malicious, thereby entitling Plaintiff to an award of punitive damages in an amount to be determined by the enlightened conscience of the jury.

**WHEREFORE**, Plaintiff prays:

a) That the Court declare that Defendants' actions, policies, and practices complained of herein violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution.

20

b) That the City of Atlanta be permanently enjoined from violating the rights of Plaintiff and others pursuant to its unlawful policy;

c) That special damages be awarded to compensate Plaintiff for his economic injuries as a consequence of Defendants City of Atlanta, Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds' violations of Plaintiff Brown's rights in an amount to be determined by the enlightened conscience of the jury;

d) That compensatory damages be awarded against Defendants City of Atlanta, Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds to compensate Plaintiff Brown for his pain and suffering, mental and emotional distress, anxiety, humiliation, outrage, and loss of professional and personal reputation as a consequence of Defendants' actions in an amount to be determined by the enlightened conscience of the jury;

e) To delete, expunge, and seal any arrest records that may have been created pursuant to Plaintiff Brown arrest on February 8th, 2014;

f) That punitive damages be awarded against Defendants Burns, Walls, Watkins, Smith, Dillon, Scandrick, Cabanaw, Newell, and Reynolds (and not the City of Atlanta, unless a change in law permits such damages) in an amount to be determined by the enlightened conscience

21

of the jury to deter Defendants and others from similar misconduct in the future;

g) That a trial by jury be had on all issues wherein a jury trial is permitted under law;

h) That attorneys' fees and expenses of litigation be awarded as authorized under 42 U.S.C. § 1988 and other provisions of law;

i) That pre-judgment and post-judgment interest be awarded; and

j) That the Court award such other equitable or monetary relief as deemed just and proper.

A JURY TRIAL IS DEMANDED.

Respectfully submitted, this March 2, 2016.

/s/ Joshua Landon Brownlee
Joshua Landon Brownlee
Georgia Bar No. 611140
125 East Trinity Place, Suite 312
Decatur, Georgia 30030
(404) 844-6139
jbrownleelaw@gmail.com


/s/ James Radford
James Radford
Radford & Keebaugh, LLC
315 W. Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030

(678) 271-0300
james@decaturlegal.com


ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I, the undersigned, certify that I have this day served upon the attorneys of record the foregoing pleading by filing same with the Court's electronic filing system.

This March 2, 2016.

/s/ James Radford
James Radford
Georgia Bar No. 108007

# DEF. MSJ

# EX. 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEVON W. BROWN                          )
    Plaintiff                          )
                     )
                     )
v.                                       )
                     )
CITY OF ATLANTA, Georgia,                )     CIVIL ACTION FILE
BRYANT BURNS, KELVIN WALLS,              )     NO. 1:16-CV-00008-CAP
ALFRED WATKINS, GARY SMITH,              )
RICHARD DILLON,                          )
ROBBIE SCANDRICK,                        )
GORDON CABANAW,                          )
RITCHIE NEWELL, and                      )
STANLEY REYNOLDS                         )
                     )
    Defendants                         )

## PLAINTIFF'S RESPONES TO DEFENDANTS' FIRST REQUEST FOR ADMISSIONS

COMES NOW, DEFENDANTS and files its First Request for Admissions and request that Plaintiff answer the following First Set of Admissions separately and fully in writing under oath on or before 30 days from the date of service, pursuant to Rules 36 of the Federal Rules of Civil Procedure, Local Civil Rule 33.1 of the United States District Court for the Northern District of Georgia, and the definitions and instructions prescribed as follows: as follows:

## OBJECTIONS

These requests have been served less than 30 days before discovery expires.
Therefore, they do not require responses. In an abundance of caution, Plaintiff has
provided responses. By doing so, Plaintiff does not waive his objection to the
propriety of the requests.

## RESPONSES

1. Admit that there was a posting of prices inside the club for the sale of food,
   and/or drink and alcoholic beverages.

   DENIED. There was no such posting.

2. Admit that you did not submit the names, addresses, and telephone numbers
   of each of the officers and directors of the private club, and of any other
   person(s) who will manage, operate, direct, supervise or otherwise have any
   control over the day to day operations of the private club.

   OBJECTION:  Irrelevant. Plaintiff was not operating an establishment that
   sold or provided alcoholic beverages and therefore was not required to
   comply with the definition of "private club" contained in the City's alcohol
   ordinances. Moreover, there was no "management, operation, direction, or
   supervision" or any "day to day operations" of the clubhouse. It was not a

2

formal operation as contemplated by this definition of "private club"; rather, it was just a space for Plaintiff and his friends to "hang out."

RESPONSE: Admitted.

3. Admit that when officers entered the club, it was more than 3 hours after midnight.

RESPONSE: Admitted.

4. Admit that naked women were walking around inside the club and a naked woman and a man located to the left of the front door engaged in sexual activity.

RESPONSE: Denied.

5. Admit that during the incident an officer asked who was 'in charge' and/or who was the owner or manager of the club.

RESPONSE: Admitted.

6. Admit that Plaintiff was arrested for a misdemeanor.

RESPONSE: Denied. Plaintiff does not believe the conduct for which he was arrested qualified as any sort of crime, misdemeanor or otherwise.

7. Admit that the club, at the time the officers entered, was not closed to the public.

RESPONSE: Denied. The club house was not open to the public.

3

8. Admit that neither the police officers or Plaintiff asked patrons to leave the establishment up and including the time that Plaintiff was placed under arrest.

RESPONSE: The Club did not have patrons. Plaintiff does not recall whether the police asked people to leave, so cannot admit or deny.

9. Admit that Plaintiff initially refused to provide any identification to Officer Burns.

RESPONSE: Denied.

10. Admit that there were more than four bottles of alcoholic beverages of 30 ounces or more located on the bar of the club at the time officers and City of Atlanta personnel entered the club.

RESPONSE: Denied. Plaintiff has no recollection of there being "more than four bottles of alcoholic beverages of 30 ounces or more located on the bar of the club."

11. Admit that Plaintiff stated he did not know that he was required to have a license to operate a private club.

RESPONSE: Denied as stated. Plaintiff's recollection is that he stated he did not believe he was required to have a license for the particular use of the property.

4

12. Admit that Plaintiff never submitted an application to the City of Atlanta for an alcohol license at the location.

RESPONSE: Denied as stated. Plaintiff did inquire with the City about having to have a license when he first began renting the space, and was told that he did not need one.

13. Admit that Plaintiff never applied for a business license from the City of Atlanta for the location.

RESPONSE: Denied as stated. Plaintiff did inquire with the City about having to have a license when he first began renting the space, and was told that he did not need one.

14. Admit that there were tinted windows near the front of the location at the time of the incident.

RESPONSE: Admitted.

15. Admit that Plaintiff did not have a roster of its members at the time of the incident.

RESPONSE: Denied. Plaintiff had at some point created a roster. Plaintiff does not recall having one in his custody on the night in question.

16. Admit that Plaintiff did not have a certificate of occupancy posted at the location.

RESPONSE: Admitted.

17. Admit that the urinals in the men's bathroom were removed from the walls.

OBJECTION: It is irrelevant whether urinals are present at the club. Plaintiff was not cited or arrested for not having urinals.

RESPONSE: Denied, there was one urinal and one toilet.

18. Admit that the club has no dues payments or applications process are required to be members of the club.

RESPONSE: Denied as stated. Plaintiff admits there are no due requirements and the club had an informal process for admitting new members.

19. Admit that patrons had the option of staying overnight at the club.

Objection: Irrelevant. It is irrelevant to these proceedings if members could stay the night.

RESPONSE: Admit. However, the club did not have patrons, only members, friends, and family.

20. Admit that you spoke to an investigator at the Ponce de Leon location a few days before January, 2010 regarding whether a license to operate was needed to operate the club.

6

RESPONSE: Denied as stated. Plaintiff cannot be 100% sure about the exact time he met with the Atlanta investigator. The investigator told Plaintiff that he didn't need a business license.

21. Admit that the video of the incident shown by Plaintiffs in the deposition of Officers Miles and Burns does not show any officer or City of Atlanta personnel "smashing on the door."

RESPONSE: Admit that Defendants didn't smash the door, rather they lied in their official report about someone holding the door open for them to enter.

22. Admit that you took medication to treat high blood pressure prior to the incident.

RESPONSE: Admit.

23. Admit that any 'member' could bring alcohol on the premises.

RESPONSE: Denied as stated. A member would have to be allowed to legally drink alcohol.

24. Admit that persons could rent the location and supply their own alcohol at the location.

RESPONSE: Denied. "Persons" could not rent the location, but members could use the location for family events or charities.

25. Admit the persons could rent the location and the club would supply the alcohol if requested.

RESPONSE: Denied.

26. Admit that the club is not registered as a business entity with the secretary of state.

RESPONSE: Admit, it's not a business.

27. Admit that you did not possess an occupancy license for the Dirty South Slab Ryders ("DSSR") Clubhouse located at 2081Metropolitan Parkway.

RESPONSE: Admit.

28. Admit that the DSSR not registered as a non-profit pursuant to the laws of the state.

RESPONSE: Admit.

29. Admit that no federal or state income tax returns were filed for 3 years prior to date of incident.

OBJECTION: The question is vague and unclear as to whether it refers to Plaintiff or the DSSR.

RESPONSE: Deny as stated for being vague. Plaintiff filed taxes in 2013.

30. Admit that alcohol was maintained on the premises.

OBJECTION: The question is vague and unclear concerning the word "maintained"

RESPONSE: Denied as stated. Plaintiff does admit that alcohol could be brought by members for events. No alcohol was stored at the location.

31. Admit that alcohol was consumed on the premises.

RESPONSE: Admit.

32. Admit that DSSR had a longstanding policy that patrons could bring their own alcohol for use and consumption.

RESPONSE: Denied as stated. DSSR does not have patrons.

33. Admit that the front door to the premises were not locked at the time officers entered the premises.

OBJECTION: It's irrelevant if the door was locked. Plaintiff had two signs saying "private club" as well as tinted windows. Plaintiff had a reasonable expectation of privacy that is not dependent on whether he locked his door.

RESPONSE: Admit, the door was closed with a sign prominently displayed stating "private club".

34. Admit that there were vehicles in the parking lot at approximately 4:30 a.m.

RESPONSE: Admitted.

Respectfully submitted this 30th day of June, 2017.

/s/ Joshua Brownlee
Joshua Brownlee
Georgia Bar No. 611140
*Counsel for Plaintiff*

Andres & Brownlee, LLC
125 East Trinity Place
Suite 312
Decatur, Georgia 30030
joshua@andresbrownlee.com
(404) 844-6139

10

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for the opposing party with a copy of the within and foregoing **PLAINTIFF'S RESPONSES TO CITY OF ATLANTA FIRST REQUESTS FOR ADMISSIONS** via electronic mail or addressed as follows:

VALORRI C. JONES AND
M. THERESA STEWART
CITY OF ATLANTA LAW DEPARTMENT
55 Trinity Avenue, Suite 5000
Atlanta, Georgia 30303

Respectfully submitted this 30th day of June, 2017.

/s/ Joshua Brownlee
Joshua Brownlee
Georgia Bar No. 611140
*Counsel for Plaintiff*

Andres & Brownlee, LLC
125 East Trinity Place
Suite 312
Decatur, Georgia 30030
joshua@andresbrownlee.com
(404) 844-6139

11

# DEF. MSJ
# EX. 4

# In The Matter Of:

*DEVON W. BROWN vs.*
*THE CITY OF ATLANTA, GEORGIA, et al.*

---

*SERGEANT BRYANT BURNS*
*May 31, 2017*

---



JPA REPORTING, LLC

CERTIFIED COURT REPORTERS

1776 PEACHTREE STREET, N.W.
SUITE  390-N
ATLANTA, GEORGIA 30309
404-853-1811
1-888-947-2963

*Original File 0531Burns17.txt*
*Min-U-Script® with Word Index*

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION

 3    _____

      DEVON W. BROWN,
 4
                    Plaintiff,
 5                                    CIVIL ACTION CASE NO.
              vs.
 6                                    1:16-CV-00008-CAP

      THE CITY OF ATLANTA, GEORGIA,
 7    et al.,

 8                  Defendants.
      _____
 9

10                       DEPOSITION OF

11                 SERGEANT BRYANT BURNS

12

13                 Wednesday, May 31, 2017

                         12:13 p.m.
14

15                  55 Trinity Avenue, S.W.
                       Atlanta, Georgia
16

17

18           Patricia M. Lesch, CCR B-2435

19

20

21

22

23

24

25
```

2

```
1                    APPEARANCES OF COUNSEL

2

3    On behalf of the Plaintiff:

4         JAMES E. RADFORD, Esq.
          Radford & Keebaugh, LLC
5         315 W. Ponce de Leon Avenue
          Suite 1080
6         Decatur, Georgia 30030
          678-369-3609
7         james@decaturlegal.com

8    On behalf of the Defendants:

9         M. THERESA STEWART, Esq.
          City of Atlanta, Department of Law
10        68 Mitchell Street, Suite 4100
          Atlanta, Georgia 30303
11        404-330-6663
          mtstewart@atlantaga.gov
12
          VALORRI C. JONES, Esq.
13        Senior Assistant City Attorney
          City of Atlanta, Department of Law
14        City Hall, Suite 5000
          55 Trinity Avenue, S.W.
15        Atlanta, Georgia 30303
          404-546-4178
16        vcjones@atlantaga.gov

17

18

19                                  - - -

20

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2

3       EXAMINATIONS                                        PAGE

4    Cross-Examination by Mr. Radford                        4

5    Direct Examination by Ms. Stewart                      75

6    Recross-Examination by Mr. Radford                    102

7

8                              - - -

9
     PLAINTIFF'S
10      EXHIBIT            DESCRIPTION                      PAGE

11   Exhibit 6      Atlanta, GA Code of Ordinances,          29
                    Sec. 98-1 Code Enforcement
12                  Agents

13   Exhibit 7      Atlanta Police Department Policy         30
                    Manual, Standard Operating
14                  Procedure, License and Permits
                    Unit
15
     Exhibit 8      City of Atlanta Arrest Citation         41
16
     Exhibit 9      Defendant City of Atlanta's             41
17                  Responses and Objections to
                    Plaintiff's First Interrogatories
18
     Exhibit 10     Atlanta, GA Code of Ordinances,         43
19                  Sec. 30-55 Violations

20   Exhibit 11     Atlanta, GA Code of Ordinances,         45
                    Sec. 10-3 Compliance with Chapter
21                  Required

22

23        (Original Plaintiff's Exhibits 6 through 11 have

24   been attached to the original transcript.)

25

```
 1                (Reporter disclosure made pursuant to
 2      Article 10.B of the Rules and Regulations of the Board
 3      of Court Reporting of the Judicial Council of
 4      Georgia.)
 5                     MR. RADFORD:  This will be the
 6           deposition of Bryant Burns, taken in the matter
 7           of Devon Brown vs. The City of Atlanta, Georgia,
 8           taken pursuant to notice.
 9                Case currently pending in the U.S. District
10           Court for the Northern District of Georgia.
11                Ma'am, I'd ask you to please swear in the
12           witness.
13                     SERGEANT BRYANT BURNS,
14      having been first duly sworn, was examined and
15      testified as follows:
16                     CROSS-EXAMINATION
17      BY MR. RADFORD:
18           Q.    All right, Mr. Burns.  Could you tell us
19      your full name for the record.
20           A.    Bryant, B-R-Y-A-N-T; Burns, B-U-R-N-S.
21           Q.    Okay.  And are you still with the City of
22      Atlanta?
23           A.    No, I am not.
24           Q.    Okay.  Have you retired recently?
25           A.    Yes.
```

5

1       Q.     Okay.  And you were formerly a officer with

2    the City of Atlanta Police Department; is that right?

3       A.     Correct.

4       Q.     Okay.  And what was your ultimate rank?

5       A.     Sergeant.

6       Q.     Okay.  And when did you retire?

7       A.     In June of last year, so June of 2016.

8       Q.     Okay.  And you are familiar, aren't you,

9    with a entry of a premises that occurred on February

10   8, 2014, that resulted in the arrest of Devon Brown;

11   correct?

12      A.     Yes, I'm familiar with the case.

13      Q.     Okay.  And were you the commanding officer

14   in charge of that entry?

15      A.     There were two supervisors on the scene, and

16   I was one of the two supervisors.

17      Q.     Who was the other one?

18      A.     Sergeant Calvin Walls.

19      Q.     Calvin Walls?

20      A.     Yes.

21      Q.     Between you and Mr. Walls, which one of you,

22   I guess, made the decision to enter into that

23   premises?

24      A.     It was a decision made by myself and

25   Sergeant Walls.

6

1          Q.    Okay.  But you would be able to testify as

2     to the basis for that decision; right?

3          A.    Absolutely.

4          Q.    Okay.  And let me show you what I've marked

5     as Plaintiff's Exhibit 2, and I'll state for the

6     record this appears to be an Employee Statement by you

7     related to that particular incident.

8                If you could review it, and tell me if this

9     is an accurate copy of a statement that you gave.

10         A.    Yes, this is.

11         Q.    Okay.  And this was part of an Internal

12    Affairs investigation?

13         A.    Yes, it was.

14         Q.    Okay.  Now, it looks like this was a sworn

15    statement, so you actually took an oath and swore

16    before a notary with respect to this statement?

17         A.    Yes, I did.

18         Q.    Okay.  All right.  Now, the incident on

19    February 8, 2014, at that time, were you assigned to

20    Licenses and Permits?

21         A.    Yes, I was.

22         Q.    Okay.  But you were not what's often defined

23    in the code as a compliance officer; is that right?

24         A.    Correct.

25         Q.    Okay.  And I guess safe to say your

1      authority exceeded what authority might apply to a

2      compliance officer?

3            A.    So the City of Atlanta, we don't have

4      compliance officers with the police department, so the

5      civilians are called inspectors.

6            Q.    Okay.

7            A.    But we all enforce compliance within Chapter

8      30-10, state laws.

9            Q.    Okay.  And this, the property in question,

10     it was 2031 Metropolitan Parkway; is that right?

11           A.    Yes, it was.

12           Q.    Okay.  And if you can take a look at the

13     second page of your statement, second paragraph here,

14     you're asked a question:  Was a due cause package

15     prepared for 2031 Metropolitan Parkway?

16                 What is a due cause package as contemplated

17     by this statement?

18           A.    A due cause is a package prepared after a

19     action has been taken against the licensed

20     establishment of Chapter 10 of the Alcohol Code.

21                 So once we find that a location that we went

22     to was not in compliance, it's more of an

23     administrative procedure then to bring sanctions

24     against the agent of the alcohol license.

25                 So it's two investigations that kind of run

1    parallel.  One would be the initial criminal charges

2    that we would cite.  After those cases are disposed of

3    in Municipal Court or whatever jurisdiction it has,

4    then we will move forward with the administrative

5    hearing.  So no, there was not a due cause prepared

6    for this.

7         Q.   Okay.  And on the day at 2031 Metropolitan

8    Parkway, did you know that this was a -- I guess prior

9    to the incident in question, did you already know this

10   establishment did not have a business license?

11        A.   I had no information about this

12   establishment until that night.

13        Q.   Okay.  Is there some database or some record

14   of what properties have business licenses or alcohol

15   licenses with the City of Atlanta?

16        A.   Yes.  The business license data is

17   maintained in this building through the Business

18   License Department.  Different locations, the alcohol

19   license or any other subsequent licenses, then we

20   would maintain those records as well.

21        Q.   Okay.  So that's information that you, if

22   there's a premises that you suspect, for example, with

23   not being in compliance with the licensure

24   requirements, one thing you could do as an initial

25   step would be to check whether they have a license;

1   correct?

2       A.    If it was during normal hours, between 8:00

3   and 5:00, and we're in the office, we could check,

4   yes.  Those checks would have to be done in the

5   office.  I mean, we don't carry any computers out in

6   the field to check a various location.

7       Q.    Okay.  Well, for example, if you drove by a

8   location and it, from the sounds emitting from it or

9   something else, you suspected that property was

10  engaged in a business, you could the next day, during

11  normal business hours, you could look in those files

12  and find out whether in fact that premise was licensed

13  to do business; correct?

14      A.    Yes.  I could call the next day, during

15  business hours, call over to the Office of Business

16  Licenses and find out, in fact, if there's a business

17  license for it.  I could then check our database to

18  see if there were an alcohol license or whatever

19  subsequent other licenses they would need.

20      Q.    Okay.  And you could, if you witnessed

21  things that would lead you, you know, create probable

22  cause to believe there was some business going on in

23  there or some alcohol being sold there, and then you

24  check that database and find out that's not in fact a

25  licensed establishment, you could then take out a

1   warrant to conduct a search there; correct?

2        A.   There wouldn't be a need to search because I

3   would know whether or not they had a license.   There

4   wouldn't be a need to search.

5        Q.   Or you could take a warrant to enter into

6   the property; correct?

7        A.   There wouldn't be a need to because, if I'm

8   on the location and probable cause exists to conduct a

9   compliance check, I'm there, so there wouldn't be a

10  need to check the database.

11       Q.   Okay.   And you're talking about probable

12  cause exists before you enter into the premises?

13       A.   Well, in order to do a compliance check, if

14  I were to see a business that I thought was operating

15  illegally, I wouldn't wait until the next day to go

16  and check to see whether or not they had a business

17  license or an alcohol license.

18            Since I can enforce the codes of Chapter 30

19  and 10, I would go in and do a compliance check at

20  that time to see if they had a license.

21       Q.   Okay.

22       A.   Oftentimes, what we find is that some

23  locations are fly-by-night, so they may not open up

24  within the next three or four days.   Our resources are

25  limited.   We have currently in the City --

1          When I left, it was 1,385 establishments
2    that we were responsible for, so we wouldn't have time
3    to take out a warrant and go back and revisit every
4    location, so we address the problem at that time.
5          Q.   Okay.  And that number you just cited, that
6    1,035 number, is that the number of business licenses
7    that have been issued?
8          A.   No, no, no.  Business licenses would be much
9    more than that.  That's currently alcohol license.
10         Q.   Okay.  So 1,035, that was the alcohol
11   licenses that had been issued?
12         A.   No.  That was at about the time when I left.
13   I'm sure there's several open businesses that have
14   came up.
15         Q.   Okay.  And if one has been issued an alcohol
16   license, they're not likely to be a fly-by-night.
17   Would you agree with that?
18         A.   Not necessarily.  We found a lot of agents
19   that conduct business illegal.  Just because you have
20   an alcohol license does not mean that you're
21   completely in compliance.
22         So you may have an alcohol license, and
23   you're serving to minors, you're serving after hours,
24   you're not open on Sundays.
25         Q.   Okay.

1      A.   Just because a location has a license,

2    there's still further investigation that we can do to

3    the licensee as well as to the business itself.

4      Q.   Now, would you agree that if someone has a

5    business license, that they're within the -- or an

6    alcohol license, they're within the licensure scheme,

7    and administrative inspection is permitted with or

8    without probable cause?  Would you agree with that?

9      A.   Would you repeat your question.

10     Q.   An administrative inspection, you know, go

11   in and check for the license, make sure they're

12   complying with the requirements of their license?

13     A.   Correct.

14     Q.   If they have a license, then they get

15   permission to conduct alcohol sales; right?  What the

16   City gets in exchange for that is the right to go in

17   at any time to inspect for compliance?

18     A.   Correct.  And part of inspecting for the

19   compliance, we check the business to make sure that it

20   is licensed or whether it is not licensed, so that is

21   part of the compliance check.

22     Q.   Okay.

23     A.   So our compliance check does extend to

24   licensed businesses.  It extends to unlicensed

25   businesses.  That's how we found a lot of locations

1    that are not properly licensed.

2         Q.   Okay.  And that's an important question.  So

3    it's your view that the City code or the City policies

4    that permit warrantless entries into a property to

5    check for licensure, that that would apply equally to

6    a business that has a license and to a business that

7    doesn't have a license, but that you suspect should

8    have a license?

9         A.   Correct.  So once again, we do not know all

10   the locations off the top of our head that are

11   licensed or not, so that is why it is our job to go in

12   to find out if they are properly licensed.

13        And if they are, we check these licenses to

14   make sure there's no minors inside, all of the things

15   that they have complied with when they -- under the

16   code of 10-47 when they obtained their license.

17        Then, if they're in compliance, then we

18   leave the scene; if they're not, then we conduct our

19   business, issue citations or make physical arrests.

20        Q.   Okay.  If you can look at the same paragraph

21   I was just asking you about that begins:  QUESTION:

22   Was a due cause package prepared?

23        The last sentence in your answer, the

24   sentence, quote:  In this case there was no license

25   for a board to rule upon; therefore, all charges had

1    to be criminal.

2         A.    Correct.

3         Q.    Can you explain to me what that means.

4         A.    Sure.  So once again, the License and Review

5    Board is an administrative sanction against an alcohol

6    license.

7              So for example, if I were the agent of an

8    alcohol license and the Atlanta Police Department

9    License and Permits went in to inspect my business, if

10   I was selling alcohol after hours, I would receive a

11   citation for selling alcohol after hours; right?

12             Once that case is adjudicated in Municipal

13   Court, then we can move forward then with a due cause

14   or show cause package that will inflict some type of

15   penalties upon the agent himself for failure to

16   supervise the location.

17             In order to bring a due cause package,

18   though, the person, the location, has to be properly

19   licensed.  A good example would be if I'm operating a

20   vehicle, I'm driving a vehicle, and the police pull me

21   over, and I don't have a license.

22             There's no license to suspend, so that's the

23   kind of situation.  So there's no reason to bring them

24   to an administrative board.

25        Q.    Okay.  What does it mean, all charges had to

1    be criminal?

2         A.    All the charges that we made at that

3    location that night, on that night of February 8, were

4    all criminal charges, meaning they went into a

5    criminal court.

6         Q.    Okay.

7         A.    So we couldn't make, in other words, any

8    administrative charges because there is no license to

9    impose sanctions against, whether it be a minimum

10   suspension of the license or it be a revocation, so

11   there's no license to revocate or to suspend.

12        Q.    Okay.

13        A.    Oftentimes, that is why a lot of illegal

14   businesses do business the manner in which they do

15   because it's the cost of doing business.  If they were

16   to get caught selling alcohol, they know that it's

17   just a Criminal Code violation.  They'll go to

18   Municipal Court and pay that fine.

19             There's nothing to impose a sanction on

20   because there's not a license to suspend

21   administratively.  So that's oftentimes why a lot of

22   cases, from my training, knowledge, and experience

23   know that a lot of businesses operate kind of in the

24   dark.  It's because of that.

25        Q.    Would you agree -- and I'll look at some

1    specific codes and things.

2         A.    Sure.

3         Q.    But would you agree that the City rules that

4    permit administrative inspections and set forth the

5    policies, those are designed to cover businesses that

6    are already in the licensure scheme?

7         A.    I would disagree with that because we

8    wouldn't know that a business is licensed until we go

9    in to check.

10        Q.    Okay.

11        A.    So what we have to kind of realize is that

12   as a police officer, whether it is alcohol related or

13   not -- set aside License and Permits -- I could walk

14   into any business in the City of Atlanta, whether it's

15   alcohol or not, and ask for their general business

16   license to conduct business.

17             If they have video game machines and they're

18   coin-operated machines, those are permits in which

19   they are required.  So a lot of people kind of get

20   caught up with License and Permits and alcohol, but

21   it's general businesses.

22        Q.    Okay.  I'm going to show you --

23        A.    So if I wanted to go to -- I'm sorry.

24        Q.    No.  Go ahead.

25        A.    I probably would be able to on Metropolitan

1   Parkway.  It has nothing to do with alcohol, but

2   first, performing Licensing and Permits.  I'm a police

3   officer, so I can go in and do any type of inspection

4   or request any type of license.

5        Q.   Let me show you what I've previously marked

6   as Plaintiff's Exhibit 3.  I'll represent to you this

7   is from Chapter 10, which is the Alcohol Sales chapter

8   of the City Ordinances.  This is Section 10-31, which

9   relates to inspection of establishments.

10            Is this the code that would permit a

11  warrantless entry into a premises to inspect for

12  alcohol licensure?

13       A.   Yes, for alcohol license.  Once again, first

14  and foremost, I'm a police officer.  Without this code

15  being here, I can still walk into any business,

16  whether this is a licensed establishment or not, to

17  find out, to check for compliances.

18       Q.   Okay.  Even without a warrant?

19       A.   Yes.

20       Q.   Okay.  Would you agree that this code that

21  we're looking at specifically only applies to, quote,

22  establishments licensed under this chapter?

23       A.   Correct.

24       Q.   Okay.  So you're saying you have some

25  authority beyond what is authorized here to enter into

1    establishments to check it because you believe they

2    should have a business license?

3         A.   Correct.

4         Q.   Okay.  And do you know if that authority is

5    in writing anywhere?

6         A.   That's the oath I took when I became a

7    police officer.

8         Q.   Okay.  That's just your general law

9    enforcement authority?

10        A.   Yes.

11        Q.   Okay.  So let me ask you about -- if you'll

12   turn to the third page of your statement, this big

13   paragraph right here.  If I could direct your

14   attention to a section that begins with the word

15   "Additionally, if the door was closed, etcetera."  Do

16   you see that?

17             MS. STEWART:  No.

18             THE WITNESS:  Okay.

19        Q.   (By Mr. Radford) So I'll read into the

20   record.  You state here:  Additionally, if the door

21   was closed and unlocked, this is a commercial building

22   zoned C1 commercial, which gives the City of Atlanta

23   the authority to come in to check if the building was

24   in compliance and all necessary licenses were

25   presented.

1          Is that a fair statement of what you believe

2    the basis of your authority was to enter into the

3    premises without a warrant?

4          A.    Yes.

5          Q.    Okay.  And is it City policy that any

6    building that is zoned C1 commercial can be entered

7    into without a warrant to check for licensure?

8          A.    Regardless how it's zoned, the police

9    department or the business license department can

10   enter into any business during the hours that it is

11   open and the door is unlooked.

12          If the door is locked, then, of course, that

13   will require a little more, maybe a warrant, just

14   depending upon the circumstances.  However, it doesn't

15   matter how it's zoned, whether it's C1 commercial,

16   what have you.

17          Q.    Okay.

18          A.    We often find that a lot, more often than

19   not, we'll sometimes devote our time to just checking

20   business licenses.  So there may be a building that

21   has multiple suites in it, so we'll go from suite to

22   suite, checking on that business license.

23          As long as they're doing business, we can

24   enter into that business -- and the doors are

25   unlocked.

1    Q.   Well, you don't know they're doing business
2    until you go in; right?
3    A.   Correct.  That's why we call to confirm.
4    Q.   Okay.  And even if something said, you know,
5    there's a sign outside that said, No Trespassing, Do
6    Not Enter, would you still have the authority, under
7    your view of the policy, to go in and check out
8    whether there was in fact something going on there
9    that would require a license?
10   A.   So the signage, No Trespassing, I don't
11   think we apply, would be applicable to a police
12   officer conducting an investigation if a location said
13   it's a private business.
14   Q.   Well, not private business, but just
15   Private, Do Not Enter, No Trespassing, that sort of
16   thing.
17   A.   Okay.  So once again, the No Trespassing is
18   not applicable to a police officer, I don't think, in
19   carrying out an investigation.
20   Q.   Okay.
21   A.   Secondly, private business, I don't know
22   what's deemed as a private business in the City of
23   Atlanta.  So you can say whatever type of business you
24   are, but if you are conducting business at that
25   location, that's why we're entering into that location

1    to check.

2        Q.   Well, what if you are in the C1 commercial
3    but you're not conducting any business?

4        A.   So once again, the zoning does not matter.
5    A business is a business.

6        Q.   Well, my question is:  You don't know if
7    it's a business or not.  You just know there is a
8    building, and you think there might be some business
9    going on there, but you're not sure.

10            Is it your testimony that as an officer you
11   are allowed to enter into that property even if there
12   is a No Trespassing sign, for example, and inspect
13   whether they are in fact conducting business?

14       A.   So I think you just helped me out with the
15   answer.  Correct.  That is our job to go into -- if we
16   go there, and they say, we don't conduct any business,
17   we'll find out what type of business that they are
18   doing, and then, if that meets muster, then we will
19   leave.

20            If we think that there's business going on,
21   then we will cite that business -- or check to see if
22   they had a business license.

23       Q.   Do you think you have any obligation to
24   knock on the door and ask permission to come in?

25       A.   Once again, if the door is unlocked, we can

1    enter because, if the door's unlocked for me, then

2    it's unlocked for any pedestrian or any generally

3    public person to walk in.

4         Q.    That wouldn't apply to a home, would it?

5         A.    That would not apply to a home, so.

6         Q.    So like, for example, even if someone's home

7    is unlocked, that doesn't give you permission to go

8    in; right?

9         A.    Absolutely not.  So unless their home --

10   they're conducting business and their home is maybe

11   zoned for that, we would check with the Business

12   License Office or what have you.  So there are a lot

13   of home-based businesses in Atlanta, thousands.

14              But that is not our normal procedure to go

15   into a home-based business, but in a commercial zone,

16   that's a little different.

17        Q.    Okay.  Well, let me ask you.  If you suspect

18   that someone is conducting business in their home and

19   it's in a commercial zone, would you be allowed, under

20   City policy, to go into that -- and the door's

21   unlocked.

22              Would you be allowed to go in without a

23   warrant to inspect whether they are conducting a

24   business as you suspect?

25        A.    Well, if it was a residence where I know

1    people actually lived there, no.  If it was a

2    dwelling, single-family dwelling, no, I would not.

3        Q.   Okay.  So I understand your testimony to be

4    even if it's not zoned C1 commercial, but you believe

5    there's business being conducted in a building, you

6    can go in without a warrant; right?

7        A.   Correct.

8        Q.   Okay.  So I just want to -- let's narrow it

9    to just C1 commercial.  Okay?

10       A.   Well, I'm not going to narrow it to C1

11   because the zoning does not matter.  So I'll just look

12   at a commercial building.  Whether it's A-1, C1, it

13   does not matter.

14       Q.   Okay.

15       A.   The reason I use that term C1 in that is

16   because, when I pulled the tax records up, that's how

17   it was.

18       Q.   Okay.  But you do say, quote, there's a

19   commercial building, zoned C1 commercial, which gives

20   the City of Atlanta the authority to come in.

21            So it would appear from your statement that

22   its zoning was significant to you in some way.

23       A.   Yes.  Because if it was R, it would be

24   residential.

25       Q.   I understand it was broader than that, but

1    at least C1 commercial zoned premises, you believe you

2    have the authority to go into those premises even

3    without a warrant to inspect for license?

4               MS. STEWART:  Objection, asked and

5         answered.

6         Q.   (By Mr. Radford) You can answer.

7         A.   I've answered it three or four times.  So

8    the zoning does not matter --

9         Q.   Okay.

10        A.   -- as long as it's business or we suspect

11   it's a business.  Again, the reason I say C1 in here

12   is because this Internal Affairs complaint was taken

13   post-February the 8th, so I knew how it was zoned at

14   that time.

15        Q.   Okay.  Well, is this a fair statement:  That

16   nonresidential premises, including but not limited to

17   C1 zoned, you have the authority to enter into without

18   a warrant to inspect for whether they should have a

19   business license?

20        A.   So once again, if we believe that a business

21   is located in a commercial building, is conducting

22   business, we go in and inspect regardless of how it's

23   zoned.  Commercial to me says sort of business.

24        Q.   Okay.  So any nonresidential premises that

25   you suspect may be conducting business, you have the

1    authority to go in without a warrant to inspect if

2    they are in fact conducting business?

3         A.   We go to confirm and spell out what the

4    business is being conducted.

5         Q.   Okay.  And you have the authority to

6    actually enter into the premises?

7              MS. STEWART:  Objection, asked and

8         answered.

9         Q.   (By Mr. Radford) Is that right?

10        A.   I keep answering the same question.

11        Q.   You have the authority to actually go into

12   the premises?

13        A.   Yes.

14        Q.   Okay.  I'll tell you to look at what I've

15   marked as Plaintiff's Exhibit 4.  I'll represent to

16   you this is a section of the Atlanta code that defines

17   C1 zoning.  Are you familiar with what C1 zoning

18   includes?

19        A.   No, I'm not.

20        Q.   Okay.  All right.  So as I asked you to look

21   at Exhibit 4, can you confirm or deny that this is an

22   accurate statement of what C1 zoning included during

23   the relevant time frame?

24             MS. STEWART:  Objection.  The witness

25        has already stated that he's not familiar with

1          this code section or the specifics and every

2          section of the C1 zoning as represented in

3          Plaintiff's Exhibit 4.

4                    MR. RADFORD:   Okay.  So noted for the

5          record.

6          Q.    (By Mr. Radford) The question is:  Can you

7   confirm or deny that this is an accurate statement of

8   what --

9          A.    I cannot.  This is something I'm not

10  familiar with.

11         Q.    Okay.  Fair enough.  I'll ask you to take a

12  look at what's marked as Plaintiff's Exhibit 5, and

13  I'll represent to you that this is from the General

14  Business License section of the Atlanta City Codes,

15  and this governs compliance investigators.  Are you

16  familiar with this code section?

17         A.    I've read it before.

18         Q.    Okay.  And is this the authority pursuant to

19  which Mr. Brown's property was entered on February 8?

20         A.    No, it was not.  So no one on the location

21  was a compliance investigator.  Everybody was POST

22  certified police officers that were involved in the

23  arrest.

24                The section is for civilians who go about

25  the business -- sometimes they're in power from the

1    Business License Office, and they get their

2    enforcement status, yes, from 98-1 to enforce

3    administrative codes and write citations, but they

4    cannot effect an arrest.

5         So this is not saying that police officers

6    can't effect an arrest under this code.  If you are

7    not POST certified and sworn, you cannot make an

8    arrest.

9         So for an example, if there was a situation

10   where a member of License and Permits compliance

11   investigator or inspector went out to a location, and

12   let's say the agent failed -- wouldn't give up the

13   business license or wouldn't qualify, they would call

14   a sworn officer to come out.

15        No different from Fulton County Animal

16   Control coming out for a dog not being on a leash.

17   The Animal Control officer couldn't make an arrest, so

18   they would call a sworn officer, which we were all

19   sworn officers on that particular day.

20        Q.   Okay.  So fair statement that Section 30-59

21   limits the authority of compliance investigators, but

22   does not define or limit the authority of sworn police

23   officers?

24        A.   Yeah.  This is more just basically saying

25   that the compliance officers can issue, write the

1  citations and not make a physical arrest.

2      Q.   Okay.  Are you aware of any code or statute

3  or policy that would place a limit on the discretion

4  of a sworn police officer with respect to a compliance

5  investigation?

6      A.   Well, police officers generally have

7  discretion to arrest someone or issue a copy of

8  charges or a citation, so that discretion is kind of

9  relied, given the circumstances, amongst the

10  individual officer.

11      Q.   Okay.  I don't mean the officer's discretion

12  to arrest.  So this code section we were looking at

13  here would, you know, define the scope of a compliance

14  investigator's, a civilian, their ability to go into a

15  premises and inspect for licensure.

16           But my question is:  Is there a similar code

17  that would place limits upon a sworn police officer's

18  ability to go in and do a compliance investigation?

19      A.   No.  I mean, we're POST certified police

20  officers, so we can conduct investigations, run

21  criminal histories, a plethora of things that maybe

22  the average -- that a civilian inspector could not do.

23      Q.   Okay.  So just your general law enforcement

24  authority?

25      A.   Yes.

1       Q.    Okay.  I'm going to --

2             (Plaintiff's Exhibit 6 was marked for

3       identification.)

4       Q.    (By Mr. Radford) I'm going to show you

5   Plaintiff's Exhibit 6, which appears to be Section

6   98-1 of the Atlanta codes, and it defines the

7   authority of a code enforcement agent.

8             Is that a fair characterization of what this

9   document is?

10      A.    I haven't read it, but if you say so.

11      Q.    Well, is this something you're familiar

12  with, Section 98-1, the part of the code that defines

13  what a code enforcement agent is?

14            MS. STEWART:  If you're not familiar,

15      just --

16            THE WITNESS:  I'm not familiar with

17      this.

18      Q.    (By Mr. Radford) Okay.  Would you agree in

19  general that Atlanta law strictly defines the

20  authority of a code enforcement agent and limits that

21  authority?

22      A.    To some extent, yes.

23      Q.    For example, they don't have the power to

24  arrest?

25      A.    Correct.

1      Q.    But they do have the power to do a

2   warrantless entry into a licensed business to check

3   for compliance; correct?

4      A.    They can go out and check for compliance of

5   businesses.

6      Q.    Okay.  Are you aware of any -- with respect

7   to the conducting administrative inspections, are you

8   aware of any similar law or provision that would limit

9   or define the scope of a law enforcement officer's

10  authority to enter into a premises for an

11  administrative inspection?

12     A.    So once again, generally, as a police

13  officer, we can conduct any investigations that we

14  deem to confirm or dispel our belief about certain

15  crimes or whether the business in compliance or not.

16          So generally, and then specifically in

17  Atlanta Police Department Standard Operating

18  Procedures, it defines how things should be conducted,

19  especially within the License and Permits.  There's a

20  SOP set up just for License and Permits.

21     Q.    Okay.  That's actually what I have next.

22          (Plaintiff's Exhibit 7 was marked for

23          identification.)

24     Q.    (By Mr. Radford) I'll show you what I'm

25  marking as Plaintiff's Exhibit 7.  If you could, take

1   a look at this, and tell me, is this the City of

2   Atlanta Standard Operating Procedure for the License

3   and Permits Unit?

4        A.   Yes, it is.

5        Q.   Okay.  And was this the one that was

6   effective as of February 8, 2014?

7        A.   Yes.

8        Q.   Okay.  And is this the document that would

9   define the scope of officers' authority to conduct

10  administrative searches?

11       A.   Yes, this is the Administrative Standard

12  Operating Procedure for how business should be

13  conducted, the License and Permits Unit.

14       Q.   Okay.  All right.  If you could turn to page

15  4 of the document, and specifically to Section 4.5.1.

16  There's a group of paragraphs that relate to spot

17  checks and 4.5.1 states:  Inspectors, officers, and

18  inspectors -- it says it twice -- shall conduct spot

19  checks of all locations with licenses or permits

20  issued by the City of Atlanta.  Is that right?

21       A.   Yes.

22       Q.   Okay.  And the License and Permits Unit

23  knows what locations have licenses or permits in order

24  to do those spot checks; correct?

25       A.   No.

1       Q.    No?

2       A.    No.   That's the purpose for the spot checks.

3       Q.    Well, the plain language of this paragraph

4    refers to spot checks of locations with licenses or

5    permits.  Would you agree with that?

6       A.    Yes.  But if you look at 4.5, it says:

7    Enforce state laws and City ordinances.

8       Q.    Okay.

9       A.    So enforcing state laws and City ordinances

10   would also mean to make sure that a business is in

11   compliance whether they have a license or not.  We

12   wouldn't know that they had a licence to do 4.5.1 if

13   it were not for 4.5.

14      Q.    Okay.  Well, there is a database or a record

15   of what establishments are licensed; correct?

16      A.    Licensed how?  What do you mean?

17      Q.    Well, both general business licenses and

18   alcohol licenses.

19      A.    Sure.  So the Atlanta Police Department, we

20   don't house the data for a general business license.

21   We house data for police power permits.

22      Q.    What does that mean, police power permits?

23      A.    Yes.  The police -- the permits that we have

24   the police power to issue.  So if someone were to walk

25   up to our office and say, hey, I want to become a

1   vendor in the City of Atlanta, that is a police power

2   permit.  They can get that the same day.  We issue

3   those.

4           There are some permits that are fore-issued,

5   that they would have to go through the Mayor's Office

6   for approval.

7       Q.   Well, the City, the police department does

8   have access to the information that would tell them

9   who has an alcohol license and who has a general

10  business license; correct?

11      A.   Once again, the general business license

12  information is housed here in City Hall.  We house

13  information for police power permits and alcohol

14  licenses.

15      Q.   But without respect to who houses it, you

16  have access to it; right?

17      A.   I do not have access to general business

18  license.

19      Q.   Those are public records, aren't they?

20      A.   Well, they're public record for anyone.  I

21  guess they could get it, but I don't have specific

22  access to go to my computer and pull that up.  I have

23  not had any training for that.

24          So I'm primarily concerned with the police

25  power permits, and if there were a question about a

1  business, if we were doing it normal business hours, I

2  could call over to this building and find out whether

3  a business is in compliance or not.

4      Q.   Okay.  Well, there's nothing that would

5  restrict you from access to records regarding who has

6  a business license and who has an alcohol license?

7            MS. STEWART:  Object, misstates the

8       testimony.

9            MR. RADFORD:  No.  I'm asking is that

10      true.

11            THE WITNESS:  Well, so I wouldn't be

12      comfortable going into a database, reading about

13      a general business license because that's not

14      what I do day to day.

15      So I would be comfortable going in and

16      reading about a police power permit because that

17      is what I'm more familiar with, so if I had a

18      question about a general business license, I

19      would call that office.

20      Q.   (By Mr. Radford) So Section 4.5 gives the

21  License and Permits Unit the authority to enforce

22  state laws and City ordinances; correct?

23      A.   Yes.

24      Q.   General law enforcement authority; correct?

25      A.   Yes.

1        Q.   But 4.5.1 permits, quote, unquote, spot
2    checks specifically to, quote, all locations with
3    licenses or permits issued by the City of Atlanta;
4    correct?
5        A.   Correct.
6        Q.   Okay.  And there's not a written policy that
7    would permit spot checks, quote, unquote, for
8    locations that do not have licenses or permits;
9    correct?
10              MS. STEWART:  Objection, misstates the
11          testimony.
12              MR. RADFORD:  I'm not --
13              MS. STEWART:  You can answer.
14              MR. RADFORD:  I'm not stating his
15          testimony.  I'm asking a question.
16              THE WITNESS:  So repeat the question
17          again, please.
18        Q.   (By Mr. Radford) So 4.5.1, by its plain
19    language, permits, quote, spot checks for locations,
20    quote, with licenses or permits?
21              There's not a section like that that
22    permits, quote, spot checks for locations without
23    licenses or permits?
24        A.   I would say 4.5 because --
25        Q.   Just the general law enforcement authority?

1        A.   Well, not generally.   The specific here is
2   in 4.5, so to enforce state laws and City ordinance.
3   If someone were to call me as a police officer and say
4   that a location at 55 Trinity was operating without a
5   business license, as a police officer, whether I'm in
6   License and Permits or not, I could go and check that
7   location.
8             In 4.5.1., it's specific to the License and
9   Permits Unit.   So oftentimes, a general police
10  officer, a beat officer who's patrolling, would not
11  have the knowledge, training, and experience as a
12  License and Permit officer.
13            So I would not recommend to a general patrol
14  officer to go and inspect a business for compliance,
15  especially administratively.   We're sort of the -- we
16  know it like the back of our hands whether --
17            There are some things that I wouldn't know
18  that a beat officer would know or I may have forgotten
19  because it's been so long.
20       Q.   Okay.
21       A.   So we discourage patrol officers from going
22  and check the Alcohol Code because there are so many
23  factors that can be involved.
24       Q.   Okay.   But if someone reports there's an
25  unlicensed business going on at such and such

1    location, then your general law enforcement duties

2    would kick in; right?

3         A.   Yes.

4         Q.   Okay.  And you could -- and if someone

5    reported firsthand that this was going on, you could

6    actually go and apply for a warrant based on that

7    information to enter the property; correct?

8         A.   No.  I wouldn't need a warrant.

9         Q.   But could you get a warrant?

10        A.   Can I get -- there would be not a need for a

11   warrant.

12        Q.   That's not the question.  Could you get a

13   warrant?

14        A.   I would not get a warrant.

15        Q.   Could you?

16        A.   You can do anything.

17        Q.   So there's two different questions.  One is:

18   Do you have to get a warrant?

19        A.   I do not have to get a warrant.

20        Q.   Okay.  I understand the answer to that

21   question.  The other question is:  Is there anything

22   that would prevent you from getting a warrant?

23        A.   No.

24        Q.   Okay.  So 4.5.1 and then .2 and then .3

25   talks about citations, revocation proceedings.  Those

1    apply more to civilian -- what did we call them? --

2    code enforcement agents as opposed to sworn law

3    enforcement officers?

4         A.    No.   This is both.

5         Q.    Okay.

6         A.    It states:   Investigators, officers, and

7    inspectors.

8         Q.    Okay.

9         A.    So this is the umbrella for everyone that's

10    assigned to License and Permits.

11        Q.    Okay.   4.6.1 states:   Inspectors, officers

12    and -- investigators, officers, and inspectors shall

13    prepare a due cause package on all locations found to

14    be in noncompliance with City ordinance and/or state

15    law.

16             But again, there wasn't a due cause package

17    created in this case; right?

18        A.    There was not a need to.   There was no agent

19    to bring forth to the administrative board.   So in

20    this case, if Mr. Brown would have been summoned to

21    come to an administrative hearing and he not showed

22    up, there is no sanctions that can be sanctioned

23    against him because he's not an agent.

24             He's been held on alcohol license or police

25    power permit, so we can't revoke something he didn't

1   have.  Really can't bring any type of administrative

2   action to something that's not held by him.  So again,

3   that's why it was only a criminal -- criminal charges.

4          Q.   And when you say "agent," that's a term that

5   has specific meaning in the licensure scheme; right?

6          A.   Yeah.  Agent or licensee, kind of used

7   interchangeably.

8          Q.   So that's someone whose name is on the

9   license.  It's basically saying, I'm responsible for

10  whatever happens?

11         A.   Correct.

12         Q.   Okay.  And you're saying if there's not an

13  agent, quote, unquote, this section is basically

14  meaningless because there's no one to give the due

15  cause package to?

16         A.   Well, I wouldn't say the entire section, but

17  I would say specifically 4.6.1.

18         Q.   Okay.  Any reference to a due cause letter?

19  Like a due cause letter only issues to an agent;

20  correct?

21         A.   Correct.

22         Q.   Okay.  And there's not an agent that --

23  provisions for how a due cause letter work, don't go

24  into effect?

25         A.   No.  We can do it, but oftentimes, there's

1   no one who ever shows up to the board.

2        Q.   Okay.  All right.  The Standard Operating

3   Procedure that we're looking at, will you agree that

4   this is the document that defines the scope of an

5   officer's ability to enter into a premises without a

6   warrant to check for licensure?

7        A.   No.

8        Q.   Okay.

9        A.   This SOP is strictly for members of the

10  License and Permits who are assigned to tell how we do

11  conduct business in this specific unit.  So there are

12  other SOPs that kind of give a more broad view, a

13  general view of how police work should be conducted.

14       Q.   Okay.  So is there any other document that

15  specifically defines the scope of a law enforcement

16  officer's authority to do a warrantless entry into a

17  premises to investigate whether they are conducting a

18  business that requires a license?

19       A.   I think that would just be general policing,

20  just our powers as police officers --

21       Q.   Okay.

22       A.   -- to do warrantless entry or warrantless

23  arrest.

24       Q.   Okay.  There's no law, policy, or rule that

25  defines that scope any more narrow than general --

1      A.    I mean, Title 16 will give you authority

2   under state law.

3      Q.    Okay.

4            (Plaintiff's Exhibit 8 was marked for

5      identification.)

6      Q.    (By Mr. Radford) Take a look at what I'm

7   marking as Exhibit 8.  Tell me if you recognize that.

8      A.    Yes.

9      Q.    Okay.  This is the arrest citation that was

10  issued to Mr. Brown on February 8, 2014?

11     A.    Yes, it was.

12     Q.    And is that your signature at the bottom?

13     A.    Yes, it is.

14     Q.    Is this a true and accurate copy of your

15  citation you issued to him?

16     A.    Yes, it is.

17     Q.    As this lawsuit has proceeded, have you had

18  any involvement in preparing responses to something

19  called interrogatories, which are questions that the

20  Plaintiff's lawyer has proposed to the Defendants in

21  the case to gather information?

22     A.    No.

23           (Plaintiff's Exhibit 9 was marked for

24      identification.)

25     Q.    (By Mr. Radford) Okay.  Well, let me show

1    you what I've marked as Plaintiff's Exhibit 9, which

2    I'll represent is responses to some interrogatories

3    that we served upon the City -- well, excerpts from

4    those interrogatory responses.  If you'll turn to the

5    second page in the --

6                    MS. STEWART:  I'm sorry.  You have

7         excerpts here or --

8                    MR. RADFORD:  Yeah.  These are

9         excerpts, yeah.

10                    MS. STEWART:  I'm going to have to

11         object.  I would need to look at the complete

12         section because, in our interviews with him to

13         prepare answers for the interrogatories, we are

14         going through the entire question that you posed.

15                    MR. RADFORD:  I just want to ask about

16         one question.

17    Q.    (By Mr. Radford) If you'll look at paragraph

18    12, which is on the second page of the document, we

19    asked the question:  Identify the specific City policy

20    pursuant to which the Plaintiff was arrested.

21                    And then in bold is the City's response.

22                    So I just want to ask if you can confirm, on

23    the next page, the statement:  Plaintiff was arrested

24    for violation of Sections 30-55 and 10-3 of the City

25    of Atlanta Code of Ordinances.

 1              Can you confirm that?

 2        A.    That those were the charges?

 3        Q.    Yes.  Or that those were why he was

 4   arrested?

 5        A.    Yes.

 6              MS. STEWART:  By the way, don't

 7        hesitate to ask for whatever document you need if

 8        you need to.

 9              THE WITNESS:  Sure.

10              MS. STEWART:  I'm sorry.  It's just

11        during interviews, we have everything before us,

12        and you're asking questions about certain code

13        sections, and it's not before him.

14              (Plaintiff's Exhibit 10 was marked for

15        identification.)

16        Q    (By Mr. Radford) I'll show you what I'm

17   marking as Plaintiff's Exhibit 10, which I'll

18   represent to you is a copy of Code Section 30-55.  Are

19   you familiar with this code section?

20        A.    Yes, I am.

21        Q.    Okay.  Does this appear to be a true and

22   accurate copy of the code section as it was in effect

23   as of February 8, 2014?

24        A.    Yes.

25        Q.    And this is the code section applicable to

1   violating the business license provisions; correct?

2       A.    Correct.

3       Q.    Okay.  If you look at subsection (a), it

4   states:  Any person violating any of the provisions of

5   this article may be cited and required to appear

6   before the court with jurisdiction of the violations

7   of City law.

8             And then subsection (b) states:  Any person

9   required to pay a business tax or to register with the

10  Business Tax Division and who fails to do so in this

11  manner, in the manner provided by this article, shall

12  also be liable to have the tax or any fees, penalties,

13  and interest collected, etcetera, etcetera.

14            And then also take a look, please, at

15  subsection (d), which states:  The sole purpose for

16  the imposition of all fines, penalties and interest

17  provided by this article is to support and enhance the

18  collection of the taxes levied by this article.

19            Based on these provisions and the section as

20  a whole, would you agree that there is no authority

21  stated here to make an arrest for a violation of 30,

22  Section 55?

23      A.    So once again, I am a police officer.  I can

24  enforce Titles 10, 30, 40 -- Title 40, Title 16 of

25  state law.  So this was a violation, and this was a

1    violation to a company, an additional charge that was

2    compliance with the Alcohol Code under 10-3, which

3    gives the power to make an arrest or to cite.

4        Q.    Okay.  You would agree with me that 30-55

5    does not permit arrest?

6        A.    I do believe, if you look furthermore,

7    30-65, it does, which is a business -- I do believe.

8    I don't have my Code of Ordinance in front of me.

9        Q.    Okay.  So we'll look at 30-65 -- I don't

10   have that with me today.

11       A.    Okay.

12       Q.    But it's something we can take a look at.

13       A.    Sure.

14            (Plaintiff's Exhibit 11 was marked for

15            identification.)

16       Q.    (By Mr. Radford) If I can show you

17   Plaintiff's Exhibit 11, which is a copy of Section

18   10-3.  Can you confirm whether this is a true and

19   accurate copy of Ordinance Section 10-3 that was in

20   effect on February 8, 2014?

21       A.    Yes.

22       Q.    And would you agree that there is no

23   authority set forth in this section for an arrest?

24       A.    I think the word in 10-3(a) says "unlawful."

25       Q.    Okay.  So you think the reference to

1  unlawful by itself permits arrest?

2       A.   So this is how we get our charging code.   So

3  if someone was not in compliance with the chapter,

4  under Chapter 10, this would be the applicable charge,

5  10-3.   And again, it says the word "shall be unlawful

6  for any person to sell or offer."

7            Once again, I'm empowered as a police

8  officer to enforce City ordinances, state and local

9  laws.

10      Q.   Okay.   So anything that's unlawful, it's

11 your belief you can arrest for it?

12      A.   So the way it works, there are some City

13 ordinances that I'm not as familiar with that are not

14 arrestable and may just be a violation.

15           So the kind of checks and balance the City

16 of Atlanta has in place, if I were to take someone to

17 the jail -- right? -- and charge them with 10-3, if it

18 were not a criminal charge, the jail wouldn't even

19 take that body.   The jail would not be able to set a

20 bond in that situation.

21           So from my training and experience, I've

22 arrested several people under 10-3, and they were able

23 to get a bond.   So if it were not a criminal offense,

24 no bond could be issued, and the jail would bring it

25 to our attention.

1       Q.    Is there a distinction in your mind between

2    if something is described as being unlawful versus

3    being described as a violation in terms of what your

4    arrest authority is?

5       A.    Once again, if it were not a proper charge,

6    the jail would not take those individuals.

7       Q.    Well, they would or they wouldn't; right?

8       A.    But then I would know that that was a

9    problem.

10      Q.    Okay.  But is there a distinction as far as

11   arrest powers go?  In your mind, is there a

12   distinction between something being called unlawful

13   versus it being called a violation?

14            MS. STEWART:  Objection, asked and

15       answered.

16      Q.    (By Mr. Radford) You can answer to the best

17   of your ability.

18      A.    Okay.  Once again, if something was unlawful

19   and it was written in a criminal code, then I could

20   make an arrest or issue a citation.

21      Q.    Well, what if something is just described as

22   a violation?

23      A.    It will just depend upon the specific charge

24   of what I'm reading to interpret it as.  But once

25   again, an additional checks and balances to make sure

1   it's further.  It's that all criminal citations have

2   to be first proofread by a supervisor to make sure

3   that it is a good charge and document.  So that's the

4   kind of first tier of the check.

5          The next tier would be, once you got down to

6   the jail, if it were not a violation of a criminal

7   code or quasi-criminal, then the jail would not take

8   that body.

9       Q.   Okay.  But you would have made the arrest

10  already?

11      A.   Yes.

12      Q.   Okay.

13      A.   But as I stated previously, 10-3, I know is

14  a criminal charge, and I know exactly what the bond

15  would be.

16      Q.   Well, do you agree there's a distinction

17  between 10-3(a) and (b), 10-3(a) referring to:

18  Selling or offering for sale at wholesale or retail

19  alcoholic beverages;

20         And then Section (b) referring to:

21  Undertaking any type of operation or activity for

22  which an occupation tax certificate issued pursuant to

23  Chapter 30, to provide alcoholic beverages, etcetera,

24  etcetera, without regard to whether they are provided

25  free of charge?

1          A.   Right.  So there wouldn't be -- I mean, both

2    of them are chargeable offenses, and I have used both.

3          Q.   Okay.  You didn't witness anyone selling

4    alcohol at Mr. Brown's premises, did you?

5          A.   No, I did not.

6          Q.   Or offering for sale any alcohol, did you?

7          A.   Well, it was there on the counter behind the

8    bar, so to me, that was offered for sale.

9          Q.   Well, if you've got some beer behind the

10   bar, that doesn't mean you're selling it; right?

11         A.   Well --

12         Q.   Did you see a price list or anything like

13   that?

14         A.   Well, in order, answer to your first

15   question, I'm not sure if you're familiar with 10-47.

16   So 10-47, the Alcohol Code, states that even to store

17   alcohol on a commercial property, you would have to

18   have a license.

19              So whether the patrons are consuming it or

20   it's being stored there, you need an alcohol license

21   in the City of Atlanta, so that's what 10-3 speaks to,

22   and then 10-47 kind of clarifies it.

23         Q.   Well, what if it's just for you and your

24   friends?

25         A.   It's being stored in a commercial building.

1   It's behind the counter, and it's not in their

2   possession.  To me, that's storing alcohol.

3       Q.   So like at my law office right now, I've got

4   a fridge with some beer in there.  Do I need an

5   alcohol license to do that?

6       A.   On an individual basis.  I would have to

7   come to your law office.  I'm not sure.

8       Q.   I mean, but that would be -- you're saying

9   someone has to comply with the alcohol licensure

10  chapter even if the alcohol is stored on their

11  premises just for them and their friends to drink?

12      A.   So once again, it's a totality of

13  circumstances.  On that particular night, I went into

14  a location where people were consuming alcohol in a

15  commercial building, partying, dancing, and there was

16  alcohol behind a makeshift bar.  To me that is being

17  offered for sale.

18           Regardless of whether it was being offered

19  for sale or not, at least it was being stored or

20  housed on the property there.

21      Q.   Did you go back behind the bar and look and

22  that's how you saw it back there?

23      A.   It was in plain view behind the bar.  You

24  didn't even have to go behind the bar.

25      Q.   I'll show you what was previously marked as

 1    Plaintiff's Exhibit 12, which is the Section 10-1,
 2    which is the Definitions section in the alcohol
 3    licensure chapter.
 4         A.   Sure.
 5         Q.   If you could turn to page 7 of the document,
 6    where private club is defined.  You would agree with
 7    me that this definition of private club is
 8    specifically designed for the context of the alcohol
 9    chapter; correct?
10         A.   It's defined, yes.
11         Q.   Okay.  There may be other provisions that
12    apply to clubs, for example, that don't sell alcohol
13    or provide alcohol.  This definition of private club
14    is not meant for anybody who says they're a club.
15    It's meant for somebody who has a club that is meant
16    to provide alcohol?
17         A.   No.  I disagree with that.  So once again,
18    private club being defined here with or without
19    alcohol is clearly being defined.  So whether they
20    have alcohol or not, this comes under our power,
21    police power, to issue a private club permit, License
22    and Permits Unit.
23              Whether or not you have alcohol or not at
24    this location, if you said, hey, I want to open up a
25    private club and we want to play Bingo at night, then

1    you would need a private club license.

2         Q.    As defined by the alcohol chapter?

3         A.    Well, this, private club, is just defining a

4    private club, period.

5         Q.    Okay.  But wouldn't you agree that it's part

6    of the alcohol chapter; right?

7         A.    This happens to fall within the alcohol

8    chapter, yes.

9         Q.    Okay.  But your interpretation is it applies

10   to like if a bunch of elderly folks wanted to have a

11   Bingo Club, it would apply to that too?

12        A.    Yeah.  Hotel is also defined in the Alcohol

13   Code.

14        Q.    Okay.  All right.

15        A.    Sidewalk cafe is defined in the Alcohol

16   Code; restaurant is defined in the Alcohol Code;

17   private residence is also.

18        Q.    Okay.  Well, and the definition we're

19   looking at here refers to, you know, requires that you

20   have at least 250 members.  So is it your

21   understanding that you're not allowed to have a club

22   unless it has 250 members?

23        A.    That one calls -- I can only read the code,

24   and that's what I enforced that night.  So I can't go

25   back and say how many people should be there and

1    should not.  I can only go by what's in black and

2    white in the code, and that's what I enforce.

3         Q.   Okay.  If you found out someone was

4    operating something they called a club, but they

5    didn't have 250 members --

6                   MS. STEWART:  Objection, speculative.

7              You can answer.

8                   MR. RADFORD:  Noted for the record.

9         Q.   (By Mr. Radford) And they don't have 250

10   members, but they could be cited for violating the

11   Alcohol Code?

12                  MS. STEWART:  Objection, speculative.

13             You can answer.

14                  THE WITNESS:  I don't know.  So here's

15             the thing:  With the private club, you're saying

16             "club," so here the word "club" by itself is not

17             defined.  So I'm looking at private club, so

18             that's what I go by.

19        Q.   (By Mr. Radford) Okay.  I'll say I have a

20   private club, again, elderly folks who get together to

21   play Bingo, and they've got 20 members, and they're in

22   a commercial space to play Bingo out of, them and

23   their friends.

24                  MS. STEWART:  Objection, speculative.

25                  MR. RADFORD:  I haven't finished the

1        question yet.

2        Q.    (By Mr. Radford) Under your reading of the

3   code, would they be in violation of the alcohol

4   chapter because they don't have 250 members?

5                    MS. STEWART:   Objection, speculative.

6                    MR. RADFORD:   Noted.

7                    THE WITNESS:   I can't answer that.

8        Q.    (By Mr. Radford) I can look back at

9   Plaintiff's Exhibit 2, which is your statement.

10       A.    I have it here.

11       Q.    Take a look at that.  The question that

12  begins "was the door to the establishment," etcetera,

13  do you see that?

14       A.    Uh-huh (affirmative).

15       Q.    Okay.  Your answer, you say, quote:  No.

16  The door was open.  Actually, there was a black male

17  standing, holding the door open while he was on the

18  telephone.  Is that right?

19       A.    Correct.

20       Q.    Okay.  Why was that significant to you that

21  the man was holding the door open?

22       A.    That was the question that the Internal

23  Affairs investigator asked me, and that was my

24  recollection of -- that was my statement.

25       Q.    And so your statement was that someone --

1    when the man held the door open, did you interpret

2    that as him consenting to you coming in?

3         A.    Well, whether the male was not there or not,

4    then we pulled the door, and the door was open.  We

5    were going in to conduct an investigation.

6         Q.    Okay.  So it's not significant to you

7    whether someone held the door open for you or not?

8         A.    No.  This was a commercial business in a

9    commercial zone.  We were going in to conduct a

10   compliance check.

11        Q.    So you entered the premises.  So no one who

12   entered the premises on behalf of the City of Atlanta

13   Police Department had a warrant; is that correct?

14        A.    Correct.

15        Q.    Okay.  And everyone who entered was there

16   pursuant to their duties as a law enforcement officer;

17   correct?

18        A.    But there were some people that were

19   civilians on the location.

20        Q.    But they were there under color of law as

21   officers of the City of Atlanta; correct?

22        A.    Not police officers.

23        Q.    Agents or -- not police officers, but

24   officers in the sense that they were there pursuant to

25   their law enforcement authority; correct?

1          A.     They were there to conduct their, I guess,

2    area of the compliance check, yes.

3          Q.     So that was you.   Calvin Walls also entered

4    the premises; is that right?

5          A.     Yes.

6          Q.     Alfred Watkins entered the premises; right?

7          A.     No, I don't think he did.

8          Q.     Who is Alfred Watkins?

9          A.     A police officer.

10         Q.     So you don't think he entered the premises.

11   Gary Smith, did he enter the premises?

12         A.     Yes.

13         Q.     Richard Dillon, did he enter the premises?

14         A.     Yes.

15         Q.     Robbie Scandrick, did he enter the premises?

16         A.     Yes.

17         Q.     Gordon Cabanaw, did he enter the premises?

18         A.     Yes.

19         Q.     Richie Newell, did he enter the premises?

20         A.     Yes.

21         Q.     Stanley Reynolds, did he enter the premises?

22         A.     Yes.

23         Q.     Did any of those gentlemen have a warrant,

24   ladies or gentlemen?

25         A.     There was no warrant.

1     Q.   Okay.  Who actually effected the arrest of

2  Mr. Brown?

3     A.   I think I may have.  I think I did.

4     Q.   Did you place handcuffs on him?

5     A.   Yes.

6     Q.   Was anyone else involved in the decision to

7  make the arrest?

8     A.   No.

9     Q.   Once you entered the premises, was there any

10  kind of search done?

11     A.   No.  No search.

12     Q.   Did any of your officers go throughout the

13  premises to see what they could see?

14     A.   Probably a better question for them.

15     Q.   Okay.  Did you witness anyone moving

16  throughout the premises to look around, to inspect for

17  evidence of crimes?

18     A.   At that point, I was more so focused on

19  finding the person in charge of the business.  What I

20  can say is that I did not witness any officers or

21  people on the scene looking into any locked drawers,

22  personal compartments, anything.

23       If they went anywhere, it was in the common

24  area where the patrons or other people could have

25  gone.  The building -- I'm sorry.  The room itself is

1    not huge at all.

2         Q.    Okay.  Now, you said you saw some alcohol

3    behind the bar area.  You didn't see any signs or

4    anything indicating that anything was for sale;

5    correct?

6         A.    There were a price list for food items on

7    the wall in the back near the little side room off, so

8    there was a menu there.

9         Q.    Did you take any photographs of it?

10        A.    No, I did not.

11        Q.    Okay.  Did you seize any evidence?

12        A.    No.

13        Q.    Did you actually see any business being

14   conducted, any money changing hands?

15        A.    So once we entered the property -- no, I did

16   not see that.  But normally what happens in those type

17   business, persons knowing that they don't have a

18   license will blend in with the crowd.

19             This was not like it was a business where

20   employees could be identified by wearing the same

21   color shirts or name tags or anything like that.  So

22   we wouldn't know who would have been the bartender,

23   who would have been working behind the bar.

24        Q.    Okay.  Did you see any, like a cash

25   register?

1      A.   I would have to refresh my police report.  I

2  don't recall whether I saw a cash register or not.

3      Q.   Is that something you would have noted in

4  your report if you had seen it?

5      A.   Maybe.

6      Q.   Okay.  Why wouldn't you have collected any

7  evidence, you know, as to the question of whether

8  there was a business being conducted there?

9      A.   Well, there was nothing to collect, to be

10 honest.  The items that we asked for were not

11 presented.  That was an alcohol license, a general

12 business license, a coin-operated machine license for

13 the billiard table.  So there was nothing to collect.

14     Q.   Okay.  But if they're saying no business is

15 being conducted, it seems like you would want -- you

16 know, this is not a business, for example.  Wouldn't

17 you want to gather evidence whether in fact this was a

18 business?

19          MS. STEWART:  Object, assumes facts not

20      in evidence.

21          MR. RADFORD:  You're right.  It's not

22      in evidence.

23          MS. STEWART:  No.  You assumed that

24      it's not a business.  That was part of your

25      question, so I'm making the objection to the form

1          of the question.

2                    MR. RADFORD:   Okay.   All right.   I'll

3          ask it in a different way.

4          Q.   (By Mr. Radford) Did you collect any

5    evidence that would be dispositive of the question of

6    whether this was a business or not?

7          A.   Well, there was -- no one at the location

8    told me that a business was not occurring, but from

9    looking at a menu with a price list and looking at a

10   bar that was stocked, as a police officer, you could

11   assume that business was being conducted there.

12                Why else would they have a price list of

13   items to be sold or displayed?

14        Q.   Other than the price list, which I

15   understand you didn't gather any evidence of that

16   price list, did you?

17        A.   I don't recall.   That's what I'm saying.

18        Q.   Okay.   Other than the price list and the

19   fact that there was alcohol behind the bar, are you

20   aware of any evidence that there was business being

21   conducted there?

22        A.   Yes.   In speaking to Mr. Brown at the

23   location, he said this was his place of business and

24   that he was the owner of this business.

25        Q.   Anything beyond that?

```
 1        A.    And the price list.

 2        Q.    Right.

 3        A.    So that's it.

 4        Q.    Do you recall that when you came into the

 5   property, Mr. Brown -- once you made contact with Mr.

 6   Brown, did he ask you to leave?

 7        A.    Well, it took a while for Mr. Brown to come

 8   forward, but eventually Mr. Brown did come forward,

 9   identified himself as the owner of the business.  He

10   did ask to leave -- I'm sorry.  He did ask us to

11   leave.

12        Q.    Right.  And why did y'all not leave at that

13   point?

14        A.    We were conducting a compliance check.  We

15   were confirming or dispelling our belief that a crime

16   was being committed, and we had the right to be there.

17   I think leaving would have been a miscarriage of

18   justice.

19        Q.    Does the City of Atlanta have like a night

20   warrant division, a magistrate that's available on the

21   phone or in person at night if you needed to apply for

22   a warrant?

23        A.    Yes.  There are judges 24 hours.

24        Q.    So you could have gone and gotten a warrant

25   then on the property, couldn't you have?
```

1        A.   Well, there was no search being conducted,
2    so we didn't need a warrant.
3        Q.   But you were entering the property.
4    Wouldn't you agree that's something you -- that's
5    something in general you need a warrant to do, to
6    enter into a property?
7        A.   No.   This is a business.   The door's
8    unlocked.   Unlocked business, so there's no need for a
9    search warrant.   We were not searching for anything.
10   We were requesting documents that could not have been
11   -- that were not provided.
12       Q.   So the group of officers, both law
13   enforcement officers and I understand there were
14   investigators from the Solicitor's Office there, there
15   were some folks from the building inspector there,
16   that group of people who were assembled --
17            Were there other establishments that y'all
18   had gone to as a group on that evening prior to going
19   onto Mr. Brown's property?
20       A.   Yes.
21       Q.   Okay.   And where else did y'all go?
22       A.   So initially, we had set out to go to a
23   location in the 3000 block of Campbellton Road,
24   Southwest.   We had a signed search warrant to search
25   this location.   In doing so, when we got to the

1    location, the location was closed, not open for

2    business.  We kind of sat out for a while and waited

3    for that location to open, which it never did.

4            While we were waiting, Sergeant Walls and I

5    discussed, we have the resources now.  We could attack

6    some of these locations, what we have what we call

7    lead sheets.  So these lead sheets are the eyes and

8    ears from the community or patrol officers that are

9    dedicated to a certain area.

10           They kind of send us tips, and one of the

11   tips we had gotten through an internal e-mail was from

12   the Zone 3 commander, which at the time was Major

13   Jeffrey Glazier.

14           His e-mail was that the locations along

15   Metropolitan were not conducting themselves

16   accordingly to the hours of operation, and a lot of

17   illegal activity was going on, and he requested that

18   the Atlanta Police Department License and Permits take

19   a look at it.

20           So having that list of those locations, we

21   checked the corridor of Metropolitan Parkway.  We

22   started around, I think, 166 and worked our way back

23   northbound on Metropolitan.

24           Between northbound Metropolitan 166 and,

25   let's say, Lexington area, that's where a lot of clubs

1    and restaurants are.

2          Q.   The premises that you originally had

3    gathered to go in, you said you had a warrant.   What

4    was the warrant for?

5          A.   The warrant, we had an arrest warrant and a

6    search warrant for the location.

7          Q.   What was the probable cause, if you can

8    remember, for that warrant to search?

9          A.   Yes.   So we had -- that location had -- we

10   had entered that location in an undercover capacity a

11   couple of days before, and they were selling alcohol

12   to minors.   They were selling alcohol to minors.

13              During that time, they were -- we noted that

14   they did not -- and they also were operating outside

15   of the hours of operation.

16         Q.   Why did you feel a need to get a search

17   warrant to go into that location?

18         A.   Due to the mere fact that we knew that --

19   from our going inside the location, there were a

20   number of things that we were looking for inside the

21   location.

22              The owner, or I guess you could say the guy

23   who was running that location, had other locations in

24   the City of Atlanta, so we knew that there may be

25   documents and paper indicia of other locations that

1    were illegal that was owned by this guy.

2         Q.    You didn't feel like you could have just

3    gone in and inspected?

4         A.    We had already gone in and inspected.  We

5    had done numerous compliance checks, and they were not

6    in compliance.

7         Q.    You had gone in previously undercover or

8    actually had gone in representing yourselves as

9    officers?

10        A.    Both.

11        Q.    Okay.  And was that a licensed business?

12        A.    Partially.

13        Q.    What do you mean by that?

14        A.    They did have a general business license.

15        Q.    What was the name of that location?

16        A.    I don't recall.

17        Q.    Did y'all enter into any other premises that

18   evening?

19        A.    We left that location on Campbellton Road,

20   and at this point, it's probably 3:45, 4:00 o'clock

21   a.m., which we know that all businesses were just

22   about closed.  So we did check several locations that

23   were closed.

24             We drove through the parking lot of 2030,

25   2000 block of Metropolitan to get to a location at

1   1919 Metropolitan, which had been a target location of

2   ours, and upon getting ready to enter that business,

3   we found that that business was in compliance.  It was

4   closed.

5        Q.   All right.  So you didn't go in, but just

6   because it was closed?

7        A.   Yes.

8        Q.   So you didn't actual enter into any other

9   premises that evening other than Mr. Brown's?

10        A.   Correct.  Because the businesses that we had

11   checked were in compliance.

12        Q.   You mean it was locked?

13        A.   Right.  They were closed for business.

14        Q.   Right.  But if you had tried to open the

15   door, you couldn't have gone in; right?

16        A.   Correct.

17        Q.   Okay.  All right.  I'm going to show you a

18   video.  Take a look at this.  Have you seen the

19   surveillance video depicting the entry of the

20   premises?

21        A.   No, I have not.

22        Q.   All right.  I'm going to show you this

23   video.  If you can, just watch it.  I'll put it where

24   everyone can see it.  I'll show it to you in whole

25   first, and then I'll ask you questions about it.  Can

1  you see it okay?

2              MS. STEWART:  Just one question.  Is

3        that the video that -- is that information that

4        we've requested in our discovery?

5              MR. RADFORD:  I just got your first

6        discovery yesterday, and we have tried to send

7        you guys this video.  We put it on a -- we gave

8        you guys a link to it.

9              MS. JONES:  I don't have that.

10             MS. STEWART:  Can we get it while

11       you're here?

12             MR. RADFORD:  Yes.

13             MS. STEWART:  I'll have somebody dump

14       it.  I mean, they'll do it right in front of you

15       so we can get that video.

16             MR. RADFORD:  That's totally fine.

17             MS. STEWART:  Okay.

18             MS. STEWART:  I really have a serious

19       question.

20             MR. RADFORD:  Let's watch the video,

21       then if you want to make an objection, you can.

22             MS. JONES:  You can ask a question,

23       Theresa.  You can.  You can ask it right now.

24             MS. STEWART:  How do I know this is the

25       same night?  That's what I'm wondering.

1              Can you recall this?

2                    MR. RADFORD:  Can you let me take my

3         deposition.

4                    MS. JONES:  He's not allowed to be

5         rude.

6         Q.   (By Mr. Radford) The video that we watched,

7    does that appear to you to depict your entry into the

8    premises on the evening of February 8?

9         A.   Well, I can't even see what distance that

10   is.  I don't know what that is.

11        Q.   Okay.  Well, do you recognize the -- so if I

12   go to, in the video, to --

13                   MS. STEWART:  Can you go out?  Can you

14        zoom out so we can see the --

15                   MR. RADFORD:  This is the whole thing.

16                   MS. STEWART:  Okay.

17        Q.   (By Mr. Radford) So the individual depicted

18   as the first one to enter, does that look like you?

19   Is that you?  Can you tell?

20        A.   That's me.

21        Q.   Which one?

22        A.   The very first one.

23        Q.   The very first one to enter, that is you.

24   Okay.

25                   MS. STEWART:  That's you?

1                THE WITNESS:   Uh-huh (affirmative).

2        Q.    (By Mr. Radford) So that is a video of you

3   entering into the premises; right?

4        A.    Yes.

5        Q.    Okay.  And do you recall there being a

6   gentleman on his phone outside of the premises when

7   you went in?

8        A.    Yes.

9        Q.    Was that him, the guy that's depicted here?

10       A.    I guess that could have been him.  I don't

11   really remember.  My focus was going inside of the

12   establishment.

13       Q.    Okay.  But does this -- as we're watching

14   here, does this coincide with your recollection of the

15   circumstances of y'all going in?

16       A.    The circumstances of us going in?  You're

17   speaking of the video itself?

18       Q.    Yeah.  What is depicted on the video, is

19   that consistent with what you recall as to the

20   circumstances of y'all going into the premises?

21       A.    I don't know the order everyone entered.  I

22   know that I was the first one through the door.

23   That's the only that I can -- I don't know if this has

24   been enhanced, changed, or what have you.

25       Q.    Sure.  You would agree that -- and I'm not

1    asking you to authenticate this video because you

2    didn't make it, you know.  But you would agree that,

3    at least on the video that we're looking at now, no

4    one is holding the door open for the officers to go

5    in?

6         A.   No.  But I just saw a gentleman come out of

7    the door, and the door was unlocked.

8         Q.   Okay.

9         A.   So like I said earlier in my statement, it

10   didn't matter whether that gentleman was holding it,

11   whether that guy was there or not, we were still going

12   to go into that door.

13        Q.   Understood.  But --

14        A.   As long as it was unlocked.

15        Q.   Okay.  Without respect to the video -- the

16   video may help to refresh your recollection; it may

17   not -- there was actually not someone holding the door

18   open for you to go in; correct?

19        A.   Some of that night, what I recall, probably

20   before this video started, was that gentlemen was

21   standing in the door, holding that door.  That's what

22   I recall.

23        Q.   Okay.

24        A.   I don't know if this has been enhanced.  I

25   don't know.  But I do recall -- I can say that that is

     1    myself and other members of the License and Permits

     2    Unit.

     3         Q.    Okay.  Is it fair to say you remember at

     4    some point he was holding the door open, but he was

     5    not holding the door open at the time you went in?

     6         A.    What I recall was a gentleman holding the

     7    door open when we were going in.

     8         Q.    You recall someone holding the door open for

     9    you as you went in?

    10         A.    He may not have been holding it open for us,

    11    but the door was being held.  The door was open.

    12         Q.    So you remember, at the moment you went into

    13    the door, someone was holding it open?

    14              MS. STEWART:  Can you go back because

    15         it looked --

    16              MR. RADFORD:  I'm sorry.

    17              MS. STEWART:  Can you go back so he can

    18         see because --

    19              MR. RADFORD:  Yeah.  I'll start at the

    20         very beginning.

    21         Q.    (By Mr. Radford) You see the gentleman come

    22    out of the door, take several steps away.  He's

    23    talking on the phone.  Then you come in.  He's several

    24    feet from the door.  You open the door and go in, and

    25    two officers followed behind you, and several others

1    followed behind.

2          So at least what we're seeing here, he's not

3    holding the door open for anybody?

4    A.    That's what I see here, yes.

5    Q.    Okay.  And once you entered the premises,

6    did you come out of the premises and then go back in?

7    A.    Myself or any other officers?

8    Q.    You.

9    A.    I don't recall whether I would have.  At

10   some point, I probably would have had to go back out

11   because, as you can see, I had no paperwork.  No one

12   had any paperwork, going into the business.

13   Q.    Okay.  But it wouldn't be a situation where

14   everyone went in, then everyone came out, then

15   everyone went back in; right?

16   A.    No.  But I do see something interesting.  I

17   think, in reading the Complaint, that people were

18   detained.  The gentleman holding the door -- if this

19   was a full-fledged raid, he would not have been free

20   to leave.

21         I saw a gentleman, two people walk out of

22   the door on their own.  So if it was a situation where

23   everybody, let's say, put down on the floor or being

24   detained, they would not have been free to leave.

25   Q.    I'm going to ask if you recognize any of the

1    other folks.  The first person who enters, you do

2    recognize that as you.  So do you recognize the second

3    person who entered?

4         A.    This is grainy.  I can't really make it out.

5         Q.    Tell me, if you can, do you recognize that

6    second gentleman?

7                   MS. STEWART:  Do you have a better

8         copy?

9                   MR. RADFORD:  This is the best copy

10        I've got.

11                  THE WITNESS:  I recognize myself.  I

12        can't recognize anyone else.

13        Q.    (By Mr. Radford) Okay.  Do you recognize

14   that individual, the fourth person to go in?

15        A.    I do not.

16        Q.    Okay.  Now two other gentlemen are going in.

17   Do you recognize either of them?

18        A.    No.

19                  MR. RADFORD:  I'll give you-all a copy

20        of this.

21                  MS. STEWART:  I was trying to see if

22        you --

23        Q.    (By Mr. Radford) Do you recognize --

24        A.    No.  This video is very grainy.

25        Q.    Yeah.  It's surveillance video taken at

1    night.  Do you recognize that gentleman who just

2    walked in?

3         A.   No.

4              MS. STEWART:  I was trying to see if we

5         knew who --

6              MR. RADFORD:  That's the same guy who

7         was walking off on the phone.

8         Q.   (By Mr. Radford) Do you recognize that

9    gentleman?

10        A.   That would have been Robert Cabanaw.

11        Q.   Okay.  Cabanaw.  What about the gentleman

12   with the hat here?

13        A.   No.

14        Q.   All right.  That's the whole video.

15        A.   Well, is there more video to see how quick

16   the people came out?

17        Q.   This is what I have now, and I can --

18             We'll give you everything we've got.

19             MS. STEWART:  We'd appreciate that.  We

20        didn't ask for it because that's --

21             MR. RADFORD:  Well, y'all didn't ask

22        for any discovery actually until yesterday.

23             MS. JONES:  That can't be right.

24             MR. RADFORD:  Do you dispute that?  Did

25        y'all serve discovery requests before yesterday?

1                    MS. STEWART:  I'm not speaking to you,

2          dear.

3                    MR. RADFORD:  Okay.  Well, I don't have

4          any further questions at this time.  I may have

5          some follow-up if you have some questions.

6                         DIRECT EXAMINATION

7     BY MS. STEWART:

8          Q.    Sergeant Burns, I do have a few questions

9     for you.

10         A.    Yes.

11         Q.    Can you tell me what happened upon arriving

12    at 20 -- is it 2031 Metropolitan Parkway?

13         A.    Yes.

14         Q.    Tell me what happened, sir.

15         A.    We had returned back to the location after

16    checking other locations upon the Metropolitan Parkway

17    corridor.  We went to this location.  The door was

18    open.  There was a gentleman standing in the doorway,

19    on a cell phone.  The door was unlocked.

20               I do know that I was the first officer to

21    enter the location.

22         Q.    And apparently in your statement you stated

23    that someone was holding the door open, but the video

24    that counsel just showed us, you went through the

25    door.  Was that an important fact to you as to whether

1    you were authorized to enter the establishment?

2         A.   Yes.   If the door was locked, then there

3    would have been other circumstances, but the door was

4    unlocked and opened, so that's when we entered the

5    establishment.

6         Q.   But the question is:  Was it important to

7    you whether someone was holding the door or not as to

8    whether you were authorized to enter?

9         A.   No, it was not important at all.

10        Q.   Proceed.

11        A.   So upon getting to the sidewalk, we could

12   hear a loud thumping of bass or movement emanating

13   from outside the establishment.

14        Q.   Was there something else?  Before you

15   entered the establishment, was there anything that you

16   noticed about the surroundings or anything about the

17   establishment itself that gave you pause?

18        A.   Yes.

19        Q.   What was that?

20        A.   Several things.  The windows and the door,

21   they were tinted.  It was -- I don't know if it was

22   mirror or completely black, tinted-out windows.

23        Q.   And why was that significant?

24        A.   Well, this is a commercial business, and

25   usually in the zoning code, there's prohibit against

1   having tinted windows.

2        Q.    Proceed.

3        A.    Also, there were several cars in the parking

4   lot of 2031 Metropolitan Parkway.

5        Q.    And what time was it?

6        A.    This was probably 4:15 a.m., 4:30 in the

7   morning.

8        Q.    And how long are alcohol-licensed

9   establishments allowed to be open that time of the

10  night?

11       A.    Alcohol should cease -- all alcohol sales

12  should cease at 2:30 a.m.

13       Q.    And what types of businesses, just from your

14  experience, are open at 4:00 o'clock in the morning?

15       A.    Very few unless they are like bona fide

16  restaurant.  All clubs, adult entertainment locations

17  will be closed by then.

18       Q.    You can go ahead.

19       A.    So after seeing the number of cars in the

20  parking lot, coupled with the tinted windows and the

21  door, the loud music, and upon entering the club,

22  immediately as I opened the door, there was a keen

23  odor of marijuana, burning marijuana at the location.

24            As going through the door, there was a very

25  -- immediately left, there was a room where there was

1   a couple actually engaged in a sex act.  The male had

2   his pants completely down to his ankle.  The female

3   was in the nude.  There was loud music.

4       Q.   When you say the female was in the nude, was

5   she near him or --

6       A.   No.

7       Q.   Describe, without going into too much

8   detail, what you saw.

9       A.   Sure.  They were definitely engaged in

10  sexual intercourse.  The male -- the female and the

11  male were both sitting, in a sitting posture.  The

12  female and male were both facing the door as to where

13  patrons would come into the location.  The female was,

14  in a sense, riding this male in a sexual manner,

15  completely naked.

16          We continued to go through the location.

17  The music was extremely loud.  Marijuana being burned.

18  We smelled the odor of marijuana being burned.  Smoke.

19  Music was extremely loud.  Patrons were consuming

20  alcohol.  There was alcohol stored on the bar and

21  behind the bar.

22      Q.   Did you see any -- were there people walking

23  around in the establishment?

24      A.   Yes.  There were some patrons walking

25  around, but there were probably about seven to eight

1    females that were completely nude that were providing

2    adult entertainment, dancing.

3            And upon seeing the uniformed officers -- we

4    were all in uniform and had markings that clearly said

5    police -- those females sort of ran to an area of the

6    club.

7            At that time, I went immediately to -- there

8    was a black male that was providing music, playing

9    music, and I asked him to turn the music off or down.

10   I'm not sure.  I think I may have asked him to turn it

11   off.  Once he turned it -- but he complied.

12           And I asked him, you know, who was in

13   control of the establishment, who's business was this.

14   He said he didn't know, and I told him at that time

15   that as far as I was concerned, since he was providing

16   music, someone had employed him, so he was in control

17   of the business.

18           After asking several other times, I was

19   finally met by a male, who I later identified as Devon

20   or Devon (different pronunciation) Brown, who stated

21   that it was his business and that we should probably

22   leave.

23       Q.    And did he use the term "business"?

24       A.    Yes.  This was his business, yes.

25       Q.    And what happened after that?

1        A.    I told him that we were not leaving.  We
2    would have to conduct a compliance check.  Mr. Brown
3    was extremely belligerent with law enforcement.  He
4    used profanity.  He asked us to get out of his damn
5    business, completely rude to law enforcement.
6            I told him and I assured him, once we saw
7    the proper documentation for him to operated this
8    business, then we would in fact leave, but until then,
9    we would not leave.
10        Q.    And generally for a business that is even a
11    non-alcohol-licensed business or an alcohol-licensed
12    business, what do you generally see when you enter the
13    door?
14        A.    We would see several things.  We will see a
15    building permit issued by the Atlanta Fire Department,
16    telling us what the maximum occupancy is.  We would
17    see a general business license, saying that this
18    business can operate.
19            If there was food there, we would see a
20    permit issued by Fulton County Health Department.  If
21    there were coin-operated machines, we would see a
22    billiard room, documentation pertinent.
23            We didn't see any of that.  Actually, had we
24    saw that upon entering, if all of this would have been
25    posted in a conspicuous manner and we would have saw

1  it, that would have satisfied us with the exception of

2  the alcohol and marijuana was being sold after hours

3  or being stored after hours.

4      Q.   So when you asked -- what were the

5  circumstances for Mr. Brown stepping forward?

6      A.   After asking several times, he finally

7  stepped forward and admitted that he was in control of

8  the business and that it was his business.

9      Q.   And how many times did you ask before he

10 stepped forward?

11     A.   Maybe three or four times.  It took him a

12 while to come forward, although he was in the same

13 room.

14     Q.   And then what happened after that?

15     A.   Mr. Brown said that this was a -- he used

16 the term "private club," and I said, well, with that

17 being said, if you're a private club in the City of

18 Atlanta, you would need to have a private club

19 license.  Do you have that?

20          He could not provide a private club license,

21 and I systematically went down each permit that he

22 should have had.  I asked him if he had a general

23 business license.  He did not have a general business

24 license.

25          I asked did he have an alcohol permit.  He

1    could not proved that.  And then he went back to

2    saying that he's a private club.  He didn't need any

3    of that.  So I explained to him about the definition

4    of a private club.

5             And then I went back and asked him did he

6    have a roster of all his members, not being less than

7    250 members, if he could provide the name, addresses

8    of the members.  He could not provide any of that

9    documentation.

10       Q.   You said something earlier during counsel's

11   questions about a lead sheet and why you could enter

12   the business.  Could you explain whether that

13   particular business was on that lead sheet, or was it

14   just generally businesses being --

15       A.   General businesses along the Metropolitan

16   Parkway corridor.

17       Q.   Okay.  And let's go back to the point where

18   Mr. Brown stepped forward.  Did Mr. Brown stand up, or

19   where was he positioned in the club?

20       A.   Initially kind of midways of floor.  There

21   was some chairs and bar stools around there, and in

22   talking to Mr. Brown, he did have a seat.  He sat down

23   on like a bench stool.  He sat down there, and we

24   continued to talk to him.

25             Mr. Brown, like I said, everything that I

1   asked him, he could not provide any documentation to

2   that.  He made a statement that about ten years ago,

3   he came down to the Atlanta Police Department, and in

4   the License and Permits Unit, he was told by someone

5   that he did not need a license or he didn't need any

6   permits.

7        Q.   And could he identify that person?  Did he

8   say a name or identify that person in any way?

9        A.   No.  He could not tell a name of the person.

10  He could not even describe the person.  He said it was

11  about ten years ago, and I explained to Mr. Brown that

12  I was not there ten years ago.  No one on that

13  location was there ten years ago.

14            However, ordinances and laws change.  I'm

15  not sure what he explained to those people when he

16  went down to the License and Permits with the type of

17  business that he was there.  What I knew at that time

18  was the business was operating illegally.

19       Q.   And did you see alcohol anywhere -- no.  How

20  much alcohol did you see in the business?

21       A.   There were several cans of beer, several

22  bottlesof distilled spirits.  There was a couple of

23  coolers that had beer in them that were packed in ice.

24       Q.   And after asking who was in charge of the

25  business, were there any other questions you asked Mr.

1   Brown?

2        A.   Yes.  Again, I asked him if he could provide

3   the member list, documentation of anything.  He could

4   not.  I told him he would have to be cited for this.

5   And he goes, well, he didn't know what he was supposed

6   to have.  He went to License and Permits, and no one

7   told him eight years ago.

8             At that point, and unknown to me, there was

9   an investigator, G.A. Smith, and G.A. Smith said, you

10  can stop right there, sir.  Do you remember me coming

11  by here about two weeks ago, meeting with you, telling

12  you everything that you needed in order to make this a

13  legitimate business?

14       Q.   And who is G.A. Smith?

15       A.   G.A. Smith is an investigator of the Atlanta

16  Police Department License and Permits Unit.

17       Q.   What else did G.A. Smith say to Mr. Brown

18  and you?

19       A.   He told myself, he said, Sergeant Burns, I

20  came by here, and I told this gentleman everything

21  that he needed to come into compliance, and he said

22  that he would come down to the office and come into

23  compliance.

24            At that time, Investigator Smith, I don't

25  think he entered the business.  He spoke to this

1   gentleman, Mr. Brown, outside of the business.

2        Q.    Okay.  So Mr. Brown walked to the door?  I'm

3   trying to understand like where everybody was

4   positioned, so tell me where that conversation

5   occurred.

6        A.    It occurred still standing in the middle of

7   the floor of the business.

8        Q.    Okay.  And then what happened after that?

9        A.    Mr. Brown could not provide any of the

10  documents.  The Bureau of Buildings, Mr. Cabanaw,

11  immediately saw exposed wiring, no exit signs, no

12  occupancy level for the establishment, and basically

13  said this was a death trap because there was one way

14  in, one way out.

15            Had there been a fire to break out, everyone

16  would have burned.  They couldn't get out of the door.

17       Q.    Who was Mr. Cabanaw?

18       A.    Mr. Cabanaw was the chief building inspector

19  with the City of Atlanta at that time.

20       Q.    And where is he now?

21       A.    He's deceased.

22       Q.    Was there anything else that Mr. -- strike

23  that.  Did Mr. Cabanaw walk around?

24       A.    Yes.  Mr. Cabanaw, during our time talking

25  to Mr. Brown, went to the restroom area, which is

1    common room in the restroom, and said that he had
2    never seen anything like this.  The urinals were
3    completely removed from the wall, and there were holes
4    in the wall in which the patrons had to urinate into
5    this pipe.
6            In the kitchen area, there was no Fulton
7    County Health Department permit.  All the food was
8    being offered for sale.  There was a menu up.  There
9    was not an adequate kitchen there, as defined by code,
10   to suffice the private code section of the ordinance,
11   saying there had to be adequate kitchen equipment
12   there.  There was not.
13           Mr. Brown could not provide any of these
14   documents.  At that time, I told Mr. Brown that he
15   would be cited, and I needed his driver's license.
16   Mr. Brown initially did not comply with our request,
17   and we changed that into a physical arrest.  I made a
18   decision to physically arrest Mr. Brown.
19      Q.   Because you asked him first for his
20   identification, and what did he say when you asked for
21   his identification?
22      A.   He continued to argue and continued to talk.
23   At this time, it's probably about 4:45 in the morning.
24   So Mr. Brown was secured in handcuffs.  And I will
25   say, at that time, patrons had already began to leave

1  on their own.  No one else was detained.  Our sole

2  focus was on talking to Mr. Brown.

3       Q.   And that was because he would not or could

4  not provide any of the documentation that you

5  requested; is that correct?

6       A.   Correct.

7       Q.   And what happened after that, after you have

8  handcuffed Mr. Brown?

9       A.   At that point, Mr. Brown is now under

10 arrest.  I went to pat down Mr. Brown.  I immediately

11 felt a bulge on his right hip, and it was a handgun.

12 I secured that weapon and passed it off to Officer

13 Dillon.  Officer Dillon took the weapon.

14           I went into his rear pants pocket, into his

15 wallet, retrieved his wallet to get his

16 identification.  Immediately upon seeing the

17 identification, I saw a badge, and it said Fulton

18 County Sheriff.

19           I opened it up, and on the other side was a

20 Fulton County Sheriff Employee ID.  I looked at Mr.

21 Brown, and I said, what is this?  He goes, you know.

22 I'm a deputy.  And I told him, out of all people, he

23 should have known better, being a Fulton County Deputy

24 and violating the law.

25       Q.   And before that, did you know that he was a

1    Fulton County Deputy Sheriff?

2         A.    No, I did not.

3         Q.    Okay.  And did he identify himself as a

4    Fulton County Deputy Sheriff?

5         A.    No, not post -- not before he was arrested

6    and I found the identification.

7         Q.    And prior to his arrest, did anyone else

8    identify him as a Fulton County Sheriff?

9         A.    No.

10        Q.    And would your expectation of compliance

11   with the laws as it applied to his establishment,

12   would you expect more compliance, the same compliance

13   as the average citizen, or less compliance?

14        A.    More.  More compliance because he is an

15   officer.

16        Q.    And what happened after you have effected

17   his arrest?

18        A.    Knowing that this gentleman was a Fulton

19   County Deputy, and that we in fact had his credentials

20   and a weapon, Sergeant Walls contacted the Fulton

21   County Sheriff's Department Internal Affairs

22   investigator on call to turn over the weapon, as well

23   as the credentials because this guy was going to jail,

24   and we did not want him to go to jail with

25   identification identifying him as a law enforcement

1    officer.

2            We later were to find out that the weapon
3    did not belong to Fulton County Sheriff's Department.
4    It was his personal weapon.

5        Q.    But at that time, you would not have known
6    that; is that correct?

7        A.    No, we would not have known that.  Once all
8    the patrons had left the establishment -- no one was
9    detained.  Everyone left out.  There were used condoms
10   kind of strewn about the room, especially in the very
11   first room where we had entered and saw this couple
12   engaged in a sex act.

13           Because it was an arrest involving a public
14   official, we contacted our night commander, who was
15   the captain who was kind of in control of the City at
16   the time, just to notify him of this arrest.

17           He came out to the location and agreed that,
18   yeah, you guys should call Internal Affairs, which we
19   already had those guys coming to the location.  During
20   this time, something happened.

21           We thought that Internal Affairs was coming
22   to the scene because there were two uniformed deputies
23   that were entering to the establishment, and they
24   turned around upon seeing Atlanta Police in uniform,
25   and they got in their car and left.

1           So I can assume they were coming to party.
2    I don't know what they -- they were not coming for
3    business.  Mr. Brown was transported to jail, and we
4    had an opportunity to speak with the guy who was the
5    deejay.

6           He said he was basically a member at this
7    location, and he was fed up with Mr. Brown because
8    they were telling Mr. Brown that he needed an alcohol
9    license, he needed all of this, and Mr. Brown told him
10   that he was the police, and he did not need anything.

11       Q.   And did he tell you that, or is that what
12   the deejay was saying?

13       A.   That is what the deejay told me and also the
14   other investigators that were on location.

15       Q.   And about what time of night was this by the
16   time you effected his arrest?

17       A.    Probably about 4:30, 4:45 a.m., if I recall
18   right.

19       Q.   And where was he transported?

20       A.   He was transported to the Atlanta Pretrial
21   Detention Center on Garnett.

22       Q.   At that time, was there a specific person
23   that you turned Mr. Brown over to, or did you just
24   give him to the first corrections officer?

25       A.   No.  So initially, we had to wait for the

1   prisoner transport van to arrive at the location.

2   This van kind of goes around citywide at night,

3   picking up prisoners, to keep the uniform officers in

4   service, so we had to wait for that van to come or

5   that transport unit to come.  Transported Mr. Brown to

6   the jail.

7        I would later deliver the arrest citations

8   to the jail.  Once all that was done, I left the jail,

9   and maybe it's going on about 5:00, 5:30 in the

10  morning.  I realized, as a courtesy, I should go back

11  to the jail to let the jailer know that Mr. Brown is

12  in fact law enforcement.

13       Q.   And why would you want to tell the jail he

14  was law enforcement?

15       A.   Well, I would want him to be isolated or

16  whatever their procedures were so that, you know, he

17  wouldn't be mixed with the general population there at

18  the jail, whatever their SOP was for that, but I just

19  wanted to, as a courtesy, let them know.

20       Q.   Is there a harm that you were trying to

21  prevent?

22       A.   Oh, yeah.  I mean, definitely.  I didn't

23  want him in the same cell with someone maybe that he

24  had interacted with as a law enforcement officer.  So

25  it was more so of a courtesy.

1       Q.   And did you speak to Mr. Brown when you came
2   back to the --
3       A.   Oh, yes.
4       Q.   -- jail at that time?
5       A.   Yes, I did.  Mr. Brown was still in the
6   sally port of the jail, awaiting photographing or
7   whatever they do at the jail, and he asked, are you
8   coming back to put some more damn charges on me?
9            I told Mr. Brown, no, I'm not.  I'm coming
10  on your behalf.  I'm trying to let them know that
11  you're in law enforcement.  And he looked, and he
12  says, oh, as if he was relieved, and said, well, thank
13  you.  I appreciate that.
14      Q.   Did you have any other conversations with
15  Mr. Brown?
16      A.   No.
17      Q.   Are there any other -- did you see -- when
18  was the next time you saw Mr. Brown?
19      A.   I saw Mr. Brown maybe the next day or two
20  days later.
21      Q.   Under what circumstances?
22      A.   It was on FOX 5 News, giving an interview
23  with FOX 5 about his arrest.
24      Q.   And if you recall, what was the content of
25  that interview?

1      A.    Mr. Brown was alleging that there was an
2  illegal entry into his club, whereby all his patrons
3  were put down on the floor and detained in handcuffs
4  and not being free to leave.
5      Q.    And was that true?
6      A.    No, that was not true.  And Atlanta Police
7  did -- FOX 5 did reach out to Atlanta Police, to our
8  Public Affairs, which we declined comment, so Atlanta
9  Police Department did not comment on the situation at
10  all.
11      Q.    And did you see him on television any other
12  time?
13      A.    Yes.  I think I saw several other times that
14  he was on television with FOX 5 and maybe some other
15  local news media outlets.
16      Q.    And was it a question and answer, or did it
17  appear to be a hostile situation with the reporter, or
18  did he seem to be freely giving information about the
19  arrest?
20      A.    Oh, he was freely giving information, along
21  with his attorney at the time.
22      Q.    And what was he saying in the subsequent
23  interviews?
24      A.    That it was a warrantless arrest, the police
25  had no power, no authority to enter into his premises,

1    and he should not have been arrested.

2         Q.   And did you see him in an interview with the

3    media once, twice, three times?

4         A.   Maybe about three times.  At one point, I

5    think there was an interview conducted with him at his

6    initial hearing at Municipal Court.

7              I can say that each time that I saw him, it

8    was not any action generated by the City of Atlanta in

9    terms of calling the media.  It appeared that he had

10   made contact with the media himself and he was selling

11   his case to the media.

12        Q.   Did you have any conversations with him at

13   the times that you saw him in court?

14        A.   No.

15        Q.   And after -- that time at the Municipal

16   Court, what occurred during that particular hearing?

17        A.   During the hearing, normally in Municipal

18   Court, these criminal cases are easily disposed of

19   within minutes, but this was a two- or three-day trial

20   for Mr. Brown.

21        Q.   Was he represented by counsel?

22        A.   Yes, he was.

23        Q.   Were you called as a witness?

24        A.   Yes, I was.

25        Q.   So it was a two- or three-day trial.  And if

1   you know, what happened as a result of that trial?

2   What was the disposition?

3       A.   Mr. Brown was found guilty on the charges

4   that he was accused of.  I did see that there was a --

5   the deejay that we had spoken to the night of was also

6   a witness to testify at his hearing along with some

7   other witnesses.

8           During the hearing, Judge Crystal Gaines,

9   there was a brief recess of about 10 or 15 minutes

10  where the witnesses were sequestered.  After that 15

11  minutes came up, there was an officer of the court,

12  who I believe was a solicitor, came forward.

13          He told Judge Gaines, never, in all of his

14  years of being an officer of the court, had he saw or

15  heard what he just observed.

16      Q.   And what did he say after that?

17      A.   He was sworn in, and advised that Mr. Brown

18  was going over to the witnesses that had been

19  separated, sequestered, telling them how to testify,

20  what had been said in the case.

21      Q.   And how did the judge react to that?

22      A.   The potential witnesses were not allowed --

23  or decided not to testify at all.

24      Q.   And did you have any other interaction with

25  Mr. Brown at that hearing or any subsequent hearing?

1          A.      No, not any -- yes.   So that was during the

2    trial, and then at the end of the trial, but we didn't

3    have any personal conversation or anything like that.

4          Q.      You just happened to see him; is that

5    correct?

6          A.      Just seen him, yes.

7          Q.      Now, have you seen Mr. Brown since the date

8    of the Municipal Court hearing?

9          A.      No, I have not.

10         Q.      And has there been any other involvement in

11   this particular case?

12         A.      Yes.   During this time, I was contacted by

13   Fulton County Office of Internal Affairs, requesting

14   certain documents -- the police report, a copy of the

15   booking photo.

16              So in doing so, in giving the booking photo,

17   I pulled the first photo of Mr. Brown, electronically

18   I believe, sent it over to Fulton County.   I got a

19   call back from Fulton County Internal Affairs, saying

20   that the date of the booking photo did not coincide

21   with the date of the arrest.

22              At that time, I was not in the office.   I

23   was almost certain that this was the booking photo of

24   Mr. Brown.   When I got back to the office, I compared

25   the date to the booking photo, and the initial booking

1    photo that I sent of Mr. Brown was prior to the arrest

2    date.

3        Q.    And what did that indicate to you?

4        A.    That there was another arrest, that Mr.

5    Brown had been arrested before.

6        Q.    And did you find out that Mr. Brown was

7    arrested before?

8        A.    Yes, I did.

9        Q.    And what was that arrest far?

10       A.    Mr. Brown previously was arrested by the

11   City of Atlanta Police Department on Metropolitan

12   Parkway for Code Section 106-127(a), idle and

13   loitering for the purpose of receiving or giving an

14   illicit sex act, which is basically prostitution or

15   pandering.

16       Q.    What was the year of the arrest?

17       A.    I don't recall the year.

18       Q.    Do you know if it was during the time that

19   he was a Fulton County Police Officer?

20       A.    Yes, it was during the time he was a Fulton

21   County Police Officer.

22       Q.    Was there any other discussion with Fulton

23   County regarding the previous arrest for pandering or

24   prostitution?

25       A.    Yes.   They called over to ask for a copy of

1    the police report because that arrest had not been

2    reported by Mr. Brown to the Office of Professional

3    Standards.

4        Q.    And generally, to your knowledge, are police

5    officers required to alert their Office of

6    Professional Standards when they are arrested?

7        A.    Yes.  That is a requirement, and

8    additionally they must notify their employment and

9    employment agency as well as the Georgia POST where

10   they receive their powers from.

11            During the investigation, it was found that

12   he had not notified either of those two components.

13       Q.    In fact, did Fulton County state to you that

14   they did not know about that other arrest?

15       A.    They did not know about that other arrest,

16   no.

17       Q.    Did you have to do any other investigation

18   of Mr. Brown as a result of that initial arrest?

19       A.    I was called by their Office of Internal

20   Affairs and the Fulton County Attorney, the county

21   attorney, to appear at a civil service hearing where

22   testimony was taken in terms of what had occurred on

23   the night of February 8, 2014.

24       Q.    And did you in fact appear?

25       A.    Yes, I appeared.

1      Q.    And did you testify?

2      A.    Yes, I did.

3      Q.    And if you recall, was that Fulton County

4   hearing just about the arrest effected by you on the

5   date of this incident, or was it the totality of his

6   record at Fulton County?

7      A.    I think it was a totality because some

8   things came up about the previous arrest in which they

9   had not been notified of, in addition to the new

10   charges.

11      Q.    And if you know, was Mr. -- do you know

12   whether Mr. Brown was dismissed, or were you there

13   when the decision was given by the civil board?

14      A.    No.   I was dismissed, and I later found out

15   that Mr. Brown was terminated from the County.

16      Q.    Did you have any other interactions with Mr.

17   Brown or any proceedings involving Mr. Brown?

18      A.    No.

19            MS. STEWART:   Just one second.

20            MR. RADFORD:   Sure.

21         (Pause in proceedings.)

22            MS. STEWART:   I have no further

23   questions.

24            MR. RADFORD:   All right.   Just a couple

25   of follow-ups for me.

1          MS. STEWART:  I'm sorry.  I do have one
2      more question.
3          MR. RADFORD:  Go ahead.
4      Q.   (By Ms. Stewart) Before you retired, can you
5  just briefly detail your history at the City of
6  Atlanta Police Department.
7      A.   Sure.  I joined the Atlanta Police
8  Department right after the Olympics in 1996.  Right
9  out of the Police Academy, I was assigned to the
10  Atlanta Police Department Field Operations Division,
11  Zone 1, Bankhead Highway, where I patrolled.
12          I was promoted to the rank -- two-and-a-half
13  years later, I was promoted to the rank of
14  investigator, where I was immediately assigned to our
15  Vice Unit.  I then served about three years.  Then I
16  went to our Narcotics Unit.  From our Narcotics Unit,
17  I went to our Office of Homeland Security.
18          From our Office of Homeland Security, I had
19  the opportunity as a forward to -- afforded the
20  opportunity to work on a Federal Drug Enforcement Task
21  Force, so I was sworn in as a task force officer with
22  the Drug Enforcement Administration for about four
23  years, where I worked on a number of conspiracy cases,
24  drug trafficking cases.
25          I've written numerous federal search

1    warrants.  I've written a affidavit for Title III Pen

2    Register search warrants.  Participated in numerous

3    search warrants.  I left that location, from the

4    federal task force.

5            And I went back to APD, where I was assigned

6    to our License and Permits Unit.  I was an

7    investigator in the License and Permits Unit, so I

8    worked that assignment, issuing alcohol license and

9    compliances for about three years.

10           Left the License and Permits Unit, and I

11   worked in our Office of Internal Affairs.  So I've

12   worked on our Corruption Unit with investigating

13   police officers that had criminal charges thrown

14   against them.

15           I left Internal Affairs, was promoted to

16   Sergeant, went back to Zone 1 Patrol Division, where I

17   was a sergeant.  And then my last -- then I went to my

18   last assignment, which was in License and Permits, and

19   I was a sergeant at License and Permits for three

20   years, giving me a total of about four-and-a-half

21   years as a supervisor and investigating the unit.

22           MS. STEWART:  Okay.  No further

23      questions.

24           MR. RADFORD:  All right.  Just a couple

25      of follow-up questions.

1                    RECROSS-EXAMINATION

2    BY MR. RADFORD:

3        Q.    You mentioned you had found some evidence

4    that Mr. Brown had previously been arrested for

5    pandering, I think.  Do you know what the disposition

6    of that was?  Was he convicted?  Was it dismissed?

7        A.    I don't know.

8        Q.    You had stated that you smelled marijuana in

9    the establishment.  No one was arrested for marijuana

10   possession; correct?

11       A.    I'm sorry?

12       Q.    No one was arrested for marijuana

13   possession; correct?

14       A.    We did not find any marijuana.  That was not

15   the scope.  We did not search for marijuana.

16       Q.    Okay.  The sex act that you say you

17   witnessed, there was nothing illegal about that, was

18   it?

19       A.    Our focus was on making sure that this

20   location was in compliance.

21       Q.    Okay.

22       A.    This was not a full-fledged raid, detain

23   everyone.  And actually, there were only, sworn, maybe

24   four officers.  So if this was some type of raid or

25   something like that, we would have definitely taken

1   more officers.

2           If I can go back and paint the picture of

3   initially how we started off that night, going into

4   the morning of February 8.  We had more officers

5   because we were going to do a full-fledged raid with a

6   search warrant.

7           It was during that time we decided that this

8   business initially on Campbellton Road was not going

9   to open, so some of those officers had been released,

10  but we continued with our unit to go and do, conduct,

11  compliance checks.

12      Q.   Okay.  But the sex act that you witnessed,

13  there was nothing criminal about that?

14      A.   Well, it could have been because this is a

15  public place.  Because if it had it, it had a general

16  business license, which it should have, then and

17  members of the public were allowed to go in.  I think,

18  who would want to see this?

19      Q.   Well, some might like to see it.  But you

20  know, consensual adults having sex and other people

21  watching, there's nothing illegal about that?

22      A.   If it's in a public place, it is illegal.

23      Q.   If it's in a public place.

24      A.   Correct.

25      Q.   But if it's in a private place, that's

1    legal?

2         A.    It has to be deemed as a private place.

3         Q.    And that's one of the questions we're about

4    here.  But in a private place, that's legal; correct?

5         A.    In a private place that's deemed private.

6         Q.    Right.

7         A.    And has licenses for it, so I wouldn't know

8    exactly what I'm about to see if I were to open the

9    door.  Going into Magic City Strip Club in the City of

10   Atlanta, I know that because the sign says Adult

11   Entertainment.

12        Q.    Right.

13        A.    So I know, when I pull that door, that's

14   what I'm going to see.

15        Q.    Right.

16        A.    That was the last thing I thought that I

17   would see when I entered the establishment at 2031

18   Metropolitan Parkway.

19        Q.    And one distinction is an adult club would

20   have signs inviting the public to come in, but there

21   was nothing inviting the public to come in?

22        A.    I've never gone to an adult club with signs

23   that invite the public just to come on in.  It's just

24   there.  The door's open.  You walk in.  There's a

25   marquee.

1    Q.    The tinted windows, you didn't issue a
2    citation for that, did you?
3    A.    So that was something Mr. Cabanaw could have
4    spoken to.   He is the building expert.   And that is
5    why all these components in addition to License and
6    Permits.
7         We team up with these components because
8    everyone kind of has their area of expertise.   I
9    couldn't tell you how many volts should run through a
10   wire or how many exit signs should be illuminated, so
11   that's why we had Mr. Cabanaw there.
12        You initially alluded to asking about the
13   citations.   So that's why we have a member of
14   Municipal Court there.   So that would actually have
15   been a third tier in making sure the citation is
16   correct.
17        So we write the citation out, a supervisor
18   looks over it, and then there's a member of Municipal
19   Court that will look at these same citations and say,
20   all the facts or the elements of the crime are there.
21   This is good to go.   They sign off on it.
22        And then it goes to the jail, and then the
23   jail in fact will look at the computer and say, this
24   is a bondable offense, yes.   They sign off on it, and
25   then you're released.

1        So there have been oftentimes -- so we had

2   building, Municipal Court, and oftentimes there's a

3   fire inspector that will come out with us and look for

4   fire codes as well.

5        Q.   My question was just one of fact.  Are you

6   aware of was a citation or any charge issued with

7   respect to the tint on the windows?

8        A.   That's something Mr. Cabanaw -- I do know

9   Mr. Cabanaw wrote a plethora of violations, so I can't

10  tell you exactly if that was a specific one.  I can

11  tell you that there is a charge for that.  It's 10-72,

12  obscuring the windows.

13       Q.   10-72?

14       A.   10-72, yes, sir.

15       Q.   And that would apply to -- 10 is the Alcohol

16  Code; right?

17       A.   Yes.

18       Q.   So that would apply to a business that is

19  under the auspices of the Alcohol Code?

20       A.   What is defined in Chapter 10.  In addition

21  to that, though, there are certain codes that Mr.

22  Cabanaw would have knowledge of that certain

23  businesses can't have the tinted windows or obscured

24  windows.

25       Q.   So I understand that you testified at the

1   trial in Municipal Court.  Did you have any

2   involvement in the appeal to the Superior Court?

3        A.   No.

4        Q.   Okay.  You didn't attend any of those

5   proceedings?

6        A.   No.

7        Q.   Okay.  Were you ever consulted by counsel

8   about anything that happened for purposes of those

9   proceedings?

10       A.   No.

11       Q.   Okay.

12            MS. STEWART:  Objection, assuming facts

13       not in evidence.  You don't know if the City knew

14       or not about an appeal.

15            MR. RADFORD:  Noted for the record.  I

16       don't have any further questions.

17            MS. STEWART:  We'll read and sign.

18            (Deposition concluded at 2:21 p.m.)

19            (Pursuant to Rule 30(e) of the Federal Rules

20   of Civil Procedure and/or O.C.G.A. 9-11-30(e),

21   signature of the witness has been reserved.)

22

23

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3    STATE OF GEORGIA:

4    COUNTY OF COBB:

5

6             I hereby certify that the foregoing
     transcript was reported as stated in the caption and
     the questions and answers thereto were reduced to
7    writing by me; that the foregoing 107 pages represent
     a true, correct, and complete transcript of the
8    evidence given on Wednesday, May 31, 2017, by the
     witness, SERGEANT BRYANT BURNS, who was first duly
9    sworn by me.

10            I certify that I am not disqualified for
     a relationship of interest under O.C.G.A. 9-11-28(c);
11   I am a Georgia Certified Court Reporter here as an
     independent contractor of JPA Reporting, LLC, who was
12   contacted by James E. Radford, Esq., to provide court
     reporting services for the proceedings; I will not be
13   taking these proceedings under any contract that is
     prohibited by O.C.G.A. 15-14-37(a) and (b) or Article
14   7.C. of the Rules and Regulations of the Board; and by
     the attached disclosure form, I confirm that neither I
15   nor JPA Reporting, LLC, are a party to a contract
     prohibited by O.C.G.A. 15-14-37(a) and (b) or Article
16   7.C. of the Rules and Regulations of the Board.

17

18            This 26th day of June, 2017.

19

20

21

22

23            _____
              PATRICIA M. LESCH
24            CERTIFIED COURT REPORTER
              GEORGIA CERTIFICATE NO. CCR B-2435
25

```
 1              DISCLOSURE OF NO CONTRACT

 2

 3              I, Lynn Pyles, do hereby disclose
        pursuant to Article 10.B of the Rules and Regulations
 4      of the Board of Court Reporting of the Judicial
        Council of Georgia that JPA Reporting, LLC, was
 5      contacted by the party taking the proceedings to
        provide court reporting services for these proceedings
 6      and there is no contract that is prohibited by
        O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the
 7      Rules and Regulations of the Board for the taking of
        these proceedings.

 8
                There is no contract to provide reporting
 9      services between JPA Reporting, LLC, or any person
        with whom JPA Reporting, LLC, has a principal and
10      agency relationship nor any attorney at law in this
        action, party to this action, party having a financial
11      interest in this action, or agent for an attorney at
        law in this action, party to this action, or party
12      having a financial interest in this action.  Any and
        all financial arrangements beyond our usual and
13      customary rates have been disclosed and offered to all
        parties.

14
                This 26th day of June, 2017.
15

16

17            _____
              LYNN PYLES, FIRM REPRESENTATIVE
              JPA REPORTING, LLC

18

19

20

21

22

23

24

25
```

1  DEPOSITION OF:  SERGEANT BRYANT BURNS / PML

2      I do hereby certify that I have read all
questions propounded to me and all answers given by me
3  on May 31, 2017, taken before Patricia M. Lesch, and
that:

4
_____ 1)  There are no changes noted.
5  _____ 2)  the following changes are noted:

6      Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or the Official Code of Georgia
7  Annotated 9-11-30(e), both of which read in part:  Any
changes in form or substance which you desire to make
8  shall be entered upon the deposition...with a
statement of the reasons given...for making them.
9  Accordingly, to assist you in effecting corrections,
please use the form below:

10

11  Page No. _____ Line No. _____ should read:  _____
_____
12  Reason for change: _____

13  Page No. _____ Line No. _____ should read:  _____
_____
14  Reason for change: _____

15  Page No. _____ Line No. _____ should read:  _____
_____
16  Reason for change: _____

17  Page No. _____ Line No. _____ should read:  _____
_____
18  Reason for change: _____

19  Page No. _____ Line No. _____ should read:  _____
_____
20  Reason for change: _____

21  Page No. _____ Line No. _____ should read:  _____
_____
22  Reason for change: _____

23  Page No. _____ Line No. _____ should read:  _____
_____
24  Reason for change: _____

25

1    DEPOSITION OF:   SERGEANT BRYANT BURNS / PML

2    Page No. _____ Line No. _____ should read: _____
     _____
3    Reason for change: _____

4    Page No. _____ Line No. _____ should read: _____
     _____
5    Reason for change: _____

6    Page No. _____ Line No. _____ should read: _____
     _____
7    Reason for change: _____

8    Page No. _____ Line No. _____ should read: _____
     _____
9    Reason for change: _____

10   Page No. _____ Line No. _____ should read: _____
     _____
11   Reason for change: _____

12

13   If supplemental or additional pages are necessary,
     please furnish same in typewriting annexed to this
14   deposition.

15
                  _____
16                SERGEANT BRYANT BURNS

17   Sworn to and subscribed before me,
     This the _____ day of _____, 20____.
18
     _____
19   Notary Public
     My commission expires: _____
20

21

22   Please forward corrections to:

23                    JPA Reporting, LLC
                 1776 Peachtree Street, N.W.
24                     Suite 390-N
                   Atlanta, Georgia 30309
25                     404-853-1811

DEVON W. BROWN vs.
THE CITY OF ATLANTA, GEORGIA, et al.

SERGEANT BRYANT BURNS
May 31, 2017

## A

**A-1 (1)** 23:12
**ability (4)** 28:14,18;40:5;
47:17
**able (4)** 6:1;16:25;46:19,22
**Absolutely (2)** 6:3;22:9
**Academy (1)** 100:9
**access (5)** 33:8,16,17,22;
34:5
**accordingly (1)** 63:16
**accurate (6)** 6:9;25:22;26:7;
41:14;43:22;45:19
**accused (1)** 95:4
**act (5)** 78:1;89:12;97:14;
102:16;103:12
**action (3)** 7:19;39:2;94:8
**activity (2)** 48:21;63:17
**actual (1)** 66:8
**actually (16)** 6:15;23:1;25:6,
11;30:21;37:6;54:16;57:1;
58:13;65:8;70:17;74:22;
78:1;80:23;102:23;105:14
**addition (3)** 99:9;105:5;
106:20
**additional (2)** 45:1;47:25
**Additionally (3)** 18:15,20;
98:8
**address (1)** 11:4
**addresses (1)** 82:7
**adequate (2)** 86:9,11
**adjudicated (1)** 14:12
**Administration (1)** 100:22
**administrative (16)** 7:23;8:4;
12:7,10;14:5,24;15:8;16:4;
27:3;30:7,11;31:10,11;
38:19,21;39:1
**administratively (2)** 15:21;
36:15
**admitted (1)** 81:7
**adult (5)** 77:16;79:2;104:10,
19,22
**adults (1)** 103:20
**advised (1)** 95:17
**Affairs (12)** 6:12;24:12;
54:23;88:21;89:18,21;93:8;
96:13,19;98:20;101:11,15
**affidavit (1)** 101:1
**affirmative (2)** 54:14;69:1
**afforded (1)** 100:19
**again (23)** 13:9;14:4;17:13;
20:17;21:4,25;24:11,20;
30:12;33:11;35:17;38:16;
39:2;44:23;46:5,7;47:5,18,
25;50:12;51:17;53:20;84:2
**against (7)** 7:19,24;14:5;
15:9;38:23;76:25;101:14
**agency (1)** 98:9
**agent (14)** 7:24;14:7,15;
27:12;29:7,13,20;38:18,23;
39:4,6,13,19,22
**agents (3)** 11:18;38:2;55:23

**ago (6)** 83:2,11,12,13;84:7,
11
**agree (18)** 11:17;12:4,8;
15:25;16:3;17:20;29:18;
32:5;40:3;44:20;45:4,22;
48:16;51:6;52:5;62:4;
69:25;70:2
**agreed (1)** 89:17
**ahead (3)** 16:24;77:18;
100:3
**Alcohol (77)** 7:20,24;8:14,
18;9:18,23;10:17;11:9,10,
15,20,22;12:6,15;14:5,8,10,
11;15:16;16:12,15,20;17:1,
7,12,13;32:18;33:9,13;34:6;
36:22;38:24;45:2;49:4,6,16,
17,20;50:2,5,9,10,14,16;
51:2,8,12,13,16,19,20,23;
52:2,6,7,12,15,16;53:11;
54:3;58:2;59:11;60:19;
64:11,12;77:11,11;78:20,
20;81:2,25;83:19,20;90:8;
101:8;106:15,19
**alcoholic (2)** 48:19,23
**alcohol-licensed (2)** 77:8;
80:11
**alert (1)** 98:5
**Alfred (2)** 56:6,8
**alleging (1)** 93:1
**allowed (8)** 21:11;22:19,22;
52:21;68:4;77:9;95:22;
103:17
**alluded (1)** 105:12
**almost (1)** 96:23
**along (4)** 63:14;82:15;
93:20;95:6
**although (1)** 81:12
**amongst (1)** 28:9
**and/or (2)** 38:14;107:20
**Animal (2)** 27:15,17
**ankle (1)** 78:2
**answered (4)** 24:5,7;25:8;
47:15
**APD (1)** 101:5
**apparently (1)** 75:22
**appeal (2)** 107:2,14
**appear (7)** 23:21;43:21;
44:5;68:7;93:17;98:21,24
**appeared (2)** 94:9;98:25
**appears (2)** 6:6;29:5
**applicable (4)** 20:11,18;
43:25;46:4
**applied (1)** 88:11
**applies (2)** 17:21;52:9
**apply (12)** 7:1;13:5;20:11;
22:4,5;37:6;38:1;51:12;
52:11;61:21;106:15,18
**appreciate (2)** 74:19;92:13
**approval (1)** 33:6
**area (9)** 56:2;57:24;58:3;
63:9,25;79:5;85:25;86:6;
105:8
**argue (1)** 86:22

**around (8)** 57:16;63:22;
78:23,25;82:21;85:23;
89:24;91:2
**arrest (49)** 5:10;26:23;27:4,
6,8,17;28:1,7,12;29:24;
40:23;41:9;44:21;45:3,5,
23;46:1,11;47:4,11,20;48:9;
57:1,7;64:5;86:17,18;
87:10;88:7,17;89:13,16;
90:16;91:7;92:23;93:19,24;
96:21;97:1,4,9,16,23;98:1,
14,15,18;99:4,8
**arrestable (1)** 46:14
**arrested (13)** 42:20,23;43:4;
46:22;88:5;94:1;97:5,7,10;
98:6;102:4,9,12
**arrests (1)** 13:19
**arrive (1)** 91:1
**arriving (1)** 75:11
**Article (5)** 4:2;44:5,11,17,18
**aside (1)** 16:13
**assembled (1)** 62:16
**assigned (6)** 6:19;38:10;
40:10;100:9,14;101:5
**assignment (2)** 101:8,18
**assume (2)** 60:11;90:1
**assumed (1)** 59:23
**assumes (1)** 59:19
**assuming (1)** 107:12
**assured (1)** 80:6
**Atlanta (45)** 4:7;22:5;2:7;3;
8:15;14:8;16:14;18:22;
20:23;22:13;23:20;25:16;
26:14;29:6,19;30:17;31:2,
20;32:19;33:1;35:3;42:25;
46:16;49:21;55:12,21;
61:19;63:18;64:24;80:15;
81:18;83:3;84:15;85:19;
89:24;90:20;93:6,7,8;94:8;
97:11;100:6,7,10;104:10
**attack (1)** 63:5
**attend (1)** 107:4
**attention (2)** 18:14;46:25
**attorney (3)** 93:21;98:20,21
**auspices (1)** 106:19
**authenticate (1)** 70:1
**authority (33)** 7:1,1;17:25;
18:4,9,23;19:2;20:6;23:20;
24:2,17;25:1,5,11;26:18;
27:21,22;28:24;29:7,20,21;
30:10;31:9;34:21,24;35:25;
40:16;41:1;44:20;45:23;
47:4;55:25;93:25
**authorized (3)** 17:25;76:1,8
**available (1)** 61:20
**average (2)** 28:22;88:13
**awaiting (1)** 92:6
**aware (5)** 28:2;30:6,8;
60:20;106:6
**away (1)** 71:22

## B

**back (25)** 11:3;36:16;50:21,
22;52:25;54:8;58:7;63:22;
71:14,17;72:6,10,15;75:15;
82:1,5,17;91:10;92:2,8;
96:19,24;101:5,16;103:2
**badge (1)** 87:17
**balance (1)** 46:15
**balances (1)** 47:25
**Bankhead (1)** 100:11
**bar (13)** 49:8,10;50:16,21,
23,24;58:3,23;60:10,19;
78:20,21;82:21
**bartender (1)** 58:22
**based (2)** 37:6;44:19
**basically (6)** 27:24;39:9,13;
85:12;90:6;97:14
**basis (3)** 6:2;19:2;50:6
**bass (1)** 76:12
**beat (2)** 36:10,18
**became (1)** 18:6
**become (1)** 32:25
**beer (4)** 49:9;50:4;83:21,23
**began (1)** 86:25
**beginning (1)** 71:20
**begins (3)** 13:21;18:14;
54:12
**behalf (2)** 55:12;92:10
**behind (13)** 49:7,9;50:1,16,
21,23,24;58:3,23;60:19;
71:25;72:1;78:21
**belief (3)** 30:14;46:11;61:15
**belligerent (1)** 80:3
**belong (1)** 89:3
**bench (1)** 82:23
**best (2)** 47:16;73:9
**better (3)** 57:14;73:7;87:23
**beverages (2)** 48:19,23
**beyond (2)** 17:25;60:25
**big (1)** 18:12
**billiard (2)** 59:13;80:22
**Bingo (4)** 51:25;52:11;
53:21,22
**black (4)** 53:1;54:16;76:22;
79:8
**blend (1)** 58:18
**block (2)** 62:23;65:25
**Board (7)** 4:2;13:25;14:5,
24;38:19;40:1;99:13
**body (2)** 46:19;48:8
**bold (1)** 42:21
**bona (1)** 77:15
**bond (4)** 46:20,23,24;48:14
**bondable (1)** 105:24
**booking (6)** 96:15,16,20,23,
25,25
**both (8)** 32:17;38:4;49:1,2;
62:12;65:10;78:11,12
**bottlesof (1)** 83:22
**bottom (1)** 41:12
**break (1)** 85:15
**brief (1)** 95:9
**briefly (1)** 100:5
**bring (6)** 7:23;14:17,23;

DEVON W. BROWN vs.
THE CITY OF ATLANTA, GEORGIA, et al.

SERGEANT BRYANT BURNS
May 31, 2017

38:19;39:1;46:24
**broad (1)** 40:12
**broader (1)** 23:25
**Brown (67)** 4:7;5:10;38:20;
41:10;57:2;60:22;61:5,6,7,
8;79:20;80:2;81:5,15;
82:18,18,22,25;83:11;84:1,
17;85:1,2,9,25;86:13,14,16,
18,24;87:2,8,9,10,21;90:3,7,
8,9,23;91:5,11;92:1,5,9,15,
18,19;93:1;94:20;95:3,17,
25;96:7,17,24;97:1,5,6,10;
98:2,18;99:12,15,17,17;
102:4
**Brown's (4)** 26:19;49:4;
62:19;66:9
**Bryant (3)** 4:6,13,20
**B-R-Y-A-N-T (1)** 4:20
**building (19)** 8:17;18:21,23;
19:6,20;21:8;23:5,12,19;
24:21;34:2;49:25;50:15;
57:25;62:15;80:15;85:18;
105:4;106:2
**Buildings (1)** 85:10
**bulge (1)** 87:11
**bunch (1)** 52:10
**Bureau (1)** 85:10
**burned (3)** 78:17,18;85:16
**burning (1)** 77:23
**Burns (6)** 4:6,13,18,20;75:8;
84:19
**B-U-R-N-S (1)** 4:20
**business (156)** 8:10,14,16,
17;9:10,11,13,15,15,16,22;
10:14,16;11:6,8,19;12:3,5,
19;13:6,6,19;14:9;15:14,15;
16:8,14,15,16;17:15;18:2;
19:9,10,20,22,23,24;20:1,
13,14,21,22,23,24;21:3,5,5,
7,8,13,16,17,20,21,22;
22:10,11,15,18,24;23:5;
24:10,11,19,20,22,23,25;
25:2,4;26:14,25;27:1,13;
30:2,15;31:12;32:10,17,20;
33:10,11,17;34:1,1,3,6,13,
18;36:5,14,25;40:11,18;
44:1,9,10;45:7;55:8;57:19;
58:13,17,19;59:8,12,14,16,
18,24;60:6,8,11,20,23,24;
61:9;62:7,8;63:2;65:11,14;
66:2,3,13;72:12;76:24;
79:13,17,21,23,24;80:5,8,
10,11,12,17,18;81:8,8,23,
23;82:12,13;83:17,18,20,
25;84:13,25;85:1,7;90:3;
103:8,16;106:18
**businesses (15)** 11:13;
12:24,25;15:14,23;16:5,21;
22:13;30:5;65:21;66:10;
77:13;82:14,15;106:23

**C**

**C1 (17)** 18:22;19:6,15;21:2;
23:4,9,10,12,15,19;24:1,11,
17;25:17,17,22;26:2
**Cabanaw (13)** 56:17;74:10,
11;85:10,17,18,23,24;
105:3,11;106:8,9,22
**cafe (1)** 52:15
**call (13)** 9:14,15;20:3;
27:13,18;34:2,19;36:3;
38:1;63:6;88:22;89:18;
96:19
**called (8)** 7:5;41:19;47:12,
13;53:4;94:23;97:25;98:19
**calling (1)** 94:9
**calls (1)** 52:23
**Calvin (3)** 5:18,19;56:3
**came (11)** 11:14;61:4;
72:14;74:16;83:3;84:20;
89:17;92:1;95:11,12;99:8
**Campbellton (3)** 62:23;
65:19;103:8
**can (75)** 7:12;10:18;12:2;
13:20;14:3,13;17:3,15;19:6,
9,23;20:23;21:25;23:6;
24:6;25:21;26:6;27:25;
28:20;30:4,13;33:2;35:13;
36:23;37:10,16;38:22;
39:25;42:22;43:1;44:23;
45:12,16,18;46:11;47:16;
52:23;53:1,7,13;54:8;
57:20;64:7;66:23,24,25;
67:10,15,21,22,23,23;68:1,
2,13,13,14,19;69:23;70:25;
71:14,17,17;72:11;73:5;
74:17;75:11;77:18;80:18;
84:10;90:1;94:7;100:4;
103:2;106:10
**cans (1)** 83:21
**capacity (1)** 64:10
**captain (1)** 89:15
**car (1)** 89:25
**carry (1)** 9:5
**carrying (1)** 20:19
**cars (2)** 77:3,19
**Case (10)** 4:9;5:12;13:24;
14:12;38:17,20;41:21;
94:11;95:20;96:11
**cases (5)** 8:2;15:22;94:18;
100:23,24
**cash (2)** 58:24;59:2
**caught (2)** 15:16;16:20
**cause (19)** 7:14,16,18;8:5;
9:22;10:8,12;12:8;13:22;
14:13,14,17;38:13,16;
39:15,18,19,23;64:7
**cease (2)** 77:11,12
**cell (2)** 75:19;91:23
**Center (1)** 90:21
**certain (7)** 30:14;43:12;
63:9;96:14,23;106:21,22
**certificate (1)** 48:22
**certified (3)** 26:22;27:7;
28:19
**chairs (1)** 82:21
**change (1)** 83:14
**changed (2)** 69:24;86:17
**changing (1)** 58:14
**Chapter (17)** 7:7,20;10:18;
17:7,7,22;46:3,4;48:23;
50:10;51:3,9;52:2,6,8;54:4;
106:20
**characterization (1)** 29:8
**charge (14)** 5:14;45:1;46:4,
17,18;47:5,23;48:3,14,25;
57:19;83:24;106:6,11
**chargeable (1)** 49:2
**charges (13)** 8:1;13:25;
14:25;15:2,4,8;28:8;39:3;
43:2;92:8;95:3;99:10;
101:13
**charging (1)** 46:2
**check (36)** 8:25;9:3,6,17,24;
10:9,10,13,16,19;12:11,19,
21,23;13:5,13,16:9;17:17;
18:1,23;19:7;20:7;21:1,21;
22:11;30:2,4;36:6,22;40:6;
48:4;55:10;56:2;61:14;
65:22;80:2
**checked (2)** 63:21;66:11
**checking (3)** 19:19,22;75:16
**checks (14)** 9:4;31:17,19,
24;32:2,4;35:2,7,19,22;
46:15;47:25;65:5;103:11
**chief (1)** 85:18
**circumstances (9)** 19:14;
28:9;50:13;69:15,16,20;
76:3;81:5;92:21
**citation (9)** 14:11;28:8;41:9,
15;47:20;105:2,15,17;106:6
**citations (8)** 13:19;27:3;
28:1;37:25;48:1;91:7;
105:13,19
**cite (3)** 8:2;21:21;45:3
**cited (5)** 11:5;44:5;53:10;
84:4;86:15
**citizen (1)** 88:13
**City (50)** 4:7,21;5:2;7:3;
8:15;10:25;12:16;13:3,3;
16:3,14;17:8;18:22;19:5;
20:22;22:20;23:20;26:14;
31:1,20;32:7,9;33:1,7,12;
34:22;35:3;36:2;38:14;
42:3,19,24;44:7;46:8,12,15;
49:21;55:12,21;61:19;
64:24;81:17;85:19;89:15;
94:8;97:11;100:5;104:9,9;
107:13
**City's (1)** 42:21
**citywide (1)** 91:2
**civil (3)** 98:21;99:13;107:20
**civilian (3)** 28:14,22;38:1
**civilians (3)** 7:5;26:24;55:19
**clarifies (1)** 49:22
**clearly (2)** 51:19;79:4
**closed (9)** 18:15,21;63:1;
65:22,23;66:4,6,13;77:17
**club (32)** 51:6,7,13,14,15,
18,21,25;52:1,3,4,11,21;
53:4,15,16,16,17,20;77:21;
79:6;81:16,17,18,20;82:2,4,
19;93:2;104:9,19,22
**clubs (3)** 51:12;63:25;77:16
**code (46)** 6:23;7:20;13:3,
16;15:17;17:10,14,20;
25:16;26:1,16;27:6;28:2,12,
16;29:7,12,13,20;36:22;
38:2;42:25;43:12,18,19,22,
25;45:2,8;46:2;47:19;48:7;
49:16;52:13,16,16,23;53:2,
11;54:3;76:25;86:9,10;
97:12;106:16,19
**codes (7)** 10:18;16:1;26:14;
27:3;29:6;106:4,21
**coincide (2)** 69:14;96:20
**coin-operated (3)** 16:18;
59:12;80:21
**collect (3)** 59:9,13;60:4
**collected (2)** 44:13;59:6
**collection (1)** 44:18
**color (2)** 55:20;58:21
**comfortable (2)** 34:12,15
**coming (9)** 27:16;55:2;
84:10;89:19,20;91:2,92:8,
9
**commander (2)** 63:12;89:14
**commanding (1)** 5:13
**comment (2)** 93:8,9
**commercial (22)** 18:21,22;
19:6,15;21:2;22:15,19;23:4,
9,12,19,19;24:1,21,23;
49:17,25;50:15;53:22;55:8,
9;76:24
**committed (1)** 61:16
**common (2)** 57:23;86:1
**community (1)** 63:8
**company (1)** 45:1
**compared (1)** 96:24
**compartments (1)** 57:22
**complaint (2)** 24:12;72:17
**complete (1)** 42:11
**completely (7)** 11:21;76:22;
78:2,15;79:1;80:5;86:9
**compliance (49)** 6:23;7:2,4,
7,22;8:23;10:9,13,19;11:21;
12:17,19,21,23;13:17;
18:24;26:15,21;27:10,21,
25;28:4,13,18;30:3,4,15;
32:11;34:3;36:14;45:2;
46:3;55:10;56:2;61:14;
65:5,6;66:3,11;80:2;84:21,
23;88:10,12,12,13,14;
102:20;103:11
**compliances (2)** 17:17;
101:9
**complied (2)** 13:15;79:11
**comply (2)** 50:9;86:16
**complying (1)** 12:12
**components (2)** 98:12;
105:5,7

DEVON W. BROWN vs.
THE CITY OF ATLANTA, GEORGIA, et al.

SERGEANT BRYANT BURNS
May 31, 2017

**computer (2)** 33:22;105:23
**computers (1)** 9:5
**concerned (3)** 33:24;79:15
**concluded (1)** 107:18
**condoms (1)** 89:9
**conduct (17)** 10:1;8;11:19;
12:15;13:18;16:16;21:16;
28:20;30:13;31:9,18;40:11;
55:5,9;56:1;80:2;103:10
**conducted (12)** 23:5;25:4;
30:18;31:13;40:13;58:14;
59:8,15;60:11,21;62:1;94:5
**conducting (14)** 20:12,24;
21:3,13;22:10,18,23;24:21,
25;25:2;30:7;40:17;61:14;
63:15
**confirm (8)** 20:3;25:3,21;
26:7;30:14;42:22;43:1;
45:18
**confirming (1)** 61:15
**consensual (1)** 103:20
**consenting (1)** 55:2
**consistent (1)** 69:19
**conspicuous (1)** 80:25
**conspiracy (1)** 100:23
**consulted (1)** 107:7
**consuming (3)** 49:19;50:14;
78:19
**contact (2)** 61:5;94:10
**contacted (3)** 88:20;89:14;
96:12
**contemplated (1)** 7:16
**content (1)** 92:24
**context (1)** 51:8
**continued (5)** 78:16;82:24;
86:22,22;103:10
**Control (6)** 27:16,17;79:13,
16;81:7;89:15
**conversation (2)** 85:4;96:3
**conversations (2)** 92:14;
94:12
**convicted (1)** 102:6
**coolers (1)** 83:23
**copy (12)** 6:9;28:7;41:14;
43:18,22;45:17,19;73:8,9,
19;96:14;97:25
**corrections (1)** 90:24
**corridor (3)** 63:21;75:17;
82:16
**Corruption (1)** 101:12
**cost (1)** 15:15
**Council (1)** 4:3
**counsel (3)** 75:24;94:21;
107:7
**counsel's (1)** 82:10
**counter (2)** 49:7;50:1
**County (24)** 27:15;80:20;
86:7;87:18,20,23;88:1,4,8,
19,21;89:3;96:13,18,19;
97:19,21,23;98:13,20,20;
99:3,6,15
**couple (6)** 64:11;78:1;
83:22;89:11;99:24;101:24

**coupled (1)** 77:20
**course (1)** 19:12
**Court (19)** 4:3,10;8:3;14:13;
15:5,18;44:6;94:6,13,16,18;
95:11,14;96:8;105:14,19;
106:2;107:1,2
**courtesy (3)** 91:10,19,25
**cover (1)** 16:5
**create (1)** 9:21
**created (1)** 38:17
**credentials (2)** 88:19,23
**crime (2)** 61:15;105:20
**crimes (2)** 30:15;57:17
**criminal (18)** 8:1;14:1;15:1,
4,5,17;28:21;39:3,3;46:18,
23;47:19;48:1,6,14;94:18;
101:13;103:13
**CROSS-EXAMINATION (1)**
4:16
**crowd (1)** 58:18
**Crystal (1)** 95:8
**currently (3)** 4:9;10:25;11:9

# D

**damn (2)** 80:4;92:8
**dancing (2)** 50:15;79:2
**dark (1)** 15:24
**data (3)** 8:16;32:20,21
**database (6)** 8:13;9:17,24;
10:10;32:14;34:12
**date (6)** 96:7,20,21,25;97:2;
99:5
**day (8)** 8:7;9:10,14;10:15;
27:19;33:2;34:14,14;92:19
**days (3)** 10:24;64:11;92:20
**dear (1)** 75:2
**death (1)** 85:13
**deceased (1)** 85:21
**decided (2)** 95:23;103:7
**decision (6)** 5:22,24;6:2;
57:6;86:18;99:13
**declined (1)** 93:8
**dedicated (1)** 63:9
**deejay (4)** 90:5,12,13;95:5
**deem (1)** 30:14
**deemed (3)** 20:22;104:2,5
**Defendants (1)** 41:20
**define (4)** 27:22;28:13;30:9;
31:9
**defined (6)** 6:22;51:6,10,
18,19;52:2,12,15,16;53:17;
86:9;106:20
**defines (8)** 25:16;29:6,12,
19;30:18;40:4,15,25
**defining (1)** 52:3
**definitely (3)** 78:9;91:22;
102:25
**definition (4)** 51:7,13;52:18;
82:3
**Definitions (1)** 51:2
**deliver (1)** 91:7
**deny (2)** 25:21;26:7

**Department (23)** 5:2;7:4;
8:18;14:8;19:9,9;30:17;
32:19;33:7;55:13;63:18;
80:15,20;83:3;84:16;86:7;
88:21;89:3;93:9;97:11;
100:6,8,10
**depend (1)** 47:23
**depending (1)** 19:14
**depict (1)** 68:7
**depicted (3)** 68:17;69:9,18
**depicting (1)** 66:19
**deposition (3)** 4:6;68:3;
107:18
**deputies (1)** 89:22
**deputy (5)** 87:22,23;88:1,4,
19
**Describe (2)** 78:7;83:10
**described (3)** 47:2,3,21
**designed (2)** 16:5;51:8
**detail (2)** 78:8;100:5
**detain (1)** 102:22
**detained (5)** 72:18,24;87:1;
89:9;93:3
**Detention (1)** 90:21
**Devon (4)** 4:7;5:10;79:19,
20
**devote (1)** 19:19
**Different (6)** 8:18;22:16;
27:15;37:17;60:3;79:20
**Dillon (3)** 56:13;87:13,13
**direct (2)** 18:13;75:6
**disagree (2)** 16:7;51:17
**disclosure (1)** 4:1
**discourage (1)** 36:21
**discovery (4)** 67:4,6;74:22,
25
**discretion (4)** 28:3,7,8,11
**discussed (1)** 63:5
**discussion (1)** 97:22
**dismissed (3)** 99:12,14;
102:6
**dispel (1)** 30:14
**dispelling (1)** 61:15
**displayed (1)** 60:13
**disposed (2)** 8:2;94:18
**disposition (2)** 95:2;102:5
**dispositive (1)** 60:5
**dispute (1)** 74:24
**distance (1)** 68:9
**distilled (1)** 83:22
**distinction (5)** 47:1,1,10,12;
48:16;104:19
**District (2)** 4:9,10
**Division (4)** 44:10;61:20;
100:10;101:16
**document (9)** 29:9;31:8,15;
40:4,14;42:18;43:7;48:3;
51:5
**documentation (6)** 80:7,22;
82:9;83:1;84:3;87:4
**documents (2)** 62:10;64:25;
85:10;86:14;96:14
**dog (1)** 27:16

**done (4)** 9:4;57:10;65:5;
91:8
**door (53)** 18:15,20;19:11,
12;21:24,25;54:12,16,17,
21;55:1,4,4,7;66:15;69:22;
70:4,7,7,12,17,21,21;71:4,5,
7,8,11,11,13,22,24,24;72:3,
18,22;75:17,19,23,25;76:2,
3,7,20;77:21,22,24;78:12;
80:13;85:2,16;104:9,13
**doors (1)** 19:24
**door's (4)** 22:1,20;62:7;
104:24
**doorway (1)** 75:18
**down (12)** 48:5;72:23;78:2;
79:9;81:21;82:22,23;83:3,
16;84:22;87:10;93:3
**drawers (1)** 57:21
**drink (1)** 50:11
**driver's (1)** 86:15
**driving (1)** 14:20
**drove (2)** 9:7;65:24
**Drug (3)** 100:20,22,24
**due (14)** 7:14,16,18;8:5;
13:22;14:3,13,17;38:13,16;
39:14,18,19,23;64:18
**duly (1)** 4:14
**dump (1)** 67:13
**during (19)** 9:2,10,14;19:10;
25:22;43:11;64:13;82:10;
85:24;89:19;94:16,17;95:8;
96:1,12;97:18,20;98:11;
103:7
**duties (2)** 37:1;55:16
**dwelling (2)** 23:2,2

# E

**earlier (2)** 70:9;82:10
**ears (1)** 63:8
**easily (1)** 94:18
**effect (5)** 27:4,6;39:24;
43:22;45:20
**effected (4)** 57:1;88:16;
90:16;99:4
**effective (1)** 31:6
**eight (2)** 78:25;84:7
**either (2)** 73:17;98:12
**elderly (2)** 52:10;53:20
**electronically (1)** 96:17
**elements (1)** 105:20
**else (10)** 9:9;57:6;60:12;
62:21;73:12;76:14;84:17;
85:22;87:1;88:7
**e-mail (2)** 63:11,14
**emanating (1)** 76:12
**emitting (1)** 9:8
**employed (1)** 79:16
**Employee (2)** 6:6;87:20
**employees (1)** 58:20
**employment (2)** 98:8,9
**empowered (1)** 46:7
**end (1)** 96:2

DEVON W. BROWN vs.
THE CITY OF ATLANTA, GEORGIA, et al.

SERGEANT BRYANT BURNS
May 31, 2017

**enforce (9)** 7:7;10:18;27:2;
32:7;34:21;36:2;44:24;
46:8;53:2
**enforced (1)** 52:24
**enforcement (25)** 18:9;27:2;
28:23;29:7,13,20;30:9;
34:24;35:25;37:1;38:2,3;
40:15;55:16,25;62:13;80:3,
5;88:25;91:12,14,24;92:11;
100:20,22
**enforcing (1)** 32:9
**engaged (4)** 9:10;78:1,9;
89:12
**enhance (1)** 44:17
**enhanced (2)** 69:24;70:24
**enough (1)** 26:11
**enter (34)** 5:22;10:5,12;
17:25;19:2,10,24;20:6,15;
21:11;22:1;24:17;25:6;
30:10;37:7;40:5;56:11,13,
15,17,19,21;62:6;65:17;
66:2,8;68:18,23;75:21;76:1,
8;80:12;82:11;93:25
**entered (19)** 19:6;26:19;
55:11,12,15;56:3,6,10;57:9;
58:15;64:10;69:21;72:5;
73:3;76:4,15;84:25;89:11;
104:17
**entering (6)** 20:25;62:3;
69:3;77:21;80:24;89:23
**enters (1)** 73:1
**entertainment (3)** 77:16;
79:2;104:11
**entire (2)** 39:16;42:14
**entries (1)** 13:4
**entry (9)** 5:9,14;17:11;30:2;
40:16,22;66:19;68:7;93:2
**equally (1)** 13:5
**equipment (1)** 86:11
**especially (3)** 30:19;36:15;
89:10
**establishment (20)** 7:20;
8:10,12;9:25;17:16;54:12;
69:12;76:1,5,13,15,17;
78:23;79:13;85:12;88:11;
89:8,23;102:9;104:17
**establishments (7)** 11:1;
17:9,22;18:1;32:15;62:17;
77:9
**etcetera (6)** 18:15;44:13,13;
48:23,24;54:12
**Even (13)** 17:18;20:4;
21:11;22:6;23:4;24:2;
46:18;49:16;50:10,24;68:9;
80:10;83:10
**evening (4)** 62:18;65:18;
66:9;68:8
**eventually (1)** 61:8
**Everybody (3)** 26:21;72:23;
85:3
**everyone (11)** 38:9;55:15;
66:24;69:21;72:14,14,15;
85:15;89:9;102:23;105:8

**evidence (11)** 57:17;58:11;
59:7,17,20,22;60:5,15,20;
102:3;107:13
**exactly (3)** 48:14;104:8;
106:10
**EXAMINATION (1)** 75:6
**examined (1)** 4:14
**example (10)** 8:22;9:7;14:7,
19;21:12;22:6;27:9;29:23;
51:12;59:16
**exceeded (1)** 7:1
**exception (1)** 81:1
**excerpts (3)** 42:3,7,9
**exchange (1)** 12:16
**Exhibit (20)** 6:5;17:6;25:15,
21;26:3,12;29:2,5;30:22,25;
41:4,7,23;42:1;43:14,17;
45:14,17;51:1;54:9
**exists (2)** 10:8,12
**exit (2)** 85:11;105:10
**expect (1)** 88:12
**expectation (1)** 88:10
**experience (4)** 15:22;36:11;
46:21;77:14
**expert (1)** 105:4
**expertise (1)** 105:8
**explain (2)** 14:3;82:12
**explained (3)** 82:3;83:11,15
**exposed (1)** 85:11
**extend (1)** 12:23
**extends (1)** 12:24
**extent (1)** 29:22
**extremely (3)** 78:17,19;80:3
**eyes (1)** 63:7

**F**

**facing (1)** 78:12
**fact (17)** 9:12,16,24;20:8;
21:13;25:2;59:17;60:19;
64:18;75:25;80:8;88:19;
91:12;98:13,24;105:23;
106:5
**factors (1)** 36:23
**facts (3)** 59:19;105:20;
107:12
**failed (1)** 27:12
**fails (1)** 44:10
**failure (1)** 14:15
**fair (6)** 19:1;24:15;26:11;
27:20;29:8;71:3
**fall (1)** 52:7
**familiar (13)** 5:8,12;25:17,
25;26:10,16;29:11,14,16;
34:17;43:19;46:13;49:15
**far (3)** 47:10;79:15;97:9
**February (11)** 5:9;6:19;
15:3;26:19;31:6;41:10;
43:23;45:20;68:8;98:23;
103:4
**fed (1)** 90:7
**Federal (4)** 100:20,25;
101:4;107:19

**feel (2)** 64:16;65:2
**fees (1)** 44:12
**feet (1)** 71:24
**felt (1)** 87:11
**female (5)** 78:2,4,10,12,13
**females (2)** 79:1,5
**few (2)** 75:8;77:15
**fide (1)** 77:15
**field (2)** 9:6;100:10
**files (1)** 9:11
**finally (2)** 79:19;81:6
**find (13)** 7:21;9:12,16,24;
10:22;13:12;17:17;19:18;
21:17;34:2;89:2;97:6;
102:14
**finding (1)** 57:19
**fine (2)** 15:18;67:16
**fines (1)** 44:16
**finished (1)** 53:25
**Fire (4)** 80:15;85:15;106:3,
4
**first (18)** 4:14;17:2,13;48:2,
4;49:14;66:25;67:5;68:18,
22,23;69:22;73:1;75:20;
86:19;89:11;90:24;96:17
**firsthand (1)** 37:5
**floor (4)** 72:23;82:20;85:7;
93:3
**fly-by-night (2)** 10:23;11:16
**focus (3)** 69:11;87:2;102:19
**focused (1)** 57:18
**folks (4)** 52:10;53:20;62:15;
73:1
**followed (2)** 71:25;72:1
**follows (1)** 4:15
**follow-up (2)** 75:5;101:25
**follow-ups (1)** 99:25
**food (3)** 58:6;80:19;86:7
**force (3)** 100:21,21;101:4
**fore-issued (1)** 33:4
**foremost (1)** 17:14
**forgotten (1)** 36:18
**form (1)** 59:25
**formerly (1)** 5:1
**forth (3)** 16:4;38:19;45:23
**forward (11)** 8:4;14:13;61:8,
8;81:5,7,10,12;82:18;95:12;
100:19
**found (10)** 11:18;12:25;
38:13;53:3;66:3;88:6;95:3;
98:11;99:14;102:3
**four (5)** 10:24;24:7;81:11;
100:22;102:24
**four-and-a-half (1)** 101:20
**fourth (1)** 73:14
**FOX (4)** 92:22,23;93:7,14
**frame (1)** 25:23
**free (4)** 48:25;72:19,24;93:4
**freely (2)** 93:18,20
**fridge (1)** 50:4
**friends (3)** 49:24;50:11;
53:23
**front (2)** 45:8;67:14

**full (1)** 4:19
**full-fledged (3)** 72:19;
102:22;103:5
**Fulton (22)** 27:15;80:20;
86:6;87:17,20,23;88:1,4,8,
18,20;89:3;96:13,18,19;
97:19,20,22;98:13,20;99:3,
6
**further (6)** 12:2;48:1;75:4;
99:22;101:22;107:16
**furthermore (1)** 45:6

**G**

**GA (5)** 84:9,9,14,15,17
**Gaines (2)** 95:8,13
**game (1)** 16:17
**Garnett (1)** 90:21
**Gary (1)** 56:11
**gather (3)** 41:21;59:17;
60:15
**gathered (1)** 64:3
**gave (3)** 6:9;67:7;76:17
**general (30)** 16:15,21;18:8;
26:13;28:23;29:19;32:17,
20;33:9,11,17;34:13,18,24;
35:25;36:9,13;37:1;40:13,
19,25;59:11;62:5;65:14;
80:17;81:22,23;82:15;
91:17;103:15
**generally (9)** 22:2;28:6;
30:12,16;36:1;80:10,12;
82:14;98:4
**generated (1)** 94:8
**gentleman (15)** 69:6;70:6,
10;71:6,21;72:18,21;73:6;
74:1,9,11;75:18;84:20;
85:1;88:18
**gentlemen (4)** 56:23,24;
70:20;73:16
**Georgia (4)** 4:4,7,10;98:9
**gets (1)** 12:16
**given (2)** 28:9;99:13
**gives (4)** 18:22;23:19;
34:20;45:3
**giving (6)** 92:22;93:18,20;
96:16;97:13;101:20
**Glazier (1)** 63:13
**goes (4)** 84:5;87:21;91:2;
105:22
**good (3)** 14:19;48:3;105:21
**Gordon (1)** 56:17
**governs (1)** 26:15
**grainy (2)** 73:4,24
**group (4)** 31:16;62:12,16,18
**guess (5)** 5:22;6:25;8:8;
33:21;56:1;64:22;69:10
**guilty (1)** 95:3
**guy (7)** 64:22;65:1;69:9;
70:11;74:6;88:23;90:4
**guys (4)** 67:7,8;89:18,19

DEVON W. BROWN vs.
THE CITY OF ATLANTA, GEORGIA, et al.

SERGEANT BRYANT BURNS
May 31, 2017

## H

**Hall (1)** 33:12
**handcuffed (1)** 87:8
**handcuffs (3)** 57:4;86:24;
93:3
**handgun (1)** 87:11
**hands (2)** 36:16;58:14
**happened (11)** 75:11,14;
79:25;81:14;85:8;87:7;
88:16;89:20;95:1;96:4;
107:8
**happens (3)** 39:10;52:7;
58:16
**harm (1)** 91:20
**hat (1)** 74:12
**head (1)** 13:10
**Health (2)** 80:20;86:7
**hear (1)** 76:12
**heard (1)** 95:15
**hearing (12)** 8:5;38:21;94:6,
16,17;95:6,8,25,25;96:8;
98:21;99:4
**held (5)** 38:24;39:2;55:1,7;
71:11
**help (1)** 70:16
**helped (1)** 21:14
**here's (1)** 53:14
**hesitate (1)** 43:7
**hey (2)** 32:25;51:24
**Highway (1)** 100:11
**himself (4)** 14:15;61:9;88:3;
94:10
**hip (1)** 87:11
**histories (1)** 28:21
**history (1)** 100:5
**holding (16)** 54:17,21;70:4,
10,17,21;71:4,5,6,8,10,13;
72:3,18;75:23;76:7
**holes (1)** 86:3
**home (6)** 22:4,5,6,9,10,18
**home-based (2)** 22:13,15
**Homeland (2)** 100:17,18
**honest (1)** 59:10
**hostile (1)** 93:17
**Hotel (1)** 52:12
**hours (13)** 9:2,11,15;11:23;
14:10,11;19:10;34:1;61:23;
63:16;64:15;81:2,3
**house (3)** 32:20,21;33:12
**housed (2)** 33:12;50:20
**houses (1)** 33:15
**huge (1)** 58:1

## I

**ice (1)** 83:23
**ID (1)** 87:20
**identification (12)** 29:3;
30:23;41:5,24;43:15;45:15;
86:20,21;87:16,17;88:6,25
**identified (3)** 58:20;61:9;
79:19
**Identify (5)** 42:19;83:7,8;
88:3,8
**identifying (1)** 88:25
**idle (1)** 97:12
**Ill (1)** 101:1
**illegal (8)** 11:19;15:13;
63:17;65:1;93:2;102:17;
103:21,22
**illegally (2)** 10:15;83:18
**illicit (1)** 97:14
**illuminated (1)** 105:10
**immediately (7)** 77:22,25;
79:7;85:11;87:10,16;
100:14
**important (4)** 13:2;75:25;
76:6,9
**impose (2)** 15:9,19
**imposition (1)** 44:16
**incident (4)** 6:7,18;8:9;99:5
**included (1)** 25:22
**includes (1)** 25:18
**including (1)** 24:16
**indicate (1)** 97:3
**indicating (1)** 58:4
**indicia (1)** 64:25
**individual (4)** 28:10;50:6;
68:17;73:14
**individuals (1)** 47:6
**inflict (1)** 14:14
**information (10)** 8:11,21;
33:8,12,13;37:7;41:21;
67:3;93:18,20
**initial (5)** 8:1,24;94:6;96:25;
98:18
**initially (7)** 62:22;82:20;
86:16;90:25;103:3,8;
105:12
**inside (4)** 13:14;64:19,20;
69:11
**inspect (12)** 12:17;14:9;
17:11;21:12;22:23;24:3,18,
22;25:1;28:15;36:14;57:16
**inspected (2)** 65:3,4
**inspecting (1)** 12:18
**inspection (5)** 12:7,10;17:3,
9;30:11
**inspections (2)** 16:4;30:7
**inspector (5)** 27:11;28:22;
62:15;85:18;106:3
**inspectors (6)** 7:5;31:17,18;
38:7,11,12
**interacted (1)** 91:24
**interaction (1)** 95:24
**interactions (1)** 99:16
**interchangeably (1)** 39:7
**intercourse (1)** 78:10
**interest (2)** 44:13,16
**interesting (1)** 72:16
**Internal (12)** 6:11;24:12;
54:22;63:11;88:21;89:18,
21;96:13,19;98:19;101:11,
15

**interpret (2)** 47:24;55:1
**interpretation (1)** 52:9
**interrogatories (3)** 41:19;
42:2,13
**interrogatory (1)** 42:4
**interview (4)** 92:22,25;94:2,
5
**interviews (3)** 42:12;43:11;
93:23
**into (55)** 5:22;10:5,12;13:4;
15:4;16:14;17:11,15,25;
18:19;19:2,7,10,24;20:25;
21:11,15;22:15,20;24:2,17;
25:6,11;28:14;30:2,10;
34:12;39:24;40:5,16;50:13;
57:21;61:4;62:6;64:17;
65:17;66:8;68:7;69:3,20;
70:12;71:12;72:12;78:7,13;
84:21,22;86:4,17;87:14,14;
93:2,25;103:3;104:9
**investigate (1)** 40:17
**investigating (2)** 101:12,21
**investigation (9)** 6:12;12:2;
20:12,19;28:5,18;55:5;
98:11,17
**investigations (3)** 7:25;
28:20;30:13
**investigator (9)** 26:21;27:11;
54:23;84:9,15,24;88:22;
100:14;101:7
**investigators (6)** 26:15;
27:21;38:6,12;62:14;90:14
**investigator's (1)** 28:14
**invite (1)** 104:23
**inviting (2)** 104:20,21
**involved (3)** 26:22;36:23;
57:6
**involvement (3)** 41:18;
96:10;107:2
**involving (2)** 89:13;99:17
**isolated (1)** 91:15
**issue (8)** 13:19;27:25;28:7;
32:24;33:2;47:20;51:21;
105:1
**issued (12)** 11:7,11,15;
31:20;35:3;41:10,15;46:24;
48:22;80:15,20;106:6
**issues (1)** 39:19
**issuing (1)** 101:8
**items (3)** 58:6;59:10;60:13

## J

**jail (21)** 46:17,18,19,24;
47:6;48:6,7;88:23,24;90:3;
91:6,8,8,11,13,18;92:4,6,7;
105:22,23
**jailer (1)** 91:11
**Jeffrey (1)** 63:13
**job (2)** 13:11;21:15
**joined (1)** 100:7
**JONES (4)** 67:9,22;68:4;
74:23

**Judge (3)** 95:8,13,21
**judges (1)** 61:23
**Judicial (1)** 4:3
**June (2)** 5:7,7
**jurisdiction (2)** 8:3;44:6
**justice (1)** 61:18

## K

**keen (1)** 77:22
**keep (2)** 25:10;91:3
**kick (1)** 37:2
**kind (19)** 7:25;14:23;15:23;
16:11,19;28:8;39:6;40:12;
46:15;48:4;49:22;57:10;
63:2,10;82:20;89:10,15;
91:2;105:8
**kitchen (3)** 86:6,9,11
**knew (6)** 24:13;64:18,24;
74:5;83:17;107:13
**knock (1)** 21:24
**knowing (2)** 58:17;88:18
**knowledge (4)** 15:22;36:11;
98:4;106:22
**known (3)** 87:23;89:5,7
**knows (1)** 31:23

## L

**ladies (1)** 56:24
**language (2)** 32:3;35:19
**last (5)** 5:7;13:23;101:17,
18;104:16
**later (6)** 79:19;89:2;91:7;
92:20;99:14;100:13
**law (29)** 18:8;28:23;29:19;
30:8;9;34:24;35:25;37:1;
38:2,15;40:15,24;41:2;44:7,
25;50:3,7;55:16,20,25;
62:12;80:3,5;87:24;88:25;
91:12,14,24;92:11
**laws (8)** 7:8;32:7,9;34:22;
36:2;46:9;83:14;88:11
**lawsuit (1)** 41:17
**lawyer (1)** 41:20
**lead (5)** 9:21;63:7,7;82:11,
13
**leash (1)** 27:16
**least (5)** 24:1;50:19;52:20;
70:3;72:2
**leave (13)** 13:18;21:19;
61:6,10,11,12;72:20,24;
79:22;80:8,9;86:25;93:4
**leaving (2)** 61:17;80:1
**left (11)** 11:1,12;65:19;
77:25;89:8,9,25;91:8;101:3,
10,15
**legal (2)** 104:1,4
**legitimate (1)** 84:13
**less (2)** 82:6;88:13
**letter (3)** 39:18,19,23
**level (1)** 85:12
**levied (1)** 44:18

**DEVON W. BROWN vs.**
**THE CITY OF ATLANTA, GEORGIA, et al.**

**SERGEANT BRYANT BURNS**
**May 31, 2017**

**Lexington (1)** 63:25
**liable (1)** 44:12
**licence (1)** 32:12
**license (112)** 7:24;8:10,16,
18,19,25;9:17,18;10:3,17,
17,20;11:9,16,20,22;12:1,5,
6,11,12,14;13:6,7,8,16,24;
14:4,6,8,9,21,22;15:8,10,11,
20;16:13,16,20;17:4,13;
18:2;19:9,22;20:9;21:22;
22:12;24:3,19;26:14;27:1,
10,13;30:19,20;31:2,13,22;
32:11,20;33:9,10,11,18;
34:6,6,13,18,21;36:5,6,8,12;
38:10,24;39:9;40:10,18;
44:1;49:18,20;50:5;51:21;
52:1;58:18;59:11,12,12;
63:18;65:14;71:1;80:17;
81:19,20,23,24;83:4,5,16;
84:6,16;86:15;90:9;101:6,7,
8,10,18,19;103:16;105:5
**licensed (17)** 7:19;9:12,25;
12:20,20,24;13:1,11,12;
14:19;16:8;17:16,22;30:2;
32:15,16;65:11
**licensee (2)** 12:3;39:6
**Licenses (23)** 6:20;8:14,15,
19;9:16,19;11:6,8,11;13:13;
18:24;19:20;31:19,23;32:4,
17,18;33:14;35:3,8,20,23;
104:7
**Licensing (1)** 17:2
**licensure (11)** 8:23;12:6;
13:5;16:6;17:12;19:7;
28:15;39:5;40:6;50:9;51:3
**likely (1)** 11:16
**limit (3)** 27:22;28:3;30:8
**limited (2)** 10:25;24:16
**limits (3)** 27:21;28:17;29:20
**link (1)** 67:8
**list (10)** 49:12;58:6;60:9,12,
14,16,18;61:1;63:20;84:3
**little (3)** 19:13;22:16;58:7
**lived (1)** 23:1
**local (2)** 46:8;93:15
**located (1)** 24:21
**location (52)** 7:21;9:6,8;
10:8;11:4;12:1;14:16,18;
15:3;20:12,25,25;26:20;
27:11;36:4,7;37:1;50:14;
51:24;55:19;60:7,23;62:23,
25;63:1,1,3;64:6,9,10,17,19,
21,23;65:15,19,25;66:1;
75:15,17,21;77:23;78:13,
16;83:13;89:17,19;90:7,14;
91:1;101:3;102:20
**locations (20)** 8:18;10:23;
12:25;13:10;31:19,23;32:4;
35:2,8,19,22;38:13;63:6,14,
20;64:23,25;65:22;75:16;
77:16
**locked (4)** 19:12;57:21;
66:12;76:2

**loitering (1)** 97:13
**long (5)** 19:23;24:10;36:19;
70:14;77:8
**look (28)** 7:12;9:11;13:20;
15:25;23:11;25:14,20;
26:12;31:1;32:6;41:6;
42:11,17;44:3,14;45:6,9,12;
50:21;54:8,11;57:16;63:19;
66:18;68:18;105:19,23;
106:3
**looked (3)** 71:15;87:20;
92:11
**looking (10)** 17:21;28:12;
40:3;52:19;53:17;57:21;
60:9,9;64:20;70:3
**looks (2)** 6:14;105:18
**lot (13)** 11:18;12:25;15:13,
21,23;16:19;18:22;12:2;
63:16,25;65:24;77:4,20
**loud (5)** 76:12;77:21;78:3,
17,19

## M

**Ma'am (1)** 4:11
**machine (1)** 59:12
**machines (3)** 16:17,18;
80:21
**Magic (1)** 104:9
**magistrate (1)** 61:20
**maintain (1)** 8:20
**maintained (1)** 8:17
**Major (1)** 63:12
**makeshift (1)** 50:16
**making (3)** 59:25;102:19;
105:15
**male (9)** 54:16;55:3;78:1,
10,11,12,14;79:8,19
**man (2)** 54:21;55:1
**manner (5)** 15:14;44:11,11;
78:14;80:25
**many (5)** 36:22;52:25;81:9;
105:9,10
**marijuana (10)** 77:23,23;
78:17,18;81:2;102:8,9,12,
14,15
**marked (12)** 6:4;17:5;25:15;
26:12;29:2;30:22;41:4,23;
42:1;43:14;45:14;50:25
**marking (3)** 30:25;41:7;
43:17
**markings (1)** 79:4
**marquee (1)** 104:25
**matter (7)** 4:6;19:15;21:4;
23:11,13;24:8;70:10
**maximum (1)** 80:16
**may (15)** 10:23;11:22;
19:20;24:25;36:18;44:5;
46:14;51:11;57:3;64:24;
70:16,16;71:10;75:4;79:10
**maybe (11)** 19:13;22:10;
28:21;59:5;81:11;91:9,23;
92:19;93:14;94:4;102:23

**Mayor's (1)** 33:5
**mean (16)** 9:5;11:20;14:25;
28:11,19;32:10,16,22;41:1;
49:1,10;50:8;65:13;66:12;
67:14;91:22
**meaning (2)** 15:4;39:5
**meaningless (1)** 39:14
**means (1)** 14:3
**meant (3)** 51:14,15,15
**media (5)** 93:15;94:3,9,10,
11
**meeting (1)** 84:11
**meets (1)** 21:18
**member (5)** 27:10;84:3;
90:6;105:13,18
**members (12)** 40:9;52:20,
22;53:5,10,21;54:4;71:1;
82:6,7,8;103:17
**mentioned (1)** 102:3
**menu (3)** 58:8;60:9;86:8
**mere (1)** 64:18
**met (1)** 79:19
**Metropolitan (16)** 7:10,15;
8:7;16:25;63:15,21,23,24;
65:25;66:1;75:12,16;77:4;
82:15;97:11;104:18
**middle (1)** 85:6
**midways (1)** 82:20
**might (3)** 7:1;21:8;103:19
**mind (2)** 47:1,11
**minimum (1)** 15:9
**minors (4)** 11:23;13:14;
64:12,12
**minutes (3)** 94:19;95:9,11
**mirror (1)** 76:22
**miscarriage (1)** 61:17
**misstates (2)** 34:7;35:10
**mixed (1)** 91:17
**moment (1)** 71:12
**money (1)** 58:14
**more (19)** 7:22;11:9;19:13,
18;27:24;34:17;38:1;40:12,
25;57:18;74:15;88:12,14,
14;91:25;92:8;100:2;103:1,
4
**morning (5)** 77:7,14;86:23;
91:10;103:4
**move (2)** 8:4;14:13
**movement (1)** 76:12
**moving (1)** 57:15
**much (3)** 11:8;78:7;83:20
**multiple (1)** 19:21
**Municipal (11)** 8:3;14:12;
15:18;94:6,15,17;96:8;
105:14,18;106:2;107:1
**music (8)** 77:21;78:3,17,19;
79:8,9,9,16
**must (1)** 98:8
**muster (1)** 21:18
**myself (5)** 5:24;71:1;72:7;
73:11;84:19

## N

**naked (1)** 78:15
**name (7)** 4:19;39:8;58:21;
65:15;82:7;83:8,9
**Narcotics (2)** 100:16,16
**narrow (3)** 23:8,10;40:25
**near (2)** 58:7;78:5
**necessarily (1)** 11:18
**necessary (1)** 18:24
**need (23)** 9:19;10:2,4,7,10;
37:8,10;38:18;42:11;43:7,
8;49:20;50:4;52:1;62:2,5,8;
64:16;81:18;82:2;83:5,5;
90:10
**needed (6)** 61:21;84:12,21;
86:15;90:8,9
**new (1)** 99:9
**Newell (1)** 56:19
**News (2)** 92:22;93:15
**next (9)** 9:10,14;10:15,24;
30:21;42:23;48:5;92:18,19
**night (18)** 8:12;15:3,3;
50:13;51:25;52:24;61:19,
21;67:25;70:19;74:1;77:10;
89:14;90:15;91:2;95:5;
98:23;103:3
**non-alcohol-licensed (1)**
80:11
**noncompliance (1)** 38:14
**nonresidential (2)** 24:16,24
**normal (4)** 9:2,11;22:14;
34:1
**normally (2)** 58:16;94:17
**northbound (2)** 63:23,24
**Northern (1)** 4:10
**notary (1)** 6:16
**noted (6)** 26:4;53:8;54:6;
59:3;64:13;107:15
**notice (1)** 4:8
**noticed (1)** 76:16
**notified (2)** 98:12;99:9
**notify (2)** 89:16;98:8
**nude (3)** 78:3,4;79:1
**number (6)** 11:5,6,6;64:20;
77:19;100:23
**numerous (3)** 65:5;100:25;
101:2

## O

**oath (2)** 6:15;18:6
**Object (3)** 34:7;42:11;59:19
**Objection (12)** 24:4;25:7,24;
35:10;47:14;53:6,12,24;
54:5;59:25;67:21;107:12
**obligation (1)** 21:23
**obscured (1)** 106:23
**obscuring (1)** 106:12
**observed (1)** 95:15
**obtained (1)** 13:16
**occupancy (2)** 80:16;85:12

Case 1:16-cv-00008-CAP Document 47 Filed 08/04/17 Page 195 of 335
DEVON W. BROWN vs.
THE CITY OF ATLANTA, GEORGIA, et al.
SERGEANT BRYANT BURNS
May 31, 2017

**occupation (1)** 48:22
**occurred (5)** 5:9;85:5,6; 94:16;98:22
**occurring (1)** 60:8
**OCGA (1)** 107:20
**o'clock (2)** 65:20;77:14
**odor (2)** 77:23;78:18
**off (9)** 13:10;58:7;74:7;79:9, 11;87:12;103:3;105:21,24
**offense (2)** 46:23;105:24
**offenses (1)** 49:2
**offer (1)** 46:6
**offered (4)** 49:8;50:17,18; 86:8
**offering (2)** 48:18;49:6
**office (21)** 9:3,5,15;22:12; 27:1;32:25;33:5;34:19; 50:3,7;62:14;84:22;96:13, 22,24;98:2,5,19;100:17,18; 101:11
**officer (41)** 5:1,13;6:23;7:2; 16:12;17:3,14;18:7;20:12, 18;21:10;27:14,17,18;28:4, 10;30:13;36:3,5,10,10,12, 14,18;44:23;46:8;55:16; 56:9;60:10;75:20;87:12,13; 88:15;89:1;90:24;91:24; 95:11,14;97:19,21;100:21
**officers (36)** 7:4;26:22;27:5, 19,23,25;28:6,20;31:17; 36:21;38:3,6,11,12;40:20; 55:21,22,23,24;57:12,20; 62:12,13;63:8;65:9;70:4; 71:25;72:7;79:3;91:3;98:5; 101:13;102:24;103:1,4,9
**officer's (5)** 28:11,17;30:9; 40:5,16
**officers' (1)** 31:9
**official (1)** 89:14
**often (3)** 6:22;19:18,18
**Oftentimes (7)** 10:22;15:13, 21;36:9;39:25;106:1,2
**Olympics (1)** 100:8
**once (28)** 7:21;13:9;14:4, 12;17:13;20:17;21:4,25; 24:20;30:12;33:11;44:23; 46:7;47:5,18,24;48:5; 50:12;51:17;57:9;58:15; 61:5;72:5;79:11;80:6;89:7; 91:8;94:3
**one (39)** 5:16,17,21;8:1,24; 11:15;26:20;31:5;37:17; 39:14;40:1;42:16;52:23; 55:11;60:7;63:10;67:2; 68:18,21,22,23;69:22;70:4; 72:11;83:12;84:6;85:13,14; 87:1;89:8;94:4;99:19; 100:1;102:9,12;104:3,19; 106:5,10
**only (7)** 17:21;39:3,19; 52:23;53:1;69:23;102:23
**onto (1)** 62:19
**open (32)** 10:23;11:13,24;

19:11;51:24;54:16,17,21; 55:1,4,7;63:1,3;66:14;70:4, 18;71:4,5,7,8,10,11,13,24; 72:3;75:18,23;77:9,14; 103:9;104:8,24
**opened (3)** 76:4;77:22; 87:19
**operate (2)** 15:23;80:18
**operated (1)** 80:7
**operating (10)** 10:14;14:19; 30:17;31:2,12;36:4;40:2; 53:4;64:14;83:18
**operation (3)** 48:21;63:16; 64:15
**Operations (1)** 100:10
**opportunity (3)** 90:4;100:19, 20
**opposed (1)** 38:2
**order (6)** 10:13;14:17; 31:23;49:14;69:21;84:12
**ordinance (5)** 36:2;38:14; 45:8;19;86:10
**Ordinances (8)** 17:8;32:7,9; 34:22;42:25;46:8,13;83:14
**originally (1)** 64:2
**others (1)** 71:25
**ours (1)** 66:2
**out (46)** 9:5,12,16,24,25; 11:3;13:12;17:17;20:7,19; 21:14,17;25:3;27:11,14,16; 30:4;34:2;53:3,22;62:22; 63:2;68:13,14;70:6;71:22; 72:6,10,14,21;73:4;74:16; 80:4;85:14,15,16;87:22; 89:2,9,17;93:7;97:6;99:14; 100:9;105:17;106:3
**outlets (1)** 93:15
**outside (5)** 20:5;64:14;69:6; 76:13;85:1
**over (9)** 9:15;14:21;34:2; 88:22;90:23;95:18;96:18; 97:25;105:18
**own (2)** 72:22;87:1
**owned (1)** 65:1
**owner (3)** 60:24;61:9;64:22

## P

**package (9)** 7:14,16,18; 13:22;14:14,17;38:13,16; 39:15
**packed (1)** 83:23
**page (7)** 7:13;18:12;31:14; 42:5,18,23;51:5
**paint (1)** 103:2
**pandering (3)** 97:15,23; 102:5
**pants (2)** 78:2;87:14
**paper (1)** 64:25
**paperwork (2)** 72:11,12
**paragraph (5)** 7:13;13:20; 18:13;32:3;42:17
**paragraphs (1)** 31:16

**parallel (1)** 8:1
**parking (3)** 65:24;77:3,20
**Parkway (11)** 7:10,15;8:8; 17:1;63:21;75:12,16;77:4; 82:16;97:12;104:18
**part (6)** 6:11;12:18,21; 29:12;52:5;59:24
**Partially (1)** 65:12
**Participated (1)** 101:2
**particular (6)** 6:7;27:19; 50:13;82:13;94:16;96:11
**party (1)** 90:1
**partying (1)** 50:15
**passed (1)** 87:12
**pat (1)** 87:10
**patrol (4)** 36:13,21;63:8; 101:16
**patrolled (1)** 100:11
**patrolling (1)** 36:10
**patrons (9)** 49:19;57:24; 78:13,19,24;86:4,25;89:8; 93:2
**pause (2)** 76:17;99:21
**pay (2)** 15:18;44:9
**pedestrian (1)** 22:2
**Pen (1)** 101:1
**penalties (3)** 14:15;44:12,16
**pending (1)** 4:9
**people (16)** 16:19;23:1; 46:22;50:14;52:25;55:18; 57:21,24;62:16;72:17,21; 74:16;78:22;83:15;87:22; 103:20
**performing (1)** 17:2
**period (1)** 52:4
**permission (3)** 12:15;21:24; 22:7
**permit (15)** 13:4;16:4;17:10; 33:2;34:16;35:7;36:12; 38:25;45:5;51:21;80:15,20; 81:21,25;86:7
**Permits (48)** 6:20;14:9; 16:13,18,20;17:2;27:10; 30:19,20;31:3,13,19,22,23; 32:5,21,22,23;33:4,13,25; 34:21;35:1,3,8,19,20,22,23; 36:6,9;38:10;40:10;46:1; 51:22;63:18;71:1;83:4,6, 16;84:6,16;101:6,7,10,18, 19;105:6
**permitted (1)** 12:7
**person (15)** 14:18;22:3; 44:4,8;46:6;57:19;61:21; 73:1,3,14;83:7,8,9,10;90:22
**personal (3)** 57:22;89:4; 96:3
**persons (1)** 58:17
**pertinent (1)** 80:22
**phone (5)** 61:21;69:6; 71:23;74:7;75:19
**photo (7)** 96:15,16,17,20,23, 25;97:1
**photographing (1)** 92:6

**photographs (1)** 58:9
**physical (3)** 13:19;28:1; 86:17
**physically (1)** 86:18
**picking (1)** 91:3
**picture (1)** 103:2
**pipe (1)** 86:5
**place (6)** 28:3,17;46:16; 57:4;60:23;103:15,22,23, 25;104:2,4,5
**plain (3)** 32:3;35:18;50:23
**Plaintiff (2)** 42:20,23
**Plaintiff's (19)** 6:5;17:6; 25:15;26:3,12;29:5;30:22, 25;41:4,20,23;42:1;43:14, 17;45:14,17;51:1;54:9
**play (3)** 51:25;53:21,22
**playing (1)** 79:8
**please (3)** 4:11;35:17;44:14
**plethora (2)** 28:21;106:9
**pm (1)** 107:18
**pocket (1)** 87:14
**point (9)** 57:18;61:13;65:20; 71:4;72:10;82:17;84:8; 87:9;94:4
**Police (66)** 5:2;7:4;14:8,20; 16:12;17:2,14;18:7;19:8; 20:11,18;26:22;27:5,22; 28:4,6,17,19;30:12,17; 32:19,21,22,23,24;33:1,7, 13,24;34:16;36:3,5,9;38:24; 40:13,20;44:23;46:7;51:21; 55:13,22,23;56:9;59:1; 60:10;63:18;79:5;83:3; 84:16;89:24;90:10;93:6,7,9, 24;96:14;97:11,19,21;98:1, 4;100:6,7,9,10;101:13
**policies (2)** 13:3;16:5
**policing (1)** 40:19
**policy (7)** 19:5;20:7;22:20; 28:3;35:6;40:24;42:19
**population (1)** 91:17
**port (1)** 92:6
**posed (1)** 42:14
**positioned (2)** 82:19;85:4
**possession (3)** 50:2;102:10, 13
**POST (5)** 26:21;27:7;28:19; 88:5;98:9
**posted (1)** 80:25
**post-February (1)** 24:13
**posture (1)** 78:11
**potential (1)** 95:22
**power (15)** 26:25;29:23; 30:1;32:21,22,24;33:1,13, 25;34:16;38:25;45:3;51:20, 21;93:25
**powers (3)** 40:20;47:11; 98:10
**premise (1)** 9:12
**premises (43)** 5:9,23;8:22; 10:12;17:11;19:3;24:1,2,16, 24;25:6,12;28:15;30:10;

DEVON W. BROWN vs.
THE CITY OF ATLANTA, GEORGIA, et al.

SERGEANT BRYANT BURNS
May 31, 2017

40:5;17;49:4;50:11;55:11,
12;56:4,6,10,11,13,15,17,
19,21;57:9,13,16;64:2;
65:17;66:9,20;68:8;69:3,6,
20;72:5,6;93:25
**prepare (2)** 38:13;42:13
**prepared (4)** 7:15,18;8:5;
13:22
**preparing (1)** 41:18
**presented (2)** 18:25;59:11
**Pretrial (1)** 90:20
**prevent (2)** 37:22;91:21
**previous (2)** 97:23;99:8
**previously (6)** 17:5;48:13;
50:25;65:7;97:10;102:4
**price (8)** 49:12;58:6;60:9,
12,14,16,18;61:1
**primarily (1)** 33:24
**prior (4)** 8:8;62:18;88:7;
97:1
**prisoner (1)** 91:1
**prisoners (1)** 91:3
**private (30)** 20:13,14,15,21,
22;51:6,7,13,18,21,25;52:1,
3,4,17;53:15,17,20;81:16,
17,18,20;82:2,4;86:10;
103:25;104:2,4,5,5
**probable (5)** 9:21;10:8,11;
12:8;64:7
**probably (10)** 16:25;57:14;
65:20;70:19;72:10;77:6;
78:25;79:21;86:23;90:17
**problem (2)** 11:4;47:9
**procedure (6)** 7:23;22:14;
31:2,12;40:3;107:20
**Procedures (2)** 30:18;91:16
**Proceed (2)** 76:10;77:2
**proceeded (1)** 41:17
**proceedings (5)** 37:25;
99:17,21;107:5,9
**profanity (1)** 80:4
**Professional (2)** 98:2,6
**prohibit (1)** 76:25
**promoted (3)** 100:12,13;
101:15
**pronunciation (1)** 79:20
**proofread (1)** 48:2
**proper (2)** 47:5;80:7
**properly (3)** 13:1,12;14:18
**properties (1)** 8:14
**property (15)** 7:9;9:9;10:6;
13:4;21:11;26:19;37:7;
49:17;50:20;58:15;61:5,25;
62:3,6,19
**proposed (1)** 41:20
**prostitution (2)** 97:14,24
**proved (1)** 82:1
**provide (11)** 48:23;51:13,
16;81:20;82:7,8;83:1;84:2;
85:9;86:13;87:4
**provided (4)** 44:11,17;
48:24;62:11
**providing (3)** 79:1,8,15

**provision (1)** 30:8
**provisions (5)** 39:23;44:1,4,
19;51:11
**public (12)** 22:3;33:19,20;
89:13;93:8;103:15,17,22,
23;104:20,21,23
**pull (3)** 14:20;33:22;104:13
**pulled (3)** 23:16;55:4;96:17
**purpose (3)** 32:2;44:15;
97:13
**purposes (1)** 107:8
**pursuant (8)** 4:1,8;26:18;
42:20;48:22;55:16,24;
107:19
**put (5)** 66:23;67:7;72:23;
92:8;93:3

### Q

**qualify (1)** 27:13
**quasi-criminal (1)** 48:7
**quick (1)** 74:15
**quote (11)** 13:24;17:21;
23:18;35:1,2,7,19,20,22;
39:13;54:15

### R

**RADFORD (60)** 4:5,17;
18:19;24:6;25:9;26:4,6;
29:4,18;30:24;34:9,20;
35:12,14,18;41:6,25;42:8,
15,17;43:16;45:16;47:16;
53:8,9,19,25;54:2,6,8;
59:21;60:2,4;67:5,12,16,20;
68:2,6,15,17;69:2;71:16,19,
21;73:9,13,19,23;74:6,8,21,
24;75:3;99:20,24;100:3;
101:24;102:2;107:15
**raid (4)** 72:19;102:22,24;
103:5
**ran (1)** 79:5
**rank (3)** 5:4;100:12,13
**reach (1)** 93:7
**react (1)** 95:21
**read (5)** 18:19;26:17;29:10;
52:23;107:17
**reading (5)** 34:12,16;47:24;
54:2;72:17
**ready (1)** 66:2
**realize (1)** 16:11
**realized (1)** 91:10
**Really (4)** 39:1;67:18;
69:11;73:4
**rear (1)** 87:14
**reason (3)** 14:23;23:15;
24:11
**recall (17)** 59:2;60:17;61:4;
65:16;68:1;69:5,19;70:19,
22,25;71:6,8;72:9;90:17;
92:24;97:17;99:3
**receive (2)** 14:10;98:10
**receiving (1)** 97:13

**recently (1)** 4:24
**recess (1)** 95:9
**recognize (13)** 41:7;68:11;
72:25;73:2,2,5,11,12,13,17,
23;74:1,8
**recollection (3)** 54:24;69:14;
70:16
**recommend (1)** 36:13
**record (10)** 4:19;6:6;8:13;
18:20;26:5;32:14;33:20;
53:8;99:6;107:15
**records (4)** 8:20;23:16;
33:19;34:5
**RECROSS-EXAMINATION (1)**
102:1
**reference (2)** 39:18;45:25
**referring (2)** 48:17,20
**refers (2)** 32:4;52:19
**refresh (2)** 59:1;70:16
**regard (1)** 48:24
**regarding (2)** 34:5;97:23
**Regardless (3)** 19:8;24:22;
50:18
**register (4)** 44:9;58:25;59:2;
101:2
**Regulations (1)** 4:2
**relate (1)** 31:16
**related (2)** 6:7;16:12
**relates (1)** 17:9
**released (2)** 103:9;105:25
**relevant (1)** 25:23
**relied (1)** 28:9
**relieved (1)** 92:12
**remember (5)** 64:8;69:11;
71:3,12;84:10
**removed (1)** 86:3
**repeat (2)** 12:9;35:16
**report (4)** 59:1,4;96:14;98:1
**reported (2)** 37:5;98:2
**Reporter (2)** 4:1;93:17
**Reporting (1)** 4:3
**reports (1)** 36:24
**represent (5)** 17:6;25:15;
26:13;42:2;43:18
**represented (2)** 26:2;94:21
**representing (1)** 65:8
**request (2)** 17:4;86:16
**requested (3)** 63:17;67:4;
87:5
**requesting (2)** 62:10;96:13
**requests (1)** 74:25
**require (2)** 19:13;20:9
**required (4)** 16:19;44:5,9;
98:5
**requirement (1)** 98:7
**requirements (2)** 8:24;12:12
**requires (2)** 40:18;52:19
**reserved (1)** 107:21
**residence (2)** 22:25;52:17
**residential (1)** 23:24
**resources (2)** 10:24;63:5
**respect (6)** 6:16;28:4;30:6;
33:15;70:15;106:7

**response (1)** 42:21
**responses (3)** 41:18;42:2,4
**responsible (2)** 11:2;39:9
**restaurant (2)** 52:16;77:16
**restaurants (1)** 64:1
**restrict (1)** 34:5
**restroom (2)** 85:25;86:1
**result (2)** 95:1;98:18
**resulted (1)** 5:10
**retail (1)** 48:18
**retire (1)** 5:6
**retired (2)** 4:24;100:4
**retrieved (1)** 87:15
**returned (1)** 75:15
**review (2)** 6:8;14:4
**revisit (1)** 11:3
**revocate (1)** 15:11
**revocation (2)** 15:10;37:25
**revoke (1)** 38:25
**Reynolds (1)** 56:21
**Richard (1)** 56:13
**Richie (1)** 56:19
**riding (1)** 78:14
**right (60)** 4:18;5:2;6:2,18,
23;7:10;12:15,16;14:11;
18:13;20:22;28:23;6:25:9,
20;31:14,20;33:16;37:2;
38:17;39:5;40:2;46:17;
47:7;49:1,10;50:3;52:6,14;
54:18;56:4,6;59:21;60:2;
61:2,12,16;66:5,13,14,15,
17,22;67:14,23;69:3;72:15;
74:14,23;84:10;87:11;
90:18;99:24;100:8,8;
101:24;104:6,12,15;106:16
**Road (3)** 62:23;65:19;103:8
**Robbie (1)** 56:15
**Robert (1)** 74:10
**room (8)** 57:25;58:7;77:25;
80:22;81:13;86:1;89:10,11
**roster (1)** 82:6
**rude (2)** 68:5;80:5
**rule (3)** 13:25;40:24;107:19
**Rules (3)** 4:2;16:3;107:19
**run (3)** 7:25;28:20;105:9
**running (1)** 64:23

### S

**safe (1)** 6:25
**sale (7)** 48:18;49:6,8;50:17,
19;58:4;86:8
**sales (3)** 12:15;17:7;77:11
**sally (1)** 92:6
**same (10)** 13:20;25:10;
33:2;58:20;67:25;74:6;
81:12;88:12;91:23;105:19
**sanction (2)** 14:5;15:19
**sanctioned (1)** 38:22
**sanctions (3)** 7:23;15:9;
38:22
**sat (3)** 63:2;82:22,23
**satisfied (1)** 81:1

DEVON W. BROWN vs.
THE CITY OF ATLANTA, GEORGIA, et al.

SERGEANT BRYANT BURNS
May 31, 2017

**saw (18)** 50:22;58:2;59:2;
70:6;72:21;78:8;80:6,24,
25;85:11;87:17;89:11;
92:18,19;93:13;94:7,13;
95:14
**saying (15)** 17:24;27:5,24;
39:9,12;50:8;53:15;59:14;
60:17;80:17;82:2;86:11;
90:12;93:22;96:19
**Scandrick (1)** 56:15
**scene (4)** 5:15;13:18;57:21;
89:22
**scheme (3)** 12:6;16:6;39:5
**scope (7)** 28:13;30:9;31:9;
40:4,15,25;102:15
**search (17)** 10:1,2,4;57:10,
11;62:1,9,24,24;64:6,8,16;
100:25;101:2,3;102:15;
103:6
**searches (1)** 31:10
**searching (1)** 62:9
**seat (1)** 82:22
**second (7)** 7:13,13;42:5,18;
73:2,6;99:19
**Secondly (1)** 20:21
**Section (32)** 17:8;18:14;
25:16;26:1,2,14,16,24;
27:20;28:12;29:5,12;31:15;
34:20;35:21;39:13,16;
42:12;43:18,19,22,25;
44:19,22;45:17,19,23;
48:20;51:1,2;86:10;97:12
**Sections (2)** 42:24;43:13
**secured (2)** 86:24;87:12
**Security (2)** 100:17,18
**seeing (5)** 72:2;77:19;79:3;
87:16;89:24
**seem (1)** 93:18
**seems (1)** 59:15
**seize (1)** 58:11
**sell (2)** 46:6;51:12
**selling (9)** 14:10,11;15:16;
48:18;49:3,10;64:11,12;
94:10
**send (2)** 63:10;67:6
**sense (2)** 55:24;78:14
**sent (2)** 96:18;97:1
**sentence (2)** 13:23,24
**separated (1)** 95:19
**sequestered (2)** 95:10,19
**SERGEANT (11)** 4:13;5:5,
18,25;63:4;75:8;84:19;
88:20;101:16,17,19
**serious (1)** 67:18
**serve (1)** 74:25
**served (2)** 42:3;100:15
**service (2)** 91:4;98:21
**serving (2)** 11:23,23
**set (6)** 16:4,13;30:20;45:23;
46:19;62:22
**seven (1)** 78:25
**several (14)** 11:13;46:22;
65:22;71:22,23,25;76:20;

77:3;79:18;80:14;81:6;
83:21,21;93:13
**sex (6)** 78:1;89:12;97:14;
102:16;103:12,20
**sexual (2)** 78:10,14
**shall (4)** 31:18;38:12;44:11;
46:5
**sheet (2)** 82:11,13
**sheets (2)** 63:7,7
**Sheriff (5)** 87:18,20;88:1,4,8
**Sheriff's (2)** 88:21;89:3
**shirts (1)** 58:21
**show (13)** 6:4;14:14;16:22;
17:5;29:4;30:24;41:25;
43:16;45:16;50:25;66:17,
22,24
**showed (2)** 38:21;75:24
**shows (1)** 40:1
**side (2)** 58:7;87:19
**Sidewalk (2)** 52:15;76:11
**sign (6)** 20:5;21:12;104:10;
105:21,24;107:17
**signage (1)** 20:10
**signature (2)** 41:12;107:21
**signed (1)** 62:24
**significant (4)** 23:22;54:20;
55:6;76:23
**signs (5)** 58:3;85:11;
104:20,22;105:10
**similar (2)** 28:16;30:8
**single-family (1)** 23:2
**sitting (2)** 78:11,11
**situation (7)** 14:23;27:9;
46:20;72:13,22;93:9,17
**smelled (2)** 78:18;102:8
**Smith (7)** 56:11;84:9,9,14,
15,17,24
**Smoke (1)** 78:18
**sold (3)** 9:23;60:13;81:2
**sole (4)** 44:15;87:1
**solicitor (1)** 95:12
**Solicitor's (1)** 62:14
**somebody (2)** 51:15;67:13
**someone (22)** 12:4;22:18;
28:7;32:24;36:3,24;37:4;
39:8;46:3,16;50:9;53:3;
54:25;55:7;70:17;71:8,13;
75:23;76:7;79:16;83:4;
91:23
**someone's (1)** 22:6
**sometimes (2)** 19:19;26:25
**SOP (3)** 30:20;40:9;91:18
**SOPs (1)** 40:12
**sorry (8)** 16:23;42:6;43:10;
57:25;61:10;71:16;100:1;
102:11
**sort (4)** 20:15;24:23;36:15;
79:5
**sounds (1)** 9:8
**Southwest (1)** 62:24
**space (1)** 53:22
**speak (2)** 90:4;92:1
**speaking (3)** 60:22;69:17;

75:1
**speaks (1)** 49:21
**specific (10)** 16:1;33:21;
36:1,8;39:5;40:11;42:19;
47:23;90:22;106:10
**specifically (7)** 17:21;30:16;
31:15;35:2;39:17;40:15;
51:8
**specifics (1)** 26:1
**speculative (4)** 53:6,12,24;
54:5
**spell (1)** 25:3
**spirits (1)** 83:22
**spoke (1)** 84:25
**spoken (2)** 95:5;105:4
**spot (9)** 31:16,18,24;32:2,4;
35:1,7,19,22
**stand (1)** 82:18
**Standard (4)** 30:17;31:2,11;
40:2
**Standards (2)** 98:3,6
**standing (4)** 54:17;70:21;
75:18;85:6
**Stanley (1)** 56:21
**start (1)** 71:19
**started (3)** 63:22;70:20;
103:3
**state (12)** 6:5;7:8;18:20;
32:7,9;34:22;36:2;38:14;
41:2;44:25;46:8;98:13
**stated (6)** 25:25;44:21;
48:13;75:22;79:20;102:8
**Statement (20)** 6:6,9,15,16;
7:13,17;18:12;19:1;23:21;
24:15;25:22;26:7;27:20;
42:23;54:9,24,25;70:9;
75:22;83:2
**states (7)** 31:17;38:6,11;
44:4,8,15;49:16
**stating (1)** 35:14
**status (1)** 27:2
**statute (1)** 28:2
**step (1)** 8:25
**stepped (3)** 81:7,10;82:18
**stepping (1)** 81:5
**steps (1)** 71:22
**STEWART (43)** 18:17;24:4;
25:7,24;29:14;34:7;35:10,
13;42:6,10;43:6,10;47:14;
53:6,12,24;54:5;59:19,23;
67:2,10,13,17,18,24;68:13,
16,25;71:14,17;73:7,21;
74:4,19;75:1,7;99:19,22;
100:1,4;101:22;107:12,17
**still (7)** 4:21;12:2;17:15;
20:6;70:11;85:6;92:5
**stocked (1)** 60:10
**stool (1)** 82:23
**stools (1)** 82:21
**stop (1)** 84:10
**store (1)** 49:16
**stored (6)** 49:20,25;50:10,
19;78:20;81:3

**storing (1)** 50:2
**strewn (1)** 89:10
**strictly (2)** 29:19;40:9
**strike (1)** 85:22
**Strip (1)** 104:9
**subsection (3)** 44:3,8,15
**subsequent (4)** 8:19;9:19;
93:22;95:25
**suffice (1)** 86:10
**suite (2)** 19:21,22
**suites (1)** 19:21
**summoned (1)** 38:20
**Sundays (1)** 11:24
**Superior (1)** 107:2
**supervise (1)** 14:16
**supervisor (3)** 48:2;101:21;
105:17
**supervisors (2)** 5:15,16
**support (1)** 44:17
**supposed (1)** 84:5
**sure (24)** 11:13;12:11,19;
13:14;14:4;16:2;21:9;
32:10,19;43:9;45:13;47:25;
48:2;49:15;50:7;51:4;
69:25;78:9;79:10;83:15;
99:20;100:7;102:19;105:15
**surroundings (1)** 76:16
**surveillance (2)** 66:19;73:25
**suspect (6)** 8:22;13:7;22:17,
24;24:10,25
**suspected (1)** 9:9
**suspend (3)** 14:22;15:11,20
**suspension (1)** 15:10
**swear (1)** 4:11
**swore (1)** 6:15
**sworn (13)** 4:14;6:14;27:7,
14,18,19,22;28:4,17;38:2;
95:17;100:21;102:23
**systematically (1)** 81:21

**T**

**table (1)** 59:13
**tags (1)** 58:21
**talk (2)** 82:24;86:22
**talking (5)** 10:11;71:23;
82:22;85:24;87:2
**talks (1)** 37:25
**target (1)** 66:1
**Task (3)** 100:20,21;101:4
**tax (5)** 23:16;44:9,10,12;
48:22
**taxes (1)** 44:18
**team (1)** 105:7
**telephone (1)** 54:18
**television (2)** 93:11,14
**telling (4)** 80:16;84:11;90:8;
95:19
**ten (4)** 83:2,11,12,13
**term (4)** 23:15;39:4;79:23;
81:16
**terminated (1)** 99:15
**terms (3)** 47:3;94:9;98:22

DEVON W. BROWN vs.
THE CITY OF ATLANTA, GEORGIA, et al.

SERGEANT BRYANT BURNS
May 31, 2017

**testified (2)** 4:15;106:25
**testify (5)** 6:1;95:6,19,23;
99:1
**testimony (6)** 21:10;23:3;
34:8;35:11,15;98:22
**therefore (1)** 13:25
**Theresa (1)** 67:23
**third (2)** 18:12;105:15
**though (2)** 14:18;106:21
**thought (3)** 10:14;89:21;
104:16
**thousands (1)** 22:13
**three (8)** 10:24;24:7;81:11;
94:3,4;100:15;101:9,19
**three-day (2)** 94:19,25
**throughout (2)** 57:12,16
**thrown (1)** 101:13
**thumping (1)** 76:12
**tier (3)** 48:4,5;105:15
**times (9)** 24:7;79:18;81:6,9,
11;93:13;94:3,4,13
**tint (1)** 106:7
**tinted (5)** 76:21;77:1,20;
105:1;106:23
**tinted-out (1)** 76:22
**tips (2)** 63:10,11
**Title (4)** 41:1;44:24,24;
101:1
**Titles (1)** 44:24
**today (1)** 45:10
**together (1)** 53:20
**told (15)** 60:8;79:14;80:1,6;
83:4;84:4,7,19,20;86:14;
87:22;90:9,13;92:9;95:13
**took (5)** 6:15;18:6;61:7;
81:11;87:13
**top (1)** 13:10
**total (1)** 101:20
**totality (3)** 50:12;99:5,7
**totally (1)** 67:16
**trafficking (1)** 100:24
**training (4)** 15:22;33:23;
36:11;46:21
**transport (2)** 91:1,5
**transported (4)** 90:3,19,20;
91:5
**trap (1)** 85:13
**Trespassing (5)** 20:5,10,15,
17;21:12
**trial (6)** 94:19,25;95:1;96:2,
2;107:1
**tried (2)** 66:14;67:6
**Trinity (1)** 36:4
**true (6)** 34:10;41:14;43:21;
45:18;93:5,6
**trying (5)** 73:21;74:4;85:3;
91:20;92:10
**turn (7)** 18:12;31:14;42:4;
51:5;79:9,10;88:22
**turned (3)** 79:11;89:24;
90:23
**twice (2)** 31:18;94:3
**two (11)** 5:15,16;7:25;

37:17;71:25;72:21;73:16;
84:11;89:22;92:19;98:12
**two- (2)** 94:19,25
**two-and-a-half (1)** 100:12
**type (10)** 14:14;17:3,4;
20:23;21:17;39:1;48:21;
58:16;83:16;102:24
**types (1)** 77:13

## U

**ultimate (1)** 5:4
**umbrella (1)** 38:9
**under (15)** 13:15;17:22;
20:6;22:19;27:6;41:2;45:2;
46:4,22;51:20;54:2;55:20;
87:9;92:21;106:19
**undercover (2)** 64:10;65:7
**Understood (1)** 70:13
**Undertaking (1)** 48:21
**uniform (3)** 79:4;89:24;91:3
**uniformed (2)** 79:3;89:22
**Unit (20)** 31:3,13,22;34:21;
36:9;40:11;51:22;71:2;
83:4;84:16;91:5;100:15,16,
16;101:6,7,10,12,21;103:10
**unknown (1)** 84:8
**unlawful (7)** 45:24;46:1,5,
10;47:2,12,18
**unless (3)** 22:9;52:22;77:15
**unlicensed (2)** 12:24;36:25
**unlocked (13)** 18:21;19:25;
21:25;22:1,2,7,21;62:8,8;
70:7,14;75:19;76:4
**unlooked (1)** 19:11
**unquote (3)** 35:1,7;39:13
**up (19)** 10:23;11:14;16:20;
23:16;27:12;30:20;32:25;
33:22;38:22;40:1;51:24;
82:18;86:8;87:19;90:7;
91:3;95:11;99:8;105:7
**upon (15)** 13:25;14:15;
19:14;28:17;42:3;47:23;
66:2;75:11,16;76:11;77:21;
79:3;80:24;87:16;89:24
**urinals (1)** 86:2
**urinate (1)** 86:4
**use (2)** 23:15;79:23
**used (5)** 39:6;49:2;80:4;
81:15;89:9
**usually (1)** 76:25

## V

**van (3)** 91:1,2,4
**various (1)** 9:6
**vehicle (2)** 14:20,20
**vendor (1)** 33:1
**versus (2)** 47:2,13
**Vice (1)** 100:15
**video (23)** 16:17;66:18,19,
23;67:3,7,15,20;68:6,12;
69:2,17,18;70:1,3,15,16,20;

**view (5)** 13:3;20:7;40:12,
13;50:23
**violating (4)** 44:1,4;53:10;
87:24
**violation (11)** 15:17;42:24;
44:21,25;45:1;46:14;47:3,
13,22;48:6;54:3
**violations (2)** 44:6;106:9
**volts (1)** 105:9
**vs (1)** 4:7

## W

**wait (3)** 10:15;90:25;91:4
**waited (1)** 63:2
**waiting (1)** 63:4
**walk (7)** 16:13;17:15;22:3;
32:24;72:21;85:23;104:24
**walked (2)** 74:2;85:2
**walking (3)** 74:7;78:22,24
**wall (3)** 58:7;86:3,4
**wallet (2)** 87:15,15
**Walls (7)** 5:18,19,21,25;
56:3;63:4;88:20
**warrant (40)** 10:1,5;11:3;
17:18;19:3,7,13;22:23;
23:6;24:3,18;25:1;37:6,8,9,
11,13,14,18,19,22;40:6;
55:13;56:23,25;61:20,22,
24;62:2,5,9,24;64:3,4,5,5,6,
8,17;103:6
**warrantless (7)** 13:4;17:11;
30:2;40:16,22,22;93:24
**warrants (3)** 101:1,2,3
**watch (3)** 66:23;67:20
**watched (1)** 68:6
**watching (2)** 69:13;103:21
**Watkins (2)** 56:6,8
**way (8)** 23:22;43:6;46:12;
60:3;63:22;83:8;85:13,14
**weapon (6)** 87:12,13;88:20,
22;89:2,4
**wearing (1)** 58:20
**weeks (1)** 84:11
**what's (4)** 6:22;20:22;26:12;
53:1
**whereby (1)** 93:2
**white (1)** 53:2
**whole (4)** 44:20;66:24;
68:15;74:14
**wholesale (1)** 48:18
**who's (2)** 36:10;79:13
**whose (1)** 39:8
**windows (9)** 76:20,22;77:1,
20;105:1;106:7,12,23,24
**wire (1)** 105:10
**wiring (1)** 85:11
**within (7)** 7:7;10:24;12:5,6;
30:19;52:7;94:19
**without (18)** 12:8;17:14,18;
19:3,7;22:22;23:6;24:3,17;
25:1;33:15;35:22;36:4;

40:5;48:24;51:18;70:15;
78:7
**witness (17)** 4:12;18:18;
25:24;29:16;34:11;35:16;
43:9;49:3;53:14;54:7;
57:15,20;69:1;73:11;94:23;
95:6;107:21
**witnessed (3)** 9:20;102:17;
103:12
**witnesses (4)** 95:7,10,18,22
**wondering (1)** 67:25
**word (4)** 18:14;45:24;46:5;
53:16
**words (1)** 15:7
**work (3)** 39:23;40:13;
100:20
**worked (5)** 63:22;100:23;
101:8,11,12
**working (1)** 58:23
**works (1)** 46:12
**write (3)** 27:3,25;105:17
**writing (1)** 18:5
**written (4)** 35:6;47:19;
100:25;101:1
**wrote (1)** 106:9

## Y

**y'all (8)** 61:12;62:17,21;
65:17;69:15,20;74:21,25
**year (3)** 5:7;97:16,17
**years (12)** 83:2,11,12,13;
84:7;95:14;100:13,15,23;
101:9,20,21
**yesterday (3)** 67:6;74:22,25
**you-all (1)** 73:19

## Z

**zone (6)** 22:15,19;55:9;
63:12;100:11;101:16
**zoned (11)** 18:22;19:6,8,15;
22:11;23:4,19;24:1,13,17,
23
**zoning (9)** 21:4;23:11,22;
24:8;25:17,17,22;26:2;
76:25
**zoom (1)** 68:14

## 1

**1 (2)** 100:11;101:16
**1,035 (2)** 11:6,10
**1,385 (1)** 11:1
**10 (10)** 7:20;10:19;17:7;
43:14,17;44:24;46:4;95:9;
106:15,20
**10-1 (1)** 51:1
**10-3 (5)** 42:24;45:2,18,19;
46:5,17,22;48:13;49:21
**10-31 (1)** 17:8
**10-3a (3)** 45:24;48:17,17
**10-47 (4)** 13:16;49:15,16,22

DEVON W. BROWN vs.
THE CITY OF ATLANTA, GEORGIA, et al.

SERGEANT BRYANT BURNS
May 31, 2017

**106-127a (1)** 97:12
**10-72 (3)** 106:11,13,14
**10B (1)** 4:2
**11 (2)** 45:14,17
**12 (2)** 42:18;51:1
**15 (2)** 95:9,10
**16 (2)** 41:1;44:24
**166 (2)** 63:22,24
**1919 (1)** 66:1
**1996 (1)** 100:8

---

**2**

**2 (3)** 6:5;37:24;54:9
**2:21 (1)** 107:18
**2:30 (1)** 77:12
**20 (2)** 53:21;75:12
**2000 (1)** 65:25
**2014 (7)** 5:10;6:19;31:6;
  41:10;43:23;45:20;98:23
**2016 (1)** 5:7
**2030 (1)** 65:24
**2031 (6)** 7:10,15;8:7;75:12;
  77:4;104:17
**24 (1)** 61:23
**250 (6)** 52:20,22;53:5,9;
  54:4;82:7

---

**3**

**3 (3)** 17:6;37:24;63:12
**3:45 (1)** 65:20
**30 (4)** 10:18;44:21,24;48:23
**3000 (1)** 62:23
**30-10 (1)** 7:8
**30-55 (3)** 42:24;43:18;45:4
**30-59 (1)** 27:20
**30-65 (2)** 45:7,9
**30e (1)** 107:19

---

**4**

**4 (4)** 25:15,21;26:3;31:15
**4.5 (5)** 32:6,13;34:20;35:24;
  36:2
**4.5.1 (7)** 31:15,17;32:12;
  35:1,18;36:8;37:24
**4.6.1 (2)** 38:11;39:17
**4:00 (2)** 65:20;77:14
**4:15 (1)** 77:6
**4:30 (2)** 77:6;90:17
**4:45 (2)** 86:23;90:17
**40 (2)** 44:24,24

---

**5**

**5 (5)** 26:12;92:22,23;93:7,
  14
**5:00 (2)** 9:3;91:9
**5:30 (1)** 91:9
**55 (2)** 36:4;44:22

---

**6**

**6 (2)** 29:2,5

---

**7**

**7 (3)** 30:22,25;51:5

---

**8**

**8 (13)** 5:10;6:19;15:3;
  26:19;31:6;41:4,7,10;
  43:23;45:20;68:8;98:23;
  103:4
**8:00 (1)** 9:2
**8th (1)** 24:13

---

**9**

**9 (2)** 41:23;42:1
**9-11-30e (1)** 107:20
**98-1 (3)** 27:2;29:6,12

# DEF. MSJ
# EX. 5

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DEVON W. BROWN | ) | |
|    Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| CITY OF ATLANTA, Georgia, | ) | CIVIL ACTION FILE |
| BRYANT BURNS, KELVIN WALLS, | ) | NO. 1:16-CV-00008-CAP |
| ALFRED WATKINS, GARY SMITH, | ) | |
| RICHARD DILLON, | ) | |
| ROBBIE SCANDRICK, | ) | |
| GORDON CABANAW, | ) | |
| RITCHIE NEWELL, and | ) | |
| STANLEY REYNOLDS | ) | |
| | ) | |
|    Defendants | ) | |

---

## AFFIDAVIT OF SERGEANT BURNS

This affidavit is given by Sergeant Bryant Burns who, after being duly sworn before an officer authorized to administer oaths, states the following:

1.

I, Bryant Burns, am over the age of twenty-one (21) and am competent to testify and give this affidavit based upon my personal knowledge of the facts stated herein.

1

2.

On February 8, 2014, I and other officers and City of Atlanta personnel came upon 2031 Metropolitan Parkway in Atlanta, Georgia.

3.

There was a sign near the entrance that stated that it was a private club.

4.

The windows were obscured ("blacked out") to prevent any view from outside the building.

5.

As a Private Club, as it was designated from the outside, it was subject to inspection as a regulated location by the City.

6.

The private club was located in an area of Metropolitan Parkway where alcohol licensed establishments, used car dealerships, restaurants, and other businesses were located.

7.

License and Permits officers were familiar with the businesses in the area. Within a three block area, there were several alcohol licensed establishments.

8.

I had performed compliance checks in the Metropolitan Parkway corridor and had knowledge and experience of alcohol licensed establishments and other businesses in the corridor.

9.

As a License and Permits Unit Officer, I am tasked with ensuring compliance with the City's Alcohol Code as well as compliance with other regulations, as applicable to the type of business at a location. For example, we regulate teen clubs, another type of business in the area, which has significant public safety concerns.

10.

That area of Metropolitan Parkway is a heavily commercial area and several times businesses will attempt to operate without having required licenses or permits.

11.

Under the Atlanta City Code, at minimum, businesses operating within the City of Atlanta are required to have a business license

12,

Local governments are authorized to regulate the sale of alcohol under both state law and local ordinance. (O.C.G.A. §3-3-2, Atlanta City Code §10-1 and §10-3. Private clubs are also subject to regulation. O.C.G.A. §3-7-40. Under O.C.G.A. §3-7-40, "Each municipality and county may license and regulate any bona fide private club located within the licensing and regulatory jurisdiction of the municipality or county."

13.

In the recent past, the License and Permits Unit had cited, and sometimes arrested persons for violations of the City Code's alcohol provisions as well as the Code violations. Officers have known of several businesses in close proximity to 2031 Metropolitan Parkway that were either operating without a license, violating closing time restrictions or employing unpermitted workers in the adult entertainment locations in the area.

14.

Prior to arriving at Plaintiff's location, we performed a 'compliance check at Club Lacura, at 1919 Metropolitan Parkway, to assess their compliance with City Code regulations regarding their alcohol license and their closing time. Atlanta

4

City Code, Section 10-209 requires alcohol licensed locations to close no later than 3 am and to possess certain licenses in full display.

15.

It was after 3am when we approached the location. I saw approximately 20-30 vehicles in the parking lot and clearly heard loud music emanating from the building.   Before we entered, we could see: 1) that the windows had been obstructed ("blacked out") window; and 2) that the private club, as it was called, was open after 3 am.   When we got inside, we saw persons appearing to be engaging in a sexual act and a stripper pole.   There were several women walking around scantily clad.  I also saw beer and wine sitting on the bar.

16.

Several of these facts would render the owner and/or tenant in violation of City Code Sections 10-72 and 10-209 if the business was selling or storing alcohol and could subject them to possible arrest.

17

Under Section 1-8, for a violation of these ordinances, a person may be subject to a fine not to exceed $1000 or a term of  imprisonment not exceeding 6 months.

5

18.

To establish if the business had the appropriate license, we entered through an unlocked front door as a person was leaving the facility.

19.

Upon entering, the City Defendants, I asked for the person in charge. Plaintiff presented himself as the "President of the Club. I requested to see Plaintiff's business license. The Plaintiff stated that he did not need a license because he was a private club. Plaintiff told us to get out and used profanity.

20.

Most of the patrons left as we were talking to Plaintiff. None of the officers searched anyone at the location.

21.

Plaintiff was arrested for violation of City Code 30-55, *Failure to Obtain a Business License* and City Code 10-3 *Failure to Comply with Commercial Liquor License Provisions*.[1] No one else was arrested.

22.

I solemnly swear and affirm under the penalties of perjury and upon personal knowledge that the contents of this affidavit are true.

*[Signature Page to Follow]*

---

6

Bryant Burns
Sergeant, Atlanta Police Department
(retired)
Atlanta, Georgia 30303

Sworn to and subscribed before me this 4th day of August, 2017.

NOTARY PUBLIC

ALICIA N WILLIAMS
MY COMMISSION EXPIRES
JAN
26
2019
DEKALB CO. GEORGIA
NOTARY PUBLIC

7

# DEF. MSJ

# EX. 6

1

1          IN THE MUNICIPAL COURT FOR THE CITY OF ATLANTA

2                          STATE OF GEORGIA

3

4    CITY OF ATLANTA,                    )
                                         )
5                                        )    Operating a Business
                                         )
6              vs.                       )    Without a License
                                         )
7                                        )
     DEVON WILLIS BROWN                  )
8        Defendant.                      )

9

10           Official Proceedings of a Trial (Vol. 1 or 3)

11        before the Honorable CRYSTAL A. GAINES, Associate

12        Judge, Atlanta Municipal Court, Courtroom No. 3B,

13        150 Garnett Street, S. E., Atlanta, Georgia,

14        recorded by a computer-based digital recording

15        system, commencing at approximately 3:00 o'clock

16        a.m. on the 7th day of April, 2014  as transcribed

17        by a Certified Court Reporter, Joyce A. Gibbons.

18

19

20              ***************************
                    JOYCE A. GIBBONS
21              CERTIFIED COURT REPORTER
                150 GARNETT STREET, S.W.
22              ATLANTA, GEORGIA  30303
                     (404) 924-8124
23

24

25

1

2                      A P P E A R A N C E S

3

4       FOR THE CITY:

5       ERIKA SMITH
        Assistant City Solicitor
6       Office of the City Solicitor
        150 Garnett Street, Third Floor
7       Atlanta, Georgia  30303

8       JACOB DAUGHTRY
        Senior City Solicitor
9       Office of the City Solicitor
        150 Garnett Street, Third Floor
10      Atlanta, Georgia  30303

11

12      FOR THE DEFENDANT:

13      GEORGE MICHAEL PLUMIDES, Esq.
        5639 Western Hills Drive
14      Norcross, Georgia 30071

15

16

17

18

19

20

21

22

23

24

25

1                         W I T N E S S E S

2

3    FOR THE CITY:

4    SGT. BRYANT BURNS

5         Direct Examination by Ms. Smith        13
          Cross Examinaton by Mr. Plumides        27
6         Redirect Examination by Ms. Smith      33

7

8    OFFICER GARY A. SMITH

9         Direct Examination by Ms. Smith        34
          Cross Examination by Mr. Plumides      38
10        Redirect Examination by Ms. Smith      39

11

12   SGT. KELVIN L. WALLS

13        Direct Examination by Ms. Smith        40
          Cross Examination by Mr. Plumides      45
14        Redirect Examination by Ms. Smith      48

15

16   GORDON CAVENAUGH

17        Direct Examination by Ms. Smith        49
          No Cross Examination
18

19

20

21

22

23

24

25

4

1                    W I T N E S S E S

2

3    VOIR DIRE:

4    ALVIN COLEMAN

5         Examination by Mr. Daughtry        58
          Examination by Mr. Plumides        61
6

7    JOCK MITCHELL

8         Examination by Mr. Plumides        63
          Examination by Mr. Daughtry        64
9

10

11   FOR THE DEFENSE:

12   DEVON WILLIS BROWN

13        Direct Examination by Mr. Plumides   69
          Cross Examination by Ms. Smith       79
14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2

3          THE COURT:  Mr. Plumides, your client is

4     here?

5          MR. PLUMIDES:  He is, Judge.

6          THE COURT:  All right.  Bring him up to the

7     table as well.

8          MR. PLUMIDES:  We invoke the rule of

9     sequestration.

10        (Whereupon, witnesses leave the courtroom.)

11         MR. PLUMIDES:  There is a motion to suppress

12    pending, Judge.  I'd like to be heard before

13    (inaudible).

14         THE COURT:  Okay.  I have questions about your

15    motion to suppress.

16         MR. PLUMIDES:  I'm at the Court's pleasure.

17         THE COURT:  I'm ready at this point. Mr.

18    Plumides, if you will come to the podium since it's

19    your motion.

20         MR. PLUMIDES:  Judge, the defendant moves to

21    suppress all illegally seized evidence.  This would

22    specifically include any evidence that includes the

23    motorcycle clubhouse located at 2031 Metropolitan

24    Avenue.  Ah, Judge, basically what happened was --

25         THE COURT:  Tell me what was seized.

1          MR. PLUMIDES:  Well evidence that it's a

2     business.  Ah, we're arguing that it's not a

3     business.

4          THE COURT:  But what evidence is it, Mr.

5     Plumides?  I can't know what we need to do unless I

6     know what evidence you're trying to suppress.

7          MR. PLUMIDES:  Well they're saying that there

8     wasn't, ah, a business license, there wasn't an

9     alcohol license, there wasn't tax licenses.  And all

10     of that knowledge came from them going in there

11     illegally.  So we're suppressing evidence of that.

12     This is a private club.  It's not a private club,

13     it's a --

14          THE COURT:  Well you're talking about testimony

15     then?

16          MR. PLUMIDES?  Yes, Judge.

17          THE COURT:  All right.  Well then I'm assuming

18     you're not talking about a motion to suppress then

19     if it's testimony.

20          MR. PLUMIDES:  Yes, Judge.

21          THE COURT:  Because a motion to suppress goes

22     to an item of evidence.

23          MR. PLUMIDES:  Tangible evidence, yes, Judge.

24          THE COURT: So I'm trying to figure out where

25     we're going with this motion to suppress because if

```
 1        there's something -- let me -- let me just stop you
 2        while we're doing this.  Maybe they're not
 3        presenting any tangible evidence that I need to even
 4        talk to you about, okay.
 5             MR. PLUMIDES:  Then we're ready to go forward
 6        then with the trial.
 7             THE COURT:  With what?
 8             MR. PLUMIDES:  With the trial.
 9             THE COURT:  No, Mr. Plumides, I'm not finished
10        with you.  All right.  Ms. Smith --
11             MS. SMITH:  Yes, Your Honor.
12             THE COURT:  Are you all presenting tangible
13        evidence?
14             MS. SMITH:  No, Your Honor.  No.
15             THE COURT:  Okay. So that means that there is
16        nothing they are presenting that would be the
17        subject of your motion to suppress.
18             MR. PLUMIDES: Statements.
19             THE COURT:  Okay.  All right.  His statement I
20        assume then?  Because that's the only thing that you
21        could have a motion to suppress on.
22             MR. PLUMIDES:  That's right, Judge.
23             THE COURT:  All right.  Do you have a written
24        statement, a confession or anything on behalf of the
25        defendant that you plan to present today?
```

1          MS. SMITH:  No, Your Honor.

2          MR. PLUMIDES:  It's -- it's just in the police

3     report, the statements made in the police report to

4     the arresting officer.

5          THE COURT:  Okay. All right. Well you-all want

6     to show me what you have.  I mean I -- because she's

7     saying she's not planning on presenting it then.

8          MR. PLUMIDES:  Then that's a moot point then.

9          THE COURT:  Yeah, it is.  Ah, anything -- I

10    mean you had a whole bunch of stuff once I read this

11    that was all in here.  I -- because when I saw that

12    you attached the lease I assumed that came from your

13    client not from them, right?

14         MR. PLUMIDES:  That's right, Judge.

15         THE COURT:  All right.  And that's the only

16    thing I saw on here that you attached was something

17    that -- but that still would be within the testimony

18    of trial whether it could be admitted or not as

19    opposed to a motion to suppress.  So I -- I don't

20    see at this time anything that your motion is

21    addressing.  So I'm not denying it.  I just don't

22    see anything that it addresses.

23         MR. PLUMIDES:  Very well, Judge.

24         THE COURT:  All right.  Are there any other

25    motions on behalf of the City, Ms. Smith?

1          MS. SMITH:  No, Your Honor.

2          THE COURT:  All right. And that's it pretrial

3     for you, Mr. Plumides?

4          MR. PLUMIDES:  That's correct, Judge.

5          THE COURT: All right.

6          MR. PLUMIDES:  There is brief opening.

7          MS. SMITH:  Your Honor, I do believe -- ah,

8     before we move on I do believe that counsel has

9     invoked the rule and that does apply to his

10    witnesses as well.

11         THE COURT:  All right.  Do you have witnesses

12    as well, Mr. Plumides?

13         MR. PLUMIDES:  I beg your pardon, Judge.

14         THE COURT:  Okay.

15         MR. PLUMIDES:  Any witnesses in this case need

16    to step outside.  I just have one and possibly the

17    defendant.

18         THE COURT: Okay. All right.  We'll excuse him

19    as well.  All right.  Then we will move on.

20    Anything else before we move on to the opening

21    statements for either side?  If not you lose it at

22    this time and we're gonna go on to opening

23    statements and then to evidence.

24         MR. PLUMIDES:  I mean I think she has the

25    right to opening.

1          THE COURT:  I think she does too, Mr. Plumides.

2     I thought you were standing to say you had something

3     else to say.

4          MR. PLUMIDES:  No, Judge.

5          THE COURT:  All right.  Ms. Smith.

6          MS. SMITH:  Your Honor, in this case we have a

7     private club and in the City of Atlanta you need a

8     business license in order to operate a private club.

9     What the City will show to Your Honor today and to

10    this Court is that it was a private motorcycle club

11    being operated on the day and time that the citation

12    was issued. And to have that club you have to have a

13    business license in the City of Atlanta.

14         The evidence will also show that the particular

15    private club was not in compliance with other

16    provisions of the code that being in compliance with

17    either a liquor license and/or a bottle house

18    license.  And we will present that evidence before

19    this court today.

20         THE COURT:  Mr. Plumides.

21         MR. PLUMIDES:  Judge, in 2009 the defendant and

22    several persons with a common interest, motorcycles,

23    decided to peacefully assemble and congregate

24    occasionally at a clubhouse located at 2031

25    Metropolitan Parkway.  Now, Judge, respectfully this

1    could have been a young Democrats clubhouse. It

2    could have been a Monopoly lover's clubhouse. It

3    could be a chess or checkers clubhouse.  This is

4    just a place where these people peacefully assemble

5    and congregate with the common interest of

6    motorcycles.  Now they have functions occasionally

7    for charity and so forth but this is not a business.

8    They don't sell anything.  They don't sell any

9    alcohol.  There is nobody charging admission at the

10   door.  There's no hours of operation on the front of

11   the building.

12       These are just people that are peacefully

13   assembling in a commercial business.  Now I don't

14   know that the Constitution says something about you

15   got to peacefully assemble in somebody's house and

16   that you can't peacefully assemble in a commercial

17   establishment.  And we would expect the evidence to

18   show that the lease even says private clubhouse.

19       These are about 20 people that just have a

20   common interest of motorcycles. Now this is a not

21   for profit group.  There are no cash registers in

22   there.  There's no beer taps.  They don't even have

23   an icemaker.  So to call it a business is a huge

24   leap of faith.  They've never held itself out to be

25   a business or in business.  And as such nothing has

1     ever been bought or sold at this location including

2     alcohol.  They have posted on the door on the lease

3     clearly, "Private. Do not enter."  They congregate

4     occasionally. Sometimes they'll have a party.  They

5     don't sell any alcohol.  You just B.Y.O. as they

6     call it.

7         So about nine agents or ten agents went in on

8     this raid without a warrant and went in there and

9     just found a bunch of people congregating with some

10    dancers So they -- we'd argue respectfully they are

11    entitled to First Amendment protection to peacefully

12    assemble wherever they want to. They weren't

13    breaking any laws.  The police report in this case,

14    Judge, business, business, business, business.  It's

15    not a business, never was.  Judge, the City

16    ordinances before the Court are Operating a Business

17    Without a License and Compliance with chapter

18    Required.  Judge, this case is eerily similar to the

19    Eagle case.  Ah, and Sgt. Brown here is a Sergeant

20    of the Fulton County Police, ah, the Fulton County

21    Sheriff's Office and he was falsely imprisoned as a

22    result of this arrest. Submitted.

23        THE COURT:  All right.  Ms. Smith, we're ready

24    for your first witness.

25

1          MS. SMITH:   The City would call Officer B. D.

2     Burns.

3          (Whereupon, witness enters the courtroom.)

4               SGT. BRYANT D. BURNS

5          Having been first duly sworn, was examined and

6     testified as follows:

7     Q.   (By Ms. Smith) Can you state your name for

8  the record.

9     A.    Bryant D. Burns, B-U-R-N-S.

10     Q.   And how are you employed?

11     A.    Police Sergeant, City of Atlanta License and

12  Permits Unit.

13     Q.   Are you P.O.S.T. certified?

14     A.    Yes, I am.

15     Q.   And what are your current duties with the

16  City of Atlanta?

17     A.    Currently I'm assigned to the Atlanta Police

18  Department, License and Permits Unit which is a part of

19  our Special Enforcement Section.

20     Q.   Okay.  And how many years have you worked

21  with the City of Atlanta Police Department?

22     A.    17 years.

23     Q.   And were you a P.O.S.T. certified officer

24  working with the City of Atlanta as a Sergeant on

25  February 8, 2014?

1          A.    Yes, I was.

2          Q.    And did you go to the property location of

3    2130 -- 2031 Metropolitan Parkway?

4          A.    Yes, I did.

5          Q.    And is that property address in the City of

6    Atlanta?

7          A.    Yes, it is.

8          Q.    Sgt. Burns, what brought you attention to

9    that property address?

10         A.    The License and Permits Unit were doing a

11   late night detail.  We were checking businesses that

12   were in compliance along the Metropolitan Parkway area.

13   We had checked two prior locations in the 1900 block of

14   Metropolitan Parkway.  We came upon the location of

15   2031 Metropolitan Parkway after seeing several cars in

16   the parking lot. It was approximately about 4:15 in the

17   morning.  As we pulled up we heard loud music from

18   outside in the parking lot.

19         Q.    And was this a raid on this property

20   address?

21         A.    No, it was not.  All the officers were

22   dressed in just normal police gear; no tactical gear,

23   no mask.

24         Q.    Okay.  And your testimony was that it was a

25   compliance check?

1      A.    Yes, a compliance check.

2      Q.    And what exactly is a compliance check?

3      A.    A compliance check is when we go into

4    commercial businesses, we go into any establishment

5    that is believed to be selling alcohol, restaurants,

6    convenience stores and we check for a number of things.

7    We check for the general business license.  We also

8    check -- if it's in a location selling alcoholic

9    beverages we'll check for their liquor, beer and wine

10   license as well.

11     Q.    Okay.  And being assigned to the License

12   and Permits Unit is this something that you normally

13   do in your normal course of business?

14     A.    Yes, this is something we do all day every

15   day.

16     Q.    Okay.  So it's just and administrative

17   inspection; is that correct?

18     A.    Yes, it is.

19     Q.    Sgt. Burns, did you go inside of the

20   location?

21     A.    Yes, we did.

22     Q.    And can you tell the Court how you gained

23   access into the location?

24     A.    After seeing the cars in the parking lot,

25   hearing the loud music, we knew exactly where the music

1    was coming from.  As we approached the door there was a

2    gentleman walking out of the establishment who -- it

3    appeared that he was stepping out to use the telephone.

4    We walked right inside the establishment and, ah, we

5    were inside of the location.

6         Q.   Did anyone tell you that you could not

7    enter the establishment?

8         A.   No, they did not.

9         Q.   Okay.  Were there any locks on the doors

10   that prevented you from walking, freely walking in?

11        A.   No, it was not.

12        Q.   And when you walked into the business what

13   did you observe, if anything?

14             MR. PLUMIDES:  Objection to characterization

15        of a business. No foundation has been laid.

16             MS. SMITH:  I'm merely asking him what he

17        observed.

18             MR. PLUMIDES:  She said when he walked into

19        the business what did you observe.  There's been no

20        evidence that this is a business.

21             MS. SMITH:  I'll rephrase.

22        Q.   (By Ms. Smith) When you walked into the

23   building what did you observe?

24        A.   I immediately observed, ah, several females

25   dancing on, ah, there were about four poles in the

1  location.  They were performing adult entertainment on

2  those poles as well as there was a sex act occurring in

3  the first room to my immediate left.  There was alcohol

4  inside of the location.  Loud music was inside.

5        Q.    Okay.  And this particular building, ah,

6  was it a resident or was it a commercial structure?

7        A.    This was a commercial structure.

8        Q.    And, Officer Burns, how many inspections

9  have you done since you've been in License and

10  Permits?

11       A.    I would say over a thousand inspections.

12       Q.    Okay.  And is it normal for you to enter a

13  commercial building to do your inspections?

14       A.    Yes, it is, to check for compliance.

15       Q.    Okay. And when you normally enter -- what

16  time of night was this?

17       A.    This was about 4:15 in the morning.

18       Q.    Okay.  And Officer Burns, when you enter

19  buildings do your compliance checks that are

20  commercial structure in that time of the morning is

21  it -- do you commonly think it is a business?

22       A.    Yes, we do.

23       Q.    Okay.  And when you entered this building

24  you said you observed dancers?

25       A.    Yes.

1      Q.   And does your office also inspect for, ah,

2   adult dancing permits?

3      A.   Yes, we do.  We issue adult dancing permits.

4      Q.   Okay. Was this location one of the

5   permitted establishments?

6      A.   No, it was not.

7      Q.   Okay.  At any time --

8           MR. PLUMIDES:  Objection.  He is not charged

9       with that.  It's irrelevant.

10          MS. SMITH:  Your Honor, this is the basis for

11      that it was a business and permitting needs to be

12      done and also that if it is a compliance check he

13      has a right to be there for to check for permitting

14      for adult entertainment as well.

15          THE COURT:  You're saying that adult

16      entertainment was a part of the business he was in?

17          MS. SMITH:  I'm just saying it goes to the

18      weight that it is a business.

19          THE COURT:  I think you missed my question.

20      Are you saying that adult entertainment was also a

21      part of the business that he was in?

22          MS. SMITH:  Yes.

23          THE COURT:  Okay.  All right.  Well I guess it

24      would be relevant if that's what you're trying to

25      prove.

1          MR. PLUMIDES:  I would hope that she could lay

2     a proper foundation.

3          THE COURT:  Okay.

4     Q.   (By Ms. Smith)  Officer, what else did you

5 observe?

6     A.   Ah, there was a bar in this establishment, a

7 DJ booth with several loud speakers and amplifiers.

8 Ah, as I said earlier there were four adult

9 entertainment poles that were permanently affixed to

10 this, ah, business.  There were, ah, there was a stage

11 set up, ah, each of the, ah, where the poles were.

12 There was a kitchen, a small kitchen area to the

13 business.

14     Q.   And, Officer Burns, when you said you saw

15 alcohol at the establishment with License and Permits

16 is it -- do you commonly check for alcohol licensing

17 as well?

18     A.   Yes, we do.

19     Q.   Okay.  And at any time did you ask for any

20 license, ah, ask if any license had been obtained for

21 this particular location?

22     A.   Yes, I did.  Normally the first thing we do

23 we check around the bar area or within the first 10 to

24 15 feet of the entrance for the general business

25 license as well as for any other license that

1   accompanies the general business license whether it be

2   an alcohol license, whether it be a billiard table

3   license or any of that. We did not see any of those

4   posted as they are required to be posted in a

5   conspicuous manner.  And we did not locate any of the

6   license which would cause us to have to ask, find out

7   who was in charge of the business and request those

8   licenses.

9       Q.   At any time did you ask anyone who was in

10  charge of the business?

11      A.   Yes, I did.

12      Q.   And at that time did anyone --

13           MR. PLUMIDES:  Objection.  It's not a business.

14      No foundation has been laid to that fact.

15           MS. SMITH:  There is no foundation that needs

16      to be laid. I'm simply taking testimony from what

17      Officer Burns asked.

18           MR. PLUMIDES:  He's charged with operating a

19      business without a license.  They need to establish

20      that it is a business.  So far I haven't heard

21      anything of that nature.

22           MS. SMITH:  And, Your Honor, that is what this

23      trial is about that it actually is a business that

24      needs a license.

25           MR. PLUMIDES:  Then put up some evidence.

1          MS. SMITH: That is the whole essence of what

2      this trial is about.

3          MR. PLUMIDES:  Then put up some evidence.

4          THE COURT: Okay.  Now let me tell you

5      something.  I won't have you talking over each

6      other.

7          MR. PLUMIDES:  Yes, Judge.

8          THE COURT:  This is court.  We both will

9      remember that.  When the other person finishes then

10     the other person can talk.  Now I agree with her.  I

11     don't see where a foundation to enter any evidence

12     is needed here.  Foundation is about entering some

13     evidence like a document, etc. or a foundation for

14     an expert's testimony, those kinds of things.  In

15     this she's just taking testimony so far.  If you

16     have an objection to her choice of words, it's just

17     a choice of words.  This is a bench trial.  It's not

18     like a jury trial where a choice of words are going

19     to influence me one way or another.  So I'm gonna

20     let her do it.

21     Q.   (By Ms. Smith)  Officer Burns --

22     A.   Yes.

23     Q.   -- at any time did you request who was

24 responsible for the business?

25     A.   Yes, I did.

1      Q.    And was there a response?

2      A.    Moments later we were met by a gentleman by

3   the name of Mr. Devon Brown.

4      Q.    Okay.  And did you engage in conversation

5   with Mr. Brown?

6      A.    Yes, I did.

7      Q.    And what did you ask him?

8      A.    I asked Mr. Brown was he in control of the

9   business and he stated he was.  He stated that it was

10   his business.  It was his club.  And I requested to see

11   his general business license as well as any other

12   licenses that were needed and he could not produce any

13   of those documents.

14      Q.    Did, ah, what kind of club did he indicate

15   that he was running?

16      A.    That it was a private club.

17      Q.    At the moment that he told you that it was

18   a private club did you ask him for a roster?

19      A.    Yes.  Ah, with the private club ordinance in

20   the City of Atlanta you would need at least 250, more

21   than 250 members.  You would need documentation that

22   you're a nonprofit organization which that would be a

23   501c3 form. You would also need to show your most

24   recent tax returns for the last three years that you

25   filed.  Additionally the, ah, if you were selling

1   alcohol you would have to have an alcohol license to

2   accompany that.  I also asked that by ordinance all

3   those documents were required to be on the premises at

4   the time during the inspection by police.

5       Q.   And was Mr. Brown able to produce any of

6   these documents?

7       A.   He could not produce any of the requested

8   documents.

9       Q.   Okay.  And did you in fact ask him about

10  the alcohol that was at the premises?

11      A.   Yes.

12      Q.   And did he resp -- how did he respond?

13      A.   He stated, ah, that some of the people

14  brought the alcohol onto the property.

15      Q.   Did you request for a business license?

16      A.   Yes.

17      Q.   I'm sorry, for a liquor license.

18      A.   Yes, I did.

19      Q.   Was there a liquor license produced?

20      A.   No, there was no license produced.

21      Q.   And, Officer Burns, all applications for

22  liquor license are they -- do they come through your

23  office?

24      A.   Yes. They initiate in our office in the

25  License and Permit Unit.

1          Q.    Okay.  And has there -- was there an

2   application on file for this property address at 2031

3   Metropolitan Parkway for a liquor license?

4          A.    No, there was not.

5          Q.    Okay.  Ah, was there an application on file

6   for a bottle house license?

7          A.    No, it was not.

8          Q.    Did the defendant produce a bottle house

9   license?

10         A.    No, he did not.

11         Q.    Okay.  And the individual that you spoke to

12  that you refer to as Mr. Brown do you see that person

13  in court today?

14         A.    Yes, I do.

15         Q.    Can you point that individual out and tell

16  the Court what they are wearing today.

17         A.    Yes, he's the gentleman to my right at

18  defense table wearing a burnt orange shirt and a blue

19  pinstriped suit.

20             MS. SMITH:  Let the record reflect that

21         Sgt. Burns has identified Devon Brown, the defendant

22         in this case as the individual that he spoke to on

23         the night in question.

24             THE COURT:  All right.  Mr. Plumides, any

25         objection to the identification at this point?

1        MR. PLUMIDES:  No, Judge.

2        THE COURT:  Okay.  Continue.

3    Q.  (By Ms. Smith) Officer Burns, did you ask

4  Mr. Brown for any other licensing at that location?

5    A.   Yes.  I also asked Mr. -- there was a

6  billiard table, ah, in the location, a pool table.

7  Mr. Brown actually produced a document for the billiard

8  table that was posted on the wall for a billiard.

9  However that was expired since 2010.

10    Q.   Okay.  At any time during your questioning

11  and asking Mr. Brown for any of these documents was

12  he detained?

13    A.   No.  No, he was not.

14    Q.   Okay.  And did, ah -- Officer Burns, did

15  Mr. Brown indicate at any time that any other

16  representatives from the City of Atlanta had visited

17  the location?

18    A.   Ah, he did not.  He stated that eight years

19  ago that he went to the Atlanta Police Department

20  License and Permits and, ah, asked them if he needed a

21  license and he was told he did not.  He particularly

22  remembered that it was eight years ago.  He could not

23  remember the investigator, the person that he had

24  spoken to.  Ironically there was another investigator

25  there, Investigator G. A. Smith that was on the detail

1   that had had a conversation with Mr. Brown two months

2   prior to us entering the location that Mr. Brown had

3   a hard time remembering. But Investigator Smith had

4   advised Mr. Brown also what he needed to do.  So

5   basically he had been given a warning two months prior

6   to us going back to the location.

7        Q.   Okay.  And approximately how many private

8   clubs are in the City of Atlanta?

9        A.   Currently we have about 10 to 12 private

10  clubs in the City of Atlanta.

11       Q.   Okay.  And do all these clubs have

12  licenses?

13       A.   Yes, they do.  We have 10 to 12 currently

14  licensed private clubs with alcohol.

15       Q.   Okay.  And all of these clubs are monitored

16  by your office; is that correct?

17       A.   Yes.

18       Q.   Okay.  Sgt. Burns, if I were to -- as an

19  attorney if I wanted to have a club and meet with

20  some attorneys in a commercial building do I have to

21  have -- and I wanted to call myself a private club --

22  would I have to get a license?

23       A.   Yes, you would come to our office and obtain

24  a license.  And actually we have a lawyers club that is

25  a private club that's permitted with the City of

1   Atlanta.

2       Q.   Okay.  And, Sgt. Burns, if I were to have

3   my individual attorneys and they brought their own

4   liquor to the commercial establishment would I have

5   to have a license?

6       A.   Yes.  If you're bringing alcohol into a

7   commercial establishment then you would have to have in

8   addition to an alcohol license what is called a bottle

9   house license.  And the attorney said earlier B.Y.O.B.

10  is, ah, would require a bottle house license under

11  Section 10-64 City of Atlanta.

12      Q.   Okay.

13      A.   And we also have bottle house license

14  establishments in the city.

15      Q.   Thank you.

16           MS. SMITH:  No further questions.  Subject to

17      redirect.

18                        CROSS-EXAMINATION

19      Q.   (By Mr. Plumides) Did you make a police

20  report of this case?

21      A.   Yes, sir, I did.

22           MR. PLUMIDES:  May I approach the witness to

23      show him this?

24           THE COURT:  Certainly, once you mark it.

25           MR. PLUMIDES:  D-1.

1          (Whereupon, document is shown to the witness.)

2     A.    Yes, this is my report.

3     Q.    Okay.  Ah, and you swore to the facts

4  contained in that report; did you not?

5     A.    I authored the police report.

6     Q.    Down at the very bottom it says what?

7     A.    [reading] "The undersigned being duly sworn

8  upon his or her oath deposes that the statements

9  foregoing is true and correct." [end reading]

10     Q.    Is that right?

11     A.    I completed the report, yes.

12     Q.    Okay. And a few moments ago you testified

13  that Mr. Brown indicated to you or stated to you that

14  it was -- that he was in charge of the business.

15  Will you show us in that police report where he said

16  that.

17     A.    The first paragraph is says that Mr. Brown

18  advised that his location was a private club for

19  members only.

20     Q.    Okay.  And you said earlier that --

21          MR. PLUMIDES:  May I approach.

22          THE COURT:  Sure.

23     Q.    You said earlier that, ah, that you were

24  not stopped by anybody or anything, ah, nobody

25  stopped you from coming in; is that right?

1          A.    Correct.

2          Q.    Let me show you what has been marked at

3    Defense Exhibit #2.  Let me see if this picture

4    refreshes your recollection about the front of the

5    building.

6               (Whereupon, picture is shown to witness.)

7          Q.    Does that refresh your recollection?

8          A.    I could assume that this is the building but.

9          Q.    Does it refresh your recollection?

10         A.    No, it does not.

11         Q.    What does it say?

12         A.    It says posted no trespassing, keep out.

13         Q.    Then you can read, can't you?

14         A.    I just read it, correct?

15              THE COURT:  Mr. Plumides, now you know we are

16         not gonna go there.

17              MR. PLUMIDES:  All right.  I'll move on.

18         I'm sorry.

19         Q.    (By Mr. Plumides) Did you, ah, was anybody

20    working the door, collecting money?

21         A.    Not that I saw.

22         Q.    And how much money did you collect out of

23    the cash register?

24         A.    It was not a search warrant.  We did not

25    seize anything.  We were just --

1        Q.   Was there a cash register?

2        A.   I don't recall seeing a cash register.

3        Q.   But you would have included something of

4   that significance in your report; would you not?

5        A.   I was not there for money.   I was there for

6   licenses.

7        Q.   Well you've charged him with running a

8   business.   Wouldn't a cash register be indicative of

9   a business?

10        A.   Sometimes and sometimes not.   There are

11   several businesses that don't have a cash register.

12        Q.   Okay.   Did you find any beer taps in there?

13        A.   No, I saw beer bottles.

14        Q.   Didn't see any beer taps?

15        A.   When you say tap what do you mean?   No.

16        Q.   Okay.   And, ah, the kitchen area can you

17   show us a menu?

18        A.   Can I show you a menu from their kitchen?

19        Q.   That's right, can you?

20        A.   No.

21        Q.   Okay.   That's indicative that it's not a

22   business; isn't it?

23        A.   No, it's not.

24        Q.   So nobody working the door, no cash

25   registers, no menus, right?   Just a bunch of people

1   sitting around drinking a beer, right?

2        A.    And nude dancing, yes.

3        Q.    Nude dancing.  But you did not charge him

4   with that, did you?

5        A.    No. I did not charge him with that, no.

6        Q.    Now when did you decide to arrest Sgt.

7   Brown?

8        A.    When Mr. Brown could not provide any of the

9   documents that we requested in terms of a business

10  license, alcohol license, adult entertainment license.

11  When Mr. Brown could not provide a charter for the

12  location, tax returns, a membership roster.

13       Q.    And other than the fact that he didn't have

14  any of these documents that you say he needed there

15  wasn't anything illegal going on in there, was there?

16       A.    Yes, alcohol was on the premises without a

17  license.  There was a business --

18       Q.    But he is not charged with that, right?

19       A.    I think he was charged with compliance to the

20  chapter, Chapter 10 which is the alcohol section.

21       Q.    Do you have that statute with you up there?

22       A.    It's 10 --

23             THE COURT:  That's one of the charges I

24       arraigned him on.  Let's move on.

25       Q.    Ah, and you didn't have a search warrant

1   before you went in there, did you?

2        A.   No.

3        Q.   And you took almost ten agents to go in

4   there.  Is that usual, ten agents to check a permit?

5        A.   When we're doing -- when we're doing details

6   along Metropolitan Parkway, there are several

7   businesses along Metropolitan Parkway so the more -- we

8   could get more done with more people. And I wouldn't

9   call them agents.

10            THE COURT:  He meant officers.

11       A.   Yeah, they were -- part of this detail is

12   that we incorporate other outside agencies such as the

13   Fulton County Health Department, the Buildings

14   Department, Zoning. So those persons were with us on

15   that detail.

16       Q.   Did you go to the leasing office and

17   determine what was on the lease?

18       A.   No, sir.  This was 4:00 in the morning.

19       Q.    Okay.  Well you said you operated, I

20   believe your words were morning, noon and night.  All

21   day, all night I think is what your words were.  So

22   you could have gone during the day?

23       A.   A lease wouldn't help me in a situation.  The

24   only thing that would have helped me in that situation

25   was a business license or an alcohol license.

1              MR. PLUMIDES:  No further questions.

2              THE COURT:  All right.

3                      REDIRECT EXAMINATION

4       Q.   (By Ms. Smith)  Officer Burns, does a

5    private club need a cash register?

6       A.   No, they do not.

7       Q.   And why is that?

8       A.   Because the du -- no money can be exchanged

9    at a private club.  If there are dues it has to be paid

10   monthly, annually or bi-annually, ah, at a private

11   club.  So there wouldn't be a need to have a cash

12   register there.

13      Q.   Okay.  And, ah, on this particular detail

14   was there also being checks on the building itself?

15      A.   Yes, it was.

16      Q.   Okay.

17             MS. SMITH:  Thank you.  Nothing further.

18             THE COURT: Wait.  He gets the right to recross

19          if he so desires.

20             THE WITNESS:  I'm sorry.

21             MR. PLUMIDES:  The witness can be excused,

22          Judge.

23             THE COURT:  All right.  Thank you, Officer

24          Brown.

25

1            MS. SMITH:  The City would call Officer G. A.

2      Smith.

3        (Whereupon, the witness enters the courtroom.)

4                    OFFICER GARY A. SMITH

5      Having been first duly sworn, was examined and

6    testified as follows:

7                    DIRECT EXAMINATION

8      Q.   (By Ms. Smith) Can you state your name for

9    the record.

10     A.    Investigator Gary A. Smith.

11     Q.   And, ah, Investigator Smith, where are you

12   employed?

13     A.    City of Atlanta, License and Permits Unit.

14     Q.   And how long have you been with that unit?

15     A.    Now approximately three years.

16     Q.   And how long have you been with the City of

17   Atlanta?

18     A.    21 years.

19     Q.   And are you a P.O.S.T. certified police

20   officer?

21     A.    I am.

22     Q.   Okay.  And what are your current duties?

23     A.    All right.  My current duties I work the

24   enforcement part of License and Permits where we go out

25   and enforce the ordinances for the City.

1        Q.    Are you familiar with the property address

2    of 2031 Metropolitan Parkway?

3        A.    I am.

4        Q.    And prior to February 8, 2014 did you go to

5    that property address for a compliance check?

6        A.    I did.

7        Q.    And approximately when did you go to that

8    property address?

9        A.    I don't know the exact month nor the day but

10   I had received a complaint regarding the motorcycle

11   club there at this location.   And I went there and I --

12   to meet with the gentleman or a representative of the

13   club or this particular facility and I met with the

14   gentleman there.

15       Q.    Okay.   And who did you meet with?

16       A.    I don't know the gentleman's name right

17   offhand.

18       Q.    Do you see that individual in court?

19       A.    I believe so.

20       Q.    Can you point that individual out.

21       A.    Sitting at the defense table.

22       Q.    Okay.   Officer Smith, did you inquire about

23   any licensing at 2130 -- ah, 2031 Metropolitan?

24       A.    I went there as -- what I generally do when I

25   go out to any businesses I meet with the owner or the

1   managers and I in this particular case met with the

2   gentleman and gave him what I call a courtesy in

3   letting him know that if they didn't have the proper

4   documents or licensing that they were at that time in

5   jeopardy of or in violation of a city ordinance.

6       Q.   Okay.  And what notices did you give to the

7   individual on that date and time?  I mean when you

8   went to -- I'm sorry, I mean when you went to the

9   property address.

10      A.   When I went there I, ah, I informed the

11  gentleman after introducing myself and he did advise me

12  that they were a private organization.  And I said well

13  if you're a private club that you need to have certain

14  requirements, there are certain requirements that you

15  have to adhere to: one, being a business license; two,

16  if you are selling alcohol that you have to have

17  alcohol licensing.  And at that time he said that they

18  was a private club. And I said well even if you're a

19  private organization you will still need to have a

20  membership list and be able to present that list at any

21  given time when a representative comes from out

22  department, come and request to see that.

23      Q.   Okay.  And on the morning of February 8,

24  2014 did you again go back to the property address of

25  2031 Metropolitan Parkway?

1      A.    Yes.   I went there with Sgt. Burns and

2   several others.

3      Q.    Okay.  And, ah, what brought you to that

4   property location?

5      A.    I believe it was another complaint for that

6   location.

7      Q.    Okay.  And, Investigator Smith, at any time

8   did you advise that you had been to that location

9   before and advised that licensing was needed?

10     A.    Yes.  I, ah, while the gentleman was talking

11  with Sgt. Burns and I just interrupted and then

12  reintroduced myself.  And asked the gentleman that, you

13  know, do you remember the conversation that we had at

14  that time.  And at that time he said, yes, he did

15  remember me.  And I had also stated to him I said at

16  that time I told you that you needed a business license

17  in addition to having that list for your members, ah,

18  you should also be able to go to the location and

19  should be presented at anytime when asked to do so.

20     Q.    Okay.  And the person that was engaged in

21  conversation with Officer Burns was the same person

22  that you previously went out and gave a notice to?

23     A.    That is correct.

24     Q.    Did you -- was a business license produced

25  on the date and time on February 8, 2014?

1        A.    Not that I'm aware of.

2        Q.    Okay.  Was there a liquor license at the

3    premises?

4        A.    Not that I'm aware of.

5        Q.    Was there a bottle house license at the

6    location?

7        A.    Not that I'm aware of.

8             MS. SMITH:  Thank you.  No further questions.

9        Subject to redirect.

10            THE COURT:  Mr. Plumides, at this time you can

11       cross-examine.

12                      CROSS-EXAMINATION

13       Q.    (By Mr. Plumides)  What was the compliant?

14       A.    The complaint was that there was an illegal

15   club operating there and that they were charging people

16   to get into the club.

17       Q.    Was that what you saw when you got there?

18       A.    When I got there, no, I did not observe that.

19       Q.    The compliance with chapter required that

20   doesn't have anything to do with a occupation tax,

21   does it?

22       A.    I'm sorry.

23       Q.    The compliance with chapter required, the

24   citation that was written Sgt. Brown that doesn't

25   have anything to do with a occupation tax, does it?

1      A.   He -- from my understanding that he does have

2   to have a business license, yes.

3      Q.   If it's a business?

4      A.   Regardless if he's a business or a private

5   club.

6      Q.   Well if he's just a congregation of people

7   meeting because they have a common interest in

8   motorcycles that wouldn't necessarily be a business

9   now, would it?

10      A.   Ah, for those technicalities he was informed

11   that he would still need to have that business license

12   as a private club.

13      Q.   So people meeting, congregating

14   occasionally in a commericial building that requires

15   a business license; is that your testimony?

16      A.   Yes.

17          MR. PLUMIDES:   No further questions, Judge.

18                      REDIRECT EXAMINATION

19      Q.   (By Ms. Smith)   Officer, can -- did Mr.

20   Brown tell you it was a private club?

21      A.   Yes, he did.

22      Q.   Okay.   And when you went to the location on

23   February 8, 2014 was a club -- was it in club mode?

24      A.   Yes, it was.

25      Q.   Okay.   When you first, ah, interviewed

1    Mr. Brown how many times did he say he was gonna

2    assembly at that location?

3        A.   He -- from the conversation that I had with

4    him they had been assembling for years.

5        Q.   Okay.  At that location?

6        A.   At that location.  And he also added that,

7    you know, he had came down -- and I told him I said

8    well you need to get that business license.  And I said

9    this is -- and I also gave him a business card. And on

10   it I also instructed him the detectives who could aid

11   him in making sure that he met the required codes and

12   ordinances so that he would not be in violation.

13       Q.   Okay. Thank you.

14           MR. PLUMIDES:  No further questions.

15           THE COURT:  You are released from the witness

16       stand.  Please return to the sequestered area.  Next

17       witness, Ms. Smith.

18           MS. SMITH:  The City calls Sgt. Walls.

19        (Whereupon, the witness enters the courtroom.)

20                    SGT. KELVIN L. WALLS

21       Having been first duly sworn, was examined and

22   testified as follows:

23                    DIRECT EXAMINATION

24       Q.   (By Ms. Smith) Can you state your name for

25   the Court.

1          A.    Kelvin L. Walls.

2          Q.    And, Sgt. Walls, how are you employed?

3          A.    City of Atlanta Police Department.

4          Q.    How long have you been employed with the

5     City of Atlanta Police Department?

6          A.    16 years.

7          Q.    And what is your current duties with the

8     City of Atlanta Police Department?

9          A.    I'm supervisor over the evening watch for

10    License and Permits.

11         Q.    Okay.  And are you P.O.S.T. certified?

12         A.    Yes, I am.

13         Q.    And were you a P.O.S.T. certified officer

14    working on February 8th of 2014?

15         A.    Yes.

16         Q.    And did you go to the property location of

17    2031 Metropolitan Parkway with Sgt. Burns?

18         A.    Yes, I did.

19         Q.    Okay.  And what did you observe when you

20    went to the location?

21         A.     Ah, as the unit approached the location we

22    actually went through the parking lot the first time

23    and we noticed that there were cars in the parking lot

24    of that location after the hours of 3:00 when most

25    clubs should be closed.  We left the parking lot and

1    went to a different location to check that location.

2    And shortly thereafter we returned to that particular

3    location 2031, Suite B.  And upon approaching that

4    particular location the cars were still in the parking

5    lot and we could still hear music coming from inside of

6    the location.

7         Q.   Okay.  And at any time did you enter the

8    location?

9         A.   Yes, I did.

10        Q.   Were you ever told that you could not enter

11   the location?

12        A.   No.

13        Q.   Okay.  And, ah, when you entered the

14   location what did you see?

15        A.   Ah, upon entering the location I noticed

16   there were females walking around scantily clad in I

17   guess you would call it bikini wear. There were some

18   gentlemen standing around and ladies that were in I

19   guess in motorcycle club colors, orange and black.

20   Basically they would have on something that said the

21   Dirty South Slab Riders or either they would be dressed

22   in black and orange which were the club colors.

23        Q.   Okay.  Did you see any alcohol on the

24   premises?

25        A.   Yes.

1       Q.    Okay.  Was there a bar?

2       A.    Yes.

3       Q.    Okay.  At anytime did you ask for any

4    licensing at the location?

5       A.    No, ma'am.  Sgt Burns was in -- in a

6    conversation with the actual I guess the defendant who

7    is sitting to your left Mr. Brown.  And he was asking

8    Mr. Brown where was the lic -- the business license,

9    the -- 501c letter and also the list of the 250 members

10   for the particular club at that particular point in

11   time.

12          MR. PLUMIDES:  Respectfully, Judge, we'll

13       stipulate that there weren't any licenses.

14          THE COURT:  Okay.

15          MS. SMITH:  Okay.

16      Q.    Ah, how close were you to Sgt. Burns and

17   Mr. Brown when they were engaged in conversation?

18      A.    Ah, approximately 10 to 15 feet.

19      Q.    Were you able to overhear what they were

20   saying?

21      A.    At that parti -- when I first entered the

22   location, yes, ma'am.

23      Q.    Okay.  And how did Mr. Brown describe the

24   premises?

25      A.    Ah, he said that it was a private club, that

1    he didn't need a permit for anything.

2         Q.   Okay.  And his wording was private club?

3         A.   Yes.

4         Q.   Okay.  Let's go back a little bit, ah, Sgt.

5    Walls.  You said that you saw cars in the parking

6    lot; is that correct?

7         A.   Yes.

8         Q.   Did you see any motorcycles?

9         A.   Ah, no, but there were some inside of the

10   club.

11        Q.   Okay.  But were there any motorcycles

12   outside of the club parked?

13        A.   No.

14        Q.   Okay.  Did you overhear Sgt. Burns telling

15   Mr. Brown that he needed a business license if he

16   were going to have a private club?

17        A.   Yes.

18        Q.   Okay.  And from your experience being in

19   License and Permits do you have to have a business

20   license if you are a private club?

21        A.   Yes.

22        Q.   Okay.  While Sgt. Burns and Mr. Brown were

23   engaged in conversation was Mr. Brown detained?  Was

24   he detained while this conversation was taking place?

25        A.   No, ma'am, he was not.

1      Q.   Thank you.

2           MS. SMITH:  No further questions at this time.

3      Subject to redirect.

4           THE COURT:  Okay.

5                     CROSS EXAMINATION

6      Q.   (By Mr. Plumides)  What are colors?

7      A.   Colors are basically what the motorcycle

8      gangs or -- I'm sorry, the motorcycle club would dress

9      out in.  Usually they are, what they have on the

10     rockers or the leather -- leather, ah, vest that they

11     wear.

12     Q.   And they match?

13     A.   Yes.

14     Q.   And that indicates who is kind of in the

15     club, right?

16     A.   Yes.

17     Q.   I mean it would be faux pas to wear

18     somebody else's colors, would it not?

19     A.   Yes, it would.

20     Q.   And noticed those colors in this clubhouse?

21     A.   Yes.

22     Q.   Are there other motorcycle clubhouses?

23     A.   Yes.

24     Q.   How many; do you know?

25     A.   Not off the top of my head, no, sir.

1      Q.    More than ten?

2      A.    I would dare -- what are we -- are we

3    speaking like inside the city, inside the state or

4    across the nation?

5      Q.    Inside the city.

6      A.    Inside the city I -- I would not have any

7    idea because like I said most of those, most motorcycle

8    clubs or whatever they may come into the city but they

9    might not have an actual clubhouse in the city.

10     Q.    This particular clubhouse wasn't running a

11   foul of the law so to speak; correct?

12     A.    Other than the fact that they were --

13     Q.    Permits and License (inaudible)?

14     A.    No, sir.  Not that I was aware of, no.

15     Q.    And it's -- it's not surprising to see that

16   there weren't any motorcycles in the parking lot at

17   4:00 in the morning, is it?

18     A.    Not necessarily, no, sir.

19     Q.    Okay.  And your testimony is that if you

20   have a motorcycle clubhouse you need a business

21   license?

22     A.    No.  If you consider yourself a private club

23   then you need a permit.  If you're gonna have

24   clubhouse which is basically just at your house then,

25   no, sir, I don't -- to my knowledge do you need a

1    permit for that.

2        Q.    So you're saying you can't have a

3    motorcycle clubhouse in a commercial establishment,

4    in a commercial building; is that what you're saying?

5        A.    Yeah, you can -- let me make sure that I'm

6    answering this the correct way. You're asking me is it

7    possible or do you have to have a license if you have a

8    clubhouse?

9        Q.    Correct.

10       A.    Well if you have a clubhouse but you're not

11   considering yourself to be a private club then, no, you

12   don't have to have a license.  But if you consider to

13   say okay we are a private club and we are basically

14   using this particular clubhouse to serve as a meeting

15   hall or functions of that, yes, you need a business

16   license.

17       Q.    Okay.  And he didn't have 250 members, did

18   he?

19       A.    Not that I could count, no.

20       Q.    And there weren't 250 people in there, were

21   there?

22       A.    No, sir.

23       Q.    He didn't have the names of 250 people to

24   show you?

25       A.    No, sir.

1        Q.    And that's because he didn't have 250

2    members to be a private club; isn't that right?

3        A.    I don't know how many members he has of his

4    club.

5        Q.    Did you ask him?

6        A.    Ah, I believe we did, yes.

7        Q.    And did he tell you that he had 250?

8        A.    No, I don't think he did because I think his

9    assertion was that he didn't need any of that, any of

10   those items.

11       Q.    Well did you count 250 colors, vests?

12       A.    No, sir.

13             MR. PLUMIDES:  No further.

14                      REDIRECT EXAMINATION

15       Q.    (By Ms. Smith)  Sgt. Walls, did Mr. Brown

16   hold his establishment out to be a private club?

17       A.    Yes.

18       Q.    Okay.

19             MS. SMITH:  Nothing futher.

20             MR. PLUMIDES:  No recross.

21             THE COURT:  All right.  You're released from

22        the witness stand. If you would return to the

23        sequestered location.

24             MS. SMITH:  The City calls Gordon Cavenaugh.

25

```
 1              (Whereupon, the witness enters the courtroom.)
 2                          GORDON CAVENAUGH
 3         Having been first duly sworn, was examined and
 4    testified as follows:
 5         Q.   (By Ms. Smith) Could you state your name
 6    for the Court, please.
 7         A.   Gordon Cavenaugh.
 8         Q.   And, Mr. Cavenaugh, how are you employed?
 9         A.   I am employed as a building inspector and
10    supervisor with the City of Atlanta.
11         Q.   And how long have you been employed with
12    the City of Atlanta in Buildings?
13         A.   25 years.
14         Q.   And are you a special officer under 98-1
15    for the City of Atlanta?
16         A.   Yes, ma'am.
17         Q.   For -- to issue code enforcement
18    violations?
19         A.   Yes.
20         Q.   And were you, ah, a part of a detail on
21    February 8th of 2014?
22         A.   Yes, I was.
23         Q.   And did you go to the property address of
24    2031 Metropolitan?
25         A.   Yes.
```

1        Q.    Parkway, I'm sorry. And when you entered

2    the location what did you find if anything?

3        A.    As far as building code violations?

4        Q.    Yes, sir.

5        A.    We had some inadequate restrooms.  We had

6    some safety exit --

7             MR. PLUMIDES: Objection relevance.

8        A.    -- violations.

9             THE COURT:  How is it relevant?

10            MS. SMITH:  Your Honor, this is gonna --

11    scratch that.

12        Q.    (By Ms. Smith)  Mr. Cavanaugh, how is the,

13    this building at 2031 Metropolitan Parkway, how is it

14    zoned?

15        A.    Commercial.

16        Q.    Okay.  And are you familiar with, ah, Mr.

17    Devon Brown?

18        A.    Only from --

19        Q.    After going to this property location did

20    you engage in any communication with Mr. Devon Brown?

21        A.    Yes, I have.

22        Q.    Okay.  And can you tell the Court the

23    nature of that communication.

24        A.    Mr. Brown came down to City Hall, the

25    Building Department and was asked what he needed, what

1    to do and he felt that, ah, he was occupying the

2    building legally.  And I let him know there was no CO

3    issued for anything there and he would need to submit

4    plans and apply for permits to make that something.

5    Every building has to be something.

6         Q.   And when you engaged in conversation with

7    Mr. Brown how -- what did he indicate he was doing

8    at, ah, 2031 Metropolitan?

9         A.   Mr. Brown said that he operated a motorcycle

10   -- meetings for a motorcycle club, ah, that he had

11   social events, fundraisers and things of this nature.

12        Q.   Did he at anytime come to your office to

13   apply for a social club?

14        A.   Not to my knowledge.

15        Q.   Did he at anytime indicate to you that the

16   location was a private club?

17        A.   Yes.

18        Q.   Okay.  Thank you.

19             MS. SMITH: Nothing further.  Subject to

20        redirect.

21             MR. PLUMIDES:  Judge,(inaudible).

22             THE COURT:  All right.  You are released from

23        the witness stand. If you'll return to the

24        sequestered area.

25             THE WITNESS:  Yes, ma'am.

1          THE COURT:  Call your next witness, Ms. Smith.

2          MS. SMITH:  Your Honor, at this time the City

3      rest.

4          THE COURT:  All right. The City is resting with

5      their evidence achieved.  Mr. Plumides, the Court is

6      gonna take a brief recess, only maybe about five

7      minutes.  If you will be ready to go forward with

8      the defense at that time.

9          MR. PLUMIDES:  Yes, Judge.

10             (Whereupon, a recess was taken.)

11          THE COURT:  We are ready for the Defense side.

12          MR. PLUMIDES:  (inaudible).

13      (Whereupon, witness takes the witness stand.)

14                     JOCK MITCHELL

15      Having been first duly sworn, was examined as

16      follows:

17      Q.   (By Mr. Plumides)  Tell the Court your

18      name.

19             (Whereupon, proceedings were interrupted.)

20          MR. DAUGHTRY:  Judge, may I interrupt, please.

21      May I be heard.

22          THE COURT:  Certainly.

23          MR. DAUGHTRY:  Judge, my name Jacob Daughtry,

24      II.  I'm the Senior City Solicitor with the City of

25      Atlanta, Judge.  I believe this witness has been

1     tainted by the testimony that was previously given

2     in this courtroom.

3         THE COURT: All right.  Ms. Smith, I assume

4     this is your information then?

5         MR. DAUGHTRY:  Judge, Ms. Smith did not observe

6     it nor did she see anything (inaudible).

7         THE COURT:  I know.  But I assume since y'all

8     work together --

9         MS. SMITH:  Yes, yes.

10        THE COURT:  -- that you would have told her.

11    She's trying to case.

12        MS. SMITH:  Yes, yes.

13        MR. DAUGHTRY:  Yeah, I'm gonna let her know.

14    Yes, Judge.

15        THE COURT:  All right.

16        MR. DAUGHTRY:  Judge, there are two people in

17    the courtroom.  As soon as the Court took a leave of

18    absence and went to the back the two people were out

19    in the hall discussing everything with this

20    particular witness, Judge.  Ah, I think that it will

21    be prudent I guess if the Court would inquire of

22    this witness whether or not he's been coached by

23    those people that were in here and heard all the

24    testimony of the officers, Judge.

25        THE WITNESS:  No, ma'am.

1          THE COURT:  Hold on just a second.  All right.

2     So inquiry would not be the resolution.  It's the

3     exclusion of a tainted witness --

4          MR. DAUGHTRY:  Yes, ma'am.

5          THE COURT:  -- would be the resolution based

6     upon what you're saying, Mr. Daughtry.

7          MR. DAUGHTRY:  Yes, ma'am.

8          THE COURT:  Okay. And, ah, all right, Mr.

9     Plumides.

10         MR. PLUMIDES:  When you were asked to leave way

11    back when --

12         THE COURT:  Wait, wait, wait, Mr. Plumides.  Do

13    you want to respond?

14         MR. PLUMIDES:  Oh, I thought you were asking

15    for voir dire.

16         THE COURT:  No, not as of yet.

17         MR. PLUMIDES:  Okay.

18         THE COURT:  I am trying to figure out what is

19    going on first.

20         MR. PLUMIDES:  I -- I -- I need to understand

21    the basis of what the allegation is.

22         THE COURT:  Okay. So you have not been told

23    prior to me taking the bench what happened with your

24    witness --

25         MR. PLUMIDES: That's right.

1          THE COURT:  -- that Mr. Daughtry is alleging.

2          MR. PLUMIDES:  I don't know what happened.

3          THE COURT:  Okay.

4          MR. DAUGHTRY:  So -- so --

5          THE COURT:  No, I mean it's clear to me what

6     you're saying is that there was someone, some people

7     where were present in the courtroom during the

8     testimony of the officers --

9          MR. DAUGHTRY:  That's correct, Judge.

10          THE COURT:  -- who went outside and discussed

11     the testimony of those officers with this witness

12     who was in a sequestered position?

13          MR. DAUGHTRY:  That is what I believe, yes,

14     ma'am.

15          THE COURT:  Okay.  Did you witness that, Mr.

16     Daughtry?

17          MR. DAUGHTRY:  Yes, Judge.  As I approached

18     outside I was sitting on the bench and I saw the two

19     people on the fourth bench discussing conversations

20     with the witness here, Judge.  Now, I did not hear

21     the nature of the conversation, Judge, but I believe

22     an investigator in our office did hear the nature of

23     the conversation.

24          THE COURT:  Okay.  And you are prepared to

25     present the investigator for examination by the

1    Defense?

2        MR. DAUGHTRY:  Yes, ma'am.  I can speak to him

3    now.

4        THE COURT:  Okay.  Mr. Plumides, based upon

5    what's been presented that's my understanding of the

6    allegations.  Do you have anything in response to

7    the allegations other than to put them up for voir

8    dire?

9        MR. PLUMIDES:  Yes, Judge, I think that's the

10   course of action.

11       THE COURT:  All right. Then what I will do is

12   if you will step down -- even though he has been

13   sworn at this time.  You can have a seat.

14   (Whereupon, the witness leaves the witness stand.)

15       MR. PLUMIDES:  Judge, I would add one thing.

16   I -- I think when the Court -- when I -- when I

17   invoked the rule I'm not sure that the Court gave

18   instruction, "Y'all are not to discuss anything with

19   anybody else or anything like that."  So I know he's

20   not a lawyer so I don't -- I -- I -- I can't speak

21   to why he did what he did if in fact he did do

22   anything. But there wasn't any instruction is the

23   way I remember it.

24       THE COURT:  Well even if the Court didn't

25   instruct yet and still the -- the result would be to

```
 1        exclude the witness because your motion was to

 2        sequester.

 3             MR. PLUMIDES:  Yes.

 4             THE COURT:  Sequester in and of itself -- and I

 5        believe your witness as well as the police officers

 6        speak English -- sequester in and of itself means to

 7        sit alone, to be alone, ah, excluding contact.

 8        It's, ah, I don't know how else to describe that

 9        word.

10             MR. PLUMIDES:  Judge, the defendant has made --

11             THE COURT: Do you believe that your witness --

12        I guess when we bring your witness up you can voir

13        dire him as to maybe he had a misunderstanding or

14        whatever if that's what your argument would be here.

15        Okay.

16             MR. PLUMIDES:  Judge, Mr. Brown wants to go

17        ahead and testify at this point while they're

18        getting their other witness or whatever; is that all

19        right?

20             THE COURT:  All right.  Do you have the witness

21        available?

22             MR. DAUGHTRY:  I do, Judge.

23             MS. SMITH:  Yes.

24             THE COURT:  All right. They're saying that the

25        witness is available so I guess we can go forward
```

1          with that portion of it if you want to save your

2          client's testimony to the last.

3               MR. PLUMIDES:  Okay, Judge.

4               THE COURT:  All right.  Come up to the witness

5          stand.  Please remain standing until you are sworn

6          and then you can have a seat.

7                         ALVIN COLEMAN

8          Having been first duly sworn, was examined and

9     testified as follows:

10                    VOIR DIRE EXAMINATION

11          Q.   (By Mr. Daughtry) State your name for the

12     record.

13          A.   Alvin Coleman.

14          Q.   And, Mr. Coleman, what is your, ah, what is

15     your position?

16          A.   City of Atlanta, Investigator for the City

17     Solicitor's Office.

18          Q.   Okay.  And, Mr. Coleman, I believe, ah,

19     that during this trial you had the occasion to see at

20     least three officers give their testimony; is that

21     correct?

22          A.   Correct.

23          Q.   And when the Judge took a recess where did

24     you go from that moment?

25          A.   I went to the front door of the court here.

1       Q.   Yes, sir.

2       A.   And it was three maybe four people

3   surrounding the gentleman with the black suit talking

4   about the case that happened here.

5       Q.   And you heard the conversation?

6       A.   Yes.

7       Q.   And the gentleman with the black suit are

8   you speaking of the gentleman on the second row with

9   the pink tie?

10      A.   Correct.

11      Q.   And that is a gentleman that's supposed to

12  be a witness for the Defense; is that correct?

13      A.   Correct.

14      Q.   And the people that you saw out in the

15  hallway at the front of the courtroom they were

16  previously in this courtroom, correct?

17      A.   Correct.

18      Q.   And when Defense counsel invoked the rule

19  they did not remove themselves, did they?

20      A.   Yes, they did.

21      Q.   I mean they stayed in the courtroom during

22  the testimony of the officers; is that correct?

23      A.   Yes.

24      Q.   And could you point out the people and

25  describe what they are wearing that were speaking to

1   the witness.

2       A.   The gentleman in the red jacket.

3       Q.   In the red jacket on the fourth row?

4       A.   Yes.

5       Q.   The one that's smiling with the lime green

6   shoes on?

7       A.   Yes.

8       Q.   And who else?

9       A.   And the lady next to him.

10      Q.   The lady with the gold purse next to him.

11      A.   With the black direct next to him on his

12  right.

13      Q.   Okay.  And where specifically did you see

14  them?

15      A.   Ah, direct next to the gentleman in the black

16  who was standing on the wall outside the courtroom.

17      Q.   Okay.  And you heard them having

18  conversation about the case?

19      A.   Yes.

20      Q.   And you heard them, ah, relay testimony of

21  the officers to the defendant?

22      A.   Correct.

23      Q.   Okay.

24           MR. DAUGHTRY:  Judge, that's all I have.

25           THE COURT:  All right.  Mr. Plumides, you have

1        the right to voir dire as well.

2              MR. PLUMIDES:  Sure.

3                    VOIR DIRE EXAMINATION

4        Q.   (By Mr. Plumide) What was said?

5        A.   Well everything that went on in court. They

6    was telling him about the permits, about the officer,

7    everything that was said here they was repeating it

8    outside to the gentleman with the black suit on.

9        Q.   Okay. Well the Defense has stipulated that

10   we didn't have any permits. Is there anything else?

11       A.   They was talking about the license.  They was

12   talking about that the case has already been one.  The

13   only thing they had to do was talk about the club.

14       Q.   Talk about the club?

15       A.   Yeah.

16       Q.   Okay.

17       A.   Everything that was said in here they was

18   talking about out there.  Word-for-word I don't

19   remember the exact word.

20       Q.   Well then in order for the Court to make a

21   ruling you need to know exactly what was said,

22   exactly.

23       A.   The exact word I kept hearing them speaking

24   about the permit, speaking about the officer, speaking

25   about the testimony that the officer gave.

1      Q.   Which officer?  What testimony?

2      A.   Each officer that was sitting here at the

3   bench.

4      Q.   What testimony?  We got about the permits.

5   What else?

6      A.   What you mean what else?

7      Q.   What -- what -- we understand that they

8   were talking about permits.

9      A.   Uh-huh.

10     Q.   What else?

11     A.   Like I told you the license, the defendant

12   didn't need one.  The, ah, I don't remember each word.

13   I'm sorry.  I don't remember each word that they said,

14   that they were saying.

15          MR. PLUMIDES:  Nothing further.

16          THE COURT:  Anything else, Mr. Daughtry?

17          MR. DAUGHTRY:  No, ma'am, Judge.  I just want

18       to ascertain the basic fact that Mr. Coleman did

19       hear, ah, those people in the courtroom

20       communicating with the witness, defense witness on

21       which he asked to be sequestered, Judge. I think

22       that's unethical, Judge, and also a violation.

23          THE COURT:  All right.  Mr. Coleman, you are

24       excused from the witness stand.  Okay.  The witness

25       to be voir dired for this limited purposes.

```
 1              MR. PLUMIDES:  That will be fine.

 2         (Whereupon, the witness returns to the witness

 3     stands.)

 4              MR. DAUGHTRY:  Has he already been sworn in,

 5         Judge?

 6              THE WITNESS:  Yes, sir.

 7              THE COURT:  He has been sworn.

 8              MR. DAUGHTRY:  Okay.

 9              THE COURT:  This is Mr. Plumides' witness.

10                      JOCK MITCHELL

11         Having been previously sworn, was examined as

12     follows:

13                   VOIR DIRE EXAMINATION

14         Q.   (By Mr. Plumides) Tell the Court your name

15     if you haven't already.  I'm sorry.

16         A.   Jock (Inaudible) Mitchell.

17         Q.   Okay.  You heard what was said here.  What

18     was going on out there in the hall?

19         A.   Okay. He -- he was absolutely right that they

20     came out to talk to me.  But the statement that was

21     made the investigator was actually talking to the

22     gentleman right there with his hand up.  And they were

23     talking amongst each other about the case. I don't even

24     know who this guy is.  And the investigator and that

25     gentleman right there sitting with the black shirt on
```

1   was talking about the case together.  We never said

2   anything. What they said to me when they came out is,

3   you were a hot head and that you were pissing the Judge

4   off.  That's his statement when he came out.  That's

5   it.  He said nothing about the case at all.

6          MR. PLUMIDES:  No further voir dire.

7          THE COURT:  All right.  Mr. Daughtry, it's your

8      motion.

9                 VOIR DIRE EXAMINATION

10     Q.   (By Mr. Daughtry) I'm sorry, sir, I didn't

11  hear your name.  What's your name?

12     A.   Jock (inaudible) Mitchell.

13     Q.   Mr. Jock.  Okay, Mr. Jock --

14         THE COURT:  The last name is Mitchell; is that

15     correct?

16         MR. MITCHELL:  Yes, ma'am.

17     Q.   Mitchell, Mr. Mitchell, I'm sorry.  Mr.

18  Mitchell, what is your relationship to the defendant?

19     A.   I'm a member of the motorcycle club.

20     Q.   Okay.  And what is your relationship to the

21  gentleman with the lime green shoes on; do you know

22  him?

23     A.   He's a member.

24     Q.   Do you know him?

25     A.   Yeah, I know him.

1          Q.   Okay.  And the lady next to him you know

2    him as will, correct?

3          A.   Her.

4          Q.   You know her?

5          A.   I know that they're together.  That's his

6    girl.

7          Q.   Okay. Do you know her?

8          A.   I don't know her like I know him, no.

9          Q.   Now what is his name, I'm sorry?

10         A.   Josh.

11         Q.   Josh?

12         A.   Uh-huh.

13         Q.   And he is a member of the club?

14         A.   Yes.

15         Q.   Okay.  And he did have communications with

16   you outside of this courtroom?

17         A.   He did, sir.

18         Q.   Okay.  And he is not a witness in this

19   case, is he?

20         A.   Ah, I don't know.  I don't know.

21         Q.   You don't know if he's gonna testify or

22   not?

23         A.   I -- I don't know.

24         Q.   Okay.  But you still spoke to him.  You

25   have a conversation?

1          A.    I did.

2          Q.    Okay.   So with Josh being a member of the

3    club then he would have an interest in the outcome of

4    this particular case, would he not?

5          A.    You are absolutely right.

6          Q.    And I believe at the beginning of the trial

7    you were told to leave the court which was I guess to

8    not have witnesses or any interested parties talk

9    about the case; is that correct?

10         A.    Yes.

11         Q.    And did you discuss any facts about the

12   case?

13         A.    I did not.   I never -- I never -- there are

14   other people that were out there that witness.

15         Q.    Uh-huh.

16         A.    I -- I never said anything. I listened to

17   them talk to each other. And I laughed at the fact that

18   he said the attorney was a hot head.

19         Q.    But you did not have any conversation with

20   anybody?

21         A.    I did not.

22         Q.    Okay.   You didn't communicate any facts

23   about the case?

24         A.    No.   I'm nodding my head to what this

25   gentleman said to him.

```
 1          Q.    Okay.  So Mr. Josh and the lady next to him

 2    did not communicate to you any testimony of the

 3    officers in here?

 4          A.    No, sir.

 5          Q.    Okay.  So as soon as the Judge left the

 6    bench they just came out and told you what?

 7          A.    Said your attorney is a hot head.  He's

 8    pissing the judge off.

 9          Q.    Okay.  So that would be some facts of

10    what's going on with the case, correct?

11          A.    I guess so if that's the way you look at it.

12          Q.    And with them telling you that the lawyer

13    for your friend is pissing off the judge that would

14    at least give you an indication when you come to

15    court or when you testify on how you should act,

16    correct?

17          A.    No.  I would know as a man --

18          Q.    Right.

19          A.    -- how to act in court.

20          Q.    Okay.  But when they relayed the

21    information to you it gave you some added information

22    on how to testify, correct?

23          A.    No.  It let me know that what he was doing

24    with the judge.

25          Q.    Correct.
```

1    A.   That has nothing to do with me.

2    Q.   Okay.  Thank you.

3         MR. DAUGHTRY:  That's all I have, Judge.

4         THE COURT:  Anything else, Mr. Plumides, for

5    this witness?

6         MR. PLUMIDES:  I think this witness has not

7    been tainted.  I think he (inaudible).

8         THE COURT:  Well let me -- first of all let me

9    return you to a sequestered position at this point.

10        MR. MITCHELL:  Yes, ma'am.

11   (Whereupon, the witness leaves the courtroom.)

12        MR. PLUMIDES:  Judge, the Defense is not going

13   to call Mr. Mitchell.

14        THE COURT:  Are you sure?

15        MR. PLUMIDES:  Yes, Judge. We've talked about

16   it.  We're ready to move it along.

17        THE COURT:  All right.  Because there was lots

18   more for me to read here.

19        MR. PLUMIDES:  I know.

20        THE COURT:  All right.

21        MR. PLUMIDES:  Call the next witness?

22        THE COURT:  Yes, sir.

23        MR. PLUMIDES:  I call the defendant.

24   (Whereupon, the defendant takes the witness stand.)

25

1                    DEVON WILLIS BROWN

2        Having been first duly sworn, was examined and

3    testified as follows:

4                    DIRECT EXAMINATION

5        Q.   (By Mr. Plumides) Tell the Court your name.

6        A.   Devon W. Brown, Fulton County Sergeant.

7        Q.   How long have you been a Sergeant?

8        A.   I've been with the Sheriff's Department going

9    on 20 years.

10       Q.   Are you P.O.S.T. certified?

11            THE COURT:  Let him have a seat, Mr. Plumides.

12       A.   Yes, sir, P.O.S.T. certified.  I've been in

13   law enforcement in Georgia for about 24 years.  I did

14   Georgia Department of Corrections for about 3 1/2,

15   Sheriff's Office for about 19, 20 years.

16       Q.   Tell us about the motorcycle club.

17       A.   Ah, back in the year 2000, ah, me and a

18   couple of friends got together and started a motorcycle

19   club by the name of Dirty South Slab Riders.

20       Q.   Are y'all on the internet?

21       A.   Yes, sir.  If you Google our location which

22   is 13 -- I mean 2031 Metropolitan Parkway.  It will be

23   on the internet Dirty South Slab Riders Clubhouse.

24       Q.   When did you get that location?

25       A.   Back in 2000, well actually in 2008, ah, our

1    club started growing and we used to meet at each others

2    houses.  So as we got bigger we decided we needed to go

3    ahead and get us a motorcycle clubhouse.  So in 2008 we

4    went around looking for a location and we came across

5    that location.

6         Q.    How many members do you have in your

7    motorcycle club?

8         A.    Ah, right now we currently have about 15

9    members.

10        Q.    Is it some initiation or how do you become

11   a member?

12        A.    Well what happens is for one you have to have

13   a motorcycle.  You have to have a motorcycle license

14   and also have to have a job to be a part of the Dirty

15   South Slab Riders.  And, ah, hang around with us for a

16   couple months or whatever and then we sit down and vote

17   on if this person fits into what we have going on as a

18   motorcycle club.

19        Q.    Everybody's got a motorcycle that's in the

20   motorcycle club?

21        A.    Yes, sir.

22        Q.    And this location where you are at what was

23   that supposed to be used for?

24        A.    It's -- it's -- it's our motorcycle

25   clubhouse.  That's where we come, get together, hang

1    out some days.  If we're going out of town on a

2    motorcycle trip we'll meet there and we'll leave

3    together.  It's just a meeting spot and also we do

4    other events and stuff there.

5         Q.   Is it a business?

6         A.   No, sir, it's far from a business.

7         Q.   Do you sell anything?

8         A.   No, sir, we don't sell anything.

9         Q.   Do you sell alcohol?

10        A.   No, sir.  We do not sell alcohol.

11        Q.   And, ah, did you ever explore the

12   possibility or the need for getting a permit?

13        A.   Well actually in 2008, ah, I went down to the

14   City Permits office which was located on Ponce de Leon.

15   And I spoke with a detective by the name of Kenaylu --

16   actually I told the officer this the same night he

17   arrested me -- I went to the office and explained to

18   him exactly we was doing.  We're looking for a

19   motorcycle clubhouse.  What do we need to be -- I mean

20   what do we need to get to be in compliance? At that

21   time that detective stated to me --

22             MS. SMITH:  Objection, hearsay.

23        Q.   As a result of what you were told what

24   happened?

25        A.   Ah, we went on and opened up the clubhouse

1   as, you know, as told.

2          Q.   All right.  And do you have any beer taps

3   in there?

4          A.   No, sir, no beer taps.

5          Q.   Do you have an icemaker?

6          A.   No icemaker.

7          Q.   Menus?

8          A.   No, sir.

9          Q.   What's on the front of your building?

10         A.   It's "private club" as well as "Dirty South

11   Slab Riders" our logo and "keep out, no trespassing".

12         Q.   Do you have a menu in there?

13         A.   No, sir.

14         Q.   Do you have a DJ in there?

15         A.   We don't have a DJ.  Our members will sit

16   there and play music, you know, if somebody gets tired

17   put in a CD or it just runs by itself.

18         Q.   Anybody collect an admission at the door?

19         A.   No, sir.

20         Q.   Ever?

21         A.   No, sir.

22         Q.   Are there hours of operation on the door?

23         A.   No, sir.

24         Q.   Do you have a kitchen?

25         A.   Yes, sir.

1    Q.   You have a menu?

2    A.   No, sir.

3    Q.   Do you sell anything out of that kitchen?

4    A.   No, sir.

5    Q.   All right.  When they came into your club

6    -- and I'm talking about the police officers that

7    night, what happened?

8    A.   Well actually, ah, about prior -- about two

9    months before that actual night, ah, one of the

10   officers say he came and spoke with me.  Can I -- can I

11   start off from there --

12   Q.   Yeah, that's fine.

13   A.   -- and move forward? Ah, I was inside the

14   clubhouse and I was looking at our surveillance cameras

15   and I saw a individual standing outside.  So I went

16   outside and I asked him, you know, can I help you. He

17   identified himself as being a officer with the police

18   department.  I asked him, you know, what do you need?

19   He asked me what type establishment this was.  I told

20   him this is a motorcycle clubhouse.  He said, "Do you

21   sell anything?"  I told him, "No, we don't sell

22   anything.  It's a private motorcycle clubhouse."  And

23   at that point he said okay and he left.

24   Q.   After that what happened?

25   A.   Two months later we was inside the clubhouse

1    having a party, a little get together and we see about

2    13, at least 8 to 13 officers just bumrush my front

3    door.

4         Q.   And that was on videotape?

5         A.   Yes.  I got them on videotape just bumrushing

6    my front door as they was doing a raid.

7         Q.   And what did they say or what happened

8    next?

9         A.   Once they got towards the back where I was

10   located by the bar, ah, Sgt. Burns yelled out who is in

11   charge of this, ah, who is in charge?  At that point I

12   said, "I'm the president of the motorcycle clubhouse.

13   How can I help you?"  At that time he ordered one of

14   his officers to put me in handcuffs.  So he immediately

15   put me in handcuffs.  So I asked him as I was being

16   handcuffed I was asking him what are you locking me up

17   for?  He said "Operating a business without a license."

18   I told him this is a private motorcycle clubhouse.  This

19   is not a business.  As I was getting handcuffed you got

20   officers searching like in front of me all in the

21   couches, all in the refrigerators, all up under the

22   bar, ah, searching turning over stuff looking.

23        So at that point I looked at Officer Burns or Sgt.

24   Burns I said, "Do you have a search permit?"  He told me,

25   "No, I don't need a search permit."  So I repeated I

1    said, "You don't need no search permit?"  He said, "No, I
2    don't need no search permit." So at that time I just said
3    okay.  So they continued to, you know, do what they were
4    doing throughout the building.  They ordered everybody
5    else to get out except for the gentleman who was standing
6    at the -- sitting at the DJ booth which is Mr. Mitchell
7    who y'all just kicked out.  They told him to stay put.
8    They told everybody else to get out.

9         So for the next 20, 30, 45 minutes Sgt. Burns was
10   going back and forth asking me about a business license.
11   I told him this is a private motorcycle clubhouse.  This
12   is not a business.  I also reiterated that I already went
13   down to the City five years ago, over five years ago to
14   see what I needed and I was in compliance according to
15   what the officer told me downtown. He asked me what
16   officer?  I told him like I said Detective Kenyalu.  He
17   looked at the other Sergeant.  They started laughing.
18   They said, "Well he don't work down there anymore."

19        MS. SMITH:  Objection.  Again hearsay, Your
20        Honor.

21        MR. PLUMIDES:  All right.  Don't talk about
22        what somebody told you, okay. You need somebody here
23        to testify.

24   A.    Okay.  Well they did testify. So I told them
25   the name of the officer that I spoke with and they

1    chuckled and said he didn't work down there anymore.

2    Can I say that?

3        Q.   If it's your own knowledge that he doesn't

4    work there anymore you can't (inaudible).

5        A.   Okay.  Well they -- okay, well maybe he could

6    testify they told me that.  So that went on about 45

7    minutes of being handcuffed.

8        Q.   Did you tell them that you were a Deputy

9    Sheriff?

10       A.   No, sir.

11       Q.   Why not?

12       A.   Because if I wouldn't have just came out the

13   door letting them know who I was it would have been a

14   disservice of the City of Atl -- ah, the -- the people

15   who live in the city because I want you to treat me the

16   same way you would treat a normal Joe Citizen.  So I

17   don't use my badge to define who I am.  So I just

18   stayed and let them do what they was gonna do as if I

19   was a normal citizen in -- in Atlanta and they showed

20   me.

21       Q.   So then what happened?

22       A.   So at that point, ah, he kept on telling me

23   why don't you go get a business license.  I told him I

24   don't need one.  This is not a business.  That went on.

25   So about 50 minutes later he was getting frustrated.

1    Sgt. Burns was getting frustrated and he asked one of

2    his officers, "Did anybody search him?" And at that

3    point one of the officers said, "No, we ain't search

4    him."

5         So he ordered one of the officers go search him.  So

6    as the officer was coming towards me to search me I

7    informed the officer I have a weapon on my side.  So I

8    moved up still handcuffed.  He took my weapon.  Sgt.

9    Burns ordered him to run the weapon to see if it was

10   stolen or used in a crime or whatever the case may be.

11            MR. PLUMIDES:  Back up off the microphone a

12        little bit.  We're getting a little bit of feedback.

13            MR. BROWN:  Okay.  Is that better, sir?

14            MR. PLUMIDES:  Yes, much better.

15        A.   Okay.  So he ran the weapon and the weapon

16   came back clean.  So then, ah, he ordered -- he said

17   well check his ID.  So at that point once he went in my

18   wallet and saw my badge they had, you know, a look on

19   their face as if they saw a ghost. Like, you know, oh

20   well. You know, I want to say something but I ain't

21   gonna say it.  So at that point the Building guy, I

22   guess it was a couple of Building guys, the gentleman

23   who testified earlier they looked at each other after

24   they found out I was law enforcement.  And he stated

25   that, ah, well he's not the -- well he don't own this

1    building so we might as well leave. So they left about

2    15, 20, 30 minutes before I left out, before I went to

3    jail.  And that came after they found out I was law

4    enforcement.

5        So at that point, ah, Sgt. Burns was like hey man,

6    look why don't you just go get you a business license.

7    And I kept on telling him this is a motorcycle clubhouse.

8    It's not open up to the public so I don't need no

9    business license.

10       Q.    Anything else?

11       A.    Ah, I guess maybe about an hour or so of

12   being handcuffed they called a unit to come pick me up

13   and transport me to Atlanta City Jail where I stayed a

14   day and a half in jail due to not having a bond.

15       Q.    Any money change hands in that building?

16       A.    No.  No, sir.  No, sir.

17       Q.    You got a cash register?

18       A.    No, sir.

19       Q.    Do you have 250 members?

20       A.    No.  No, sir.  Most motorcycle clubs do not

21   have more than 20 members in the clubhouse.  It's over

22   300 motorcycle clubs in the City of Atlanta.

23       Q.    And are you a member of that group of

24   people?

25       A.    Yes, sir.  We are well respected in the

1    community.  We have charts with at least a 130-40 that

2    deals in the same community.  We do Feed the Hungry

3    during the holidays and stuff like that.  It's well

4    organized.  Ah, Georgia Council is what we call it and

5    everybody is part of a motorcycle club, different clubs

6    and we all get together and do different things for the

7    community.

8        Q.   I've thought of all of the questions I

9    wanted to ask you.  Is there anything else you want

10   to add?

11       A.   The only thing I would like to say is the way

12   I was treated should no citizen in Atlanta go through

13   what I've been through for the last two, three months.

14           MR. PLUMIDES:  Nothing further.

15                    CROSS EXAMINATION

16       Q.   (By Ms. Smith) Good evening, Mr. Brown.

17       A.   Good evening, ma'am.

18       Q.   You did indicate to Sgt. Burns that you

19   were a private club; isn't that correct?

20       A.   I told him I was a motorcycle clubhouse.

21   This is our private motorcycle clubhouse.  Can't

22   anybody join a motorcycle club.  It's a motorcycle

23   clubhouse.

24       Q.   Okay.  Ah, and you indicated that you have

25   members; is that correct?

1      A.    Yes, ma'am.

2      Q.    And isn't it correct that those members pay

3   membership dues; isn't that correct?

4      A.    Well a couple years ago we stopped taking

5   dues because everybody wasn't on the same financial

6   chart.  So what we do every month get together, put our

7   money together and make sure the bills are paid.

8      Q.    But since you've been at Metropolitan you

9   have collected dues for your members; isn't that

10  correct?

11     A.    No, we stopped collecting dues before

12  Metropolitan.

13     Q.    Okay.

14     A.    We used to collect dues to take trips out of

15  town to different motorcycle events.

16     Q.    Okay.  But my question is at sometime you

17  collected membership dues?

18     A.    Before Metropolitan, yes.

19     Q.    Okay.  And on the night in question, on

20  February 8, 2014 there were dancers there; isn't that

21  correct?

22     A.    Yes, ma'am.

23     Q.    And those girls weren't members of the

24  club?

25     A.    No, ma'am.  We had a bachelor party going on

1   that particular night.

2        Q.   Okay.  And as a law enforcement officer you

3   do know that for adult entertainment that you have to

4   be permitted?

5        A.   Not in a private establishment.

6        Q.   Okay.  And your testimony is that it's a

7   private establishment; is that correct?

8        A.   It's a private motorcycle club establishment,

9   yes, ma'am.

10        Q.   Okay. And pri -- and prior to Officer Burns

11   and the other officers coming to the location you

12   were visited by Officer Smith; isn't that correct?

13        A.   I'm not sure of the officer's name.

14        Q.   Okay.  You did hear the testimony in this

15   court today and Officer Smith, you did see him and

16   hear his testimony?

17        A.   Correct.

18        Q.   Okay.  And he did visit your establishment

19   and tell you that in order to have a private club

20   that you needed a business license; is that correct?

21        A.   That's not true, ma'am.

22        Q.   So your testimony is that he did not tell

23   you that you needed a license?

24        A.   Correct.  He came and asked me what type of

25   establishment this was.  He didn't tell me to do

1   anything.

2          Q.   Okay.   And you told him that it was a

3   private club; isn't that correct?

4          A.   I told him it was a private motorcycle

5   clubhouse, yes, ma'am.

6          Q.   Okay.   When the officers entered the

7   establishment they never drew their weapons; isn't

8   that correct?

9          A.   I'm not sure.

10         Q.   So as a law enforcement officer you're not

11   sure if somebody draws their weapon?

12         A.   Actually they came in there with blinding

13   flashlights so I couldn't see exactly what they had in

14   their hands.   If I shine a flashlight in your eyes in

15   darkness you couldn't tell me what was in my hand.

16         Q.   Okay. So, ah, but also when you overheard

17   Sgt. Burns asking who was the responsible party or

18   who was in, ah, who was the responsible party you

19   came forward, correct?

20         A.   Yes, ma'am.   I just -- ah, he was standing

21   about as far as you were from me and I told him I was

22   the President of this motorcycle clubhouse.   That's

23   what I told him.

24         Q.   Okay.   And he did ask you for your business

25   license; isn't that correct?

1          A.    That is after he ordered his officer to put

2     me in handcuffs.

3          Q.    Okay.  But my question is, he asked you for

4     a business license; isn't that correct?

5          A.    That's correct.

6          Q.    He also asked you for a roster; isn't that

7     correct?

8          A.    That's correct.

9          Q.    He also asked you about your membership;

10    isn't that correct?

11         A.    That's correct.

12         Q.    And he asked you these questions based on

13    you telling him you were a private club; isn't that

14    correct, Mr. Brown?

15         A.    That's a negative.  I told him I was a

16    motorcycle clubhouse.

17         Q.    Okay.  And he also inquired about a liquor

18    license; isn't that correct?

19         A.    He mentioned a liquor license, yes, ma'am.

20         Q.    Okay.  Because there was liquor on the

21    premises; isn't that correct?

22         A.    Yes, ma'am, but it was not being sold.

23         Q.    And -- but isn't it true that the members

24    brought liquor to the establishment?

25         A.    Yes.  We bring liquor to the establishment

1   when we're coming to hangout, yes, ma'am.

2        Q.   So it's B.Y.O.B., bring your own bottle; is

3   that correct?

4        A.   Some people bring something, some people

5   don't.

6        Q.   Okay.  But he also told you that if you

7   were B.Y.O.B., bring your own bottle, that you had to

8   have a license in order to do that; isn't that

9   correct?

10       A.   No, ma'am, that's not correct.

11       Q.   Okay.  Also, Mr. Brown, you never at

12   anytime told Officer Burns to leave; isn't that

13   correct?

14       A.   By this time I was already handcuffs.  It --

15   it --

16       Q.   But you never indicated to the officers to

17   leave?

18       A.   Once he put me in handcuffs within 30 seconds

19   and told me he didn't need a search warrant there was

20   nothing I could tell him.  When you tell me as a law

21   enforcement officer you don't need a search warrant and

22   that's what I do for a living I don't have (inaudible)

23   at that point.

24       Q.   Okay.  Let's go back. The officers came

25   into the establishment.  The officers asked for the

1   responsible party.  The officers asked you for a

2   roster.  The officers asked you about the membership.

3   They asked you about the licensing.  But at no time

4   did you say leave; isn't that correct?

5        A.   I shouldn't have to.  I've got private on the

6   front of the door.  A legit law enforcement officer

7   will see private and knock on the door. So --

8           THE COURT:  Hold on just a minute.  Do you

9        remember your attorney told you to lean back out of

10       that microphone.

11          MR. BROWN:  Oh, I'm sorry.  I'm sorry, ma'am.

12          THE COURT:  All I'm getting is a bunch of

13       muffled words, yeah.

14          MR. BROWN:  I'm sorry. Right.

15   A.   A officer that's --

16          THE COURT:  You're still in it.

17   A.   A officer that's working under the color of

18   the law --

19          THE COURT: Let him back that up off of you.

20          MR. BROWN: Okay.  I'm sorry.

21          THE COURT:  All right.

22   A.   A officer that's working under the color of

23   the law would have never entered into a building --

24          THE COURT:  Sgt. Brown.

25          MR. BROWN:  Yes, ma'am.  You tapping on that

1    thing --

2        MR. BROWN:  I'm sorry, Your Honor.

3        THE COURT:  -- is not gonna help anything in

4    this courtroom, okay.

5        MR. BROWN:  I'm sorry.  I -- I apologize, Your

6    Honor.  I'm real passionate about law enforcement.

7        THE COURT:  I understand.  That's why I'm

8    taking the time to say it because you did it before

9    and I didn't say anything.

10        MR. BROWN:  I'm gone sit on my hands, Your

11    Honor.

12        THE COURT: All right.  Because I want to get

13    everything that you're saying.

14        MR. BROWN:  I apologize.

15        THE COURT:  All right.  Thank you.  All right,

16    go ahead.

17    A.    As a law enforcement officer if you see

18    private in -- a private sign or anything on an

19    establishment or a house without a warrant you ain't

20    supposed to enter by no means.  And by them entering

21    that they was already there basically all they did was

22    a home invasion.  That's just like a criminal on the

23    street doing a home invasion because private is on that

24    door.

25    Q.    (By Ms. Smith)  Mr. Brown, again you never

1    answered my question.  My question was, you never

2    asked the officer to leave; isn't that correct?

3         A.   I was handcuffed.  It wasn't much I could say

4    handcuffed.

5         Q.   Okay.

6         A.   My rights was already violated by that time

7    for me to say anything.

8         Q.   Was your mouth covered?

9         A.   No, ma'am.

10        Q.   Okay.  Ah, you said you are real passionate

11   about the law; is that correct?

12        A.   Correct.

13        Q.   And, ah, you're a deputy sheriff; is that

14   correct?

15        A.   That's correct, ma'am.

16        Q.   But when asked about the pool table didn't

17   you have a license for that?

18        A.   No, ma'am.  Actually the clubhouse do not own

19   the pool table.  It's a company that owns the pool

20   table that brought the pool table five years ago for

21   our amusement. We don't have a key to that pool table.

22   We don't own it.  I did not present anything to him.

23   That piece of paper he's talking about was hanging on

24   the wall.

25        Q.   But isn't it correct that you did present

1   an expired 2009 license?

2       A.   I didn't present -- I did not present

3   anything.  That license was on the wall.

4       Q.   But as a law abiding citizen wouldn't you

5   have your private club in compliance with all

6   licensing?

7       A.   We --

8           MR. PLUMIDES:  Objection, argumentative.

9           MS. SMITH:  How is that argumentative?

10      A.   We are very much in compliance.

11          THE COURT:  Okay.  Wait a minute.  It's just me

12      and the lawyers at this point.

13          MR. BROWN:  Okay.  I'm sorry, Your Honor.

14          THE COURT: Mr. Plumides, you want to explain?

15          MR. PLUMIDES:  Judge, it's an argumentative

16      statement.  Wouldn't you be -- if you were a law

17      enforcement officer wouldn't you be in compliance

18      with the pool table is argumentative.

19          THE COURT: Well she's got him on direct.  She

20      can ask him leading questions.

21          MR. PLUMIDES: Cross you mean.

22          THE COURT:  But I mean she's got him on cross.

23      You're totally right, Mr. Plumides.  So she can ask

24      leading questions.  That's definitely a leading

25      question.  Is it argumentative?  Not really.  All

1          right.  You can go forward with it, Ms. Smith.

2          Q.   Okay.  Ah, isn't it also true that you

3    indicated to Cavenaugh that, ah, Gordon Cavenaugh in

4    Buildings that you were a private clue; isn't that

5    correct?

6          A.   I told him like I told everybody else, ma'am,

7    I have a private motorcycle clubhouse.  We're a private

8    motorcycle club.

9          Q.   Okay.  Also -- isn't it also true that you

10   told him that you hold events at that particular

11   location and you also have fundraisers; isn't that

12   correct?

13         A.   Yes, we do.

14         Q.   So you do have income or monetary means to

15   come into the facility; isn't that correct?

16         A.   When we -- when we do fundraisers it's not

17   for the Dirty South Slab Riders.  It would be for your

18   family member who lost and can't pay their funeral or

19   Feed the Hungry. If we do fundraisers it's not for us.

20   It's for the community, the motorcycle community.  Just

21   like the little boy got killed in the parking lot last

22   year we did a fundraiser for his mother.  We do it for

23   anybody except for us.  So we don't get anything back

24   from that.

25         Q.   But you are collecting money; isn't that

1    correct?

2        A.   No. You will come collect money for your

3    charity event.  We ain't gonna collect for you.

4        Q.   Okay.

5        A.   We allow you to come to our establishment,

6    which is our clubhouse and host your own event to

7    collect money for whatever you're trying to collect

8    for.  We don't collect for nobody else.

9        Q.   Okay.  So you have ev -- you have events at

10   this clubhouse; is that correct?

11       A.   We have meetings. It's our meeting place.

12       Q.   Okay.  Your testimony was that you have

13   fundraisers there.  That's an event; isn't that

14   correct?

15       A.   Yeah.  It's -- it's for other people.  It's

16   not for us.  So -- so you rent it out to other people

17   as well; isn't that correct?

18       A.   That's a negative.

19       Q.   Okay.  Let me get this right.  You allow

20   individuals to come in and fundraise for their

21   organization so is that not an event, sir?

22       A.   No, we're just hosting a fundraiser for

23   somebody with --

24       Q.   Okay.

25       A.   -- with whatever things they have going on.

1      Q.   Okay.  So you host fundraisers?

2      A.   We allow them to come in.  So, yes, we will

3  be the host, yes.

4      Q.   Okay.  But you were never able to produce a

5  501c3 to Officer Burns as a nonprofit; isn't that

6  correct?

7      A.   It's not a nonprofit.  We ain't --

8           MR. PLUMIDES:  Judge, we stipulated we didn't

9      have any permits.

10     A.   We -- we're not --

11          THE COURT:  She's talking abotu 501c3, the

12     federal tax.  It's not a permit or license.

13          MR. BROWN:  We're not -- we're not collecting

14     money, Your Honor, so that's -- we're exempt from

15     that.

16     Q.    Okay.  You were also surprised when you

17  saw Officer Smith there that night; isn't that

18  correct?

19     A.   Yes, ma'am.

20     Q.   Okay.  Because Officer Smith had been there

21  previously and advised you of the permitting and

22  licensing that you needed; isn't that correct?

23     A.   No, ma'am.  The reason why I was surprised

24  was two months prior I told this individual exactly

25  what it was and they had the nerve and audacity to come

1    in after me telling them what it was.  They had two

2    months to do they research, which is go to a leasing

3    office, Google it.  We're on the internet.  He had the

4    nerve and audacity to violate all my rights after me

5    telling him two months before.  That's why I was

6    surprised.

7         Q.   Okay.  And isn't it also true that you said

8    that you could not remember speaking to Officer

9    Smith?

10        A.   No.

11        Q.   Isn't that what you told Officer Bryant?

12        A.   No, that's not what I -- I did not recognize

13   him.  Once he told me who he was I said, oh, okay, you

14   the gentleman that I talked to outside.  I did not

15   recognize him.

16        Q.   Okay.

17        A.   But I -- I did recall a conversation and I

18   knew after I done told him what this establishment was

19   they had no business being in there.

20        Q.   Okay.

21        A.   And, yes, I was surprised for them to be that

22   blatant.

23        Q.   Okay.  And, ah, 2031 Metropolitan Parkway

24   is a commercial busi -- is a commercial building; is

25   that correct?

1     A.   Yes, ma'am.

2     Q.   Okay.  And throughout your whole testimony

3  you kept -- you were saying my establishment, my

4  establishment, my establishment.  It's not your home;

5  isn't that correct.

6     A.   Well it is an extension of my house.  Because

7  it's a private motorcycle club we pay bills over there.

8  We hang out there.  So that's an extension of my home,

9  yes.

10     Q.   But it's not your residence, correct?

11     A.   If you ask if I live there that's correct I

12  do not live there.  But that's an extension of my home.

13  Just like I don't live in my car but that's an

14  extension of my home, my residence.

15     Q.   Okay.  But you don't hold parties in your

16  car either, do you?

17     A.   I could if I want to.

18     Q.   Okay.  Mr. Brown, there is also four poles

19  in this, ah, particular establishment; isn't that

20  correct?

21     A.   That's a negative, ma'am. We have one pole.

22  They might --

23     Q.   But you do have a pole that's permanently

24  affixed in the establishment; isn't that correct?

25     A.   Yes, ma'am.  All clubhouses have poles.

1        Q.    All clubhouses have poles?

2        A.    Yes, ma'am, throughout the City of Atlanta

3    all clubhouses have poles that I've been into.

4        Q.    Okay.

5        A.    And that's motorcycle clubhouses.

6        Q.    Okay.

7        A.    And we had one not four.

8        Q.    If --

9        A.    And we had one not four.

10        Q.    Okay.  But that one pole what is it for?

11        A.    It's for entertainment.

12        Q.    Okay.  And you are aware in the City of

13    Atlanta for adult entertainment you need permitting

14    as well; isn't that correct?

15        A.    I'm not doing the entertaining.  The dancers

16    need the entertaining permit.

17        Q.    Okay.

18        A.    So -- so what you --

19        Q.    But they are in your establishment.

20        A.    So what you're telling me if I went to the

21    Hilton Hotel I need to go get a dancing permit to do it

22    in they -- in they ballroom?

23        Q.    I'm not on trial here but --

24        A.    Okay. Well I'm just -- I'm just -- I'm just

25    making a point.  I'm sorry, ma'am.

1        Q.   Are you aware that all establishments in

2   the City of Atlanta if you are performing any adult

3   entertainment you have to have a permit?

4        A.   I thought the dancers.  Well the research I

5   have the dancers need to have a permit.

6        Q.   Are you aware that the establishment itself

7   has to have a permit?

8        A.   No, it's nowhere written, ma'am.

9             MR. PLUMIDES:   Judge, he's not charged with

10        that.  He's charged with operating a business

11        without a license.  That's another chapter.

12             MS. SMITH: Well, ah --

13             THE COURT:  Let him finish.

14             MR. PLUMIDES:  He's not charged with not having

15        the proper permit for a, ah --

16             MR. BROWN:  A dance club.

17             MR. PLUMIDES:   -- a dance club.

18             THE COURT:  No, don't do that.

19             MR. PLUMIDES:  This is a one time private

20        party.

21             MR. BROWN:  I apologize, Your Honor.

22             THE COURT:  All right.  Ms. Smith.

23             MS. SMITH:  Your Honor, he has opened the door

24        to say that he is a law enforcement officer, that

25        he's passionate about the law and that he observes

1          all the laws within the City of Atlanta.

2                 MR. PLUMIDES:  Improper impeachment.

3                 THE COURT:  Ms. Smith, I think we're stretching

4          it because he is not charged with adult

5          entertainment.  So I think you're stretching it.

6          For the relevance of that line of question he said

7          there was a dancer or dancers rather.  And he said

8          that there was a pole for the entertainment.  He

9          said that his belief is that that dancer needs to

10         have a license.  Ah, so I've heard about it.  I've

11         heard that he said that a bachelor party was going

12         on so.  I've heard as much as I think that we can

13         get to relating to this charge.  I think that we're

14         going in deep water at this point --

15                MS. SMITH:  Okay.

16                THE COURT:  -- without the charge.

17         Q.    (By Ms. Smith) Ah, Mr. Brown, your

18    testimony is that, ah, Officer Burns commanded his

19    other officers to handcuff you; is that correct?

20         A.    That's affirm.  That's correct.

21                MS. SMITH:  Thank you, Your Honor.  I have

22         nothing further.

23                THE COURT:  Any redirect, Mr. Plumides?

24                MR. PLUMIDES: No, Judge.

25                THE COURT:  All right.  You can resume your

1       seat next to your lawyer.

2           MR. BROWN: Thank you, Your Honor.

3           THE COURT:  You're welcome.

4           MR. PLUMIDES: The Defense rest, Judge.

5           THE COURT:  Okay.  All right.  Let me review

6       at this time.  The Defense is resting with their

7       evidence?

8           MR. PLUMIDES:  Yes, Judge.

9           THE COURT:  All right.  Ms. Smith, ah, it's

10      about 7:44 p.m.

11          MS. SMITH:  Yes, Your Honor.

12          THE COURT:  I don't know if you have any other

13      witnesses you're trying to bring back for rebuttal.

14      Because I'm testing the waters at this point because

15      I don't know how much longer we can hold this

16      together.

17          MS. SMITH:  No, Your Honor.

18          THE COURT:  You don't have any rebuttal?

19          MS. SMITH:  No, Your Honor.

20          THE COURT:  So we are complete with all

21      witnesses at this point?

22          MS. SMITH:  Correct.

23          THE COURT:  All right.  Like the Court said

24      it's 7:44 at this time.  Each side has a right to

25      closing arguments.  Based upon the passion that was

1       presented in this case I suspect that those closing

2       arguments I'm going to have to allow you an

3       opportunity to do the closing arguments that you

4       desire.  So I'm going to reset for closing arguments

5       and decision.  Ah, lets look at calendars and

6       determine when that can occur.

7           MR. PLUMIDES:  Was the Court thinking sooner

8       rather than later?

9           THE COURT:  I was.

10          MR. PLUMIDES: Friday is good for me.

11          THE COURT: I'm not available this Friday.

12          MR. PLUMIDES:  Oh, that's right y'all are

13      closed on Friday.

14          THE COURT:  No, we're not closed on Friday.

15      The Court has a dental appointment. If you need all

16      my business to be out.

17          MS. SMITH:  No, and I have a CLE, Your Honor.

18      I have a CLE.

19          MR. PLUMIDES:  I'm so far behind in CLE I need

20      to be sitting next to you.  Wednesday is good,

21      afternoon.

22          THE COURT:  Okay.  We won't be able to do it at

23      all this week because of the trial week.  I would

24      like for you-all to look at some other time off of

25      my trial week so that we can do it.  Now, I will be

1    here on the 18th if you're talking about doing it on

2    a Friday.

3         MS. SMITH:   And I will be available on the

4    18th, Your Honor.

5         MR. PLUMIDES: Ah, I have jury duty.

6         THE COURT:   You have jury duty on the 18th.

7         MR. PLUMIDES: I don't know if I would go until

8    Friday unless I was chosen. You know nobody wants to

9    choose lawyers.

10        THE COURT:   All right.   Do you know when your

11   jury duty starts?   Does it start on the 14th?

12        MR. PLUMIDES:   Monday the 14th, yes.

13        THE COURT:   All right.   Well why don't we do

14   this. Why don't we tentatively schedule it for the

15   18th.   If you are chosen on Monday the 14th or

16   Tuesday or some time prior to the 18th if you'll

17   inform the Court by either email or by calling the

18   case manager I'll go ahead and do the reset for it.

19        MR. PLUMIDES:   Wednesday, ah, excuse me, Friday

20   afternoon rather than morning?

21        THE COURT:   No, I would prefer if we did it

22   morning.   But we can do it late morning if that's

23   okay.

24        MR. PLUMIDES:   Yes.

25        THE COURT:   We can do it about 11:00.

1          MR. PLUMIDES:  That's fine.

2          THE COURT:  Okay. All right.

3          MR. PLUMIDES: Can I have the telephone number

4     for the --

5          THE COURT:  We'll give it to you, Mr. Plumides

6     and it's on the internet too.

7          MS. SMITH:  Your Honor, I'm sorry, Your Honor,

8     but what time is the fifth calendar on the --

9          THE COURT:  9:00.

10          MS. SMITH:  9:00.  11:00, Your Honor?

11          THE COURT:  11:00.

12          MS. SMITH:  That's fine.

13          MR. PLUMIDES:  Do we need to sign a return,

14     Judge or is that a --

15          THE COURT:  We do need to give him a reset.

16          MR. PLUMIDES:  May I be excused. I have a --

17          THE COURT:  Yes, Mr. Plumides, you can be

18     excused until that date and time.

19

20          (Whereupon the proceedings concluded.)

21

22

23

24

25

1

2                    C E R T I F I C A T E

3    GEORGIA:

4    FULTON COUNTY:

5

6        I hereby certify that I am a Certified Court

7    Reporter assigned to transcribe the computer-based

8    digital recording of proceedings Had in the

9    above-entitled cause.

10       I further certify that the foregoing,

11   consisting of Pages 1 through 101, inclusive, is a

12   true and accurate transcript hereinabove set forth.

13       This, the 29th day of June, 2017.

14

15

16   JOYCE A. GIBBONS, CCR, No. B-1544
     Certified Court Reporter

17

18

19

20

21

22

23

24

25

# DEF. MSJ

# EX. 7

Sec. 10-1. - Definitions.

The following words, terms and phrases, when used in this chapter, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Adequate parking* means parking that meets the requirements of the Code.

*Adequate parking for a nightclub* means one lawful parking space for each 75 square feet of floor area within the licensed premises. Such parking space shall be exclusively available to the nightclub's patrons between the hours of 10:00 p.m. and 2:30 a.m. the following day on days on which alcoholic beverages may be lawfully sold for on premises consumption at a nightclub. Parking spaces on a street or within any part of the right-of-way shall not be included within this definition of adequate parking for a nightclub. The term "floor area" as used in this definition means, in addition to those areas defined in section 16-29.001(13)(b) of the Code, areas within the existing building footprint where the walls have been removed and a permanent roof remains.

*Alcoholic beverages* means and includes but is not limited to malt beverages, wine and distilled spirits.

*Applicant* means the person who files an application to obtain a license to sell alcoholic beverages and:

(1)  If a corporation, the chief executive officer, or some other person with written authority from the corporation to bind the corporation as to its business operations within the city;

(2)  If a partnership, the partner with the greatest proprietary interest;

(3)  If an individual, that individual;

(4)  If a firm or association, the person with the greatest proprietary interest.

*Auditorium* means a permanent building or hall used for concerts, speakers, plays and similar activities and that has a seating capacity in excess of 3,500.

*Bar* means an establishment having a minimum capacity of 25 persons and a maximum capacity of 100 persons per the City of Atlanta Fire Code that does not meet the definition of a restaurant, nightclub, lounge, farm, winery, convention center, hotel, brewpub, open air cafe or sidewalk cafe, that is primarily devoted to selling and dispensing alcoholic beverages by the drink for on-premises consumption. The bar must make food available to its patrons.

*Bottle house* means any place of business open to the public or any private club which allows patrons or members to bring in and consume alcoholic beverages on the premises.

*Brewpub* means any eating establishment in which beer or malt beverages are manufactured or brewed, subject to the barrel production limitation prescribed in O.C.G.A. § 3-5-36 for retail consumption on the premises and solely in draft form. As used herein, the term "eating establishment" means an establishment which is licensed to sell distilled spirits, malt beverages, or wines and which derives at least 50 percent of its total annual gross food and beverage sales from the sale of prepared meals or food.

*Broker* means any person who purchases or obtains an alcoholic beverage from an importer, distillery, brewery, or winery and sells the alcoholic beverage to another broker, importer, or wholesaler without having custody of the alcoholic beverage or maintaining a stock of the alcoholic beverage.

*Business area* means any street length between intersections where 50 percent or more is in use for business purposes.

*Church* means a permanent building where persons regularly assemble for religious worship.

*City food market* means a retail grocery supermarket which (a) does not sell or offer for sale any of the following: gasoline, diesel fuel or tire, distilled spirits, tobacco products, lottery tickets or related games of chance or malt beverages by the keg; (b) does not provide for the on premises use of coin operated amusements; (c) maintains at all times that it is open to the public, an inventory of saleable food products, including meat, dairy, vegetable, fruit, dry goods and beverages, with a minimum, cumulative cost of goods sold of such food products of at least $225,000.00; (d) has an interior floor area of at least 10,000 square feet and not more than 30,000 square feet, of which more than 50 percent of such interior floor area is devoted to the display for sale of food products; (e) employs not less than 50 employees who work at least 35 hours per week on the premises, and (f) derives less than 20 percent of its gross receipts from the sale of malt beverages and wine.

*City park organization* means a nonprofit entity which is organized for the purposes of preserving, restoring, developing, rehabilitating, enhancing, improving, and/or maintaining a park owned by the City of Atlanta; and which assumes complete or partial responsibility for improving and/or maintaining said park, and the majority of the organization's park services are provided without cost to the city, pursuant to a current memorandum of understanding or other agreement with the City of Atlanta.

*College* means only state, county, city, church or other colleges that teach the subjects commonly taught in the common colleges of this state and does not include private colleges where only specialized subjects such as law, stenography, business. music, art, medicine, dentistry, vocational occupations and other special subjects are taught.

*Continuing education center* means any facility offering adult education which is operated by a unit of the University System of Georgia and which has housing facilities capable of accommodating 200 people and banquet facilities capable of serving 400 people. The sale of alcoholic beverages shall only be incidental to the principal business of a continuing education center licensed under this chapter.

*Convention center* means premises that are operated exclusively for the purpose of providing accommodations for conventions. trade shows and other similar activities, as well as some social events such as wedding receptions, bar mitzvahs, banquets and meetings. The facility must be available to public or private groups of persons for monetary consideration on a rental, fee, percentage or similar basis; be used primarily for special occasions, including but not limited to the events mentioned in this definition; be open to or attended by invited or selected guests or paying patrons; and the premises shall contain a

minimum occupancy load of 200 persons for each show, event, reception or activity as permitted by the department of fire. The term "convention center" shall not include premises that provide adult entertainment, as that term is defined and used in Part 16 of this Code, either regularly or occasionally, nor shall convention centers licensed to sell alcoholic beverages under this Code provide such adult entertainment on their licensed premises. All convention center licensees holding a valid city license for the sale of alcoholic beverages at the time of the enactment of the ordinance from which this amended definition derives (January 21, 1992) shall be deemed to have complied with all requirements for a convention center.

*Distance* means the measurement in linear feet from the front door of the structures from which alcoholic beverages are sold or offered for sale in a straight line to the nearest public sidewalk, walkway, street, road or highway by the nearest route to the front door of the building or to the nearest portion of the ground, whichever is applicable. For the purposes of this chapter, distances shall be measured along the pedestrian route of travel to and from the premises.

*Distilled spirits* or *spirituous liquors* means all beverages containing alcohol obtained by distillation or containing more than 21 percent alcohol by volume, including fortified wines.

*Domestic wine* means any and all wines produced by a farm winery within this state.

*Entertainment* means the live performance by any person, whether such person be a musician, dancer or otherwise, which occurs upon the premises of a licensed establishment.

*Family* means and includes any person related to the holder of a license within the first degree of consanguinity or affinity, as determined according to civil law.

*Farm winery* means a domestic winery located on premises, a substantial portion of which is used for agricultural purposes, including the cultivation of grapes, berries or fruits to be utilized in the manufacture or production of wine by the winery, or a domestic winery which:

(1)  Makes at least 40 percent of its annual production from agricultural produce grown in this state;

(2)  Is owned and operated by persons who are engaged in the production of a substantial portion of the state agricultural produce used in its annual production, and for this purpose such production of a substantial portion of such state agricultural produce shall be determined by the state commissioner of revenue;

(3)  Produces less than 100,000 gallons per year; and

(4)  Has been certified and licensed as a farm winery by the state commissioner of revenue.

*Government center* means a building owned or leased by and operated by the state or the county and which contains a lobby or atrium area or other room which is used for group functions. The city is specifically excluded from this definition. If a license is issued for premises within a government center, a

government official or employee shall be the named licensee. All government centers, while being used for the serving of alcoholic beverages, shall have posted the following sign visible to persons being served:

"No person may purchase and/or consume within a government center more than three regular servings of alcoholic beverages within a two-hour period. Violations of this ordinance shall be punishable by a fine of up to $1,000.00 or imprisonment up to 30 days."

*Hotel* means a building or other structure kept, used, maintained, advertised and held out to the public to be a place where food is actually served and consumed and sleeping accommodations are offered for adequate pay to travelers and guests, whether transient, permanent or residential, in which 50 or more rooms are used for the sleeping accommodations of these guests, and having one or more public dining rooms, with an adequate and sanitary kitchen and a seating capacity of at least 40 where meals are regularly served to those guests, the sleeping accommodations and dining rooms being conducted in the same building or in separate buildings or structures used in connection therewith that are on the same premises and are a part of the hotel operation. Motels meeting the qualifications set out in this definition for hotels shall be classified in the same category as hotels. Hotels shall have the privilege of granting franchises for the operation of a lounge, restaurant or nightclub in their premises and the holder of the franchise shall be included in the definition of hotel.

*Importer* means any person who imports an alcoholic beverage into the State of Georgia from a foreign country and sells the alcoholic beverage to another importer, broker, or wholesaler and who maintains a stock of the alcoholic beverage.

*License* means the authorization by the council to engage in the sale or consumption of alcoholic beverages on the premises.

*Licensee* means a person, real or artificial, holding any class of license issued under this chapter.

*Lounge* means a separate room connected with a part of and adjacent to a restaurant or located in a hotel or located in any airport owned by the city, with all booths, stools and tables being unobstructed and open to view. All lounges shall be air conditioned and shall have a seating capacity for at least 50 persons. However, lounges located in any airport owned or operated by the city shall be exempt from the seating capacity requirement. A lounge that is operated on a different floor in the premises or in a separate building or that is not connected to or adjacent to a restaurant shall be considered a separate establishment and an additional license fee shall be paid therefore.

*Malt beverage* means any alcoholic beverage obtained by the fermentation of any infusion or decoction of barley, malt, hops or any other similar product or any combination of such products in water, containing not more than 14 percent alcohol by volume and including ale, porter, brown, stout, lager beer, small beer and strong beer. The term does not include sake, known as Japanese rice wine.

*Manufacturer* means any maker, producer or bottler of an alcoholic beverage. The term also means:

(1)   For distilled spirits, any person engaged in distilling, rectifying or blending any distilled spirits;

(2)   For malt beverages, any brewer; and

(3)   For wine, any vintner.

*Nightclub* means an establishment having a capacity of at least 100 persons per the City of Atlanta Fire Code, with all booths and tables unobstructed and open to view, dispensing alcoholic beverages and in which music, dancing or entertainment is conducted. All such establishments shall be equipped with air conditioning. The principal business of a nightclub shall be entertaining, and the serving of alcoholic beverages shall be incidental thereto.

*Open air cafe* means an establishment which serves food during all hours of operation and which has a seating capacity of at least 40 and which is located within the pedestrian court area of a shopping and retail entertainment center. Such an establishment may be licensed for on-premises consumption only.

*Outdoor dining area* means a space in which a licensee serves food and beverages as part of the operation of the licensed premises as a sidewalk cafe. An outdoor dining area must be located directly in front of a licensed restaurant and may only be separated from the licensee's premises by a sidewalk. No part of a sidewalk cafe shall be located within a public right-of-way. The width of an outdoor dining area shall not exceed the width of the licensed premises. An outdoor dining area shall contain no more than 50 percent of the premises total seating capacity. The space within an outdoor dining area shall he enclosed within a clearly delineated area, which is surrounded by a continuous physical barrier no less than 36 inches and no more than 40 inches in height. An outdoor dining area shall have a single point of ingress and egress that is controlled by the licensee. Music and/or live entertainment shall not be provided within an outdoor dining area.

*Package store* means an establishment engaged in the retail sale of packaged alcoholic beverages, such as ale, beer. wine, and whiskey for consumption off the premises and at which on-premises consumption is specifically prohibited, as distinct from a bar, restaurant or similar establishment which is licensed for the retail sale of alcoholic beverages of any type by the drink and/or for consumption on the premises. The term "package store" is considered synonymous with the term "liquor store." A package store shall include any premises classified as Industry No. 5921 in the Standard Industrial Classification (SIC) Manual 1972, prepared by the Executive Office of the President, Office of Management and Budget. The term "package store" shall not include a "wine specialty shop" and shall not include a city food market.

*Park* means ally public lands owned or controlled and operated by the city, the state or any county of the state, in and upon which play facilities are provided for the recreation and enjoyment of the general public.

*Park facility* means any city-owned premises (as defined in this section with the modifications set forth in section 10-58(d) of this chapter) that is leased, managed, and/or operated by a city park organization, and that is located in a city-owned park that is completely or partially improved and/or maintained by the city

park organization, pursuant to a current memorandum of understanding or other agreement with the City of Atlanta.

*Pharmacy* means any place of business of a pharmacist, which also sells cosmetics, stationary and other such products.

*Premises* means the definite closed or partitioned-in locality, whether room, shop or building, wherein alcoholic beverages are sold or consumed. Premises also includes any area or patio immediately adjacent to the main licensed facility and located on property owned or leased by such licensee. The area or patio need not be covered, but must be completely enclosed, except for entrances and exits, by a wall, fence, shrubbery or other decorative material no less than 30 inches in height. Premises of an open air cafe need not be completely partitioned, and patios attached to such an establishment must be enclosed, except for entrances and exits, by a wall, fence, shrubbery or other decorative material no less than 30 inches in height or by a body of water at least three feet wide and one foot deep or by some other architectural or landscaping barrier which would prevent access to the premises. Open air cafes shall be subject to all other requirements contained in this definition.

*Private club* means a corporation chartered, organized and existing under the laws of the state, exempt from federal income taxes pursuant to section 501(c) of the Internal Revenue Code, as amended, actively and continuously in operation within the city as a nonprofit corporation for at least one year immediately prior to the application for a license under this chapter and during which time such corporation shall have had continuously not less than 250 members whose names, current addresses and current telephone numbers shall be kept listed on the club premises and made available for inspection on the premises by the Atlanta Police Department during all hours during which the private club is open for business, which members shall have regularly paid monthly, quarterly, semiannual or annual dues. In no event shall dues be paid on a daily basis. All applications for either a new or renewal license to sell alcoholic beverages by a private club for the year 2001 and all years thereafter must he accompanied by proof from the Internal Revenue Service that the corporation seeking such license is deemed exempt from federal income taxes by the Internal Revenue Service at the time of application for the new or renewal license. In addition, the corporation shall be required to submit its most recent Form 990 Return of Organization Exempt from Income Tax as certified by a certified public accountant. Furthermore, the corporation shall maintain on its premises any additional federal and state income tax returns filed by the corporation within the past three years and shall make such documents available for inspection upon request by the Atlanta Police Department during all hours during which the private club is open for business. In the event that a corporation licensed as a private club for any given year loses its 501(c) exemption, such private club must inform the licenses and permits unit in writing of such change in status within 15 days of the change in status. The failure to provide in writing notification of such change in status within 15 days, in addition to the violation of any other provision of this chapter, shall be grounds for the denial, suspension or revocation of said license and/or the implementation of a fine of up to $1,000.00 against the corporation. The corporation shall be operated exclusively for pleasure, recreation and other nonprofitable purposes,

but in no event shall the corporation have as its primary purpose the operation of an establishment licensed for the sale of alcoholic beverages. No part of the net earnings of the corporation shall inure to the benefit of any member, director or officer. During the period of time prior to the time of application, the corporation shall have owned, hired or leased a building having kitchen and dining room space therein for the reasonable use of its members and shall have maintained sufficient personnel and equipment to prepare on the premises and serve hot meals, which hot meals shall have been served and shall continue to be served at least once per day at least six days per week. After an establishment has been granted private club status from the city, these requirements as to meal preparation, kitchen equipment and dining room facilities shall continue in effect. No member, director, officer, agent, or employee of the club shall be paid or directly or indirectly, receive, in the form of salary or other compensation, any profits from the sale of alcoholic beverages by or to the club or its members or guests, except such salary as may be fixed by its members at any annual meeting or by its governing board out of the general revenue of the club. The nonprofit corporation must be the sole owner and operator of the private club. Prior to the date of application, no nonprofit corporation shall have transferred, either directly or indirectly, by sale, lease or otherwise, any ownership, or any interest in the nonprofit entity or its assets (other than in the ordinary course of business), or the right to manage the private club in order to obtain its license to sell alcoholic beverages nor shall any nonprofit corporation transfer, during the time that the nonprofit corporation holds a license pursuant to this chapter, any such interest or right.

*Private residence* means a house or dwelling wherein not less than one or more than three families customarily reside and does not include a mobile home, an apartment house having facilities for housing more than four families, a boardinghouse or roominghouse where there are five or more boarders or roomers or any residence which has been unoccupied for a period of six consecutive months immediately prior to the filing of an application.

*Restaurant* means any public place kept, used, maintained, advertised and held out to the public as a place where meals are served and where meals are actually and regularly served, without sleeping accommodations, such place being provided with adequate and sanitary kitchen and dining room equipment and seating capacity of at least 40 people, having employed therein a sufficient number and kind of employees to prepare, cook and serve suitable food for its guests. However, restaurants located in any airport owned or operated by the city shall be exempt from the seating capacity requirement. At least one meal per day shall be served at least six days per week, with the exception of holidays, vacations and periods of redecorating, and the serving of those meals shall be the principal business conducted, with the serving of distilled spirits to be consumed on the premises as only incidental thereto.

*Retail grocery supermarket* means any retail market or supermarket selling a full range of food products including meat, dairy, vegetable, fruit, dry goods and beverages.

*Retail sale* means selling or offering for sale alcoholic beverages to any member of the public.

*School* means only such state, county, city, church or other schools as teach the subjects commonly taught in the common schools of this state and does not include private schools where only specialized subjects such as law, stenography, business, music, art, medicine, dentistry, vocational occupations and other special subjects are taught.

*Sexual orientation* means the state of being heterosexual, homosexual or bisexual.

*Shopping and retail entertainment center* means a structure containing five or more retail establishments and three or more eating establishments, which has a court area for pedestrian use covered and enclosed on at least three sides. Such a court must extend vertically two or more floor levels and must constitute a minimum of 10,000 square feet. This definition shall also include single floor level shopping and retail entertainment centers which are completely enclosed and which meet all other requirements contained in this definition.

*Sidewalk cafe* means an establishment that serves food during all hours of operation, has a seating capacity of at least 30 people, operates an outdoor dining area, and is located within a mixed-use development (as that term is defined in section 16-29.001(24)) that has zoning approval for at least 50,000 square feet of retail space, 100,000 square feet of office space and 300 residential units. A sidewalk cafe shall not provide any outdoor seating or any other outdoor service unless it is within an outdoor dining area. When interpreting the hours of operation listed in section 10-209(c) and 10-209(d) of this Code, sidewalk cafes shall be subject to the same limitations as restaurants. Sidewalk cafes must operate in compliance with the city's noise ordinance, found in chapter 74 of the City of Atlanta Code of Ordinances, and with section 10-60(a)(4)b.3). [As provided for in section 10-109(a)(17)) of this part]

*Specialty food shop* means a retail establishment that:

(1)  Deals in the sale of foods. specialty foods, and wine, fortified wine, port, sherry. and malt beverages for consumption off the premises and at which on premises consumption of alcoholic beverages is specifically prohibited, except that if a specialty food shop is the holder of a license under section 10-60(a)(1)(c) of this Code, that licensed retail establishment shall be authorized to hold wine tastings in conjunction with educational programs on the subjects of enology or viticulture;

(2)  Does not offer check cashing services; does not maintain a drive-thru window; and does not maintain on the premises for sale any of the following: distilled spirits, malt beverages containing more than six percent alcohol by volume, gasoline, diesel fuel, tires, lottery tickets or related games of chance, or tobacco;

(3)  Offers prepared food, made and packaged on the premise available for on and off premise consumption;

(4)  Maintains an inventory of saleable food products including, but not limited to, prepared foods, packaged foods, meat, dairy, vegetables, fruits, dry goods, and beverages,

(5) Has an interior floor area of not more than 5.000 square feet (inclusive of storage), of which more than 60 percent of interior floor area is devoted to the display for sale of food products; and

(6) Derives less than 30 percent of its gross receipts from the combined sale of malt beverages and wine.

*Sports coliseum* means premises operated exclusively for the purpose of providing major league sporting events of basketball, hockey or similar athletic or amusement events for attendance by the public and where such premises contain a minimum of 3,000 square feet.

*Suite hotel* means a building or other structure kept, used, maintained, advertised and held out to the public to be a place where 50 or more suites, each consisting of at least one bedroom, a living room and a bathroom, are offered for adequate pay to travelers and guests, whether transient, permanent or residential, and where alcoholic beverages are served and the price of such beverages is included in the suite rates.

*Tasting room* means an outlet operated by a farm winery for the promotion of a farm winery's wine by providing complimentary samples of such wine to the public and for the sale of such wine at retail.

*Wholesaler* means any person engaged in distribution or selling of alcoholic beverages to retailers for the purpose of resale.

*Wine* or *vinous liquors* means any alcoholic beverage containing not more than 21 percent alcohol by volume made from fruits, berries or grapes either by natural fermentation or by natural fermentation with brandy added. The term includes but is not limited to all sparkling wines, champagnes, combinations of such beverages, vermouths, special natural wines, rectified wines and like products. The tern does not include cooking wine mixed with salt or other ingredients so as to render it unfit for human consumption as a beverage. A liquid shall first be deemed to be a wine at that point in the manufacturing process when it conforms to this definition of wine.

*"Wine specialty shop"* means a retail establishment:

(1) Which shall deal in the sale of table wine, fortified wines, port, sherry for consumption off the premises and/or wine accessories; and at which on-premises consumption of alcoholic beverages is specifically prohibited, except that if a wine specialty shop is the holder of a license under section 10-60(a)(1)(c) of this Code, that licensed retail establishment shall be authorized to hold wine tastings in conjunction with educational programs on the subjects of enology or viticulture.

(2) Which shall not maintain on the premises or offer for sale malt beverages or distilled spirits;

(3) Which shall maintain on the premises and offer for sale at all times a variety of wines from not less than 100 nor more than 200 manufacturers or importers of wine or any combination thereof the total of which shall not fall below 100 nor exceed 200;

(4)

Which shall maintain and replenish an inventory of at least 36 bottles of wine from each manufacturer or importer of wine referred to in subsection (3) above; provided however, that any inventory which is depleted to less than 36 bottles of wine must be replenished to at least 36 bottles of wine within 15 days of the date that the inventory falls below 36 bottles;

(5)   Which shall submit an inventory list of all wines maintained on the premises and offered for sale to the licenses and permits unit of the police department. Such inventory list shall be submitted to the licenses and permits unit on a quarterly basis by the first day of each of the following months: January, April, July and October; and

(6)   Whose total interior floor area, inclusive of storage area, shall not exceed 2,000 square feet.

(Code 1977, § 14-2001; Ord. No. 1995-43, § 1, 8-28-95; Ord. No. 1999-6, § 1, 1-27-9; Ord. No. 1999-48, § 1, 6-15-99; Ord. No. 2001-26, § 1, 3-27-01; Ord. No. 2001-43, § 2, 6-13-01; Ord. No. 2001-60, § 1, 8-13-01; Ord. No. 2001-88, § 1, 11-28-01; Ord. No. 2004-46, §§ 1, 2, 7-22-04; Ord. No. 2004-68, §§ 1, 2, 10-8-04; Ord. No. 2004-83, §§ 2, 3, 11-19-04; Ord. No. 2005-40, § 1, 7-12-05; Ord. No. 2005-56, § 1, 9-27-05; Ord. No. 2006-87, §§ 1, 2, 12-13-06; Ord. No. 2007-60(07-O-1897), §§ 1, 2, 10-8-07; Ord. No. 2007-61(07-O-1900), § 1, 10-22-07; Ord. No. 2009-12 (08-O-0843), § 1, 3-25-09; Ord. No. 2010-27(10-O-0780), § 4, 6-16-10; Ord. No. 2010-58(10-O-1419), § 1, 10-27-10)

**Cross reference—** Definitions generally, § 1-2.

**State law reference—** Definitions for alcoholic beverage laws generally, O.C.G.A. § 3-1-2.

Sec. 10-3. - Compliance with chapter required.

(a)   It shall be unlawful for any person to sell or offer for sale at wholesale or retail any alcoholic beverages without having first complied with this chapter.

(b)   It shall be a violation of this chapter for any premises, that performs or undertakes any type of operation or activity for which a occupation tax certificate issued pursuant to Chapter 30 to provide alcoholic beverages to persons on the premises unless a license issued under this chapter allowing on premises consumption of alcoholic beverages has first been obtained. This prohibition shall apply without regard to whether the alcoholic beverages are provided free of charge as a part of any promotion by the owner of the premises or operator of the business, given as prizes in connection with any type of contests or raffles, given as bonuses or inducements offered in connection with the purchases of goods and/or services.

(c)   Any person employed by the business and who is present at the time when alcoholic beverages are being provided by a non-licensed premises or location may be charged with this offense.

(Code 1977, § 14-2003; Ord. No. 2004-68, § 3, 10-8-04; Ord. No. 2011-35(11-O-1137), § 2, 8-24-11; Ord. No. 2012-48(12-O-1258), § 1, 11-14-12)

Sec. 10-32. - Inspection of establishments.

(a)   *Authorized.* Sworn officers of the department of police shall have the authority to inspect establishments licensed under this chapter during the hours in which the premises are open for business. These inspections shall be made for the purpose of verifying compliance with this chapter.

(b) *Fees.* The bureau of buildings and the department of fire shall each charge a fee of $50.00 for the inspections made to report on the compliance status of structures were alcoholic beverage licenses are requested.

*(Code 1977, §§ 14-2007, 19-14.001; Ord. No. 2002-35, § 6, 5-28-02)*

Sec. 30-1. - Identification of coin-operated vending machines or amusement devices.

(a) Each coin-operated vending machine or amusement device situated, operated, maintained or used within the city shall have conspicuously stamped upon it or affixed thereon for identification purposes the name, address and telephone number, if any, of the owner thereof. The identification shall be provided by the owner of the machine at the owner's expense.

(b) It shall be unlawful for the owner and operator of any public premises to permit any coin-operated vending machine or amusement device on the premises unless the coin-operated vending machine or amusement device shall have conspicuously stamped upon it or affixed thereon for identification purposes the name, address and telephone number, if any, of the owner thereof, as required in subsection (a) of this section.

*(Code 1977, § 14-5192)*

**Cross reference—** Amusements and entertainments, ch. 14; vending on public property, § 30-1401 et seq.; newspaper vending devices, § 138-156 et seq.

Sec. 30-59. - Compliance investigators.

Compliance investigators are authorized, when so designated by the chief financial officer, to conduct investigations in the manner provided elsewhere in this article. Compliance investigators are eligible to apply for status as code enforcement agents under section 98-1. In order to enforce code provisions and issue citations, compliance investigators must apply for and receive status as a code enforcement agent. Compliance investigators may cite individuals or persons for violation of this article but are not empowered to arrest any individual for any violation of this article, and, notwithstanding any authority to the contrary elsewhere in the Atlanta City Code of Ordinances, shall not arrest any individual for any violation of this article.

*(Ord. No. 2004-80, § 1(Exh. B), 10-20-04; Ord. No. 2006-75, § 1, 10-11-06)*

Sec. 30-76. - Certificate to be available for inspection.

The certificate issued for any business location shall be available for inspection at the address listed on the certificate and shall be displayed to any authorized enforcement officer of the city when so requested. This requirement may also be satisfied by posting the certificate in some conspicuous place at the address listed on the certificate. This section does not apply to practitioners of professions listed in section 30-63.

*(Ord. No. 2004-80, § 1(Exh. B), 10-20-04)*

Sec. 98-1. - Code enforcement agents.

(a)  The police chief or his or her designee shall have the authority to appoint code enforcement agents
     who shall not be regular police officers in the department of police but who shall have the power to
     serve subpoenas, citations and summonses for the violation of, or failure to comply with, any section of
     this Code or ordinance of the city, the requirements thereof or of any order or direction made pursuant
     to the provisions contained in any section of this Code or ordinance of the city which shall not have
     been complied with.

(b)  All persons appointed or who shall desire appointment as code enforcement agents to operate within
     the city shall apply to the police chief or his or her designee for a permit. The police chief or designee
     may set an expiration date for the permit.

(c)  The application for the permit required by subsection (b) shall show the name and address of the
     applicant, the applicant's job title, place of employment, and department head and shall have attached
     thereto a photograph of the applicant, together with sufficient fingerprints to definitely identify the
     applicant. The applicant and his or her department head must sign the application. The department
     head must attest to the applicant's training for the job and the physical and mental qualifications to be
     a code enforcement agent. The police chief or his or her designee is specifically authorized to require
     additional information from the applicant or department head. Upon receipt of the application, the
     police chief or designee shall cause a criminal history check to be made of the applicant and shall
     thereafter grant or deny the permit.

(d)  Only city employees in job classifications that require enforcement of the City Code are eligible to
     become code enforcement agents. The chief of police and the commissioner of human resources or
     their designees will create and maintain a list of such job classifications.

(e)  The city solicitor will train applicants in enforcement procedures prior to their being sworn in.

(f)  On satisfactory completion of the enforcement training, the police chief or designee will issue badges
     and identification cards to the code enforcement agents and swear them in.

     The police chief or the chief's designee is authorized, in accordance with Georgia law, to administer the
     oath of office to all code enforcement agents employed by the City of Atlanta. When taken, the agent
     shall sign the official oath and copies thereof shall be filed with the Fulton county Probate court and in
     the personnel records of the agent so sworn. That oath shall take the following form:

     I, _____, do solemnly swear (or affirm) that I am duly qualified, according to the City Code of
     Ordinances and the policies of my department of employment, to perform the duties imposed upon me
     as a Code Enforcement Agent of the City of Atlanta, Georgia, and that I will, to the best of my ability,
     discharge the duties thereof.

     I further swear that I will enforce the ordinances of the City of Atlanta that are particular to my job
     assignment, abide by the direction given me by the Office of the City Solicitor and the Atlanta Police
     Department, and uphold the Ethics Code of the City of Atlanta. In doing so, I will be mindful of the trust

that has been placed in me to improve the quality of life and make every effort to live up to that trust. I will not persecute the innocent, nor help to shield the guilty, nor will I be influenced in the discharge of my duties by fear, favor, affection, or reward.

(g)  Status as a code enforcement agent does not confer any additional benefits or authority other than specified in this section. A code enforcement agent does not have the power of physical arrest.

(h)  The chief of police or designee will investigate allegations of abuse of authority by a code enforcement agent; the employing department head will cooperate with the investigation. The chief of police or designee may suspend or cancel a person's status as code enforcement agent if he or she fails to meet the requirements or abuses the authority.

(i)  The department head of a code enforcement agent must return the badge and identification card to the police department if that agent's status is canceled under subsection (h) or if the individual is no longer employed by that department in a qualifying classification.

(j)  It shall be unlawful for any person, not authorized as a code enforcement agent, to act as a code enforcement agent or to represent such person as a code enforcement agent or to wear the badge of a code enforcement agent.

*(Ord. No. 2004-66, § 1, 9-28-04; Ord. No. 2006-71, § 1, 10-11-06)*

Sec. 98-38. - Arrest powers.

The police shall have arrest powers in accordance with local, state and federal law.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Code of Georgia Annotated
Title 3. Alcoholic Beverages
Chapter 3. Regulation of Alcoholic Beverages Generally (Refs & Annos)
Article 1. General Provisions

Ga. Code Ann., § 3-3-2

§ 3-3-2. Discretion and due process as to grant or suspension of permits; fingerprints of applicants to be furnished

Effective: July 1, 2006

Currentness

(a) Except as otherwise provided for in this title, the manufacturing, distributing, and selling by wholesale or retail of alcoholic beverages shall not be conducted in any county or incorporated municipality of this state without a permit or license from the governing authority of the county or municipality. Each such local governing authority is given discretionary powers within the guidelines of due process set forth in this Code section as to the granting or refusal, suspension, or revocation of the permits or licenses; provided, however, that residency by an applicant within the city or county issuing the permit or license shall not be a requirement by the respective local governing authority if the applicant designates a resident of the city or county who shall be responsible for any matter relating to the license.

(b) The granting or refusal and the suspension or revocation of the permits or licenses shall be in accordance with the following guidelines of due process:

(1) The governing authority shall set forth ascertainable standards in the local licensing ordinance upon which all decisions pertaining to these permits or licenses shall be based;

(2) All decisions approving, denying, suspending, or revoking the permits or licenses shall be in writing, with the reasons therefor stated, and shall be mailed or delivered to the applicant; and

(3) Upon timely application, any applicant aggrieved by the decision of the governing authority regarding a permit or license shall be afforded a hearing with an opportunity to present evidence and cross-examine opposing witnesses.

(c) As a prerequisite to the issuance of any such initial permit or license only, the applicant shall furnish a complete set of fingerprints to be forwarded to the Georgia Bureau of Investigation, which shall search the files of the Georgia Crime Information Center for any instance of criminal activity during the two years immediately preceding the date of the

§ 3-3-2. Discretion and due process as to grant or suspension of..., GA ST § 3-3-2

application. The Georgia Bureau of Investigation shall also submit the fingerprints to the Federal Bureau of Investigation under the rules established by the United States Department of Justice for processing and identification of records. The federal record, if any, shall be obtained and returned to the governing authority submitting the fingerprints.

**Credits**

Laws 1935, p. 73, § 15A; Laws 1973, p. 12, § 1; Laws 1973, p. 14, § 1; Laws 1980, p. 1573, § 1; Laws 1981, p. 1269, § 17; Laws 1998, p. 1300, § 1; Laws 2006, Act 510, § 6, eff. July 1, 2006.

**Formerly** Code 1933, § 5A-502.

Notes of Decisions (70)

Ga. Code Ann., § 3-3-2, GA ST § 3-3-2
The statutes and Constitution are current with legislation passed during the 2017 Session of the Georgia General Assembly. The statutes are subject to changes by the Georgia Code Commission.

End of Document                                        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

| West's Code of Georgia Annotated |
| --- |
| Title 3. Alcoholic Beverages |
| Chapter 7. Sale of Distilled Spirits by Private Clubs |
| Article 3. Local Authorization and Regulation |

Ga. Code Ann., § 3-7-40

§ 3-7-40. Local regulatory authority not impaired; licensing of private clubs

Currentness

(a) Nothing contained in this chapter shall be so construed as to limit the licensing and regulatory authority of any municipality or county in which the sale of alcoholic beverages is lawful.

(b) Each municipality and county may license and regulate any bona fide private club located within the licensing and regulatory jurisdiction of the municipality or county.

**Credits**

Laws 1978, p. 1155, § 5; Laws 1980, p. 1573, § 1.

**Formerly** Code 1933, § 5A-6107.

Notes of Decisions (1)

Ga. Code Ann., § 3-7-40, GA ST § 3-7-40
The statutes and Constitution are current with legislation passed during the 2017 Session of the Georgia General Assembly. The statutes are subject to changes by the Georgia Code Commission.

End of Document                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

| West's Code of Georgia Annotated |
|---|
| Title 36. Local Government |
| Provisions Applicable to Municipal Corporations Only |
| Chapter 33. Liability of Municipal Corporations for Acts or Omissions |

Ga. Code Ann., § 36-33-4

§ 36-33-4. Personal liability of officers

Currentness

Members of the council and other officers of a municipal corporation shall be personally liable to one who sustains special damages as the result of any official act of such officers if done oppressively, maliciously, corruptly, or without authority of law.

**Credits**

**Formerly** Civil Code 1895, § 752; Civil Code 1910, § 901; Code 1933, § 69-208.

Notes of Decisions (39)

Ga. Code Ann., § 36-33-4, GA ST § 36-33-4
The statutes and Constitution are current with legislation passed during the 2017 Session of the Georgia General Assembly. The statutes are subject to changes by the Georgia Code Commission.

**End of Document**                                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# DEF. MSJ

# EX. 8

**CITY OF ATLANTA ARREST CITATION**

**2127855**

| 1. Incident / CICA Number: | 2. GA Code(s): | 3. UCR: | 4. Family Violence: |
|---|---|---|---|
| 140 3 9 0 5 2 9 | | | ☐ Yes ☑ No |

| 5. ☐ Reported Case ☑ Witnessed Case | Off Days: S M T W T F S | Court Day: | Time: 750 |

| 6. Incident Report Made? ☑ Yes ☐ No | If yes, indicate report type | ☑ Original ☐ Supplement | ☐ Computer ☐ Handwritten |

**DEFENDANT**

7. Name: (last) BROWN, (first) DEVON (middle) Willis (alias)

8. Address, St. No. 3371 Street Name Waggoner Lane Type Apt. ☐ NW ☐ NE ☐ SW ☐ SE

9. City REX State Zip Telephone # ☑ Physical Arrest ☐ Copy of Charges

10. Race/ Sex B/M DOB 9/1/ ☐ DL# ☐ SSN If DL # issuing State: GA

11. On __/__/__ at ____ AM/PM in the City of Atlanta, _____ County the above accused did commit the offense(s) of: NOTE: (If arrest is based on a warrant; list the warrant #, and issuing jurisdiction in block 12 )

**VIOLATION**

a. Operating Busin against section 10-69 ( ) state law (☑) city of ordinance
b. Compliance w Chapter against section 10-300 ( ) state law (☑) city of ordinance
c. against section ( ) state law ( ) city of ordinance

12. In that the accused did: operated Dirty Slab Club without a kind business license. Accused stated location was a Private Club accused could not provide a member roster Not only Sel(E)(K)s documentation. Alcohol was being consumed on premises with an alcohol license. Adult entertainment

13. Place of Arrest: (Street address) 2051 Metropolitan Parkway AA ☐ NW ☐ NE ☐ SW ☑ SE Beat 306

14. Place of Arrest: (Street address) SAME ☐ NW ☐ NE ☐ SW ☑ SE Beat 306 at 2:37 AM/PM on

**SUMMONS**

15. YOU ARE HEREBY COMMANDED to appear in the Municipal Court, General Division of the City of Atlanta, in Court Court, General Division of the 150 Garnett St., S.W. on FEB 16th 20 14 AM/PM

Signature: NIL

16. Arresting Officer: (print) BURNS D.D APD ID # 2517 Radio # 6415
17. Arresting Officer: APD ID # Radio #
18. Investigating Officer: APD ID # Radio #
19. Transporting Officer: APD ID # Radio #

20. Codefendants (list name, first initial) List all on this line: Ticket #

**VICTIM / WITNESS**

21. Name, (Victim/ Witness/Business Name): City of Atlanta Telephone # Race/ Sex Rel Code Hospital ☐
22. Name (Victim/ Witness/Business Name): Telephone # Race/ Sex Rel Code Hospital ☐

23. Rel Code: (1)Domestic (2)Acquaintance (3)Stranger (4)Bias Crime (W)Witness Check block if victim sent to hospital

**CERTIFICATION**

24. ARRESTING OFFICER'S CERTIFICATION: The undersigned, being duly sworn, upon his/her oath, deposes and states that he/she has just and reasonable grounds to believe, the person named herein has committed the offense(s) herein set forth, contrary to law. Affiant states that the foregoing is true, complete and legible to the best of his/her knowledge and belief.

OFFICER'S SIGNATURE D. BURNS

These charges, have been reviewed for accuracy (under) the laws of the State of Georgia and the City of Atlanta) and have been sworn and subscribed before me this ____ day of ____ Yr. 2014

SUPERVISOR'S SIGNATURE

25. Security Risk ☐    OFFICER'S COPY

Form APD 600, 7/05

18-1-1

# DEF. MSJ

# EX. 9

ATLANTA POLICE DEPARTMENT
Offense Report
INCIDENT NUMBER: 140390529-00

| | | | | |
|---|---|---|---|---|
| Rec Type: | RECOVERED | | | |
| Ucr Type: | FIREARMS | | Property Type: | FIREARM |
| Brand: | 9MM RUGER | | Model: | |
| Description: | HANDGUN W/16 ROUNDS | | Serial No: | 301-33-241 |
| Quantity: | 1 | | | |
| Owner Applied No: | | | Value Stolen: | $100    Value Recovered: |
| Date Reported: | 2/8/2014 | | Time: 0432 | |
| Date Recovered: | | | Time: | |

TOTAL VALUE STOLEN: $100
TOTAL VALUE RECOVERED: $0

*NARRATIVE*

On February 8, 2014 members of the License and Permits Unit conducted establishment compliance checks in the area of Metropolitan Parkway corridor. These compliance checks were to ensure that businesses had the proper permits, operating within the scope of licenses, opening within the hours of operation and ensuring that business were up to building code for life safety issues.   During the compliance checks, officers came upon a business located at 2031 Metropolitan Parkway.  The parking lot was dimly lit and there were several cars parked outfront of this business.  The windows and doors to this location were obscured with black paper and window tint.  Officers approached the establishment and observed one male standing outside of the door.  Officers entered the location from the front door that was opened. Upon entering the club, officers were met with the keen odor of burning marijuana.  There was several piles of tobacco that had been gutted from cigars about the floor of this business. Officers observed four to five completely nude females that  began to run into a back room of the establishment upon the presence of uniformed police officers. In a private VIP room was one male and one female actively involved in sexual intercourse.  There were 15-20 patrons inside the location consuming alcohol.  Officers requested from the DJ that the music be turned off.  Sgt. Burns asked the crowd who was in charge of the establishment. Moments later a male, later identified as Devon Brown, stated that he was in charge and it was his club.  The business license was requested from Mr. Brown.  Mr. Brown advised that his location was a private social club for members only.  Sgt. Burns and other officers then asked to see his private social club license.  Mr. Brown began to advise that he, 5-7 years ago,

17-2-4

asked if he needed a license and he was told no by some unknown individual in the police department.

I, Sgt. B. Burns, showed Mr. Brown a copy of the city ordinance concerning private social clubs. I advised Mr. Brown that in order to have a social club then there must be a charter present, there must be at least 250 members and the name/addresses of such members must be readily available for the police to inspect anytime the business is open.

Mr. Brown was then asked if we could see his charter for the establishment. Mr. Brown could not produce such. Mr. Brown was asked to see the roster for all of his club members. Mr. Brown could not produce this requested documents either. Mr. Brown was asked to produce his alcohol license. Mr. Brown advised that alcohol was being given away and not sold. I then allowed Mr. Brown to read the ordinance relating to Compliance with Chapter.

Mr. Brown had a coin operated billiard table inside the establishment. The amusement permit for this device had expired in 2011.

In a separate room of the club, officers observed a male cooking food for the patrons. There was no food service permit for the location nor proper ventilation for the preparation or cooking of food. Mr. Brown continued to loudly advise that he did not need any license or permits for the business because of his conversation (5)or (7) years ago with some officer. Mr. Brown had a great memory as to what happened (5) years ago; but could not remember speaking to Inv. G. A. Smith 2 months ago. Inv. Smith attempted to conduct a business inspection, 2 months ago, and advised Mr. Brown that he needed to obtain all permits and licenses for a private club. Mr. Brown was shocked to realize that Inv. Smith was present on this detail and was the same officer whom had given him a warning about the illegal business two months ago.

Inv. Scandrick and others found several nude women in a back room of the establishment. These women were providing adult entertainment. Inv. Scandrick was able to take the identification of those females found in the back room. Members of the city of Atlanta Building Department were present for this detail. These engineers found numerous code violations. Such violations were no exit doors, no exit signs, faulty wiring, faulty plumbing, improper ventilation. Bureau of Buildings will have pending citations for the individual and owner of the property.

17-3-4



ATLANTA POLICE DEPARTMENT
Offense Report
INCIDENT NUMBER: 140390529-00

Part of this detail were members of the License and Permits Unit, Bureau of Buildings and Investigators from the Solicitor Office.

Inside one of the private rooms was a black sofa. There were several used condoms and condom packages on the floor to this room. Mr. Brown was secured and was found to be possession of a handgun. The weapon (Taurus 9mm) was made safe and secured by Officer Dillon. During a search of Mr. Brown, Sgt. Burns found a Fulton County SO badge and Deputy identification in the name of Mr. Devon Brown. Mr. Brown admitted that he was an active employee with Fulton County S.O. Sgt. K. Walls made the proper notification to Fulton County. Mr. Brown stated that his shoulders were hurting as a result of the handcuffs. Officer Dillon placed two sets of handcuffs on Mr. Brown in an effort to reduce any discomfort.

Mr. Brown asked if his cellphone, keys and personal belongings could be given to the DJ of the club. Mr. Brown was transported to Atlanta Pre-Trial Detention Center by a marked zone three unit. Sgt. Burns, as a courtesy, went to the City Jail and made contact with the on duty supervisor. Sgt. Burns requested that the Deputy not be placed with the general population. The handgun was placed into Atlanta Police Property management as property. Mr. Brown also gave his vehicle (red ford explorer) keys to the DJ.

OFFENSE REPORT #140390529-00 REVIEWED BY BURNS, B D ON 2/8/2014 8:04:08 AM

OFFENSE REPORT #140390529-00 APPROVED BY BURNS, B D ON 2/8/2014 8:04:08 AM

17-4-4

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DEVON W. BROWN<br>   Plaintiff | )<br>)<br>) |
| v. | )<br>) |
| CITY OF ATLANTA, Georgia,<br>BRYANT BURNS, KELVIN WALLS,<br>ALFRED WATKINS, GARY SMITH,<br>RICHARD DILLON,<br>ROBBIE SCANDRICK,<br>GORDON CABANAW,<br>RITCHIE NEWELL, and<br>STANLEY REYNOLDS<br>   Defendants<br>_____ | )   CIVIL ACTION FILE<br>)   NO. 1:16-CV-00008-CAP<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CERTIFICATION

Counsel for City Defendants certifies that this Request has been prepared with Times New Roman font, 14 point, and therefore it complies with the requirements of L.R. 5.1(C).

Respectfully submitted this 4th day of August, 2017.

/s/ Valorri C. Jones
**VALORRI C. JONES**
Senior Assistant City Attorney
Georgia Bar No. 848714
vcjones@atlantaga.gov
(404) 546-4178 *direct*

**City of Atlanta Law Department**
55 Trinity Avenue SW Suite 5000
Atlanta, GA 30303-3520
(404) 546-4100 *main*

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEVON W. BROWN                          )
   Plaintiff                            )
                                        )
  v.                                       )
                                        )
CITY OF ATLANTA, Georgia,               )        CIVIL ACTION FILE
BRYANT BURNS, KELVIN WALLS,             )        NO. 1:16-CV-00008-CAP
ALFRED WATKINS, GARY SMITH,             )
RICHARD DILLON,                         )
ROBBIE SCANDRICK,                       )
GORDON CABANAW,                         )
RITCHIE NEWELL, and                     )
STANLEY REYNOLDS                        )
   Defendants                           )
_____       )

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2017, I electronically filed the forgoing

Motion for Summary Judgment and Incorporated Brief with the Clerk of Court

using the CM/ECF system with service on all attorneys of record electronically.

*/s/ Valorri C. Jones*
**VALORRI C. JONES**
Senior Assistant City Attorney
Georgia Bar No. 848714
vcjones@atlantaga.gov
(404) 546-4178 *direct*

**City of Atlanta Law Department**
55 Trinity Avenue SW Suite 5000
Atlanta, GA  30303-3520
(404) 546-4100 *main*